**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

Midwest Pilots Merger Committee, et al.

       Plaintiffs

       v.                                Case No. 2:14-CV-01441-RTR

Frontier Airlines, Inc. and Frontier Airline
Pilots Association

       Defendants.

## MEMORANDUM OF DEFENDANT FRONTIER AIRLINE PILOTS ASSOCIATION  IN SUPPORT OF MOTION TO DISMISS

Defendant Frontier Airline Pilots Association ("FAPA"), by its undersigned counsel, hereby submits this Memorandum of Law in support of its Motion to Dismiss, pursuant to Rules 12(b)(1) and (6), F.R.Civ.P.

Count I of the Complaint seeks, pursuant to the Railway Labor Act ("the "RLA"), 45 U.S.C. § 151 *et seq.*, to compel defendant Frontier Airlines, Inc. ("Frontier") and FAPA (through its purported Merger Committee) to arbitrate with plaintiff Midwest Pilots Merger Committee ("MPMC") under a November 3, 2009 Dispute Resolution Agreement (the "DRA"); Count II alleges that FAPA has breached its duty of fair representation by refusing to arbitrate, and by entering into a letter of agreement with Frontier. Count I should be dismissed under Rule 12(b)(6), because on its face the DRA does not require Frontier or FAPA to arbitrate based on the facts alleged in the Complaint; and under Rule 12(b)(1), because Count I raises questions of representation within the exclusive jurisdiction of the National Mediation Board ("NMB"), which has in fact ruled on those issues adversely to plaintiffs' claim.  Count II should be dismissed under Rule 12(b)(6), because on the facts alleged in the Complaint and the documents referred to therein, FAPA has acted rationally

and with legitimate union purposes, defeating a claim for breach of the duty of fair representation.

## STATEMENT OF FACTS[1]

### Frontier and FAPA

Frontier is a common carrier by air as that term is used in Section 201 of the RLA, 45 U.S.C. § 181, providing scheduled passenger airline service throughout the United States.  (Compl. ¶ 5.) FAPA is an unincorporated labor organization which represented the craft or class of pilots employed by Frontier at all material times prior to June 28, 2011 (Compl. ¶ 6), pursuant to a December 3, 1998 certification by the National Mediation Board ("NMB").  See Frontier Airlines, 26 NMB 94 (1998). As of October 1, 2009, the Frontier/FAPA collective bargaining agreement ("FAPA CBA") provided, *inter alia*, that a Frontier Pilot's seniority be determined by "the date the Pilot is first placed on the Company payroll as a Pilot ..." (Kennedy Decl. Exh. 1, at 10.)

### The Events Leading To the Eischen Award

On June 23, 2009, Republic Airways Holdings, Inc. ("RAH") announced that it had entered into an agreement with the parent of Midwest Airlines, Inc. ("Midwest") to acquire that holding company and Midwest, which it did on July 31, 2009.  Subsequently, RAH sponsored Frontier Airways Holding, Inc.'s plan of reorganization, acquiring Frontier Holdings and its operating

---

[1]    This Statement of Facts is based on the factual allegations of the Complaint (which are assumed only for purposes of this Motion), the face of the Exhibits to the Complaint, and the face of the following documents referred to in the Complaint: Sections 1, 3, 12, and 14 of the Frontier/FAPA collective bargaining agreement ("Frontier CBA"), and Letters of Agreement 39 and 67 of the Frontier CBA (Declaration of Wesley Kennedy ["Kennedy Decl."]  Exh. 1); the February 19, 2011 Award of Arbitrator Dana E. Eischen ("Eischen Award") (Kennedy Decl. Exh. 2); and undersigned counsel's October 10, 2014 letter to Arbitrator Eischen (Compl. Exh. 8), including the enclosures thereto which were not included in the Exhibits to the Complaint. (Kennedy Decl. Exh. 3.)  Reliance on documents referred to in the Complaint is permissible on a motion to dismiss.  See e.g.  Bogie v. Rosenberg, 705 F.3d 603, 609 (7th Cir. 2013).

2

subsidiaries, Frontier and Lynx Aviation, Inc., as of October 1, 2009, when they emerged from

reorganization under 11 U.S.C. § 1101, *et seq*. (Compl. ¶ 9.) Those acquisitions affected[2] four

separate pilot groups, each represented for collective-bargaining purposes by separate labor

organizations. The International Brotherhood of Teamsters, Airline Division ("IBT") represented the

pilots employed by RAH's pre-2009 operating subsidiaries (Republic Airlines, Inc; Shuttle America,

Inc.; and Chautauqua Airlines, Inc.), see Republic Airlines, 38 NMB 138, 139 (2011); the Air Line

Pilots Association, International ("ALPA")  represented Midwest's pilots, see Midwest Express

Airlines, Inc., 25 NMB 118 (1997); FAPA represented Frontier's pilots, see Frontier Airlines, 26

NMB 94 (1998); and the United Transportation Union ("UTU") represented Lynx's pilots, see Lynx

Aviation, Inc., 36 NMB 143 (2009). (Compl. ¶10.) All but the Lynx pilots were covered by

collective-bargaining agreements which required that, in the event of a "successorship transaction"

---

[2]      The Complaint alleges that RAH's acquisitions of Frontier, Midwest and Lynx
created a "single transportation system." (Compl. ¶ 10.) However, as a matter of law, that
question was subject to the exclusive jurisdiction of the NMB over representation issues under
the RLA. See e.g. Gen.Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Mo.-Kan.-Tex.
R.R. v. Mo.-Kan.-Tex. Ry. Co., 320 U.S. 323 (1943); Southwest Airline Pilots Association, 41
NMB 297, 298 (2014). Under the NMB's Merger Rules, the existing certifications of bargaining
representatives remained effective until formally extinguished by the NMB based on a valid
representation petition, an NMB finding that a single transportation system exists, and the
certification of a bargaining representative in the combined craft or class. See NMB
Representation Manual § 19.7 ("Existing certifications remain in effect until the NMB issues a
new certification or dismissal"). As set forth below, it is undisputed that the separate pre-
acquisition certifications were not extinguished until June 28, 2011.

         Thereafter, as also set forth below, prior to the events giving rise to the Complaint, the
NMB found that Frontier is a separate transportation system; and certified FAPA as the
bargaining representative of the separate Frontier craft or class. Frontier Airlines, Inc., 41 NMB
11 (2014); Frontier Airlines, Inc., 41 NMB 88 (2014). Insofar as plaintiffs rely on contrary
allegations – e.g., that Frontier is part of a single transportation system; that the Frontier Pilots
are part of a combined craft or class; that FAPA is the bargaining representative of a combined
craft or class; or that the Frontier CBA is a collective bargaining agreement applicable to a
combined craft or class – this Court lacks subject matter jurisdiction. (See Section I.B. below.)

which resulted in an operational merger, the pilots' seniority should be integrated in a fair and equitable manner as provided in Sections 3 and 13 of the Labor Protective Provisions (LLP) imposed by the Civil Aeronautics Board in the Allegheny-Mohawk Merger Case. It was recognized by the four pilot groups that, even though the Lynx pilots were not covered by a CBA, they were entitled to a fair and equitable integration of their seniority by virtue of the McCaskill-Bond Amendment to the Federal Aviation Act, 42 U.S.C. § 42112 note.[3]

On November 3, 2009, the DRA was entered into by RAH, on behalf of itself and its then-wholly-owned affiliates (Republic, Chautauqua, Shuttle America, Midwest, Frontier and Lynx), as "one 'party'" under the DRA; and the Republic, Midwest, Frontier and Lynx pilots, as represented by Seniority Merger Committees created and authorized by each pilot group's duly designated representative, each as a separate "party" to the DRA. The DRA established procedures for resolving the seniority integration issue in accordance with Sections 3 and 13 of the LPPs. (Compl. ¶ 11; Compl. Exh. 1.) The DRA provided the process whereby the airlines and the pilot groups would integrate the pilots' seniority in a fair and equitable manner as required by Section 3 of the Allegheny-Mohawk LPPs, and provided the manner in which the parties would resolve disputes over the interpretation and enforcement of the seniority conferred upon the pilots through that process in the event that the integrated seniority became effective. Id.

On its face, the DRA expressly limited the parties and circumstances to which it would apply,

_____

[3] As alleged by plaintiffs, McCaskill Bond requires a seniority integration in the event of a transaction which results in an "operational merger." RAH's acquisition of Frontier did not, by itself, require such an operational merger. To the contrary, for instance, Letter of Agreement 39 of the Frontier CBA, entered into as a condition of the RAH acquisition, expressly required further collective bargaining before the implementation of an integrated seniority list. (Kennedy Decl. Exh. 1, at LOA 39.2.)

4

and in which an integrated seniority list would apply, in at least six respects.  (1) The  carrier party to the DRA was defined as "Republic Airways Holdings Inc. (RAH), on behalf of itself *and its wholly owned affiliates* Republic Airline Inc., Chautauqua Airlines, Inc. and Shuttle America Corp. (hereinafter collectively, 'Republic'), Midwest Airlines, Inc., Frontier Airlines, Inc. and Lynx Aviation, Inc. (RAH and its affiliates together *one 'party'* under this Agreement)." (Compl. Exh. 1, at 1 [emphasis added].) (2) Section II.e. of the DRA provided that the effective date of any agreement on an integrated seniority list "shall not be before the NMB issues its ruling on whether the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system." (Id., at 2.) (3) Section V.(g) of the DRA provided, in the event of an arbitrated seniority integration:  "The award shall include the date on which the seniority integration will become effective, which date shall not be before the NMB issues its ruling on whether the RAH affiliates comprise  a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system." (Id., at 4-5.) (4) Section V.(h) of the DRA provided for the continuation of the pre-acquisition groups' Merger Committees following the effective date of the integrated list, but only by "[t]he Organization, if any, *designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system*." (Id., at 5 [emphasis added].)   (5) Section V.(j) of the DRA provided that a seniority integration arbitration award would be considered as a part of "the collective bargaining agreement(s) *applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system*." (Id., Exh. 1, at 5 [emphasis added].)  (6) Section V.(j) also provided for the resolution of "[a]ny dispute arising out of the interpretation or application of the award more than

5

one-hundred and twenty (120) days after the effective date of the seniority integration," but culminating "the adjustment board *established by the designated representative of the combined craft or class and the single carrier*." (Id. [emphasis added].)

Thus, on the face of the DRA, Frontier was a party to the DRA only as an "affiliate" of RAH; and the DRA and the integrated seniority list were conditioned on the existence of a "single transportation system" and single bargaining representative for the pilots in that single transportation system, and a collective bargaining agreement or agreements "applicable to the combined craft or class." The dispute resolution process set forth in Sections V.(h) and (j) was applicable only to the single carrier and an "Organization ... designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system," and as part of a "collective bargaining agreement[] applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system."

Section V.(c) of the DRA provided, *inter alia*, with respect to the arbitrator selected to establish the integrated seniority list: "In addition to jurisdiction to resolve disputes under Section I [dealing with discovery] and to devise the fair and equitable integration of seniority, the arbitrator shall have the authority to resolve any dispute arising out of the interpretation or application of this Agreement." (Compl. Exh. 1, at 4.)

The four pilot groups were unable to reach an agreement on a unified integration proposal; thereafter, Dana E. Eischen was selected as the Arbitrator under DRA § IV. Arbitrator Eischen issued the Eischen Award on February 19, 2011, determining the integrated seniority list. (Compl. ¶ 17; Kennedy Decl. Exh. 2.) However, Arbitrator Eischen recognized that the parties had agreed to a process for the integrated seniority list *before* it was known whether a single transportation system

6

would be found. (Kennedy Decl. Exh. 2, at 40.) Accordingly, Arbitrator Eischen made the effectiveness of the Award contingent on an NMB finding of a single transportation system and certification of a single bargaining representative – "The IMSL ... shall become effective ... on the sixtieth (60th) day following the date of the National Mediation Board rulings and certification referenced in DRA §V (g), unless an earlier date is agreed upon by the designated pilot representative and the single carrier." (Id., at 49.) Arbitrator Eischen acknowledged the unknown contingencies which had to occur in order for the IMSL to be effective (id., at 42-43), and made clear:

> *It is unknown whether the NMB will find a single transportation system for the pilot craft or class; if so, which of the pre-acquisition carriers will be included; and what organization, if any, will be certified by the NMB as the representative of the combined pilot craft and class in such a single transportation system.* As I understand the RLA and the NMB regulations, unless and until the NMB rules otherwise, the existing separate certifications of bargaining representatives of the respective pre-acquisition pilot groups remain in effect ... See NMB Representation Manual §19.

(Id., at 42 [emphasis added].)

Moreover, Arbitrator Eischen recognized "the 'dynamic' nature of NMB single-carrier determinations" (Kennedy Decl. Exh. 2, at 46), and expressly contemplated *a scenario in which Frontier was not part of a future single transportation system*:

> The Award also expressly provides that the awarded seniority integration would still be implemented, with appropriate adjustments in the IMSL, if the NMB rules that fewer than all of the carriers are included in a single transportation system for the pilot craft or class. This comports with the unanimous agreement of the Parties, as expressly set forth in the written record. For example, all Parties to the DRA agree that, *if the NMB concludes that Frontier is not part of the Republic single transportation system for the pilot craft or class, the integration methodology of the Award will be applied with the Frontier pilots excluded.* Thus, the Award makes clear that this is the intended result in the event that the NMB so rules in the instant case.

(Id., at 45 [emphasis added].)

Arbitrator Eischen further held that any modification of existing contractual bidding,

displacement and other mechanisms was beyond his authority:

> My arbitral authority under the DRA does not extend to elimination or modification of existing contract language or to resolution of issues unrelated to the seniority integration, which must be addressed in another forum or at the negotiations table ...

(Kennedy Decl. Exh. 2, at 38-39.) Arbitrator Eischen accordingly made clear that any single carrier and single bargaining representative *had to negotiate a collectively-bargained implementing agreement* to determine how the IMSL would apply between the pre-acquisition operations:

> In the event that the NMB finds a single transportation system and then certifies a single bargaining representative for the system-wide craft or class of pilots, *applicable CBAs will remain applicable, in accordance with their terms, until consolidated or otherwise modified by valid mutual agreement between the affected single carrier and a certified single pilot craft or class bargaining representative*, if any. There appears to be consensus that the RAH/IBT and Frontier/FAPA collective bargaining agreements remain applicable to the pilot craft and class of those respective properties ... After the NMB makes its determinations, *the designated single representative and the Company must negotiate an implementing agreement and/or consolidate the applicable CBAs.*

(Id., at 43. [emphasis added].) Arbitrator Eischen made clear that he intended that such "implementing agreement" or "consolidate[d] ... CBAs" would be concluded during that 60-day time period following NMB certification: "In my judgment, that is a reasonably defined period of time sufficient to allow knowledgeable, informed and properly motivated labor-management bargainers to consummate at least an implementing agreement, if not the consolidated CBA(s)." (Id., at 45.)

Arbitrator Eischen retained jurisdiction under his Award, but *only* "[t]o the extent specified in Sections V(c) and V(i)" of the DRA. (Kennedy Decl. Exh. 2, at 49.) Thus, any further jurisdiction was limited to the terms of those provisions of the DRA.[4]

---

[4]     Plaintiffs allege several respects in which FAPA "took steps to avoid or at the least limit [the Eischen Award's] application." (Compl. ¶ 20. See Compl. ¶¶ 21-23.) The apparent thrust of those allegations is to support the conclusion that FAPA's conduct has been

8

**Frontier's Hiring Of New-Hire Pilots**

During the period between the date on which the Eischen Award was issued and its effective date, Frontier hired eight furloughed Midwest pilots. Since the Eischen Award was not effective when they were hired, they were considered by Frontier to be "new-hires," and were assigned seniority dates that coincided with their Dates-Of-Hire (DOH) at Frontier. (Compl. ¶ 24.) That seniority placement was required by Section 3.A.1 of the Frontier CBA, which provided: "The seniority of a Pilot shall begin to accrue from the date the Pilot is first placed on the Company payroll as a pilot ..." (Kennedy Decl. Exh. 1, at 10.)

**The Certification of the IBT and the Implementation of the Eischen Award**

On April 7, 2011, the NMB found that a single transportation system existed, comprised of RAH's pre-June 2009 operating subsidiaries (Republic, Shuttle America, and Chautauqua), Frontier and Lynx; and further, that Midwest Pilots were included in the single transportation system. Republic Airlines, et al., 38 NMB 138-39 (2011). (Compl. ¶ 9.) FAPA ceased to be the representative of the craft or class of Frontier pilots on June 28, 2011, when the NMB certified the IBT as the representative for collective bargaining purposes under the RLA of the craft or class of pilots employed by the single transportation system. See Republic Airlines, et al., 38 NMB 245 (2011). (Compl. ¶¶ 6, 10.) By the terms of the Eischen Award (Kennedy Decl. Exh. 2, at 49), the certification of the IBT as the bargaining representative of the combined craft or class triggered the 60-day period for negotiating of an implementing agreement in anticipation of the effective date of the IMSL on

---

based on illicit motivations. In each respect alleged by plaintiffs, FAPA (or the Frontier Pilots Merger Committee) took good faith legal positions; such good faith advocacy cannot constitute ulterior motivation. See Bautista v. Pan Am. World Airlines, Inc., 828 F.2d 546, 552 (9th Cir. 1987). As discussed in Section II below, so long as FAPA acted with a legitimate union purpose, other ulterior motivations would not support a duty of fair representation claim.

August 27, 2011.

After August 27, 2011, a series of disputes arose regarding the interpretation and application of the Eischen Award, including an assertion by the MPMC that the integrated seniority list replaced the seniority established under the Frontier CBA and required that Frontier allow the eight former Midwest pilots at Frontier to use their IMSL seniority in bidding for schedules, vacations and other purposes; FPMC opposed that position, asserting that the integrated list was not, and would not be, effective until RAH and the IBT reached either a consolidated CBA or an interim agreement implementing the IMSL Award. (Compl. ¶ 24. See Compl. Exh. 2, at 5-10.) On October 22, 2011, Arbitrator Eischen issued his Interpretive Award No. 1. (Compl. Exh. 2.) In that Interpretive Award, Arbitrator Eischen held that the IMSL became effective on August 27, 2014. (Id., at 14.) Arbitrator Eischen further held:

> 3) The IMSL confers upon each listed pilot a specific seniority rank status, which differs from the seniority rank status that s/he held under the old pre-acquisition seniority lists now superseded by the IMSL. Unless and until the Company and the IBT agree upon collectively bargained contractual modifications or new Agreements, the IMSL does so in the context of the RJET/IBT Agreement and the Frontier/FAPA Agreement Various collectively bargained provisions in those respective Agreements address the invocation, utilization, administration, implementation and retention of the seniority rank status conferred upon a pilot by the IMSL.

> 4) The Conditions/Restrictions set forth expressly in Part B of my February 19, 2011 Award are the only conditions, restrictions, exceptions, qualifications or limitations of the invocation, utilization, administration, implementation and retention of the IMSL seniority rank status conferred upon a pilot by Appendix A that are contained in or intended by the Award.

> 5) Nothing contained in or intended by the Award supports or requires the conditions, restrictions or limitations imposed during the September and October 2011 bidding periods upon the exercise of IMSL seniority rank status for schedule, vacation and other recurrent bidding by certain furloughed former Midwest pilots who were hired as Frontier First Officers during the period between February 19, 2011 and August 27, 2011.

10

(Id.)  Pursuant to Interpretive Award No. 1, the former Midwest Pilots employed by Frontier were permitted to bid for monthly schedules, vacations and the like based on their IMSL seniority.[5]

**The Sale of Frontier and Ensuing Events**

On October 1, 2013, RAH announced that it had entered into a definitive agreement to sell Frontier Holdings, including Frontier, to an investment fund. On December 3, 2013, RAH completed the sale of all of the outstanding shares of Frontier Holdings to the Falcon Acquisition Group, Inc., an affiliate of Indigo Partners, LLC. Two weeks later, FAPA filed an application with the NMB on December 18, 2013 to represent the pilots employed by Frontier.  (Compl. ¶ 30.)

On March 31, 2014, the NMB found that "Frontier is operating as a single transportation system for the craft or class of pilots." Frontier Airlines, Inc, 41 NMB 11, 31 (2014). (Compl. ¶ 31.)

---

[5]     Plaintiffs allege that "Frontier complied with Interpretative Award No. 1, but the Frontier pilots continued to resist implementing the integrated seniority. Several Frontier pilots, with the active assistance of FAPA, caused a hostile work environment to be created for the eight former Midwest pilots." (Compl. ¶ 29.)  That allegation lacks the specificity required under the Federal Rules. See Ashcroft v. Iqbal, 556 U.S. 662, 677-84 (2009); Yeftich v. Navistar, Inc., 722 F.3d 911, 916 (7th Cir. 2013);  McCauley v. City of Chicago, 671 F.3d 611, 617 (7th Cir.2011); Cunningham v. United Airlines, Inc., No. 13 C 5522, 2014 WL 441610, at *9 (N.D. Ill. Feb. 4, 2014) (Attachment A hereto), aff'd, 769 F.3d 539 (7th Cir. 2014).

Plaintiffs also allege that, "when Frontier closed its Milwaukee, Wisconsin pilot domicile in August 2012 where the eight former Midwest pilots were assigned, and opened a new pilot domicile in Chicago, Illinois, Frontier did not allow the former Midwest pilots to use their IMSL ranking when it displaced those pilots and awarded vacancies at the new base. Rather, as advocated by FAPA, Frontier administered those displacements and vacancies based on the Midwest pilots' DOH at Frontier."  (Compl. ¶ 29.)  To the extent that plaintiffs allege that Frontier failed to properly administer the Eischen Award and/or the Frontier CBA, that represents a "minor" dispute under the RLA, subject to resolution exclusively pursuant to the applicable minor dispute processes.  It is therefore beyond this Court's jurisdiction. See e.g. Haw. Airlines, Inc. v. Norris, 512 U.S. 246, 252–53 (1994); see also Ryan v. Union Pac. R. Co., 286 F.3d 456, 460 (7th Cir. 2002); Cunningham, 2014 WL 441610 at *3. Cf. Consol. Rail Corp. v. RLEA, 491 U.S. 299, 302-303 (1989) (explaining "major" and "minor" disputes).  Plaintiffs do not allege that any effort was made to pursue the alleged infractions under the applicable procedures.

11

Among other things, the NMB found, *inter alia*, as follows:

<u>Seniority Integration Agreement</u>

Arbitrator Eischen issued the IMSL on February 19, 2011, before the Board's single system determination. *Eischen noted that if the Board were to find Frontier separate from the Republic system, "the integration methodology of the Award will be applied with the Frontier pilots excluded." Further, the Award noted that its application may change if "facts and circumstances have materially changed."*

*While the 2011 IMSL covers all Pilots at Frontier and the RAH carriers, no collectively-bargained implementing agreement has even been concluded ...*

*Accordingly, the Pilots at Frontier continue to work separately under the Frontier CBA ...*

...

There still remains an IMSL covering all Pilots on the formerly-found Republic Airlines, et al./Frontier single transportation system. However, *no collectively bargained implementing agreement was ever concluded so the Frontier Pilots have been effectively operating separately under the Frontier CBA. Further, the only indicia still supporting Frontier's inclusion in the RAH single transportation system is the IMSL. This factor alone is insufficient to support finding Frontier part of the RAH transportation system*. [citations omitted].

<u>Frontier Airlines, Inc</u>, 41 NMB at 39, 41 (emphasis added). The NMB then conducted an election among the Frontier pilots and on June 13, 2014 certified FAPA as the duly designated and authorized representative for purposes of the RLA of the craft or class of Pilots employed by Frontier. <u>Frontier Airlines, Inc</u>. 41 NMB 88 (2014). (Compl. ¶¶ 30-31.)

Accordingly, it is undisputed that, as of December 3, 2013, Frontier was no longer an "affiliate" of RAH. As of no later than March 31, 2014, Frontier became a separate carrier under the RLA. And, as of no later than June 14, 2014, the Frontier Pilots were no longer part of a combined craft or class; the Frontier Pilots were no longer represented by the IBT; FAPA was the certified representative of the separate Frontier Pilot craft or class, *not* the combined craft or class; and the

12

Frontier CBA was *not* a collective bargaining agreement applicable to the combined craft or class, if it ever had been.

**The Events Giving Rise to the Complaint**

Shortly before RAH disposed of its ownership interest in Frontier – while Frontier was part of the RAH single transportation system – a dispute had arisen over whether Frontier must offer new-hire First Officer positions to pilots holding seniority on the IMSL before it hired new pilots "off the street." That dispute was presented to an adjustment board formed under DRA § V(j) and by agreement among Frontier, RAH and the IBT, with Arbitrator Eischen being selected as the arbitrator. As authorized by DRA § V(j), MPMC participated in that proceeding. (Compl. ¶ 32.)

On September 12, 2014, Arbitrator Eischen issued his Interpretive Award No. 2. (Compl. ¶ 33; Compl. Exh. 3.) While Arbitrator Eischen found it unnecessary to rule on the status of the IMSL following the NMB's certification of FAPA in the separate Frontier craft or class (Compl. Exh. 3, at 22), Arbitrator Eischen ruled that the IMSL Award did not compel Frontier to offer new hire positions to pilots holding IMSL seniority.  (Compl. ¶ 33; Compl. Exh. 3.)

On September 13, 2014, FAPA sent a written communication to Frontier. (Compl. Exh. 9.) Among other things, FAPA recited the terms of Section 3.A.1. of the Frontier CBA, defining seniority based on a pilot's first day on the Frontier payroll as a pilot; the conditions in the DRA and the Eischen Award limiting the application of the Eischen Award and the DRA, discussed above; the fact that none of those conditions continued to exist; and that, together with the NMB's findings and certification with respect to the separate Frontier operation, Arbitrator Eischen's Interpretive Award No. 2 "removes any practical risk that additional pilots would be granted the right to use IMSL seniority under the Frontier CBA."  (Id.) Accordingly, FAPA concluded:

Based on the foregoing, FAPA requests that the Company forthwith implement and apply the Frontier CBA in accordance with the foregoing interpretation for all contractual purposes, pending the conclusion of an appropriate agreed-upon written document memorializing the following:

> 1.     Effective June 13, 2014, the Eischen Award and the IMSL are no longer effective with respect to seniority under the Frontier CBA.
>
> 2.     Effective June 13, 2014, the seniority of a Pilot under the Frontier CBA shall be determined based on the date on which the Pilot was first placed on the Company payroll as a pilot, in accordance with Section 3.A.1. of the Frontier CBA; and the Frontier Airlines, Inc. Pilot System Seniority List or "Seniority List" shall be determined in accordance with Section 3.B. of the Frontier CBA.
>
> 3.     The Company will issue the Seniority List, effective as of June 13, 2014, which shall constitute the Seniority List a defined in Section 3.B. of the Frontier CBA.
>
> 4.     The Company will maintain and post an accurate copy of the Seniority List, as updated, in accordance with Section 3.B.3 of the Frontier CBA.
>
> 5.     A Pilot may protest his position on the Seniority List in accordance with Section 3.C. of the Frontier CBA.

(Id.) Frontier acknowledged and agreed on the same date. (Kennedy Decl. Exh. 3, encl. 2.) FAPA notified several of the five remaining Midwest pilots at Frontier that they should rebid the October 2014 schedules since, as a result of Eischen's latest award, they no longer had IMSL seniority, but rather, from that date forward, must use their DOH at Frontier as their seniority date. Frontier proceeded to award the former Midwest pilots' bids for the October schedule by using their DOH, which deprived them of their preferred schedules. (Compl. ¶ 34.)

Frontier and FAPA thereafter memorialized their understandings in Letter of Agreement 71 of the Frontier CBA ("LOA 71"), which was concluded on October 10, 2014 and thereafter ratified by the Frontier Pilots. (Kennedy Decl. Exh. 3, encl. 3.) LOA 71 sets forth in detail the

14

basis for those understandings, both as to the interpretation and application of the existing Frontier CBA, and as to the proper administration of seniority in light of the circumstances – including that the understandings "represent reasonable working conditions and be consistent with proper compensation, by treating all pilots' seniority rights similarly based on the first date each pilot appeared on the payroll as a pilot employee of Frontier; restoring the normal seniority system historically used at Frontier as a separate carrier; and thereby furthering stability and the stated purposes of the Frontier CBA." (Kennedy Decl. Exh. 3, encl. 3.)

By letter dated September 20, 2014, the MPMC purported to initiate a dispute under Section V.(h) of the DRA (Compl. ¶ 35; Compl. Exh. 4); and, by letter dated September 23, 2014, purported to initiate in its own name the contractual grievance procedure under the Frontier CBA. (Compl. ¶ 36; Compl. Exh. 5.) Counsel for FAPA responded to those purported submissions by letter dated September 24, 2014, stating in part:

> ... The November 3, 2014 Dispute Resolution Agreement ("DRA") is no longer applicable to Frontier Airlines, Inc. ("Frontier") or FAPA. Accordingly, your clients' request to invoke the arbitration provisions of the DRA are without basis, and substantively inarbitrable.
>
> ...
>
> There is thus no agreement to arbitrate the issues raised by your correspondence under the DRA, and the matters you assert are substantively inarbitrable under that Agreement. Accordingly, your request for a "conference" pursuant to the DRA on September 26, 2014, is similarly misplaced. Since it has not agreed to the application of the DRA in these circumstances, FAPA will not consent to or participate in such a conference, or any other effort to process the claims asserted in your correspondence under the DRA.

(Compl., Exh. 6.) However, counsel made clear:

> To the extent that the affected Frontier Pilots who you represent believe that Frontier is improperly administering seniority under the Frontier CBA, those pilots (although not the Midwest Merger Committee) may invoke the grievance procedure

15

of that CBA pursuant to the terms thereof. FAPA will fulfill its obligations with respect to the processing of any such grievance in accordance with the CBA.

(Id.)

The MPMC then purported to submit the dispute to Arbitrator Eischen for interpretation and application of the DRA under Section V.(c) of the DRA. (Compl. ¶ 38; Compl. Exh. 7.) Undersigned counsel responded on behalf of FAPA by letter to Arbitrator Eischen dated October 10, 2014, setting forth the background facts, and reiterating, *inter alia*, that the DRA was no longer in effect; that, even were the DRA in effect, Arbitrator Eischen lacked authority over the matters submitted; and that those contentions represented issues of substantive arbitrability outside of Arbitrator Eischen's authority. (Compl. ¶ 39; Compl. Exh. 8; Kennedy Decl. Exh. 3.) Frontier concurred in FAPA's position. (Compl. ¶ 40; Compl. Exh. 10.) By letter dated October 29, 2014, Arbitrator Eischen declined to take jurisdiction over the MPMC's submission, based on the parties' dispute over substantive arbitrability. (Compl. ¶ 41; Compl. Exh. 11.)

MPMC purportedly invoked each step of the Frontier CBA's grievance process.[6] At each

_____

[6] FAPA's CBA with Frontier places FAPA as the gatekeeper for the processing of grievances past the initial informal claim. Sections 12.B.1 and 12.C.1 of that CBA provide that, within fourteen (14) days of the occurrence, the "concerned pilot shall first present the dispute to the Chief Pilot ... for discussion in an effort to informally resolve the dispute ..." Frontier's Chief Pilot is to render his decision within twenty-one (21) days of the occurrence (Kennedy Decl. Exh. 1, at 13.), and thereafter further processing of the grievance is controlled by FAPA. CBA § 12.D provides that: "If the Association is not satisfied with the informal resolution of the dispute by the Chief Pilot or his designee, the Association may present a written grievance to the Senior Manager of Labor Relations." CBA § 12.E provides that: "If the Association is not satisfied with the Senior Manager of Labor Relations' decision at the First Level of Grievance ..., the Association may appeal the Senior Manager of Labor Relations' decision to the Vice President of Labor Relations ..." And as provided by CBA § 12.F: "If the Association is not satisfied with the Vice President of Labor Relations' decision at the Second Level of Grievance, the President of the Association or his designee (limited to a member of the Association Board) may appeal the decision to the System Board of Adjustment in accordance with the Procedures in Section 14, System Board of Adjust- ment." (Compl. ¶ 42; See Kennedy Decl. Exh. 1, at 17-24.)

step to which either Frontier or FAPA responded, they denied that MPMC had the authority to invoke that grievance process. On November 10, 2014, MPMC invoked the jurisdiction of the Frontier CBA board of adjustment under DRA § V(j) and CBA §§ 12.F and 14 "to resolve the disputes raised by its earlier grievances," including the procedural defenses raised by defendants. (Compl. ¶ 43; Compl. Exh. 12.)

In the interim, FAPA progressed a separate grievance for each of the five former Midwest pilots employed as First Officers at Frontier, and on November 8, 2014 invoked the jurisdiction of the Frontier/FAPA System Board of Adjustment to hear their claims. (Compl. ¶ 44; Compl. Exh. 14.) FAPA notified the individual grievants of that submission, stating in part:

> FAPA had no obligation to process your grievances under the CBA, but has done so. In addition, although FAPA does not concede that it has any contractual, statutory or other obligation to submit your grievances to a System Board of Adjustment, based on the unique circumstances of this case and on a non-precedential basis FAPA intends to submit the grievances to the System Board of Adjustment within the time limits provided under Section 14.C. of the CBA. In addition, although the CBA does not so provide, based on the unique circumstances of this case and on a non-precedential basis FAPA will not oppose a request by some or all of you to appear before the System Board of Adjustment, separately from and in addition to FAPA, with legal representation if you so request. The System Board of Adjustment would otherwise be administered in accordance with the CBA.
>
> FAPA will provide you with copies of the submission of the grievances to the System Board of Adjustment, and will notify you of the System Board Adjustment hearing.

(Compl. Exh. 13.)

## ARGUMENT

## I. COUNT I OF THE COMPLAINT SHOULD BE DISMISSED

In Count I, plaintiffs seek to compel arbitration pursuant to the RLA under the DRA. That claim fails as a matter of law under Rule 12(b)(6) because, on its face, the DRA no longer applies

to Frontier and FAPA; and under Rule 12(b)(1) because plaintiffs' claim depends on a representational issue within the NMB's jurisdiction, on which the NMB has already ruled.

### A. Plaintiffs Have Not Pleaded Facts Establishing That Frontier And FAPA Have Agreed To Arbitrate Under The DRA

A motion pursuant to Rule 12(b)(6) challenges the sufficiency of a complaint as failing to state a claim upon which relief can be granted. Under Rule 8(a)(2), F.R.Civ.P., a plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiffs have pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The allegations must sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citations omitted). See also Tylke v. Diversified Adjustment Serv., Inc., No. 14-CV-748, 2014 WL 5465173, at *1 (E.D. Wis. Oct. 28, 2014)(Attachment B hereto). The Court should "accept the well-pleaded facts in the complaint as true," but separate out "legal conclusions and conclusory allegations merely reciting the elements of the claim." McCauley, 671 F.3d at 616, citing Iqbal, 556 U.S. at 680. After removing allegations that are not entitled to a presumption of truth, the court must determine whether the remaining allegations "plausibly suggest an entitlement to relief." Id.

Arbitration is a matter of contract. A party cannot be required to submit to arbitration a dispute which the party has not agreed to arbitrate. AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986); Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc., 765 F.3d 776, 781 (7th Cir. 2014). A party moving to compel arbitration bears the burden of establishing that there is an agreement requiring the other party to arbitrate. Henry Technologies Holdings, LLC v. Giordano, No. 14-CV-63-JDP, 2014 WL 3845870, at *3 (W.D.

18

Wis. Aug. 5, 2014) (Attachment C hereto), <u>citing</u> <u>Fox v. Nationwide Credit, Inc.</u>, No. 09–cv–7111, 2010 WL 3420172, at *2 (N.D.Ill. Aug. 25, 2010) (Attachment D hereto). <u>See also</u> <u>Gibson v. Neighborhood Health Clinics, Inc.</u>, 121 F.3d 1126, 1130 (7th Cir. 1997). "The RLA does not dispense with the preliminary question of arbitrability." <u>In re Cont'l Airlines, Inc.</u>, 484 F.3d 173, 183 (3d Cir. 2007). <u>See also</u> <u>Ass'n of Flight Attendants, AFL-CIO v. USAir, Inc.</u>, 960 F.2d 345, 349 (3d Cir. 1992); <u>Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l</u>, 861 F.2d 1546, 1550 (11th Cir.1988).

Plaintiffs have not met this burden in this case. Accepting the factual allegations of the Complaint, it is clear from the face of the DRA that it no longer applies to Frontier and FAPA, and that they have not agreed to arbitrate plaintiffs' claims under that agreement, for at least three reasons. *First, the DRA bound Frontier only insofar as it was an "affiliate" of RAH.* Frontier was not itself a signatory to the DRA; it was bound by the terms of the DRA only through its status as "wholly-owned affiliat[e]" of RAH, as part of a "one party" to the DRA. (Compl. ¶ 49; Compl. Exh. 1.) It is undisputed that, as of no later than December 3, 2013, "RAH completed the sale of all of the outstanding shared of its wholly owned-subsidiary, Frontier Airlines Holdings, Inc., to the Falcon Acquisition Group, Inc., an affiliate of Indigo Partners, LLC." (Compl. ¶ 30). At that time, Frontier ceased to be an "affiliate" of RAH. As such, Frontier is not subject to the DRA.

*Second, FAPA is not, and has never been, designated as the representative of the combined craft or class of pilots in the RAH single transportation system.* Section V.(g) of the DRA required the continuation of the pre-acquisition groups' Merger Committees only by "[t]he Organization, if any, *designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system*." (Compl. Exh. 1, at 5

19

[emphasis added].) The "single transportation system" referenced in the DRA was the RAH system resulting from RAH's acquisitions of Midwest and Frontier, as found by the NMB in April 2011. It is undisputed that FAPA was never designated as that "Organization;" as of March 31, 2014, the Frontier Pilots were no longer part of that "single transportation system;" and, as of June 13, 2014, FAPA is the duly designated bargaining representative only of the separate craft or class of Frontier Pilots, not the pilots of the "single transportation system."   As such, FAPA is not subject to the DRA.

*Third, the Frontier CBA is not a collective bargaining agreement applicable to the combined craft or class*.  Section V.(j) of the DRA provided that a seniority integration arbitration award would be considered as a part of "the collective bargaining agreement(s) *applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system*." (Compl. Exh. 1, at 5 [emphasis added].)  Section V.(j) also provided for the resolution of "[a]ny dispute arising out of the interpretation or application of the award more than one-hundred and twenty (120) days after the effective date of the seniority integration," through "the adjustment board *established by the designated representative of the combined craft or class and the single carrier*." (Id. [emphasis added].) Since Frontier is no longer part of the single carrier, and the Frontier Pilots now constitute a separate craft or class, the Frontier CBA is no longer "applicable to the combined craft or class," and Frontier and FAPA are not party to an adjustment board "established by the designated representative of the combined craft or class and the single carrier."

This is consistent with Arbitrator Eischen's own qualifications on the implementation of his Award, and the NMB's finding that Frontier was a separate carrier as of March 31, 2014. Consistent with the DRA, Arbitrator Eischen made his Award effective only within the context of

a single transportation system with a single bargaining representative. (Kennedy Decl. Exh. 2, at 42-43, 49.) Indeed, Arbitrator Eischen expressly recognized "the 'dynamic' nature of NMR single-carrier determinations," (id., at 46), and contemplated the scenario, now come to pass, of a single carrier not including Frontier – "if the NMB concludes that Frontier is not part of the Republic single transportation system for the pilot craft or class, the integration methodology of the Award will be applied with the Frontier pilots excluded." (Id., at 45.) Arbitrator Eischen's conditions were relied on by the NMB in finding that Frontier is now a separate carrier. Frontier Airlines, 41 NMB at 39, 41.

Based on the foregoing, it is clear that plaintiffs have failed to allege sufficient facts to establish the alleged agreement to arbitrate,[7] and have therefore failed to state a claim upon which relief can be granted on Count I. See Iqbal, 556 U.S. at 678.

----

[7] Plaintiffs cite 45 U.S.C. §§ 152 First and 184, which provide for the creation of Boards of Adjustment (Compl. ¶¶ 47, 48), and allege an entitlement to arbitrate *under the DRA* pursuant to those provisions. (Compl. ¶ 55.) To the contrary, insofar as plaintiffs assert claims in Count I which are subject to resolution as minor disputes, they are being afforded the minor dispute processes required under the RLA, and more. When plaintiffs' claims arose, Frontier was a separate carrier; FAPA was the bargaining representative only of the separate pilot craft or class at that carrier; and the Frontier CBA governed the terms and conditions of that separate craft or class. Accordingly, the claims underlying Count I represent, if anything, minor disputes under the Frontier CBA. As such, those claims are subject to resolution exclusively under the grievance and System Board of Adjustment provisions of that CBA.

The Frontier CBA does not provide for the participation of the MPMC or any other entity (other than FAPA) in the grievance and System Board process. (Kennedy Decl. Exh. 1, at 13-25; Compl. ¶ 43.) Thus, plaintiffs have no basis for asserting any such right. However, *plaintiffs concede that grievances have been filed under the Frontier CBA by the individual affected pilots, and that FAPA has undertaken to process those grievances in accordance with the Frontier CBA*. (Compl. ¶ 44.) Indeed, FAPA has submitted the grievances to the contractual System Board of Adjustment, and has offered the individual grievants the opportunity to appear separately, with legal representation if they so desire. (Compl. ¶¶ 43-44.)

21

**B.  The Court Lacks Subject Matter Jurisdiction Over Count I**

On a Rule 12(b)(1) motion, the Court is to accept all well-pled factual allegations and draw reasonable inferences in favor of the plaintiffs.  Long v. Shorebank Dev. Corp., 182 F.3d 548, 554 (7th Cir.1999). The Court is also permitted to look beyond the pleading and "view whatever evidence has been submitted on the issue to determine whether in fact subject matter exists." Id., quoting Capitol Leasing Co. v. FDIC, 999 F.2d 188, 191 (7th Cir.1993). The party that invokes the court's jurisdiction has the burden of proving it exists.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

As discussed above, on its face the DRA applies to Frontier and FAPA only if, *inter alia,* there is a "single transportation system" that includes Frontier, and FAPA is the "Organization ... designated as the bargaining representative of the combined craft or class ... for the single transportation system."  Accordingly, for plaintiffs to prevail on Count I, they must prove, and the Court must find, that Frontier is part of that "single transportation system," and that FAPA is the "Organization designated as the bargaining representative of the combined craft or class" in that transportation system.  This Court has no jurisdiction over those questions, which as a matter of law are representation issues within the exclusive jurisdiction of the NMB. See e.g. Gen.Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Mo.-Kan.-Tex. R.R. v. Mo.-Kan.-Tex. Ry. Co., 320 U.S. 323 (1943); United Transportation Union v. Gateway Western Ry., 78 F.3d 1208, 1213 (7th Cir.1996); Int'l Bhd. of Teamsters Airline Div. v. Frontier Airlines, Inc., 628 F.3d 402, 405 (7th Cir. 2010); Air Line Employees Ass'n, Intern. v. Republic Airlines, Inc., 798 F.2d 967 (7th Cir.), cert. denied, 479 U.S. 962 (1986); see also Southwest Airline Pilots Association, 41 NMB 297, 298 (2014). Indeed, as plaintiffs concede, the NMB has already ruled on these questions,

Case 2:14-cv-01441-RTR   Filed 01/16/15   Page 22 of 31   Document 14

*adversely to plaintiffs' claim in Count I*, finding that Frontier is separate carrier, <u>Frontier Airlines, Inc.</u>, 41 NMB 31 (2014); and that FAPA is the exclusive representative of the Frontier pilots, <u>Frontier Airlines, Inc.</u>, 41 NMB 88 (2014).

Because Count I requires the Court to rule on representation issues within the NMB's exclusive jurisdiction, the Court lacks subject matter of this claim and should dismiss the matter pursuant to Fed. R. Civ. P. 12(b)(1).[8]

## II.   <u>COUNT II OF THE COMPLAINT SHOULD BE DISMISSED</u>

Count II asserts a claim that FAPA has breached its duty of fair representation[9] by failing to arbitrate their claims under the DRA, and by entering into LOA 71.  Count II should be dismissed under Rule 12(b)(6) because, based on the allegations of the Complaint and the documents referenced therein, FAPA had legitimate union purposes for its actions, and a claim for

---

[8]      As set forth above, in LOA 71 Frontier and FAPA have agreed that, regardless of the interpretation of the pre-existing Frontier CBA, the application of seniority agreed to in LOA 71 represents reasonable working conditions and is consistent with proper compensation, by treating all pilots' seniority rights similarly based on the first date each pilot appeared on the payroll as a pilot employee of Frontier; restoring the normal seniority system historically used at Frontier as a separate carrier; and thereby furthering stability and the stated purposes of the Frontier CBA.  (Kennedy Decl. Exh. 3, encl. 3.)  In Section II below, FAPA demonstrates, *inter alia*, that LOA 71 does not violate FAPA's duty of fair representation.  To the extent that LOA 71 modified the pre-existing CBA prospectively, any dispute regarding the interpretation and application of LOA 71 would itself be a minor dispute, subject to resolution exclusively under the applicable provisions of the Frontier CBA.

[9]      The duty of fair representation extends only to employees for whom a union is the exclusive bargaining representative. <u>Thomas v. United Parcel Serv., Inc.</u>, 890 F.2d 909, 916 (7th Cir.1989). <u>See</u> also <u>Vaca v. Sipes</u>, 386 U.S. 171, 190 (1967). Accordingly, FAPA can owe no such duty to the MPMC, or to those plaintiffs who are not, and have never been, employed in the craft or class of Frontier Pilots, such as plaintiffs Schwerman and Till. (Compl. ¶¶ 2-3.) *Only plaintiff Ward* is alleged to be an employee of Frontier in the craft or class represented by FAPA. (Compl. ¶ 4.)  All other plaintiffs lack standing as to Count II.  The other affected individual pilots employed by Frontier are not named as plaintiffs.

23

breach of the duty therefore may not lie.[10]

A union breaches its duty of fair representation only by conduct that is arbitrary, discriminatory, or in bad faith. Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 78 (1991); Vaca, 386 U.S. at 190; Cunningham v. Air Line Pilots Ass'n, Int'l, 769 F.3d 539, 541 (7th Cir. 2014). To state a claim for a breach of the duty of fair representation, a plaintiff must show that the union's actions were outside of the wide latitude granted to the union in performing its representative functions. As recently summarized by the trial court in Cunningham v. United, this requires a showing that the union's actions are either:

> (1) "arbitrary," meaning that the actions are "so far outside a 'wide range of reasonableness' " accorded to union decisions as to be "wholly 'irrational,' " id. (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)); (2) "discriminatory," which requires "substantial evidence" of discrimination that is "intentional, severe, and unrelated to legitimate union objectives," Amalgamated Ass'n of St., Elec., Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 301 (1971), or that is based on an "invidious" trait such as race, gender, national origin, union membership or internal union politics, Breininger v. Sheet Metal Workers Local Union No. 6, 493 U.S. 67, 77–78 (1989); or (3) in "bad faith," which is demonstrated by " 'substantial evidence of fraud, deceitful action or dishonest conduct[.]' " Lockridge, 403 U.S. at 299 (citation omitted)).

2014 WL 441610, at *10. The union's conduct can only be considered outside of the wide range of reasonableness if it is "wholly irrational or arbitrary." O'Neill, 499 U.S. at 78. There are inherent conflicts when a union represents different classes or groups of employees; however, the

---

[10]     In addition, with respect to the refusal to arbitrate under the DRA, FAPA has (as discussed above) processed individual grievances on behalf of the affected pilots, and has submitted those grievances to the contractual System Board of Adjustment with the understanding that the grievants may appear separately with legal representation. Thus, the affected pilots are, in fact, being afforded a minor dispute resolution process. If anything, on these undisputed facts, this aspect of Count II should further fail based on a failure to exhaust the contractual minor dispute process. See e.g. Copeland v. Penske Logistics LLC, 675 F.3d 1040, 1042 (7th Cir. 2012); Bell v. Daimler Chrysler Corp., 547 F.3d 796, 804 (7th Cir. 2008).

existence of differences does not make the union's conduct invalid or illegal. Huffman, 345 U.S. at 338. It is not possible for all represented individuals to be completely satisfied and a union does not have a duty to achieve such an impossible result. Id. See also Rakestraw v. United Airlines, Inc., 981 F.2d 1524, 1533, 1534-1535 (7th Cir. 1992).

These principles apply to a union's representation of its constituents with respect to the treatment of seniority. Seniority is a creature of contract. "Seniority arises only out of contract or statute. An employee has no inherent right to seniority in service." Trailmobile Co. v. Whirls, 331 U.S. 40, 53 n.21 (1947). Accordingly, seniority rights arise from and are defined by the pertinent union contract. Id.; Aeronautical Indus. Dist. Lodge 727 v. Campbell, 337 U.S. 521, 526 (1949). See e.g., Wightman v. Springfield Terminal Ry., 100 F.3d 228, 232 (1st Cir. 1996); Dempsey v. Atchison, Topeka & Santa Fe Ry. Co., 16 F.3d 832, 839 (7th Cir. 1994) (citations omitted). As creatures of contract, seniority rights do not "vest." Wightman, 100 F.3d at 232; Local 1251 UAW v. Robertshaw Controls Co., 405 F.2d 29, 33 (2d Cir. 1968); McMullans v. Kan., Okla. & Gulf Ry., 229 F.2d 50, 53 (10th Cir. 1956). As the Seventh Circuit made clear in Rakestraw v. United:

> Once a seniority system is in place, many employees come to think of their position in the pecking order as a form of property. Higher seniority means more desirable assignments and greater security of employment ... Yet seniority does not "belong" to an employee, any more than he "owns" the prospect of receiving a given wage next year or flying the St. Louis-Paris route rather than the leg from Minneapolis to Duluth. Seniority is a creation of collective bargaining agreements and equivalent contracts between unions and employers.

981 F.2d at 1535.

Accordingly, like other entitlements established by a collective bargaining agreement, such rights are subject to expiration or modification through the collective bargaining process. Id. at 1535 ("Like wages and fringe benefits, seniority is a legitimate subject of discussion and

25

compromise in collective bargaining"). Thus, seniority rights are subject to revision or even termination. Wightman, 100 F.3d at 232; Dempsey v. Atchison, Topeka & Santa Fe Ry., 16 F.3d 832, 839 (7th Cir. 1994); Robertshaw Controls Co., 405 F.2d at 33; McMullans, 229 F.2d at 53; NLRB v. Whiting Milk Corp., 342 F.2d 8, 10 (1st Cir. 1965). As the Ninth Circuit has held:

> ... [S]eniority rights are creations of the collective bargaining agreement, and so may be revised or abrogated by later negotiated changes in this agreement. Employee seniority rights are not 'vested' property rights which lie beyond the reach of subsequent union-employer negotiations conducted in the course of their evolving bargaining relationship. A union thus may renegotiate seniority provisions of a collective bargaining agreement, even though the resulting changes are essentially retroactive or affect different employees unequally.

Hass v. Darigold Dairy Prod. Co., 751 F.2d 1096, 1099 (9th Cir. 1985).[11]

These standards have been applied to determine whether a union has violated its duty of fair representation in the composition or modification of a seniority list, which represents a "zero sum game" in which one employee's enhanced seniority is another's reduced seniority. Rakestraw, 981 F.2d at 1533. In Rakestraw, the Seventh Circuit held that the union's duty of fair representation did not prevent it from adjusting seniority in a way that favored some employees over others. 981 F.2d at 1524. Rakestraw involved, in part, a dispute arising from a strike by United pilots in 1985. In anticipation of the strike, United directed a group of 570 new-hire pilots in training to work as replacements; and also hired "fleet qualified" pilots to work at the carrier. In return for agreeing

---

[11]     Plaintiffs cite the duty, under 45 U.S.C. § 152 Seventh, to refrain from changes in the terms and conditions of employment, except pursuant to the full-blown collective bargaining process under 45 U.S.C. § 156. (Compl. ¶ 58.) To the extent that plaintiffs assert that LOA 71 is invalid under that statutory ground, plaintiffs are in error – as evidenced by the fact that LOA 71 is the 71st mid-term side letter to the Frontier CBA. Under the RLA, the carrier and designated bargaining representative may agree to mid-term modifications of a collective bargaining agreement prior to its amendable date. See In re UAL Corp., 443 F.3d 565, 568 (7th Cir. 2006); Local 107 Office & Prof'l Employees Int'l Union v. Offshore Logistics, Inc., 380 F.3d 832, 835-36 (5th Cir. 2004).

to work during the strike, United offered those individuals improved seniority. As part of the agreement reached to end the strike, ALPA agreed not to disturb some of those seniority enhancements. Id. at 1528-29.  However, in the next collective bargaining agreement, ALPA persuaded the carrier to rescind the seniority premiums and return to the seniority system which had historically applied, with the effect of reducing the seniority placement of the affected pilots. The affected pilots asserted a violation of the duty of fair representation.

The Seventh Circuit held in Rakestraw that the seniority modifications were not a breach of the duty.  The court held that, even if the union was motivated by hostility to the affected employees, that did not necessarily lead to the conclusion that there was no rational reason for disadvantaging one group of pilots to another. "Slapping the label 'bad faith' or 'discrimination' on a classification that is rationally related to a legitimate objective" does not establish a claim for discrimination. 981 F.2d at 1531. See id., at 1532, 1535  (references to "legitimate" union objectives satisfying duty of fair representation).  Similarly, "[a] 'bad' motive does not spoil a collective bargaining agreement that rationally serves the interests of workers as a whole."  Id. at 1535.  As long as the union's actions rationally serve the interest of the workers a whole, there is no violation of the duty of fair representation. Id.  The court found that the seniority modifications at issue were based on legitimate union purposes, namely, "(1) to reduce the advantages enjoyed by the replacements, and thus to strengthen the hand of organized labor in future conflicts with management, and (2) to restore the seniority system that United had long used." Id. at 1536.

Thus, even if (as plaintiffs allege) FAPA has been motivated by hostility, FAPA has breached its duty of fair representation *only* if it has *no* rational reason, and *no* legitimate union purpose, for its actions.  Rakestraw, 981 F.2d at 1535. To the contrary, it is clear beyond dispute

from the face of the Complaint and the documents referenced therein, that FAPA had rational reasons and legitimate union purposes for declining to arbitrate under the DRA, and entering into LOA 71. Those purposes are recited, in detail, in FAPA's September 13, 2014 communication to Frontier (Compl. Exh. 9), and the preamble to LOA 71. (Kennedy Decl. Exh. 3, encl. 3, at 1-5.) Those rational bases and legitimate union purposes include, without limitation, (1) the historical definition of seniority at Frontier based on the first date on which a pilot appears on the Frontier payroll as a pilot; (2) the recognition in the DRA and the Eischen Award that the integrated seniority list would apply only within a single transportation system with a single bargaining representative, and the Eischen Award's express contemplation of the possibility that Frontier would not be part of a single transportation system; (3) Arbitrator Eischen's recognition, in the Eischen Award and his Interpretive Awards Nos. 1 and 2, that the application of seniority in bidding for vacant positions, schedules and the like was governed by the applicable collective bargaining agreements, and that the application of the integrated seniority list would depend on an implementing agreement between the single carrier and single bargaining representative, which was never accomplished; (4) RAH's operational separation of Frontier from the other RAH-affiliated carriers, and the sale of Frontier effective December 3, 2013, as a result of which Frontier ceased to be an "affiliate" of RAH; (5) the NMB's finding that Frontier is a separate carrier, and certification of FAPA as the bargaining representative of that separate craft or class; (6) the NMB's express recognition, in finding Frontier to be a separate carrier, of Arbitrator Eischen's conditions on the application of the integrated seniority list; (7) FAPA's well-founded position that the DRA does not apply, given that Frontier is a separate carrier; (8) FAPA is not, and has never been, the designated bargaining representative of the combined craft or class, and the Frontier CBA is not

a collective bargaining agreement applicable to the combined craft or class; (9) the elimination of any practical possibility of pilots transferring from the RAH carriers to Frontier as a result of Arbitrator Eischen's Interpretive Award No. 2; and (10) the mutual recognition by Frontier and FAPA that,

> ... in addition to representing the correct interpretation and application of the existing seniority-related provisions of Frontier CBA, Frontier and FAPA have agreed that, in the event of any dispute or inconsistency regarding the correct interpretation and application of such provisions, the administration of seniority agreed upon in this Letter of Agreement will, in light of the same circumstances, represent reasonable working conditions and be consistent with proper compensation, by treating all pilots' seniority rights similarly based on the first date each pilot appeared on the payroll as a pilot employee of Frontier; restoring the normal seniority system historically used at Frontier as a separate carrier; and thereby furthering stability and the stated purposes of the Frontier CBA.

(Kennedy Decl. Exh. 3, encl. 3, at 5.)

Thus, on the face of the Complaint and the referenced documents, FAPA's refusal to arbitrate under the DRA and entry into LOA 71 are rational and based on legitimate union purposes, including purposes parallel to those expressly relied on by the Seventh Circuit in Rakestraw – "reducing the advantages enjoyed" by the pilots who had gained seniority beyond their Frontier dates-of-hire under the Eischen Award; and "to restore the seniority system that [Frontier] had long used."[12] The parties were free to agree to, and implement, such a seniority system, and FAPA did not violate its duty of fair representation by doing so. See Rakestraw, 981 F.2d at 1535. As such, Count II fails to present sufficient allegations to support a plausible claim for relief and must be dismissed. See Iqbal, 556 U.S. at 678.

---

[12]     In fact, FAPA has done precisely what ALPA did in Rakestraw – returned to date-of-hire seniority for all pilots, so that "all pilots now have seniority from the beginning of their time ... with the airline ..." 981 F.2d at 1530.  Measuring seniority in this fashion is hardly irrational.

29

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed pursuant to Rules 12(b)(1) and (6), F.R.Civ.P.

Respectfully submitted,

By:      /s/ Wesley Kennedy
         Wesley Kennedy (Illinois Bar No. 6188089)
         Ryan M. Thoma (Illinois Bar No. 6314134)
         Allison, Slutsky & Kennedy, P.C.
         230 West Monroe Street
         Suite 2600
         Chicago, Illinois 60606
         Telephone: (312) 364-9400
         Facsimile: (312) 364-9410
         E-mail: kennedy@ask-attorneys.com

Dated: January 16, 2015

30

## CERTIFICATE OF SERVICE

The undersigned certifies that, on January 16, 2015, the foregoing Memorandum of Defendant Frontier Airline Pilots Association  in Support of Motion to Dismiss, and the attachments thereto, was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

/s/    Wesley Kennedy
          Counsel for Defendant Frontier Airline
          Pilots Association