# EXHIBIT 1




# AGREEMENT
Between
Frontier Airlines, Inc.
and
the Airline Pilots
in the Service of
Frontier Airlines, Inc.
as Represented by the
Frontier Airline Pilots Association

Case 2:14-cv-01441-RTR Filed 01/16/15 Page 2 of 36 Document 15-1

# SECTION 1

## RECOGNITION AND JOB SECURITIES

A. RECOGNITION

In accordance with the certification of Case No. R-6630, 26 NMB, No. 18 issued by the National Mediation Board on December 3, 1998, Frontier Airlines, Inc. (hereinafter known as the "Company") recognizes the Frontier Airline Pilots Association (hereinafter known as the "Association" or "FAPA") as the duly designated and authorized collective bargaining representative of the Pilots employed by the Company with the authority and obligations to represent them for the purposes of the Railway Labor Act, as amended.

B. PURPOSE OF AGREEMENT

1. This Collective Bargaining Agreement ("Agreement") is made and entered into between the Company and the Association.
2. The purpose of this Agreement, in the mutual interest of the Company and the Association, is to provide for the operation of the Company under methods which shall further, to the fullest extent possible, the safety of air transportation, the efficiency of operation, the sustained profitability of the Company and the continued employment of all Pilots under reasonable working conditions and with proper compensation. It is recognized to be the duty of the Company, the Association and the employees to cooperate fully and make it their highest priority to provide to the traveling public high quality, affordable, uninterrupted air transportation while maintaining a desirable work environment.
3. No statement contained herein shall be construed to prohibit an employee from conferring with management on any issue not specifically covered in this Agreement.

C. AMENDMENTS TO AGREEMENT

1. Either party hereto may, at any time, propose in writing to the other party any amendment which it may desire to make to this Agreement, and if such amendment is agreed to by both parties hereto, such amendment shall be stated in writing, signed by both parties, and shall then be deemed incorporated in, and shall become part of, this Agreement. No amendment hereto will be valid unless in writing and duly and properly executed by both parties.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 3 of 36 Document 15-1

D. SEPARABILITY

Should any provision in this Agreement be declared illegal by any court of competent jurisdiction, such provision shall immediately become null and void, leaving the remainder of the Agreement in full force and effect, and the Company and the Association shall thereupon seek to negotiate substitute provisions which are in conformity with applicable law.

E. DEFINITIONS

1. "Affiliate" means, with respect to a specified Entity: (a) any Subsidiary or Parent of the specified Entity, or (b) any Subsidiary or Parent of either a Parent or a Subsidiary of the specified Entity, or (c) any Entity that Controls the specified Entity or is Controlled by the specified Entity whether directly or indirectly through the Control of other Entities.
2. "Control" or a "Controlling interest" of an Entity shall mean the ownership of an equity interest representing more than 50% of the outstanding capital stock of an entity or voting securities representing more than 50% of the total voting power of outstanding securities then entitled to vote generally in the election of such Entity's board of directors or other governing body.
3. "Company," "Frontier," or "Frontier Airlines, Inc" as used in this Agreement, means, and is specifically limited to Frontier Airlines, Inc. and does not include any other airline, other Entity, or Parent.
4. "Entity" means a natural person, corporation, association, partnership, trust or any other form for conducting business, and any combination or concert of any of the foregoing.
5. "Fence Agreement" shall mean an agreement to keep the seniority lists and operations of 2 pilot groups separate and distinct for a pre-determined period of time.
6. "Force Majeure" means extraordinary event or circumstance beyond the control of the Company, such as:
   a. An act of God;
   b. Grounding or repossession of a substantial number of the Company's aircraft;
   c. Reduction in flight operations because of (1) a decrease in available fuel supply or other critical materials due to either governmental action or commercial suppliers being unable to provide sufficient fuel or other critical materials for the Company's operations or (2) adverse economic, market or business conditions that directly materially impact the Company's level of operations;


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 4 of 36 Document 15-1

d. An increase in the price of jet fuel that has a material adverse impact on the financial condition of the Company;

e. Revocation of the Company's operating certificate(s);

f. A U.S. Government declared national emergency affecting the Company's operations, a war on U.S. soil, an act of terrorism or invasion by the U.S. into a foreign country which has a material adverse impact on the financial condition of the Company;

g. Any delay, not caused by the Company, in delivery of new aircraft scheduled for delivery;

h. An ongoing labor dispute involving the Company's employees;

i. Loss or destruction of the Company's aircraft;

j. A health crisis or pandemic (e.g., SARs, Swine Flu) that has a material adverse impact on the financial condition of the Company;

k. A Chapter 11 bankruptcy filing by the Company or RAH.

7. "Holdings" means the Parent company of Frontier Airlines, Inc.
8. "Parent" means any Entity that Controls another Entity.
9. "Subsidiary" means any Entity that is controlled by another Entity.

F. SCOPE

*All Frontier, Inc. and A320 family flying is done by FAPA Pilots*

1. Except as otherwise provided for in this Agreement, all flying performed by the Company shall be performed by pilots whose names appear on the Frontier Airlines, Inc. Pilots System Seniority List.
2. The Company, or any Affiliate thereof, shall not establish or acquire an "alter ego" for the purpose of transferring the assets of the Company to such airline or Entity and/or avoid the terms and conditions of this Agreement.
3. The Company or Affiliate may not cause the number of pilots to fall below the number (639) of pilots on the Frontier System Seniority List as of the 8/1/2009 Seniority List (not including those pilots on furlough as of August 11, 2009), while at the same time operating similar Airbus or non-Airbus aircraft ("Narrow Body") in another entity controlled by Parent. "Narrow Body" is defined as any combination of Airbus 320 family (e.g. A318, A319, A320, and A321), Boeing 737, Boeing 757 aircraft or aircraft with a Maximum Takeoff Weight of between 120,000 and 255.000 pounds.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 5 of 36 Document 15-1

a. Should the Company or Affiliate acquire Narrow Body aircraft covered by sub-paragraph F.3 above and place these aircraft on the Frontier Airlines operating certificate, these aircraft will be flown by Pilots on the Seniority List. FAPA and the Company will meet to amend this Agreement per Section 4.B.2., as appropriate.

b. Should the Company or Affiliate acquire Airbus 320 Family Narrow Body aircraft types covered by sub-paragraph F.3 above, these aircraft will be added to the Frontier Airlines operating certificate and flown by Pilots on the Frontier Seniority List, pursuant to any applicable Transition Agreement that needs to be negotiated between the parties.

4. Should a force majeure event occur, the Company shall no longer be bound by the number of pilots requirements contained in paragraph F.3 of this Section. At the conclusion of the force majeure event, the parties will meet to discuss the setting or resetting of the number of pilots requirement. There will be no obligation to reach an agreement on the setting or resetting of the number of pilots requirement. The issue of setting or resetting the number of active pilots requirement is not subject to interest arbitration under any provision of this collective bargaining agreement.

5. Notwithstanding paragraph F.3 of this Section, the minimum number of pilots requirements will no longer have any force or effect as of March 1, 2015.

6. Nothing in this Section shall preclude the Company from entering into a code share agreement, a marketing agreement, a capacity purchase agreement, an interline agreement, or a pro-rate or block space agreement.

*Temporary Scope exceptions.*

7. Notwithstanding Paragraph F.1. of this Section, the Company may assign, wet lease or contract out present or future flying for a period of 90 days per occurrence during the term of this Agreement. The duration of this assignment, wet lease, or subcontract, may be extended for a period of 30 days with approval of the Association. The Company shall notify the Association President prior to executing the assignment, subcontracting, or wet lease agreement. The following conditions shall apply:

a. Such conduct is necessary to accomplish the needs of service of the Company, and,

b. The Company does not have sufficient aircraft and Pilots to perform such flying, and,

c. No Company Pilot is on furlough status or is displaced as a result of such contracting out of revenue flying, and,


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 6 of 36 Document 15-1

8. Notwithstanding Paragraph F.1. of this Section, the Company may use manufacturer's pilots to qualify the Instructor Pilots, Check Airmen, and Pilots on a new aircraft type, and may use non-Seniority List pilots in connection with aircraft transactions and non-revenue flying.
9. Notwithstanding Paragraph F.1. of this Section, should the Company enter into an aircraft interchange agreement with another carrier, such agreement shall not be entered into if there are any Company Pilots on furlough, and may not result in the furlough or displacement of any Company Pilot(s).
10. In the event of a Force Majeure event, the parties shall promptly meet and confer to address the consequences of such event(s) and the appropriate response thereto. The objective of such discussions will be to achieve a mutually acceptable response, which shall, to the maximum extent reasonable, protect the Company's scheduled airline service without unreasonably burdening the Pilots.

G. MERGER PROTECTION

1. In the event of a merger between the Company and another air carrier (i.e. the combination of all or substantially all the assets of the 2 carriers) where the pre-merger operations are integrated, the integration shall be in accordance with Sections 2, 3, and 13 of the Labor Protective Provisions specified by the Civil Aeronautics Board in the Allegheny-Mohawk merger ("Allegheny-Mohawk LPP's"). The term merger as used herein means joint action by the 2 carriers whereby they unify, consolidate, merge, or pool in whole or in part their separate airline facilities or any of the operations or services previously performed by them through such separate facilities.
2. In the event the Company acquires all or substantially all of the assets or equity of another air carrier, or another air carrier acquires all or substantially all of the assets or equity of the Company, the Company shall meet promptly with the Association to negotiate a possible Fence Agreement to be in effect during the period, if any, the 2 carriers are operated separately without integration of the Pilot work force. These discussions shall not be pursuant to Section 6 of the Railway Labor Act, as amended, and reaching an agreement with the Association shall not be a prerequisite for closing, or any other aspect of the transaction or operations pursuant to the transaction.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 7 of 36 Document 15-1

H. SUCCESSORSHIP

*Successor is bound to the CBA and must employ Pilots.*

1. This Agreement shall be binding upon any successor or assign of the Company unless and until changed in accordance with the provisions of the Railway Labor Act, as amended. For the purposes of this Paragraph H, a successor or assign shall be defined as an Entity, which acquires all or substantially all of the assets or equity of the Company through a single transaction or multi-step, related transactions.
2. No contract or other legally binding commitment involving a successor or assign shall be signed or otherwise entered into unless it is agreed as a material and irrevocable condition of entering into, concluding and implementing such transaction that the successor shall be bound by this Agreement, shall recognize the Association as the representative of the Pilots, and shall assume the employment of the Pilots.

I. NOTICE

1. If the Company, or any Affiliate thereof, enters into any definitive agreement of acquisition or merger, with any other air carrier, or any other Entity which has control of, or acquires control of another air carrier, it shall notify the Association, in writing, of the proposed acquisition or merger within 3 working days after the execution of such agreement.
2. The Company must give written notice of the existence of this labor agreement to any air carrier, or any other Entity, which has control of, or acquires control of, another air carrier with which the Company enters into an agreement of acquisition or merger. A copy of this written notice shall be given to the Association no later than 3 working days after the parties have signed an agreement of acquisition or merger.

J. HOLD HARMLESS

*Pilots not responsible for accidental damage*

1. No Pilot, nor their estate, shall be required to pay for the costs of aircraft, equipment or other property damaged when such damage arises out of the performance of their duties with the Company as a Pilot unless such damages are a result of the willful negligence of the Pilot.
2. The Company shall indemnify a Pilot or their estate and provide defense against any claims, whether by third parties or by fellow employees, arising out of such Pilot's performance of their duties with the Company as a Pilot, unless such claims arise from the willful negligence of the Pilot.



Case 2:14-cv-01441-RTR Filed 01/16/15 Page 8 of 36 Document 15-1

K. REOPENER

1. In the event the Company, for the duration of this Agreement, should
   a. acquire for use any new type of aircraft other than Airbus A318, A319 or A320, or
   b. establish any new classification for employees employed within the bargaining unit not in existence on the date of this Agreement,
   c. open a Domicile outside the contiguous 48 states

   then this Agreement, at the sole request of the Association, shall be reopened for the sole purpose of negotiating wages, bidding, hours, conditions of employment, or relocation expenses (applicable only to a new classification of employees), particularly applicable to the situation. These negotiations shall not be pursuant to Section 6 of the Railway Labor Act, as amended. This shall not prevent the Company from acquiring and placing into service any new type of aircraft or hiring, training, and placing into service such classification of employee prior to reaching an agreement.
2. In the event the Company should open a new Domicile such that the Company has more than one Domicile, or creates a single Domicile other than in Denver, the Company and the Association shall agree on the applicable sections of this Agreement that shall be reopened.

   The reopening shall be for the limited purpose of addressing issues related to multiple Domiciles or the closing and opening of a single Domicile that do not exist in a single Domicile system, (e.g., displacements, moving expenses, TDYs, filling of vacancies, training.)

   These negotiations shall not prevent the Company from opening a new Domicile prior to reaching an agreement on the opened sections, however, until provisions can be negotiated regarding relocation to the new Domicile, the Company will agree to the same terms as are contained in Article 5 – Moving Expenses of the CHQ-IBT Agreement, and any future improvements negotiated by CHQ and IBT in the event there are multiple Domiciles or the closing or opening of a single Domicile occurs. These negotiations shall not be pursuant to Section 6 of the Railway Labor Act, as amended.

L. MANAGEMENT RIGHTS

1. The right to manage and direct the work force, subject to the provisions of this Agreement, is vested in the Company.
2. Employees covered by this Agreement shall be governed by all reasonable rules, regulations and orders issued by the Company.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 9 of 36 Document 15-1

M. EXPEDITED ARBITRATION

The parties agree that any grievance filed by either the Company or the Association alleging a violation of Section 1 of this Agreement shall bypass the initial steps of the grievance process, and shall be submitted, heard and resolved through binding arbitration on an expedited basis directly before the System Board of Adjustment sitting with a mutually agreed upon neutral arbitrator. If a mutually agreed upon neutral arbitrator cannot be selected within 3 days of the filing, an arbitrator shall be selected pursuant to Section 14, Paragraph J.2.a. of this Agreement. The dispute shall be heard no later than 15 days following the submission to the System Board (subject to the availability of the arbitrator) and the decision rendered no later than 30 days after the hearing, unless the parties agree otherwise in writing. Any fees or other expenses incurred by the arbitrator shall be shared equally by the Company and the Association


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 10 of 36 Document 15-1

# SECTION 3

## SENIORITY

A. GENERAL

1. The seniority of a Pilot shall begin to accrue from the date the Pilot is first placed on the Company payroll as a Pilot, and shall continue to accrue thereafter during all service as a Pilot except as provided in this Agreement. When 2 or more Pilots are hired on the same date, their names shall be placed on the Seniority List according to their Date of Birth, with the oldest Pilot receiving the lowest number (i.e. highest seniority).

*Determining seniority.*

2. A Frontier employee who is hired as a Pilot shall be placed on the top of the Seniority List within his New Hire class regardless of their age within that class. When 2 or more Frontier Employees are hired as Pilots on the same date, the seniority between these Pilots shall be according to his current Company seniority.

B. SENIORITY LIST

A Seniority List shall be maintained by the Company according to the following provisions:

1. A copy of the Seniority List as of the date of this Agreement is attached as Appendix 1 to this Agreement and is expressly made a part of this Agreement.
2. The Association shall be made aware in writing of any changes made to the Seniority List within 5 Calendar Days of the change.
3. An accurate copy of the Seniority List shall also be maintained and posted by the 1st Wednesday each month on the Company intranet. This Seniority List shall include the following items:
   a. The names of all Pilots with seniority rights
   b. Date of Hire
   c. Date of Birth
   d. Equipment
   e. Seat
   f. Domicile

C. PROTEST

1. Pilots shall have 60 days from their date of hire as a Pilot to protest to the Company any omission or incorrect information affecting their seniority.

*Protest of seniority*


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 11 of 36 Document 15-1

2. In addition, during the calendar month of October each year, a Pilot shall be permitted to protest to the Company any omission or incorrect information affecting his seniority. A Pilot on leave during October shall have a period of 30 days from the date of return to work during which to file such protest. Any discrepancy which was not protested during this period cannot be protested until the next October.

D. PROBATION

1. Except as specifically provided in this Agreement, Probationary Pilots enjoy the same rights and privileges afforded non-Probationary Pilots.

*Probation is later of 12 months from date of hire (or as extended by LOA) or first PC.*

2. Each Pilot shall be on Probation from his date of hire as a Pilot. Such Probationary period shall continue for a period of 12 months from the date of hire as a Pilot or the successful completion of the Probationary Proficiency Check ("Probationary PC") as described in Section 20, whichever comes later. Such Probationary Period shall be extended by any period during the Probationary period in which the Pilot is on furlough or leave of absence of 30 days or more.
3. All Probationary Pilots may have a personal records review conducted by the Chief Pilot, or his designee, prior to the Probationary PC. This review may be requested by the Probationary Pilot. Any problems or discrepancies noted will be addressed with the Pilot.

E. SENIORITY RIGHTS

*Forfeiture of seniority rights.*

A Pilot shall forfeit all seniority rights and his name shall be removed from the Seniority List under the following conditions:

1. Retirement (other than an FAA mandated retirement covered under Paragraph F.), resignation, or discharge.
2. Decline recall subject to bypass provisions of Section 19.E.3.
3. Failure to return to work from furlough in accordance with Section 19.
4. Not recalled in accordance with Section 19.E.1.

F. SENIORITY RIGHTS FOR RETIRED PILOTS

*Age-60 retirees may return to vacancies they can hold.*

Should federal law or regulations change to allow a Pilot who has retired due to the FAA mandated retirement to return to flying status, he may return to work under the following conditions:

1. The retired Pilot shall have his seniority and Longevity frozen as of the date of his retirement.
2. The Pilot shall not retain or accrue sick or vacation during the period of his retirement.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 12 of 36 Document 15-1

3. Captain and First Officer Voluntary Staffing Adjustments VSAs shall be posted on the Company website. The retired Pilot shall be responsible for bidding for a VSA and must be senior enough to hold a posted VSA.
4. If the retired Pilot has less than 12 months available from the posted VSA date to his new federally mandated retirement date, the Company shall have the option to bypass and pay protect the Pilot.
5. A retired Pilot who returns to work shall be placed back on the Seniority List with the seniority held at the time of his retirement and shall be subject to all provisions of the Agreement.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 13 of 36 Document 15-1

# SECTION 12

## DISPUTE AND GRIEVANCE

Any Pilot or group of Pilots who has a grievance concerning any violation of the provisions of the Agreement (excluding discipline, suspension, or termination matters subject to Section 13) shall be entitled to have the grievance handled in accordance with the procedures in this Section.

A. GENERAL

1. Time Limits. Time limits in this Section may be extended by mutual written agreement of the Company and the Association.
2. Grievance Decisions. Decisions by the Company regarding grievances shall clearly indicate whether the grievance is sustained or denied. If a grievance involves more than one issue, each issue will be addressed separately.

B. DISPUTE RESOLUTION

1. The concerned Pilot(s) shall first present the dispute to the Chief Pilot, or his designee, for discussion in an effort to informally resolve the dispute in accordance with the following procedures.

*Pilot should discuss dispute with Chief Pilot first.*

2. Unless otherwise impractical (e.g. an immediate response/ resolution is needed), the Association recommends that a Pilot file a dispute with an online or paper Notice of Dispute form (to be provided by the Association). The subsequent discussion(s) may be conducted in person, by telephone or through electronic mail.

C. TIME LIMITS

1. Aggrieved Pilot(s). The Pilot(s) shall discuss his dispute informally within 14 Calendar Days from the occurrence of the event upon which the dispute is based (or within 14 Calendar Days after the Pilot and/or the Association reasonably would be expected to have knowledge of the event upon which the dispute is based). Non-compliance by the Pilot with this time limit shall result in denial of the dispute on a non-precedent setting basis, with no further appeal.

*Pilot has 14 days from event to submit dispute. Chief pilot has 21 days from event to respond.*


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 14 of 36 Document 15-1

2. Chief Pilot (or his designee). The Chief Pilot, or his designee, shall have 21 Calendar Days from the occurrence of the event upon which the dispute is based (or 21 Calendar Days after the Pilot and/or Association reasonably would be expected to have knowledge of the event upon which the dispute is based) to resolve the dispute informally. Non-compliance by the Chief Pilot or his designee with this time limit shall result in advancement to the provisions of the First Level of Grievance outlined in this Section.

D. FIRST LEVEL OF GRIEVANCE - ASSOCIATION GRIEVANCE TO THE FRONTIER AIRLINES, INC. SENIOR MANGER OF LABOR RELATIONS ("SENIOR MANAGER OF LABOR RELATIONS")

If the Association is not satisfied with the informal resolution of the dispute by the Chief Pilot or his designee, the Association may present a written grievance to the Senior Manager of Labor Relations. If the written grievance is presented to the Senior Manger of Labor Relations by the Association, the following procedure shall apply:

1. Association Grievance Format and Time Limit.

   a. Format. The Association shall file the grievance with the Senior Manager of Labor Relations in writing via hand delivery with a dated receipt signed by the Senior Manager of Labor Relations or via electronic mail with written (email or otherwise) response confirmation verifying receipt.

   *The Association may submit a grievance to the Senior Manager Labor Relations within 28 days of the event*

   b. Time Limit. The Association shall have 28 Calendar Days from the occurrence of the event upon which the grievance is based (or 28 Calendar Days after the Pilot and/or Association reasonably would be expected to have knowledge of the event upon which the grievance is based) to present the grievance to the Senior Manager of Labor Relations. Non-compliance by the Association with this time limit shall result in denial of the grievance on a non-precedent setting basis, with no further appeal.

2. Senior Manager of Labor Relations Response Format and Time Limit.

   a. Format. The Senior Manager of Labor Relations' First Level Grievance decision shall be in writing and delivered via hand delivery with a written receipt signed by an Association employee or a member of the Association's Board, or via electronic mail to the Association President or his designees) listed in the written grievance submitted to the Senior Manager of Labor Relations with written (email or otherwise) response confirmation verifying receipt.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 15 of 36 Document 15-1

b. Time Limit. The Senior Manager of Labor Relations shall render decision within 7 Calendar Days from the date the Association's grievance is filed at the First Level of Grievance. Non-compliance by the Senior Manager of Labor Relations or his designee with this time limit shall result in the grievance being advanced to Second Level of Grievance outlined in this Section.

*The Senior Manager Labor Relations shall respond within 7 days of the grievance submission.*

E. SECOND LEVEL OF GRIEVANCE - ASSOCIATION APPEAL TO THE FRONTIER AIRLINES, INC. VICE PRESIDENT OF LABOR RELATIONS ("VICE PRESIDENT OF LABOR RELATIONS")

If the Association is not satisfied with the Senior Manager of Labor Relations' decision at the First Level of Grievance as described in this Section, the Association may appeal the Senior Manager of Labor Relations' decision to the Vice President of Labor Relations. If the grievance is appealed to the Vice President of Labor Relations, the following procedure shall be used.

1. Association Grievance Format and Time Limit:

a. Format. The Association shall send a notice of appeal to the Vice President of Labor Relations in writing delivered via electronic mail with written (email or otherwise) response confirmation verifying receipt.

b. Time Limit. The Association shall file the notice of appeal within 7 calendar days of the Senior Manager of Labor Relations' written decision. Non-compliance by the Association with this time limit shall result in denial of the grievance on a non-precedent setting basis, with no further appeal.

*The Association may appeal to the VP Labor Relations within 7 days of the Chief Pilot's decision.*

2. Vice President of Labor Relations Response Format and Time Limit:

a. Format. The Vice President of Labor Relations shall render a decision in writing via electronic mail with written (email or otherwise) response confirmation verifying receipt.

b. Time Limit. The Vice President of Labor Relations shall render a decision within 14 days from the date the Association's grievance is filed at the Second Level. Non-compliance by the Vice President shall result in the grievance being awarded to the Association on a non-precedent setting basis.

*The VP Labor Relations shall respond within 14 days of the appeal.*


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 16 of 36 Document 15-1

F. THIRD LEVEL OF GRIEVANCE - APPEAL TO THE SYSTEM BOARD OF ADJUSTMENT

*The Association may appeal the decision of the VP Labor Relations to the System Board.*

If the Association is not satisfied with the Vice President of Labor Relations' decision at the Second Level of Grievance, the President of the Association or his designee (limited to a member of the Association Board) may appeal the decision to the System Board of Adjustment in accordance with the Procedures in Section 14, System Board of Adjustment.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 17 of 36 Document 15-1

# SECTION 14

## SYSTEM BOARD OF ADJUSTMENT

A. GENERAL

1. Basis and Purpose. In compliance with Section 204, Title II, of the Railway Labor Act, as amended, a System Board of Adjustment (the "SBA") is established for the purpose of adjusting disputes arising out of grievances or interpretation of application of this Agreement that have been processed through but not resolved in the procedures as set forth in Sections 12 and 13 of this Agreement. The purpose of the SBA is to resolve disputes prior to resorting to arbitration, and the SBA is not bound by the requested relief or positions presented by the parties.
2. Jurisdiction. The SBA shall have jurisdiction over disputes between any employee covered by this Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of this Agreement. The jurisdiction of the SBA shall not extend to proposed changes in hours of employment, basic rates of compensation or working conditions covered by this Agreement or any amendment(s) hereto.
3. Time Limits. The time limits specified in this Section may be extended by mutual consent of the Company and the Association.
4. Delivery and Time Limit Compliance Dates for notices and decisions.
   a. Delivery Methods. Notices or decisions required in this Section shall be delivered by:
      1) A traceable means with the U.S. Postal Service or a nationally recognized overnight delivery service such as Fed-Ex or UPS, or
      2) Actual physical delivery with a written receipt for the delivery. Physical deliveries to the Association shall be signed for by a member of the Association's Board or by an Association employee. Physical deliveries to the Company shall be signed for by the Senior Manager of Labor Relations, a Director in Flight Operations, or a clerk in the Company mail room.
      3) Electronic mail with written (email or otherwise) response confirmation verifying receipt.

   *Deliveries must be by traceable means or in person*

   b. Time Limit Compliance. If a notice or decision required in this Section is mailed (post mark) or delivered to a nationally recognized overnight delivery service (receipt indicating when delivered to the carrier) or physically delivered (signed receipt) within the time limits established in this Section, the notice or decision time limit shall be considered met.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 18 of 36 Document 15-1

*SBA may by avoided or bypassed by mutual agreement.*

5. Settlement, Mediation and SBA Bypass Meeting. The parties hereby agree that they may at any time during the process described in this Section meet in person or by telephone to discuss possible settlement and/or mutually agreeable mediation options. The parties may also, by mutual agreement only, bypass the SBA and go directly to a Board of Arbitration as if the SBA had deadlocked under the provisions of this Section. However, nothing in this settlement, mediation or SBA bypass option sub-paragraph shall be construed to change any applicable time limitations provided for in this Section without the mutual consent of the parties.
6. Independent SBA Members. It is understood and agreed that each and every SBA Member shall be free to discharge their duty in an independent manner, without fear that their relations with the Company or Association may be affected in any manner by such action taken by them in good faith in their capacity as an SBA Member.
7. Record of Proceedings.
    a. Record-keeping: The SBA shall maintain a complete record of all matters submitted for its consideration including all findings and decisions. The complete record shall be kept at the Company's general office.
    b. Transcripts: A transcript shall be made of any proceeding before the SBA and the cost shall be borne equally between the parties.
8. Failure to Attend. Should either party, without good faith, fail to attend and/or participate in hearings before the SBA, then such case or cases to be heard therein shall be considered terminated and the relief of recovery sought by the party who was available to participate shall be considered granted with the same force and effect as any other SBA decision and on a non-precedent setting basis.
9. Pay Protection For Association SBA Members, Representatives And Witnesses. Association SBA Members, Association Representatives and Pilot witnesses summoned by the Association shall be pay protected by the Association.
10. Travel. For purposes of traveling to and from an SBA hearing, the grievant, witnesses, representatives, and SBA Members who are employees of the Company shall receive free positive space non-revenue transportation over the lines of the Company.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 19 of 36 Document 15-1

11. Exoneration of a Pilot. If at any time before, during or after any SBA or arbitration proceeding, a Pilot is exonerated in a disciplinary case, the Pilot shall be reinstated without any loss of seniority or Longevity. The Pilot shall also be reimbursed for any lost pay (lost Pay Credits or for Monthly Pay Guarantee if the Pilot was not allowed to bid) and health and welfare benefits. Any and all records and/or references to the disciplinary proceeding, investigation, SBA proceeding or arbitration shall be promptly removed from the Pilot's File.

*Exonerated Pilot shall be reimbursed and reinstated.*

B. COMPOSITION AND APPOINTMENTS TO SBA

1. Composition of SBA. The SBA shall consist of 2 Pilots appointed by the Association President, and 2 Company employees appointed by the Vice President Labor Relations or the Senior Manager Labor Relations.
2. Appointments of SBA Members.
   a. Annual Appointment Date. SBA Members shall be appointed each year on the first business day in March.
   b. SBA Member Terms. SBA Members shall serve one year terms and may be appointed for consecutive terms.
3. Chairman and Vice Chairman of the SBA Duties, Term and Rotation.
   a. Duties. The Chairman, or in their absence the Vice-Chairman, shall preside at meetings of the SBA and at hearings. Both shall have a vote in connection with all actions taken by the SBA.
   b. Term. The Chairman and Vice Chairman of the SBA shall serve for one year terms.
   c. Rotation. The offices of the Chairman and Vice Chairman of the SBA shall be filled and alternate annually as follows:
      1) Odd Years: starting on the first business day in March during odd numbered calendar years, the Chairman of the SBA shall be one of the 2 Association appointed SBA Members, and the Vice Chairman of the SBA shall be one of the 2 Company appointed SBA Members.
      2) Even Years: starting on the first business day in March during even numbered calendar years, the Chairman of the SBA shall be one of the 2 Company appointed SBA Members, and the Vice Chairman of the SBA shall be one of the 2 Association appointed SBA Members.

C. REFERRALS TO THE SBA

1. Referable Disputes. The SBA shall consider any dispute properly submitted to it by the Association when such dispute has not been previously settled in accordance with the terms provided in this Agreement.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 20 of 36 Document 15-1

2. Submission Requirements.

   a. Submittal to the SBA. The Association shall submit a "Notice of Appeal to the SBA" addressed to the SBA through the Chairman of the SBA. Copies of the Notice of Appeal to the SBA shall also be sent by the Association to the SBA Vice Chairman and the Vice President Labor Relations or Senior Manager Labor Relations.

   b. The Notice of Appeal to the SBA shall be submitted within 14 days of the decision of the Vice President Labor Relations (or his designee) that is being appealed to the SBA. Non-compliance by the Association with this time limit shall result in denial of the appeal on a non-precedent setting basis, with no further appeal.

*Notice of Appeal shall be sent to the SBA within 14 days of VP Labor Relations decision.*

   c. The Notice of Appeal to the SBA shall include the following information:
      1) The Grievant's name, address, status, Domicile, and contact number.
      2) The question or questions at issue and the alleged Section(s) of the Agreement to have been violated.
      3) A brief statement of the relevant information.
      4) A summary of the Position of the Association.
      5) A summary of the Position of the Company.
      6) The requested relief.

D. SETTLEMENT, MEDIATION AND SBA BYPASS MEETING

1. Meeting. Before the SBA holds a hearing, the parties hereby agree to meet and discuss possible settlement and/or mutually agreeable mediation options. This discussion may be held in person or by telephone.
2. SBA Bypass Option. The parties may also, by mutual agreement only, bypass the SBA and go directly to a Board of Arbitration as if the SBA had deadlocked under the provisions of this Section.
3. Time Limitations. Nothing in this settlement, mediation or SBA bypass option sub-section shall be construed to change any applicable time limitations provided for in this Section without the mutual consent of the parties.

E. SBA HEARING DATE AND NOTIFICATION

1. Hearing Date. The SBA hearing shall be held within 42 days from the submittal by the Association of the Notice of Appeal to the SBA.
2. Setting the Hearing Date. The SBA Chairman shall set the date for the SBA hearing within 14 days of the submission by the Association of the Notice of Appeal to the SBA. If a hearing date is not set by the Chairman within this time frame, the SBA shall be held on the 42nd day after the Notice of Appeal to the SBA is submitted, at 9 a.m. at the Company's General Office.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 21 of 36 Document 15-1

3. The SBA Chairman shall notify the SBA Vice Chairman, the Vice President Labor Relations or the Senior Manager of Labor Relations, and the Association President of the SBA hearing, to include the date, time and location of the hearing. The initial notification by the SBA Chairman may be in person, by telephone or by electronic mail, but shall be confirmed in writing within a reasonable time thereafter.

*Timelines for setting hearing.*

F. DOCUMENTATION, INFORMATION AND WITNESS LIST

Each party shall provide the other party and the SBA Chairman and Vice Chairman with copies of all documents and information relevant to the issue to be heard by the SBA, and a list of witnesses planned to be summoned by each party, at least 7 days prior to the SBA hearing. Documents and information, or other witnesses not listed at this time will be considered and weighed by the individual members of the SBA at their individual discretion.

G. REPRESENTATION

Pilots covered by this Agreement may be represented at SBA hearings by such person(s) as they may designate, and the Company may be represented by such person(s) as it may designate.

H. ORDER OF PRESENTATION, EVIDENCE AND WITNESSES

1. Order of Presentation.
   a. Disciplinary Action. If the hearing is in reference to a disciplinary action against a Pilot, the Company's representative shall begin, followed by the Pilot's representative to dispute or defend.
   b. Contract Issue. If the hearing is in reference to a contract issue, the Pilot's representative shall begin, followed by the Company's representative to dispute.
2. Evidence Allowed. Evidence may be presented either orally, in writing, or both.
3. Witnesses Testimony.
   a. Summoning of Witnesses. Either party may summon witnesses to a hearing. The SBA may, by majority vote, summon witnesses to a hearing.
   b. Oath Required. All individuals giving testimony during an SBA hearing shall be placed under oath.
   c. Telephone Testimony. Witnesses may, by mutual agreement between the parties, testify by telephone.
   d. Cross Examination. Company and Association Representatives shall have the right to cross-examine all witnesses.
   e. SBA Member Questioning. SBA members shall be allowed to question any or all witnesses.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 22 of 36 Document 15-1

I. SBA DECISION

1. Majority Vote Final and Binding. A majority vote of all members of the SBA shall, in all cases properly referable to it, be final and binding upon the parties hereto.
2. Deadlock. A tied vote by the members of the SBA or failure of the SBA to reach a decision within 3 Calendar Days after the end of the hearing shall constitute a deadlock.
3. All SBA finding and decisions shall be rendered in writing to the Vice President Labor Relations and the Association President.

J. DEADLOCK

1. Settlement and Mediation Meeting. Before proceeding to a Board of Arbitration as provided below, the parties hereby agree to meet and discuss possible settlement and/or mutually agreeable mediation options. This discussion may be held in person or by telephone. Nothing in this settlement and mediation sub-paragraph shall be construed to change any applicable time limitations provided for in this Section without the mutual consent of the parties. Should the parties not meet under this Paragraph J.1., the arbitration shall proceed in accordance with Paragraph J.2. below.
2. Board of Arbitration. Upon a deadlock, the Company and the Association shall select a mutually agreeable neutral arbitrator in accordance with the provisions in Paragraph J.2.a. to decide the outcome of the case with the assistance of an Association Member appointed by the Association and a Company employee appointed by the Company. The neutral arbitrator and these 2 appointees shall constitute the Board of Arbitration. These appointees do not need to be SBA Members.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 23 of 36 Document 15-1

a. Selection of the Arbitrator. Within 14 days of the rendering of the SBA's decision, the third and neutral member of the System Board shall be selected by the Company and the Association. If the Company and the Association cannot agree upon the neutral member or a method for selecting him, they shall select him by alternately striking names from the panel attached in Appendix 2. The order of striking shall be determined by a flip of a coin for the first case in which a neutral member is chosen under the provisions of this subparagraph and, in subsequent cases, the parties shall alternate taking the first strike. The Chairman or his designee will immediately contact the selected neutral to determine his availability and will advise the other Board members of his availability and they shall agree upon a date for the hearing. If the neutral member selected for the particular case is unable to serve within 90 days after his selection, the arbitrator who was remaining on the list prior to the last strike shall be contacted as above. Such a procedure will be followed until a panel member is selected to hear the case. The Chairman or his designee shall supply the necessary notices of such meeting, time and place, in writing to the Board members and the parties to the dispute.

*Arbitrators shall be selected by "alternate strike."*

b. Terms of Arbitrator Panel. The Panel of neutrals shall consist of 7 arbitrators. Each panel member shall serve for a minimum period of 12 months, effective on the date of signing of this Agreement. After a panel member has served for a 12 month period, either the Company or the Association may serve notice to remove him by notifying the other party unless the panel member has jurisdiction over an active case. Within 30 days of such notification, or if a vacancy occurs on the panel, the parties will select a replacement. If the parties cannot agree on a replacement panel member within 30 days, the Company and the Association shall each provide 3 names of arbitrators and the Company and the Association will select an arbitrator under the alternate strike procedures set forth in Paragraph J.2.a. above.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 24 of 36 Document 15-1

c. Arbitrator Decision. The arbitrator shall render an initial decision in the case within 30 days of the conclusion of the hearing(s) or submission of briefs, whichever is later. Any and all briefs shall be submitted no later than 30 days after the conclusion of the hearing(s), or 30 days after the completion of transcripts if transcripts have been requested, whichever is later. These timelines may be extended by mutual agreement between the parties or by the arbitrator. The members on the Arbitration Board shall be given the opportunity to review and comment on the arbitrator's initial decision before it becomes final and binding.

d. Expenses. The Association shall be responsible for pay protecting its member on the Arbitration Board. The Company and the Association shall share any fees or expenses incurred by the arbitrator equally.


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 25 of 36 Document 15-1

**FRONTIER.**

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249
P 720 374 4200
F 720 374 4375
frontierairlines.com

**Letter of Agreement 39**

September 30, 2009

Captain John Stemmler
President
Frontier Airline Pilots Association
18300 E. 71st Avenue, Suite 140
Denver, CO 80249

**Re: REPUBLIC AIRWAYS HOLDINGS EXIT FINANCING AGREEMENT**

This Letter of Agreement 39 ("LOA 39") is made and entered into by and between Frontier Airlines, Inc. ("Company" or "Frontier") and the Pilots in the service of Frontier Airlines, as represented by the Frontier Airline Pilots Association (the "Association" or "FAPA"). The Company has represented to the Association that Republic Airways Holdings ("RAH") has conditioned its bid to buy Frontier on the specific changes to the current Collective Bargaining Agreement and Amendments that are outlined below.

**THEREFORE, IT IS AGREED AS FOLLOWS:**

**A. Effective Date**

This Agreement shall become effective on the Effective Date of the Plan of Reorganization, provided that the sale of Frontier to RAH has been approved by the Bankruptcy Court and RAH has closed on the sale.

**B. Conditions**

1. This Letter of Agreement amends certain provisions of the Frontier – FAPA Agreement, including, but not limited to Sections 1, 4, 19, and 24. This LOA 39 also amends and alters any Letters of Agreement relating to Scope entered into prior to the date of this LOA 39, including, without limitation, the March 2, 2007 Frontier Airlines Holdings, Inc. Recognition Agreement. If there is any conflict between a prior letter of agreement and this LOA 39, this LOA 39 shall control in all respects.

2. The Company agrees to assume and assign the Agreement to any Successor.

3. The seniority lists of Frontier Airlines Pilots, Republic pilots (pilots employed by Republic Airlines, Shuttle America and Chautauqua Airlines), and any other pilot group employed by an Entity which acquires, is acquired by or merged with RAH will be integrated into a Master Seniority List (MSL) in accordance with Sections 3 and 13 of the Allegheny-Mohawk LPPs and submitted to RAH for acceptance. RAH will accept such MSL,

*A whole different animal.*



**FRONTIER**

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720 374 4200
F 720 374 4376

frontierairlines.com

including conditions and restrictions, if such list and the conditions and restrictions comply with the following criteria:

a. no "system flush," whereby any non-furloughed pilot may displace any other non-furloughed pilot from the latter's position; and

b. furloughed pilots may not bump/displace non-furloughed pilots; and

c. no requirement for pilots to be compensated for flying not performed, applicable only as a result of the seniority integration (e.g., differential pay for a position not actually flown). The requirement not to be compensated for flying not performed does not apply to pay protections that exist under the current Frontier-FAPA Agreement); and

d. allows pilots who, at the time of implementation of an integrated seniority list, are in the process of completing or who have completed initial qualification training for a new category (e.g., A320 Captain or First Officer) to be assigned to the position for which they have been trained, regardless of their relative standing on the integrated seniority list; and

e. does not contain conditions and restrictions that materially increase costs associated with training or company paid moves.

4. Such MSL list shall be applied for transfer of pilots between the Company and any RAH entity only as may be hereafter agreed to by RAH, FAPA (or any properly-designated successor to FAPA) and the properly-designated representative of Republic pilots or any other pilot group of an RAH entity. The carriers will be operated separately under their respective CBAs without integration of the Pilot seniority lists until such integration and implementation is agreed to and concluded in accordance with Sections 3 and 13 of the Allegheny-Mohawk LPPs.

**C. Amendments to the Agreement** (emphasis added only for the purposes of this LOA)

**1. Section 1 – E. Definitions**

Paragraph 3. shall be changed to add "Company" definition for clarification and subsequent paragraphs shall be renumbered. The new Section 1.E.3. shall read:

> 3. "Company," "Frontier," or "Frontier Airlines, Inc" as used in this Agreement, means, and is specifically limited to Frontier Airlines, Inc. and does not include any other airline, other Entity, or Parent.

Paragraph 6. "Force Majeure" (renumberd to 1.E.7.) items shall be modified as follows:

*A whole different animal.*

**FRONTIER**

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720.374.4200
F 720.374.4375

frontierairlines.com

c. Reduction in flight operations because of *(1)* a decrease in available fuel supply or other critical materials due to either governmental action or commercial suppliers being unable to provide sufficient fuel or other critical materials for the Company's operations *or (2) adverse economic, market or business conditions that directly materially impact the Company's level of operations;*

d. *An increase in the price of jet fuel that has a material adverse impact on the financial condition of the Company;*

f. A U.S. Government declared national emergency affecting the Company's operations, a war on U.S. soil, *an act of terrorism or invasion by the U.S. into a foreign country which has a material adverse impact on the financial condition of the Company;*

j. *A health crisis or pandemic (e.g., SARs, Swine Flu) that has a material adverse impact on the financial condition of the Company.*

k. *A Chapter 11 bankruptcy filing by the Company or RAH.*

Paragraph 8. "Scheduled Airline Service" shall be deleted as the term is no longer used in the Agreement.

**2. Section 1 – F. Scope**

Paragraph 1. shall be changed to the following to reflect the changes in Scope language that will allow RAH to fly previously restricted "Small Jets."

1. Except as otherwise provided for in this Agreement, all flying performed by the Company shall be performed by pilots whose names appear on the Frontier Airlines, Inc. Pilots System Seniority List.

Paragraph 3. and its sub-paragraphs shall be replaced with the following in order to modify scope restrictions so that limitations on, and protections from, "Small Jets" change to limitations on, and protections from, the use of Narrow Body aircraft by RAH.

3. The Company or Affiliate may not cause the number of pilots to fall below the number (639) of pilots on the Frontier System Seniority List as of the 8/1/2009 Seniority List (not including those pilots on furlough as of August 11, 2009), while at the same time operating similar Airbus or non-Airbus aircraft ("Narrow Body")

***A whole different animal.***

**FRONTIER.**

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720 374 4200
F 720 374 4375

frontierairlines.com

in another entity controlled by Parent. "Narrow Body" is defined as any combination of Airbus 320 family (e.g. A318, A319, A320, and A321), Boeing 737, Boeing 757 aircraft or aircraft with a Maximum Takeoff Weight of between 120,000 and 255,000 pounds.

a. Should the Company or Affiliate acquire Narrow Body aircraft covered by sub-paragraph F.3 above and place these aircraft on the Frontier Airlines operating certificate, these aircraft will be flown by Pilots on the Seniority List. FAPA and the Company will meet to amend this Agreement per Section 4.B.2., as appropriate.

b. Should the Company or Affiliate acquire Airbus 320 Family Narrow Body aircraft types covered by sub-paragraph F.3 above, these aircraft will be added to the Frontier Airlines operating certificate and flown by Pilots on the Frontier Seniority List, pursuant to any applicable Transition Agreement that needs to be negotiated between the parties.

Paragraph 4. shall be renumbered to Paragraph 6. (and modified as described below). A new Paragraph 4. and 5. shall be added to define the limitations of the agreement to maintain a minimum number of pilots.

4. Should a force majeure event occur, the Company shall no longer be bound by the number of pilots requirements contained in paragraph F.3 of this Section. At the conclusion of the force majeure event, the parties will meet to discuss the setting or resetting of the number of pilots requirement. There will be no obligation to reach an agreement on the setting or resetting of the number of pilots requirement. The issue of setting or resetting the number of active pilots requirement is not subject to interest arbitration under any provision of this collective bargaining agreement.

5. Notwithstanding paragraph F.3 of this Section, the minimum number of pilots requirements will no longer have any force or effect as of March 1, 2015.

Paragraph 4. shall be renumbered to Paragraph 6. and shall be modified to add "capacity purchase agreement."

6. Nothing in this Section shall preclude the Company from entering into a code share agreement, a marketing agreement, *a capacity*

*A whole different animal.*

FRONTIER.

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720 374.4200
F 720 374 4375

frontierairlines com

*purchase agreement*, an interline agreement, or a pro-rate or block space agreement.

Paragraph 5. shall be renumbered to Paragraph 7. and sub-paragraph d. shall be deleted.

**3. Section 1 – K. Reopener**

Paragraph 1. shall be modified to clarify when relocation expenses are applicable.

then this Agreement, at the sole request of the Association, shall be reopened for the sole purpose of negotiating wages, *bidding, hours, conditions of employment, or relocation expenses (applicable only to a new classification of employees),* particularly applicable to the situation. These negotiations shall not be pursuant to Section 6 of the Railway Labor Act, as amended. This shall not prevent the Company from acquiring and placing into service any new type of aircraft or hiring, training, and placing into service such classification of employee prior to reaching an agreement.

Paragraph 2. shall be modified to address Domiciles other than Denver.

2. In the event the Company should open a new Domicile such that the Company has more than one Domicile, or creates a single Domicile other than in Denver, the Company and the Association shall agree on the applicable sections of this Agreement that shall be reopened.

   The reopening shall be for the limited purpose of addressing issues related to multiple Domiciles or the closing and opening of a single Domicile that do not exist in a single Domicile system, (e.g., displacements, moving expenses, TDYs, filling of vacancies, training.)

   These negotiations shall not prevent the Company from opening a new Domicile prior to reaching an agreement on the opened sections, however, until provisions can be negotiated regarding relocation to the new Domicile, the Company will agree to the same terms as are contained in Article 5 -- Moving Expenses of the CHQ-IBT Agreement, and any future improvements negotiated by CHQ and IBT in the event there are multiple Domiciles or the closing or opening of a single Domicile occurs. These negotiations shall not be pursuant to Section 6 of the Railway Labor Act, as amended.

*A whole different animal.*



Case 2:14-cv-01441-RTR Filed 01/16/15 Page 30 of 36 Document 15-1

FRONTIER.

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720.374.4200
F 720.374.4376

frontierairlines.com

**4. Section 1 – M. Expedited Arbitration**

The first sentence of this paragraph shall be modified to allow for the Company to file for expedited arbitration.

> The *parties agree* that any grievance filed by *either the Company or* the Association alleging a violation of Section 1 of this Agreement shall bypass the initial steps of the grievance process, and shall be submitted, heard and resolved through binding arbitration on an expedited basis directly before the System Board of Adjustment sitting with a mutually agreed upon neutral arbitrator.

**5. Section 4 – B. Aircraft Categories**

Paragraph 1. shall be changed to add A321 aircraft.

1. For pay purposes the Airbus A318, A319, A320, *and A321* shall be considered in the same category.

**6. Section 4 – D. Pilot Hourly Rates**

The Table II in Paragraph D. shall be supplemented so that commencing with the July 20, 2013 paycheck, hourly rates for all Pilots will be increased by 2% and commencing with the January 20, 2015 paycheck, hourly rates for all Pilots will be increased by 2%.

| Longevity | Captain | First Officer |
|---|---|---|
| Year | 7/1/13 | |
| 1 | $116.45 | $38.34 |
| 2 | $117.47 | $66.62 |
| 3 | $122.78 | $75.96 |
| 4 | $129.68 | $80.22 |
| 5 | $138.61 | $85.74 |
| 6 | $141.72 | $87.65 |
| 7 | $144.43 | $89.34 |
| 8 | $147.76 | $91.40 |
| 9 | $150.40 | $93.03 |
| 10 | $153.05 | $94.68 |
| 11 | $155.75 | $96.35 |
| 12 | $158.51 | $98.05 |
| 13 | $160.97 | $98.05 |
| 14 | $163.41 | $98.05 |

| Longevity | Captain | First Officer |
|---|---|---|
| Year | 1/1/15 | |
| 1 | $118.78 | $39.11 |
| 2 | $119.82 | $67.95 |
| 3 | $125.23 | $77.48 |
| 4 | $132.28 | $81.83 |
| 5 | $141.38 | $87.46 |
| 6 | $144.55 | $89.40 |
| 7 | $147.32 | $91.13 |
| 8 | $150.71 | $93.23 |
| 9 | $153.41 | $94.89 |
| 10 | $156.11 | $96.57 |
| 11 | $158.87 | $98.28 |
| 12 | $161.68 | $100.01 |
| 13 | $164.19 | $100.01 |
| 14 | $166.68 | $100.01 |

***A whole different animal.***



Case 2:14-cv-01441-RTR Filed 01/16/15 Page 31 of 36 Document 15-1

**7. Section 4 – Q. Company Bonus Programs**

Paragraph Q. shall be modified as follows to allow Pilots to participate in the RAH bonus program.

> Pilots of Frontier Airlines, Inc. shall participate in the discretionary Republic Airways Holdings Discretionary Bonus Program on the same terms and conditions as other non-management employees.

**8. Section 19 – E. Recall From Furlough**

Paragraph 1. shall be changed to delete the second sentence referring to recall expiration and shall read:

> 1. Pilots shall be recalled in order of their seniority. Notice shall be sent via certified mail to their last known address. Such Pilots shall be allowed 10 working days in which to notify the Company in writing of their intent to return to Active Service. If such Pilot accepts the recall, then he shall be allowed 15 days from the date of acceptance to return to Active Service. The Company may, at its discretion, extend the period of time for a return to Active Service.

**9. Section 24 – Duration and Termination**

Section 24 shall be replaced with the following to remove the reference to an implementation schedule, reflect the new date of March 2, 2015, include the option for the Association to reopen up to 12 months prior, and a new signing date.

> This Agreement shall become effective upon the date of signing of this Agreement, and shall remain in full force and effect until March 2, 2015, and shall renew itself without change each succeeding March 2 thereafter, unless written notice of intended change is served in accordance with Section 6, Title I of the Railway Labor Act, as amended, by the Association up to 12 months prior to March 2, 2015, or by either party hereto at least 90 Calendar Days prior to the date the parties may commence negotiations or a subsequent anniversary of such date, unless the parties agree otherwise.

*A whole different animal.*



Case 2:14-cv-01441-RTR Filed 01/16/15 Page 32 of 36 Document 15-1

**FRONTIER.**

Frontier Airlines, Inc.
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720 374 4200
F 720 374 4375

frontierairlines.com

In witness whereof, the parties have signed this Agreement September 30, 2009.

Respectfully,

Sean Menke
Chief Executive Officer

Agreed:
Captain John Stemmler
President
Frontier Airlines Pilots Association

*A whole different animal.*



FRONTIER AIRLINE PILOTS ASSOCIATION
18300 E 71ST AVE • STE 140 • DENVER, CO 80249
303-373-0137 • FAX: 720-374-2027 • email@f9fapa.org

June 24, 2011

Letter of Agreement 67

Jacalyn W. Peter
Senior Manager Labor Relations
Frontier Airlines, Inc.
7001 Tower Road
Denver, Colorado 80249

Restructuring Agreement

Dear Ms. Peter:

This Letter of Agreement 67 ("LOA") is entered into between the Frontier Airline Pilots Association ("FAPA") and Frontier Airlines, Inc. ("the Company").

A. Investments: The following modifications to the CBA constitute the Investments:

1. The 7/1/11 pay adjustments in LOA 21 shall be deferred until January 1, 2016. During the duration of this agreement, should Frontier Airlines Holdings Inc. earn more than a 5% annual pretax profit (excluding special items), after payment of profit sharing payments, if any, in any calendar year, this pay adjustment shall be reinstated in the following year on the earlier of April 1st or the issuance date of the Frontier Airlines Holdings, Inc. audited financial statements.

2. The 1/1/12 pay adjustments in LOA 21 shall be deferred until January 1, 2017. During the duration of this agreement, should Frontier Airlines Holdings Inc. earn more than a 5% annual pretax profit (excluding special items), after payment of profit sharing payments, if any, for any two consecutive years, this pay adjustment shall be reinstated in the following year on the earlier of April 1st or the issuance date of the Frontier Airlines Holdings, Inc. audited financial statements.

3. In the event the reinstatement of pay in A.2. is effective prior to January 1, 2017, the Company and FAPA agree to negotiate in good faith for further upward pay adjustments based on business conditions.

4. Effective July 01, 2011 all Longevity steps, for the purposes of pay rates only, at year 2 and above shall be frozen for one year. (e.g. a Pilot moving to Year 10 Longevity for pay on August 15, 2011 would remain at year 9 Longevity scales, then move to year 10 Longevity pay on August 15, 2012). Effective July 01, 2015 the Longevity step will be restored based on Longevity in Section 4.A.1.

5. The Company's matching contribution to the 401k Plan referenced in Section 16.B.2. shall be reduced as follows:

   a. From 5% to 0% starting with the 7/20/11 paycheck until the 1/20/12 paycheck.

   b. From 5% to 3% starting with the 1/20/12 paycheck until the 1/20/14 paycheck.

   c. From 5% to 4% starting with the 1/20/14 paycheck until the 1/20/15 paycheck.

   d. Effective with the 1/20/15 paycheck or in the event Frontier Airlines Holdings Inc. earns more than a 5% annual pretax profit (excluding special items), after payment of profit sharing payments, if any, for any two consecutive years, the original match of 5% described in Section 16.B.2. shall be reinstated.

6. Vacation accruals described in 8.B. shall be reduced so that the accrual in 8.B.2. is reduced to 13 days and may be used in 1 or 2 periods; the accrual in 8.B.3. is reduced to 18 days and may be used in 1, 2 or 3 periods; and the accrual in 8.B.4. is


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 34 of 36 Document 15-1



**FRONTIER AIRLINE PILOTS ASSOCIATION**
18300 E 71ST AVE • STE 140 • DENVER, CO 80249
303-373-0137 • FAX: 720-374-2027 • email@f9fapa.org

reduced to 24 days and may be used in 1, 2, 3 or 4 periods. For purposes of bidding "blocks" of days described in Section 8.C.2., vacation periods shall be 6-8 days instead of 7 days. When bidding vacation periods, the Pilot shall bid on a numbered period listed in Section 8.I. and define the starting day, limited to the first or second day of the vacation period, and number of days for each period. Eight day periods must start on the first day, or the day prior to the first day, of the vacation period. (For example: A Pilot bids Period 35 SEP 16-22 for 6 days and may define Sep 16 or 17 as the start of the block of vacation days.) Pilots shall not be allowed to bid a 16-day vacation period. These changes shall only apply to the annual vacation periods taken in 2012 through 2015. Vacation accrual in 2015 (to be taken in 2016) shall be in accordance with Section 8.B.

7. Effective July 1, 2011 through December 31, 2015, the sick accrual described in Section 15.B. shall be reduced to 10 days per year (0.417 per pay period). The sick accrual rate described in Section 15.B. shall be reinstated effective January 1, 2016.

8. The amendable date in Section 24 shall be modified to reflect an amendable date of March 2, 2017 with an option for FAPA to reopen up to 12 months prior.

B. Return on Investment

1. The 1/1/15 pay rates in LOA 39 shall be effective on 3/1/17.

2. Effective July 1, 2011, prior to Longevity being frozen per Paragraph A.4. above, all Pilots recalled from furlough in 2009 or 2010 shall have their Longevity adjusted to include the period of time on Furlough (i.e. uninterrupted Longevity based on Section 4.A.1.).

3. In addition to the foregoing future "snapbacks" under the CBA, the Company and Republic Airways Holdings Inc. ("Republic") shall enter into a Commercial Agreement (the "Commercial Agreement") setting forth the commercial terms of the equity participation and profit sharing in the Company for the benefit of those persons employed as pilots by the Company as of the date of this LOA 67, in recognition of the immediate value of the investments made by those persons to the Company and Republic in executing the restructuring effort as presented to the Republic Board of Directors at its May 25, 2011 meeting.

C. Conditionality:

1. The Investments in Paragraph A1, A4, A5 and A7 shall be effective, as scheduled in those paragraphs; however, those Investments shall cease, and the affected terms of the CBA as in effect without the modifications in this LOA 67 shall be restored, if any of the conditions contained in Paragraph C of the Commercial Agreement are not met. All other Investments in Paragraph A shall not take effect unless and until the conditions contained in Paragraph C of the Commercial Agreement have been met at the time of such Investments and thereafter shall cease, and the affected terms of the CBA as in effect without the modifications in this LOA 67 shall be restored, if any of the conditions contained in Paragraph C of the Commercial Agreement are not met.

2. Unless an Equity Event as defined in the Commercial Agreement occurs on or before December 31, 2014, all Investments in Paragraph A shall cease as of that date.

D. Additional Terms: The Commercial Agreement and related equity investment agreement and Frontier Pilots Profit Sharing Plan shall be exclusively for the benefit of those persons employed as pilots by the Company as of the date of this LOA 67 in recognition of the immediate value of the Investments to the Company and Republic as set forth above, and shall not be deemed part of the CBA or subject to collective bargaining pursuant to the


Case 2:14-cv-01441-RTR Filed 01/16/15 Page 35 of 36 Document 15-1



**FRONTIER AIRLINE PILOTS ASSOCIATION**
18300 E 71ST AVE • STE 140 • DENVER, CO 80249
303-373-0137 • FAX: 720-374-2027 • email@f9fapa.org

Railway Labor Act, as amended. References to the Commercial Agreement herein are solely for purposes of determining whether conditions of the Investments hereunder have been met or the Investments shall cease.

Captain Jeffrey Thomas
President
Frontier Airline Pilots Association

Agreed:

Jacalyn W. Peter
Senior Manager Labor Relations
Frontier Airlines, Inc.

3