# EXHIBIT A

**In the Matter of the Seniority List Integration Arbitration**

**Under ALLEGHENY-MOHAWK Labor Protective Provisions, Section 13(b)**
**Pursuant to the Dispute Resolution Agreement Among and Between**
**************************************************************************

| | |
|---|---|
| **---THE PILOTS OF ---** | : |
| | : |
| **REPUBLIC AIRLINE/CHAUTAUQUA AIRLINES/SHUTTLE AMERICA,** | : |
| **represented by International Brotherhood of Teamsters ("IBT"),** | : |
| | : |
| **FRONTIER AIRLINES, represented by Frontier Airline Pilots** | : |
| **Association ("FAPA"),** | : |
| | : |
| **MIDWEST AIRLINES,  represented by Air Line Pilots Association,** | : |
| **International ("ALPA"),** | : |
| | : |
| **LYNX AVIATION, represented by United Transportation Union ("UTU")** | : |
| | : |
| **-and-** | : |
| | : |
| **REPUBLIC AIRWAYS HOLDINGS, INC., ("RAH")** | : |
| **[on behalf of Itself and Its Affiliates Chautauqua Airlines, Inc.,** | |
| **Republic Airline, Inc., Shuttle America Corp., Frontier Airlines, Inc.,** | : |
| **Midwest  Airlines, Inc., and Lynx Aviation, Inc.]** | : |

**************************************************************************

## APPEARANCES

| | |
|---|---|
| For UTU/Lynx Aviation Pilots: | **Clinton J. Miller, III, General Counsel** |
| For ALPA/Midwest Pilots: | **Highsaw, Mahoney & Clark, P.C.** |
| | **By John O'Brien Clark, Jr.** |
| For FAPA/Frontier Pilots: | **Allison, Slutsky and Kennedy, P.C.** |
| | **By Wesley G. Kennedy** |
| For IBT/Republic, Chautauqua, | |
| Shuttle America Pilots: | **Baptiste & Wilder, P.C.** |
| | **By William R. Wilder** |
| For RAH, Inc.: | **Ford & Harrison, LLP** |
| | **By Thomas J. Kassin** |
| | **Lilia R. Bell** |

| **MERGER COMMITTEE CHAIRS** | **TECHNICAL ADVISORY TEAM** |
|---|---|
| **Capt. Anthony Freitas, Midwest** | **Capt. Anthony Freitas, Midwest** |
| **Capt. Mark Manausa, Lynx** | **Capt. Eve Grauer, Republic** |
| **Capt. Jeffrey Thomas, Frontier** | **F.O. Trevor Jenkins, Frontier** |
| **Capt. Daniel Sneddon, Republic** | **Capt. Cory Sewell, Lynx** |
| | **Mr. Ken Pack, RAH, Inc.** |

## ALLEGHENY-MOHAWK Labor Protective Conditions

Section 1. The fundamental scope and purpose of the conditions hereinafter specified are to provide for compensatory allowances to employees who may be affected by the proposed acquisition of control of [CARRIER], approved by the attached order, and it is the intent that such conditions are to be restricted to those changes in employment due to and resulting from such acquisition. Fluctuations, rises and falls, and changes in volume or character of employment brought about by other causes are not covered by or intended to be covered by these provision.

Section 2

(a).     The term "merger" or "acquisition" as used herein means joint action by the two carriers whereby they unify, consolidate, merge, coordinate or pool in whole or in part their separate airline facilities or any of the operations or services previously performed by them through such separate facilities.

(b).     The term "carrier" as used herein refers to either [CARRIER] or to the corporation surviving after consummation of the proposed merger of the two companies.

c).     The term "effective date of merger" as used herein shall mean the effective date of the amended certificates of public convenience and necessity transferred to the surviving corporation pursuant to the approval granted in the attached order.

(d).     The term "employee" as used herein shall mean an employee of the carriers other than a temporary or part-time employee.

Section 3.     Insofar as the acquisition or merger affects the seniority rights of the carriers' employees, provisions shall be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected.  In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13.

* * * * *

## Section 13(b) Dispute Resolution Agreement (November 3, 2009)

WHEREAS, Section 13(b) of the Allegheny-Mohawk Labor Protective Provisions ("LPP"s) authorizes the parties to devise an alternative method to resolve the seniority integration issues which are subject to Section 3 of the Allegheny-Mohawk LPPs' command that the parties integrate seniority in a fair and equitable manner, and the parties to this Agreement desire to devise that alternative dispute resolution process;

THEREFORE, Republic Airways Holdings Inc. ("RAH"), on behalf of itself and its wholly-owned affiliates Republic Airline Inc., Chautauqua Airlines, Inc. and Shuttle America Corp. (hereinafter collectively, "Republic"), Midwest Airlines, Inc., Frontier Airlines, Inc. and Lynx Aviation, Inc. (RAH and its affiliates together one "party" under this Agreement), and the Republic, Midwest, Frontier and Lynx pilots, as represented by their respective Seniority Merger Committees (the "Merger Committees") as duly created and authorized by each pilot group's duly designated representative (each such Merger Committee another "party" under this Agreement) agree to establish the following procedures for resolving the seniority integration issue in accordance with Sections 3 and 13 of the LPPs.

## Section I: Production of Information

(a). No later than twenty-one (21) days from the effective date of this Agreement, each Merger Committee may submit to RAH, in writing, a list of specific information that is relevant, material and necessary to seniority integration. Within five (5) business days of the request, RAH shall provide such available information, subject to a confidentiality/non-disclosure agreement, or otherwise inform the Committee that the information is not available or does not meet the requirements of this paragraph. Nothing in this Agreement shall require that RAH or its affiliates create documents that are not otherwise in existence.

(b). If, during the course of the seniority integration process pursuant to this Agreement, RAH modifies the operational fleet plan previously produced to the Merger Committees, such modified plan(s) will be provided to the Merger Committees, subject to a confidentiality/non-disclosure agreement.

(c). Upon request of a Merger Committee, RAH shall facilitate a meeting with appropriate management individual(s) and all Merger Committees for the purpose of addressing any follow-up questions raised by the information produced pursuant to paragraphs (a) or (b) above.

(d). Any dispute over any party's compliance with the requirements noted in this Section I that is not resolved by the disputants five (5) days after the dispute arises may be referred by a party to the dispute to the arbitrator selected pursuant to this agreement for final and binding resolution on an expedited basis by oral decision rendered as soon as possible after the record on that dispute is closed. The oral decision shall be followed by a written order memorializing the decision.

## Section II: Negotiation of the Integrated List

(a). No later than ten (10) days after the completion of the discovery process set forth in Section I(a), but in no event later than forty (40) days after the effective date of this Section 13(b) Agreement, the Merger Committees shall exchange with each other and with RAH their respective seniority lists containing the seniority number, date of hire, date of birth, and adjustments to longevity, if any, as specified in the applicable collective bargaining agreements and/or established practices. They shall also exchange with each other, but not with RAH (unless specifically requested to do so by RAH), all applicable collective bargaining agreements, including Pilot Working Agreements, and Letters of Agreement, and all pending grievances related in any way to seniority or reinstatement of pilots.

(b). No later than five (5) days after the exchange of the seniority lists, the Merger Committees shall exchange with each other, but not with RAH, their respective proposals for the integration of the pilot seniority lists on a fair and equitable basis.

(c). No later than ten (10) days after the Merger Committees exchange integration proposals, they shall confer in an effort to reach an agreement for the fair and equitable integration of their respective airlines' pilot seniority lists. In the event of differences in the rules affecting adjustments to longevity under the parties' agreements and/or established practices, the Merger Committees shall meet in an effort to reach agreement on how to resolve those differences, but failing to reach agreement the dispute may be referred to the arbitrator selected pursuant to Section IV for resolution as part of the integration. Any adjustment of longevity to resolve such differences shall not affect any

pilot's longevity pursuant to the applicable collective bargaining agreement for any other purpose, such as pay or benefits.

(d). If the Merger Committees are able to reach a written agreement, they shall jointly transmit that agreement as a proposal to RAH by the next calendar day. RAH and the Merger Committees shall meet within five (5) days after transmittal of the agreement for the purpose of securing RAH's agreement to the seniority integration.

(e). If the parties are able to reach an agreement for the fair and equitable integration of the pilot seniority lists, they shall include in that agreement a date when the integration will become effective, which date shall not be before the National Mediation Board (NMB) issues its ruling on whether the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system.

(f). If the Merger Committees are unable within forty-five (45) days after conferences begin under Section II (c) to reach an agreement for the fair and equitable integration of the pilot seniority lists, any Committee may refer the dispute to the arbitrator selected pursuant to Section IV for final and binding resolution. If the Merger Committees reach an agreement, but then are unable to secure RAH's agreement within ten (10) days after such conferences begin under Section II (d), any party may refer the dispute to the arbitrator selected pursuant to Section IV for final and binding resolution.

## Section III: Mediation

(a). No earlier than fifteen (15) days after negotiations begin under Section II (c), any Merger Committee may request that the mediator selected pursuant to Section IV (b) assist the Merger Committees in reaching agreement for a fair and equitable integration of the seniority lists. All Merger Committees shall cooperate in the mediation of the dispute.

(b). If all parties agree, mediation may continue after the dispute is submitted to the arbitrator selected pursuant to Section IV (b), but shall cease on the date the arbitrator establishes for submitting comments under Section V (f) on the proposed award.

(c). The salary and expenses of the mediator and the costs of the mediation process shall be shared equally by the Merger Committees.

## Section IV: Selection of the Mediator and Arbitrator

(a). Within ten (10) days of the effective date of this Agreement, each Merger Committee shall submit to the other Merger Committee and RAH a list of at least three (3) arbitrators/mediators who will be acceptable to that Merger Committee to mediate under Section III, or to hear and decide any dispute under this Agreement, or over the fair and equitable integration of the pilot seniority lists. RAH shall submit to the Merger Committees by that same time period a list of three (3) arbitrators who would be acceptable to RAH to hear and decide any dispute under this Agreement, or over the fair and equitable integration of the pilot seniority lists.

(b). No later than fifteen (15) days after the effective date of this Agreement, all parties shall meet either in person or by phone to select an arbitrator and, for the Merger Committees, a separate mediator from the lists of acceptable arbitrators/mediators produced by the parties. If the parties are unable at that meeting to select an arbitrator

and/or a mediator from the Section IV (a) lists, any party to this Agreement may immediately request from the NMB a list of eleven (11) available arbitrators knowledgeable of, and experienced in, airline labor disputes, from which list the parties shall select the arbitrator. That list shall also be used by the Merger Committees to select the mediator. The parties shall first select the arbitrator by alternatively striking names until one name remains or the parties agree upon the arbitrator; the Merger Committees shall then use the same list, with the arbitrator's name removed, to select the mediator by the same strike method. The parties participating in the selection process shall determine by agreement or by lot the order of striking. The selection process shall not be delayed if a party declines to participate in the selection process.

(c). If the arbitrator or mediator selected is unwilling to serve, or subsequently withdraws, the parties shall select another arbitrator and/or mediator by the above methods.

(d). One half of the salary and expenses of the arbitrator and the costs of the arbitration (such as hearing facilities and court reporter) shall be borne by RAH and the other half by the Merger Committees. Each party shall be responsible for the compensation and expenses of its representatives and participants in the arbitration process.

## Section V: The Arbitration Hearing

(a). No later than ten (10) days after the submission of the integration dispute under Section II (f) for final and binding resolution, the arbitrator shall commence a pre-hearing conference to determine the issues in dispute, set the date for the commencement of the hearing in accordance with Section V (b), establish the order of presentation of evidence, and determine any other matter that the arbitrator believes will be conducive to a just and orderly resolution of the dispute, including procedural issues.

(b). No later than thirty (30) days after the submission of the integration dispute under Section II (f) for final and binding resolution, the arbitrator shall commence the hearing on the dispute at which the parties shall be permitted to produce evidence as to the fair and equitable integration of the seniority lists, including conditions that the parties believe are necessary for a fair and equitable integration of the seniority rights of the pilot groups. The hearing shall take place at a location(s) agreed-to by the parties but, barring such agreement, shall take place at a location(s) designated by the arbitrator.

(c). In addition to jurisdiction to resolve disputes under Section I and to devise the fair and equitable integration of seniority, the arbitrator shall have the authority to resolve any dispute arising out of the interpretation or application of this Agreement.

(d). The arbitrator shall conduct the hearing and schedule any post-hearing briefing so that the proposed award may be made within sixty (60) days after the hearing commences, unless the parties agree to an extension of the date for the issuance of an award.

(e). Unless during the hearing process the parties reach an agreement as to the manner in which the pilot seniority is to be integrated, the integration, including any conditions thereto, shall be devised by the arbitrator.

(f). Prior to issuing the final award, the arbitrator shall submit the proposed award to the parties for their review. The parties may submit written comments as to the proposed award, with suggested changes, if any, with copies to the other parties. No new evidence may be submitted. The arbitrator, in his or her sole and un-reviewable discretion, may

schedule oral argument on the comments. This comment and review process shall be conducted so that it is concluded in a twenty (20) day time period, with the final award being issued by the twentieth day from when the proposed award was issued.

(g). The award of the arbitrator shall be stated in writing and shall be final and binding on the parties to this Agreement and on the pilots employed by RAH and its affiliates. The award shall include the date on which the seniority integration will become effective, which date shall not be before the NMB issues its ruling on whether the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system.

(h). The Organization, if any, designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system shall continue the Merger Committees in existence and delegate to the Merger Committees authority solely for the purpose of adjusting any dispute or disputes that might arise as to the interpretation or application of the award, including authority to compromise such disputes, and to initiate, defend, mediate, and litigate such issues in the dispute resolution mechanism under this Agreement. The Organization shall have authority over the manner in which the Merger Committees' operations are financed. The Merger Committees which are parties to this agreement represent that they have been authorized by their principals (the duly designated representative of their airline's pilots) to enter into the commitments set forth in this paragraph and in this Agreement. Each Merger Committee shall fill its own vacancies by selection made by the remaining members of that Merger Committee.

(i). In case a dispute arises involving an interpretation of the award within one hundred and twenty (120) days of the date that the seniority integration becomes effective, the arbitrator, upon request by a party to this Agreement, shall interpret the award in light of the dispute. Any such dispute must be submitted to the arbitrator within sixty (60) days after the dispute arises.

(j). The award of the arbitrator issued under either Section V (g) or V (i) shall be considered as a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system. Any dispute arising out of the interpretation or application of the award more than one-hundred and twenty (120) days after the effective date of the seniority integration shall be handled in the usual manner by the applicable Merger Committees up to and including the highest carrier official designated to handle such disputes, but failing to reach an adjustment in this manner, the dispute may be submitted by any party to the dispute to the adjustment board established by the designated representative of the combined craft or class and the single carrier for final and binding resolution. All Merger Committees shall be given notice of the dispute and, in addition to the Merger Committee invoking the adjustment board jurisdiction, may be heard by the system board of adjustment in resolving the dispute, with the decision of the board being made by the arbitrator selected pursuant to the applicable agreement to sit with the system board (without a vote by the other members of the system board).

## PROCEEDINGS

Republic Airlines, Chautauqua Airlines, and Shuttle America (collectively, "Republic"), each have separate operating certificates issued by the Department of Transportation (DOT) and the Federal Aviation Administration (FAA), but are considered a "single carrier" by the National Mediation Board (NMB) for labor representation purposes. Republic Airways Holdings, Inc. ("Company" or "RAH"), the parent holding company of Republic Airlines, Chautauqua Airlines, and Shuttle America, acquired Midwest Air Group, Inc., ("MAG") corporate parent of Milwaukee-based Midwest Airlines ("MEA" or "YX"), on July 31, 2009. Two months later, on October 1, 2009, RAH acquired Frontier Airlines Holdings, Inc., the corporate parent of both Denver-based Frontier Airlines ("Frontier" or "F9") and Frontier's wholly owned subsidiary Lynx Aviation ("Lynx" or "L3")

The pilots of the RAH affiliates are represented by the International Brotherhood of Teamsters ("IBT"), whose Collective Bargaining Agreement (CBA) with RAH provides, at Article 1.H.3, for "fair and equitable integration" of seniority lists pursuant to *Allegheny-Mohawk* §§3 and 13, in the event of an "operational merger". In these proceedings, and when Midwest Airlines proper was in operation, the pilots of Midwest were represented by the Air Line Pilots Association, International ("ALPA"). The Midwest-ALPA CBA in effect at the time of the Midwest acquisition also contained, in §1.D.3, a seniority integration provision referencing §§3 and 13 of the *Allegheny-Mohawk* LPPs. The Frontier Airlines pilots are represented by the Frontier Airlines Pilots Association ("FAPA"). Both §1.G. and Letter of Agreement No. 39 ("LOA 39") of the FAPA-Frontier CBA provide for seniority integration, pursuant to §§3 and 13 of the *Allegheny-Mohawk* LPPs. At the time of the transaction, the pilots of Lynx Aviation were represented by the United Transportation Union ("UTU") but had not yet negotiated a CBA.

Case 2:14-cv-01441-RTR   Filed 01/16/15   Page 8 of 50   Document 18-1

Public Law No.110-61 (December 26, 2007), *a.k.a.*, the "McCaskill-Bond" legislation, also brings to bear the *Allegheny-Mohawk* LPPs in transactions involving two or more air carriers resulting in the combination of crafts or classes under the Railway Labor Act (45 U.S.C. § 151, *et seq)*.   The two LPP sections that are applicable, *Allegheny-Mohawk* §§ 3 and 13, provide for integration of the respective seniority lists, in a "fair and equitable manner", through a dispute resolution process culminating in arbitration. (59 CAB 19, Appendix B, 45, 1972).

On November 3, 2009, RAH, Inc., (on behalf of itself and its affiliates Republic Airline/Chautauqua Airlines/Shuttle America, Midwest Airlines, Frontier Airlines and Lynx Aviation) and the four Pilot Merger Committees represented by the IBT, ALPA, FAPA and UTU signed a Dispute Resolution Agreement (DRA), *supra*, pursuant to §§3 and 13 of the *Allegheny-Mohawk* LPPs.   When direct negotiations and mediation assistance resulted in stalemate, the parties appointed me solo impartial arbitrator, to conduct hearings and render an Award under the terms of the DRA.

At my request, each Committee and the Company designated a member of a Technical Assistance Team ("TAT"); whose expertise and extraordinarily diligent work made possible the calculation, cross-check, verification and certification of the proposed seniority list generated by each final proposal, as well as the various iterations, permutations and combinations thereof which led to my final Award.   The dedicated and critically important service of the TAT in verifying and certifying the accuracy of all those calculations was of inestimable assistance.   In accordance with the mandates of the DRA, however, this Arbitrator alone made any and all judgments and determinations of "fairness and equity" in the creation and issuance of the Integrated Master Seniority List ("IMSL"), which is incorporated by reference in my Award and attached thereto as Appendix A.

The DRA originally established an untenable timetable for completion of the various procedural steps of the process, which required extension by consensus of the parties. Hearings were held in Washington, D.C. on March 15-19, May 21-25, and August 9-11, 2010. Each party presented direct and rebuttal evidence in support of disparate proposals for integrating the respective lists. Revised final proposals were submitted and exchanged, following which post-hearing briefs were filed on September 24, 2010. In accordance with the DRA, a proposed Award was circulated for review and Counsel submitted comments and suggestions for modifications, a number of which were found persuasive and incorporated into the final Award.

## BACKGROUND

### Republic Airway Holdings, Inc.

Prior to the 2009 transactions, RAH Inc. subsidiaries Republic Airline, Chautauqua Airlines, and Shuttle America (collectively "Republic") operated exclusively in fee-for-departure ("FFD") service under capacity purchase agreements ("CPA") with mainline carriers; providing lift with RAH-employed crews flying RAH-owned aircraft. RAH, a holding company organized in 1996, initially operated through one FAA operating certificate, issued to Chautauqua in 1974. Chautauqua Airlines began operating various turboprop aircraft as a code-share lift provider for US Air. Due to limitations on the size of aircraft it could operate under the Chautauqua certificate to service its fixed-fee agreements, RAH obtained an operating certificate for Republic Airlines. That strategic move in 2004 enabled RAH to enter into CPAs to operate, through Republic Airlines, the Embraer E-170s that it acquired thereafter. By the end of 2004, RAH had converted its expanding fleet entirely to regional jet aircraft.

When RAH was unable to complete the Republic Airlines FAA certification process in time to commence the E-170 operations it had already contracted to provide, RAH acquired Shuttle America in May 2005 as its platform for flying those 70-seat aircraft. [Those respective pilot seniority lists were integrated by an *Allegheny-Mohawk* arbitration panel chaired by

impartial arbitrator Richard Kasher]. After it obtained the FAA operating certificate for Republic Airline in 2005, that subsidiary became RAH's platform for aircraft with more than 70 seats, while Chautauqua remained its platform to fly 37 to 50-seat jets. The described allocation of aircraft sizes among the three certificates largely holds true today, with the qualification that some of Shuttle America's planes are configured for 76 seats.

RAH experienced compound annual growth rates and steadily increased the number of jet aircraft its subsidiaries operated for several years. By the end of 2007, it had a fleet of some 221 aircraft, which meant that RAH's pilot complement also nearly doubled between 2004 and April 1, 2008, when it hired the last training class of RAH pilots appearing on the certified IBT seniority list in this proceeding. By December 31, 2007, RAH was operating nine E-170s for Frontier, under a RAH-Frontier CPA dating back to March 2007, with three E-170s added to that service prior to April 2008. However, that March 2007 CPA with Frontier was the last major expansion of RAH's fee-for departure business. Further, shortly after the addition of those extra E-170s, all twelve E-170s being flown by Frontier were grounded when Frontier Airlines rejected the CPA, as part of its Chapter 11 bankruptcy restructuring and exit strategy. After Frontier returned those aircraft in July 2008, RAH began furloughing pilots and did not hire any new pilots until mid-2010, long after the transactions involved in this proceeding.

RAH eventually found another home for the twelve (12) grounded E-170s at Midwest in October 2008 and the furloughed RAH pilots were recalled. But, in the interim, those planes was grounded for a total of 58-aircraft months, 40 in the third quarter of 2008. That equated to millions of dollars in carrying costs and lost revenues for RAH, plus unprecedented layoffs and lost earnings for Republic pilots and other RAH employees. As discussed in more detail below, another effect of Frontier's rejection of that executory contract CPA was to give RAH a pre-petition damage claim which was eventually valued by the Bankruptcy Court at $150 million. Eventually, that claim leveraged RAH's emergence as sole Debtor in Possession (DIP) lender

and, together with the infusion by RAH of multi-million dollar support which enabled a restructured FHA, Inc. to exit from bankruptcy, that claim capitalized the eventual bankruptcy auction acquisition of Frontier Airlines and Lynx Aviation by RAH on October 1, 2009.

During the 2000-07 period, RAH evolved into the most diversified and financially successful of the regional FFD carriers. At the time of the Midwest and Frontier acquisitions, RAH had FFD relationships with American, Continental, Delta, United, and US Airways; with its pilots operating a fleet of more than 200 regional jets, under terms and conditions of employment set forth in the CBA between RAH, Inc. and the IBT. Going into 2008, Republic stood out as a regional jet winner, still expanding its operations notwithstanding network carrier consolidation and major carrier bankruptcy. But by Fall 2008, the halcyon days of unfettered FFD expansion were waning images in the rear view mirror and difficult times could be seen ahead.

BY 2009, due in large part to the lingering effects of the 2008 international financial debacle, RAH management foresaw an increasingly challenging FFD business environment projected well into the second decade of the new century; including curtailed returns and several of its CPAs subject to expiration or unilateral down-sizing or rescission. Thus, RAH undertook a strategic initiative to balance the FFD counterparty risks and rewards in a new business model diversifying into scheduled branded service. It did so by purchasing two established mainline branded carriers, Midwest Airlines in July 2009 and Frontier Airlines in October 2009, in the acquisition transactions leading to this proceeding.[1]

---

[1]     RAH acquired Midwest Air Group, Inc., the parent of Midwest, pursuant to an Acquisition Agreement entered into on June 23, 2009, which closed on July 31, 2009. Two months later, RAH acquired Frontier Airlines Holdings, Inc., the parent of Frontier and Lynx, pursuant to an Investment Agreement, entered into on June 22, 2009; amended on August 10, 2009; approved by the federal Bankruptcy Court on September 10, 2009; and closed on October 1, 2009.

**Midwest Airlines**

Originally founded as an affiliate of Kimberly Clark Corporation, Midwest eventually became a passenger airline named Midwest Express and went public in 1995. Prior to the transactions, Midwest had operated a relatively small mainline branded airline with a tradition of flying narrow-body equipment in scheduled niche service geared primarily to attract upscale business travelers in the Milwaukee, WI market. ALPA was certified by the NMB as bargaining representative for the Midwest pilots in December 1997 and concluded its initial collective bargaining agreement in 1998. Midwest originally provided mainline scheduled service with DC-9 and then MD-80 aircraft but, by the end of 2001, had settled on the B-717 (an updated model of the DC-9) to service stage lengths of up to about 1,000 miles, while using MD-80s for flying from its Milwaukee hub to destinations on the West Coast.

Until Midwest's decline into financial free fall and eventual dissolution, the pilot group at Midwest experienced mainline pay, benefits and working conditions under the ALPA/Midwest CBA. However, the financial and competitive troubles that led to Midwest's ultimate demise had long roots dating back before 2003, when it first engaged in concessionary negotiations with ALPA to avoid bankruptcy. After running operating and net deficits through 2005, Midwest enjoyed a brief return to net profitability in 2006 and 2007. However, following its January 2008 purchase by investment firm Texas Pacific Group ("TPG") and Northwest Airlines, things went from bad to worse for Midwest Airlines. An accelerating spiral of financial crises, including repeated but failed attempts at restructuring with forbearance agreements, led Midwest to furlough more than an one-third of its pilots in Summer 2008, ground its entire MD-80 fleet in Fall 2008 and default on aircraft lease payments to Boeing Capital, which ultimately repossessed and reallocated all 25 of Midwest's B-717's.

Case 2:14-cv-01441-RTR   Filed 01/16/15   Page 13 of 50   Document 18-1

Midwest eventually proved unable to compete effectively with network carriers in its market, notwithstanding concessions by ALPA which remained in effect for the rest of Midwest's operating history, many other cost-cutting measures, and a business model premised on niche carrier status and high business fares. Between November 2007 and the end of August 2008, Midwest retrenched from 11,122 block hours of flying to 7,044 block hours and from 404 pilots to approximately 300 pilots.

In connection with its fleet restructuring, Midwest announced the elimination of the MD-80s and the attendant reduction of 1200 employees, about 40% of its workforce.  In April 2008, Midwest eliminated its Skyway operation and announced the loss of 109 jobs, including 35 First Officers (and downgrades of 22 Captains).  Soon thereafter, Midwest defaulted on its loans for the Fairchild Dornier 328 jets flown by Skyway.  Midwest initially replaced some of this lift by expanding its existing Airline Services Agreement ("ASA") with SkyWest Airlines for additional 50-seat jets.  But it soon defaulted on its SkyWest agreement, as well.

Midwest Air Group (MAG), the parent holding Company of Midwest and Skyway, lost $95 million between January and April 2008.   By September 2008, Boeing Capital was publicly shopping all 25 Midwest B-717's; aircraft which it had a discretionary right to repossess due to Midwest's defaulted lease payments.  On September 3, 2008, Midwest announced an "agreement in principle" for return of 16 of the 25 leased B-717's to Boeing.  Simultaneously, Midwest and RAH announced an ASA, effective October 1, 2008, for flying of 12 RAH-owned and RAH-crewed 76 passenger E-170's, using Midwest's livery and "YX" code.[2]   Midwest Airline's transition away from narrow body operations was, if not yet a foregone conclusion, well on its way to becoming a *fait accompli*.

---

2       As discussed, below, those 12 E-170 aircraft subject to the Midwest CPA were previously operated by RAH, under a CPA which Frontier had rejected in bankruptcy; thus leaving RAH looking for a new home for those 12 affected 76-seat E-170s.

When the Midwest-ALPA collective bargaining agreement became amendable in September 2008, Midwest had served a Section 6 opener on ALPA, proposing transition to a fleet consisting of the remaining nine B-717 aircraft subject to predictable Boeing repossession and twelve RAH-owned E-170 aircraft. (The September 3, 2008 ASA with RAH allowed for transition to "dry lease" operation of those E-170s by Midwest Airlines, using its own pilot crews, contingent upon Midwest achieving pay and work rule concessions it sought from ALPA. In addition to seeking pay rate and other contractual modifications from ALPA to operate the E-170's with Midwest pilots, Midwest initiated the process of amending its FAA operating certificate to permit Midwest flying of E-170s and established employee training programs for the E-170.

On September 23, 2008, ALPA filed a grievance ("Scope Grievance I") alleging that Midwest's entry into and implementation of the RAH E-170 ASA violated the scope and subcontracting provisions of the Midwest-ALPA collective bargaining agreement. On January 9, 2009, that grievance was denied by the Midwest-ALPA System Board, which found that the E-170 flying performed by Republic pursuant to the ASA was neither reserved to the Midwest pilots under their scope clause, nor prohibited by the Midwest-ALPA subcontracting provision. Midwest/ALPA, Scope I (Richard I. Bloch, Arb, 2009). Thereafter, in early 2009, Midwest and ALPA entered into formal mediation in their Section 6 negotiations, with little reported progress to date.[3]

_____

[3]    No opinion is expressed or implied by me and none should be inferred concerning the ongoing dispute between RAH and ALPA as to whether or to what extent the ALPA/Midwest CBA retains vitality. As noted, below, that issue (and several other issues raised directly or indirectly by one or more of the various Parties to this arbitration) fall well outside the ambit of my jurisdiction and authority under the DRA provisions and Allegheny-Mohawk §§ 3 and 13(b).

Due primarily to the recession and plunging demand, Midwest's operating and financial performance continued to deteriorate in 2009, despite significant financing and guarantees made available by RAH.  In March 2009, Boeing announced its successful agreement with a carrier (subsequently identified as Mexicana Airlines) to operate all 25 of the defaulted Midwest B-717 aircraft.  A repossession schedule for the nine B-717s still at Midwest was established, with the last B-717 to be returned to Boeing in December 2009.[4]  The further reduction in Midwest's fleet had led to a further retrenchment in operations, to 3,278 block hours and twelve city pairs.

By June 23, 2009, Midwest was effectively insolvent, most of its pilots had been furloughed and Midwest Airlines faced the looming prospect of a cessation of its business. Nonetheless, Midwest continued operations with some 133 active pilots operating its nine remaining B-717 aircraft-- all subject to Boeing's scheduled recall of those aircraft. Moreover, given the immanent return of the B-717s to Boeing, those remaining active Midwest pilots also faced probable furlough and the long-term furloughed Midwest pilots had no reasonable expectation of recall to Midwest Airlines service.[5]

Subsequent to the July 31, 2009 acquisition, RAH undertook to provide additional service in Midwest's brand name, on Embraer-190 aircraft flown by RAH pilots, using Midwest's livery and code.[6]  It is undisputed that the 90-seat E-190 aircraft had not previously been operated by

---

4       During the forbearance agreement negotiations, Boeing had given oral notice that it intended to re-market all 25 Midwest B-717 aircraft; as reconfirmed in Boeing's SEC Form 10-K 2008 annual report: "*In September 2008, we agreed to a restructuring of lease terms with Midwest, under which Midwest has returned 16 of 25 717 aircraft.  Additionally, the agreement provides us with options to require Midwest to return the remaining nine 717 aircraft with varying notice periods.  We are pursuing re-marketing options for the aircraft returned to date and expected to be returned in the future.*"

5       When RAH acquired Frontier and Lynx in October 2009, 102 RAH pilots were on furlough, no Lynx pilots were furloughed, and 54 Frontier pilots were on furlough, with an additional 43 were on voluntarily leaves of absence, in lieu of furloughs.

6       In an earnings call on July 31, 2009 – the day that RAH's acquisition of Midwest closed – RAH Chairman Bryan Bedford announced that the first E-190 would be going into service the next month, *i.e.,* after the acquisition.

RAH pilots, in no small part because the E-190 seating capacity makes it an aircraft that RAH was barred from operating in FFD service by the scope provisions of the collective bargaining agreements between its mainline partners and their pilot unions.

On August 27, 2009, ALPA filed an amended scope grievance on behalf of the Midwest pilots ("Scope Grievance II"), alleging "wholesale fleet replacement" and "failure to fence" Midwest from RAH operations. During the course of those arbitration proceedings, an amended issue was submitted to the SBA for determination, *viz.*, what is the status of the Midwest pilots who were in active service as of June 23, 2009? With Arbitrator Bloch again as Chairman, the SBA decreed that all Midwest pilots active as of that date should be deemed constructively "active", pending the outcome of this DRA seniority integration proceeding, *i.e.*, as if they continued to occupy the positions they had held on June 23, 2009, even if subsequently furloughed, but without any right to pay or benefits. Midwest/ALPA, Scope II (Arbitrator Richard I. Bloch, 2009).

On September 30, 2009, DOT was notified that: 1) with the return to Boeing of the last B-717 aircraft, Midwest Airlines would cease scheduled operations under its FAA and DOT certifications and, 2) thereafter, Republic Airlines would continue to operate Midwest-branded flights under the "d/b/a Midwest Airlines" trade name and "YX" designator code (since changed to the Frontier brand name and livery). Midwest Airlines' last flight in its own name with its own pilot group was on November 3, 2009. RAH crews continue to service former Midwest market flying with E-170s, some subsequently added E-190s and also some smaller 37-50 seat E-jets on the Chautauqua certificate. Following the post-transaction announcement of code sharing between Midwest and Frontier, Frontier A-319s have also been used in the former Midwest-branded operation.

For purposes of this seniority list integration proceedings, as decreed by the Bloch II SBA award, the constructive status of Midwest pilots flying on June 23, 2009 is "active". The 255 Midwest pilots furloughed prior to that date remain in furlough status. Some few of the Midwest pilots have received, in the order of their Midwest seniority, offers of employment as new hires to fill RAH pilot position vacancies.

**Frontier Airlines**

Frontier Airlines, founded in Denver Colorado in 1994 and still based solely at DEN, is a mainline "low cost" carrier that traditionally operated only with narrow-body aircraft in scheduled service under its own brand name and "F9" designator code. Prior to acquisition, Frontier never used regional jets and by 2005 had transitioned its narrow body fleet from B-737s to all Airbuses (A-318/319/320/321). As of early 2008, Frontier operated 62 such aircraft, with an additional eight Airbus aircraft on firm order. Due to its Chapter 11 bankruptcy in 2008, however, Frontier had to cash out its "piggy-bank" equity in 11 of the Airbuses in its fleet. As of the transactions, for the same reason, Frontier also lacked the wherewithal to take delivery of any of the new Airbuses until after it was acquired by RAH, Inc. in October 1, 2009.

From 1994 until 2008, Frontier experienced cyclical financial ups and downs but was successful enough to hire more pilots in each of those years. The record supports the conclusion that Frontier's filing for Chapter 11 protection on April 10, 2008, was not proximately caused by lack of profitability. Rather, it was brought down by a liquidity crisis that grew like Topsy on a diet of equity cash purchases of Airbuses, ill-timed long distance and international route network expansion, the start up of Lynx Aviation in 2006-2007, and contracting with RAH for E-170 hub feeder lift in 2007. The revenue of that regional jet CPA with RAH was outweighed by its expenses and the Lynx Aviation turbojet operation operated at a loss every year following its start up.

FAH, Inc. managed to achieve Frontier mainline profitability through the nine months ending December 31, 2007. But the accumulation of dry tinder was brought to combustion point by spiking fuel prices and a $59 million loss for the fiscal year ending in March 2008. Ignition occurred on April 8, 2008, when Frontier's credit card processor, First Data, announced a 200% increase of its "hold back" of monies paid by customers for Frontier tickets. In response, FAH, including its two subsidiaries Frontier and Lynx, filed for Chapter 11 bankruptcy protection two days later, on April 10, 2008.

During its 16-month restructuring, FAH employed various means to cut costs, including reducing capacity, disposing of aircraft, reducing headcount and restructuring labor agreements. For example, FAPA pilots agreed to pay cuts and other contract concessions and pilot staffing was reduced through 43 seniority-based voluntarily leaves "in lieu of furlough", plus 54 actual furloughs of pilots in juniority order. As previously noted, FAH also rejected its ASA with RAH, resulting in the grounding of the twelve (12) E-170 aircraft that RAH eventually ended up flying again under the Midwest ASA.

Following withdrawal of other Debtors in Possession ("DIP") lenders, cash infusions by RAH and a series of bankruptcy court valuation determinations, RAH, Inc. was declared Frontier's sole DIP lender, with an amended and restated credit facility scheduled for repayment on December 2009. The RAH DIP was described by Frontier management to the bankruptcy court as "necessary for the Debtors to be able to continue to operate their business [including paying employees] and preserve the assets of their estates." By May 2009, a little over a year after the Chapter 11 filing, FAH was successfully restructuring and again generating operating profits.[7] But the evidence plainly shows that Frontier did not have the financial wherewithal for a stand-alone exit without a sponsor.

---

[7] In FY 2008 (April 1, 2008 to March 31-2009) Frontier Airlines had an operating profit of $10.3 million but an overall pre-tax loss of $11.7 million. Lynx had an operating loss of $15.2 million and an overall pre-tax loss of $15.6 million.

Despite vigorous efforts by FAH, no sponsor except RAH showed sufficient interest to sponsor Frontier's exit from bankruptcy. In June 2009, RAH offered to acquire Frontier and Lynx for $108.75 million, conditioned upon Frontier management reaching agreement with FAPA on a contract extension and other changes to the Frontier-FAPA CBA, primarily changes to existing scope restrictions. RAH's conditional offer was preliminarily approved by the bankruptcy court in July, subject to an auction process in which interested sponsors could bring their best offers for Frontier and Lynx; with the RAH offer as the "stalking horse" bid.

At the auction, Southwest Airlines offered $170 million, strictly conditioned upon disposition of additional airbuses, eventual replacement of the entire Airbus family fleet with B-737s and an up-front agreement on seniority integration between SWAPA and FAPA, the respective pilot groups unions. Those negotiations never got off the ground during the compressed one-day period allotted for the inter-union discussions and consequently Southwest's conditional offer died aborning. In the mean time, RAH had improved its offer by agreeing to waive its $150 million CPA claim. This eventually was deemed to be the better offer because it increased the recovery for all of the FAH creditors, including FAPA.

Meanwhile, FAH management and FAPA had reached tentative agreement on the contract changes conditioning the RAH offer. The restructured Frontier-FAPA CBA, ratified by the FAPA pilots, included the following, in Letter of Agreement No. 39 ("LOA 39"):

(1)    The pilot seniority lists of Frontier, RAH and any other entity acquiring, acquired or merged with RAH would be integrated in accordance with Sections 3 and 13 of the Allegheny-Mohawk LPPs and submitted to RAH for acceptance.

(2)    RAH would be required to accept such integrated list, including conditions and restrictions, so long as: (a) there was no "system flush" whereby any non-furloughed pilot would displace any other non-furloughed pilot; (b) furloughed pilots would not bump/displace non-furloughed pilots; (c) pilots would not be compensated for flying not performed solely as a result of the seniority integration; (d) pilots in training or who had completed training at the time of implementation would be allowed to occupy the position for which they had been trained; and (e) there would be no conditions or restrictions that materially increase costs associated with training or company paid moves.

(3)  The carriers would be operated separately under their respective CBAs until seniority lists were integrated pursuant to Sections 3 and 13 of the Allegheny-Mohawk LPPs and implementation issues (*i.e.* application of the integrated list to the transfer of pilots between carriers) were resolved between management and the pilots' representative.

LOA 39 also provides that aircraft in the "Airbus 320 family" (A318s, A319s, A320s and A321s) will be placed in the Frontier operating certificate and flown by Frontier pilots and that additional narrow-body aircraft, specifically defined as "Boeing 737, Boeing 757 or aircraft with a Maximum Takeoff Weight of between 120,000 and 255,000 pounds", may be placed in another operating certificate, so long as the number of Frontier pilots does not fall below the number of pilots on the seniority list as of August 1, 2009 (639), excluding pilots on furlough as of August 11, 2009. *See* LOA 39.3, §1.F.3.

On August 13, 2009, following Southwest's withdrawal from the auction, RAH's offer ($108.75 million plus waiver of its $150 million claim) was declared the winning bid. The bankruptcy court confirmed FAH's plan for reorganization on September 10, 2009, setting the stage for the emergence from bankruptcy of Frontier and Lynx, as RAH subsidiaries, on October 1, 2009. At that time, Frontier Airlines had a fleet of 51 Airbuses, and firm orders for 11 additional A-320s, but lacked the financing to take delivery of those additional aircraft. [8]

## Lynx Aviation

Lynx Aviation began operation in December 2007, as a wholly owned subsidiary of FAH and a sister carrier to Frontier. Throughout the period prior to RAH's acquisition, Lynx operated its fleet of Q-400 turboprop aircraft exclusively under a CPA with Frontier. FAH failed to attract any outside contracts for Lynx CPA flying and post-acquisition RAH also tried but failed to obtain independent CPA contracts for Lynx. From its inception, Lynx incurred substantial losses and failed to cover its operating costs, losing over $18 million in operating and startup costs in

---

[8]  Following the transaction, with financing arranged by RAH, Frontier took delivery of three additional A-320s in the first half of 2010. Eight more A-320s are now scheduled for delivery in 2013-2014. At the same time, the fleet has been reduced since acquisition by four A-318 aircraft.

FY 2007 and over $26 million in operating and startup costs in FY 2008.  Nothing in this record supports a conclusion that Lynx would have achieved profitability in FY 09, FY10 or any time soon thereafter.

The UTU became certified by the NMB as bargaining representative for the Lynx pilot group.  As of October 1, 2009, negotiations had not yet produced a CBA and Lynx pilots were working under terms and conditions set forth in an Employer Handbook.  On the transaction closing date, Lynx was operating a fleet of 11 Q-400 turbojets and had 132 pilots on its seniority list.  Post-transaction, the plans with respect to the Q-400s have been in flux.  As early as October 2009, RAH informed all pilot committees that an 11-fleet operation was inefficient and that Lynx could be shut down after the end of the 2009-2010 ski season.  On February 4, 2010, RAH announced that it would be phasing out and replacing the Lynx Q-400 operation with E-170 and E-190 service; citing higher unit costs of turboprop aircraft and a perceived customer preference for jets.  In doing so, RAH announced that operation of the Lynx service (except Fargo and Tulsa) would be continued, but Lynx markets previously serviced with turboprops eventually would all be serviced by E-jets.  On that basis, RAH proceeded with a plan to return five of the leased Q-400s to the lessor, resulting in attendant furloughs at Lynx, and also found a prospective buyer for the remaining six turboprop aircraft.

By mid-August 2010, the sale transaction for the six Q-400s had fallen through, necessitating a new plan.  Through the winter of 2010-11, RAH is still operating Lynx Aviation service, as such, with Q-400, E-170 and E-190 aircraft, while pursuing FAA approval to transfer the six Q-400s to its Republic Airlines operating certificate.  If that occurs, RAH plans to surrender the Lynx operating certificate and continue servicing the former Lynx Aviation routes with a mixture of E-jets and turboprops until it can sell the Q-400s. RAH anticipates offering an estimated 29 Lynx pilots employment as Republic pilots to fly the fenced operation of three of the six remaining Q-400s (with the other three Q-400s as spares).

**The Post Transaction RAH Nation**

The acquisition of Midwest and Frontier/Lynx permitted RAH to balance business risks and rewards, diversify its revenue stream and complement its traditional FFD sale of capacity to other airlines by branching out into "branded" service (*i.e.* the sale of passenger service directly to the public). After acquiring Midwest, Frontier and Lynx, RAH was the new owner of two separately branded airlines collectively employing 1,211 pilots holding seniority on those carriers. RAH also had the following combined fleet of aircraft, as of those transaction dates: [9]

| AIRCRAFT TYPE | MIDWEST 6/23/09 | RAH 6/23/09 | 10/1/09 | FRONTIER 10/1/09 | LYNX 10/1/09 |
|---|---|---|---|---|---|
| CRJ200 | | 7 | 6 | | |
| E-135 | | 0 | 5 | | |
| E-140 | | 15 | 15 | | |
| E-145 | | 53 | 56 | | |
| Q400 | | | | | 11 |
| E-170 | | 77 | 76 | | |
| E-175 | | 54 | 53 | | |
| E-190 | | 0 | 5 | | |
| A-318 | | | | 9 | |
| A-319 | | | | 38 | |
| A-320 | | | | 4 | |
| B-717 | 9 | | | | |
| TOTALS | 9 | 206 | 216 | 51 | 11 |

---

[9]  The Midwest pilots submit that the appropriate date for comparing Midwest's and RAH's fleets is June 23, 2009, the date the acquisition was announced. However, whether June 23 or July 31 is used is of little consequence, for the employment count remained the same during that time period and the only changes in RAH's fleet involved reinserting one E-135 and removing one E-170 between June 23 and July 31, 2009.

Following the acquisition of Frontier and Lynx, RAH took steps to consolidate the Frontier brand with the Midwest brand by combining airport ground operations and reservations centers for its branded business. That brand integration process continues, with the expectation that it will be completed by the third quarter of 2011. Initially, Republic E190s and Frontier A319s and crews flew both Midwest-branded/liveried service and Frontier-branded/liveried service. On April 13, 2010, however, RAH announced that its consolidated branded operation would be operated with only the Frontier name and livery. There are a total of 54 Airbus family aircraft in the current fleet (including 3 added by RAH after October 1, 2009), all of which also are deployed with the E-190s in the consolidated branded operation.

Excluding special items, the branded operation experienced pre-tax losses of $2.5 million in 4Q2009, as compared to an equivalent profit of $25 million in the fixed-fee business. RAH reported, for the first quarter of 2010, its first quarterly loss since the 09/11 terrorists attacks grounded the industry in 2001. In that quarter the fixed-fee business had booked a pre-tax profit, excluding special items, of $18.3 million; whereas the branded operation experienced an equivalent loss of $42.2 million, leading to a 1Q2010 consolidated pre-tax loss, excluding special items, of $26.4 million. Initial losses in the branded side business were not unanticipated and the fleet investment strategy described above manifestly demonstrates that RAH management projects the continued growth of flying in the Frontier-branded consolidated Midwest/Frontier markets.

Currently, the RAH expanded aircraft fleet includes some 74 37-50 seat E-jets or RJs. Along with the Q-400 turbojets still in service, 11 of those aircraft apparently service branded operations, including the remaining Lynx markets. The remaining 63 small E-jets are deployed, along with some 136 70-seat E-170s/E175s, to service the FFD operation. In addition, 5 Embraer E-190s, 99-seat aircraft which RAH had never previously operated because of scope provision limitations in flying partner pilot CBAs, have been placed in service since the

acquisitions. All 15 of those E-190s are deployed in the consolidated Midwest/Frontier operation, which is now branded and liveried solely as "Frontier Airlines". The RAH operational plan calls for the continued use of E-jets in FFD service, an increasing number of E-190s/E-195s and Airbuses in the consolidated branded operation and eventual elimination of the Q-400 turboprops. In addition, on February 25, 2010, RAH announced that it had signed a purchase agreement for 40 Bombardier 138-seat CS300 jets, with an option for up to an additional 40 aircraft, scheduled for delivery beginning in the second quarter of 2015.

Since the transactions, RAH's fixed fee business has continued to show signs of shrinkage, albeit there has been an ebb and flow in that aspect of the hybrid business. RAH business volume and profitability continues to be focused on the FFD side of the hybrid business model, but the balance is predicted to shift in favor of the branded flying. Midwest's remaining aircraft, operating certificates and brand all are now history. After a brief interlude with Midwest livery and branding, the remnant of former Midwest marketed flying is operated as Frontier-branded flying, using RAH regional jets and Frontier Airbuses. Frontier Airlines operations are now normalized, but the branded operation is only marginally profitable to date, with good prospects for growth conditioned upon past and continued infusion of RAH financing. Lynx turboprop service has been largely replaced with RAH regional jet flying, with eventual elimination of turboprop flying projected, as Lynx employees are absorbed into RAH.

### POSITIONS AND PROPOSALS OF THE PARTIES

The positions set forth below are extrapolated and edited from the respective post-hearing briefs, submitted by each of the Parties on September 24, 2010, in support of the respective amended final proposals:

**UTU/Lynx Airlines Pilot Merger Committee (*See* Attachment 1)**

UTU maintains that its proposal and integrated list takes into consideration all factors set forth in arbitral precedent and the ALPA Merger Policy for a fair and equitable integration. The proposed list consists of five groups, uses a "status and category/ratio" approach which emphasizes the importance of branded service to the merged carrier. It purports to account for all pre-and post-merger career expectations of the involved pilots in formulating the list and also in providing for conditions governing the exercise of seniority. In constructing the UTU's proposed integrated roster, pilots on leaves of absence (LOA) because of management or military service, and those on long-term medical LOA (12 months or more), are "pulled" from their current roster and, after construction of that roster, "plugged" immediately ahead of the next most junior pilot from their initial list.

UTU Group A consists of the first 311 Frontier captains; Group B contains the balance of the active Frontier pilots, the RAH pilots in branded service, and the active (as of June 23, 2009) Midwest captains, listed on a relative seniority ratio basis; Group C is made up of the first 1205 Republic pilots to the junior captain, the Lynx pilots' captain range and the remainder of the active (as of June 23, 2009) Midwest first officers, again listed on a relative seniority basis. UTU asserts the Lynx pilots' captain range belongs in Group C because it would be neither fair, nor equitable, to prefer Republic pilots flying Lynx service "because of an operationally questionable decision which RAH made post-acquisition to retire the Q400s due to its commitments to RJ aircraft". Group D contains the remaining active (as of October 1, 2009) Republic pilots and the remaining Lynx pilots on a relative seniority basis (for the same stated reason), and Group E consists of the remaining Midwest pilots and the Republic and Frontier furloughees.

As to the conditions, UTU proposes that for five years after implementation, RAH fee-for-departure captains and first officers will have priority to that service and F9/YX/L3/RAH branded pilots as of November 1, 2009 will have priority for branded captain and first officer positions. Within the branded fence, all Airbus captain jobs are reserved to Frontier pilots, and all Airbus first officer jobs are reserved to Frontier pilots until the junior Frontier pilot is recalled from furlough. Additionally, all captain and first officer positions not covered by the Frontier-FAPA Letter of Agreement ("LOA") No. 39 (which reserves defined positions to Frontier pilots) are reserved to the remaining pilots in branded service as of November 1, 2009. Further, Frontier pilots will be recalled from furlough to the Airbus; Midwest and Lynx pilots will be recalled to aircraft not addressed in LOA No. 39 in branded service; and, Republic pilots will be recalled from furlough to fee-for-departure operations.

Beyond that, UTU urges that the "no bump, no flush" provision must have two exceptions: 1) all currently furloughed pilots can bid for vacancies they can hold based on their system seniority within their fences and 2) Midwest and Lynx pilots may bump junior pilots who moved from fee-for-departure service to branded service after November 1, 2009. For the same reason, UTU posits "a recall list for Midwest and Lynx pilots prior to implementation until the final master list is devised". Finally, if a branded side pilot is displaced due to aircraft reduction under an operating certificate, UTU asserts they should be able to use their system seniority to displace anywhere on the system.

**ALPA/Midwest Airlines Pilot Merger Committee (*See* Attachment 2)**

The Midwest pilots' proposal, as revised on September 10, 2010, divides the affected pilots into three tiers, again based essentially on "status and category ratio" integration. The Midwest pilots are also proposing a fourth date-of-hire tier to be populated by RAH pilots hired *since* October 1, 2009. As for Conditions, Paragraph 4 of the Midwest pilots' proposal calls for a five-year "porous fence" separating branded flying positions from fixed-fee positions. Under that proposal, branded-side pilots will have *priority* for branded positions, while fixed-fee pilots will similarly have *priority* for fixed-fee positions.

Emphasizing that the Midwest brand and market remained vibrant despite the financial woes of the carrier, *per se*, ALPA assigned the active B-717 Captains as of June 23, 2009 to the mainline aircraft Captains in Tier 1; asserting "that was the type of flying they were doing when RAH decided to acquire Midwest and they had a reasonable expectation to continue flying by using their integrated seniority". Remaining MEA pilots "active" as of June 23, 2009, are assigned to Tier 2, along with the senior half of the furloughed MEA pilots. Finally, the Midwest pilots have allocated the remaining Midwest pilots to Tier 3, which contains all remaining pre-merger pilots, including all pilots on furlough as of October 1, 2009.

The Midwest pilots submit the tiers and allocation of pilots proposed are fair and equitable and should be adopted as the Award. They further submit that a five-year "porous fence", separating branded from fixed-fee flying, is also fair and equitable and should be imposed. Midwest pilots maintain that they are unemployed while others who will be junior to them if the ALPA proposal is not imposed, "are flying Midwest service". Therefore, the Midwest proposal makes the date when the integrated list will be effective "the earliest possible date permitted by Section V (g) of the DRA" and requests that the Award impose additional special conditions for former Midwest and Lynx pilots during the so-called "interim period" *i.e.,* between the effective date of the Award and the time the single transportation system representative and RAH negotiate the single CBA that settles this issue by collective bargaining.

On that basis, the Midwest Committee proposes that the Award must order RAH (in addition to its existing contractual vacancy posting obligations under the IBT and FAPA CBAs) to post to all "active but unemployed" Midwest pilots, as well as the furloughed Midwest and Lynx pilots, all "vacancies" (as defined by the Midwest Committee) that occur during the "interim period" between issuance of the Award and the effective date of the IMSL. Further, the Midwest Committee proposes that all of those Midwest and Lynx pilots must be eligible to use their integrated seniority to bid for those positions.

**FAPA/Frontier Pilot Merger Committee (*See* Attachment 3)**

FAPA maintains that "fair and equitable" integration of the four disparate seniority lists must rest on at least two fundamental understandings: vastly disparate placement of the pre-transaction groups on the career path of the commercial pilot; and, second, FAPA's "narrative" of the transactions and their aftermath, *viz.,* 1) The RAH pilots did not have a pre-merger expectation of consistent advancement within an expanding operation and economically stable business model; 2) The Frontier Pilots' expectations were not significantly impaired by bankruptcy; 3) The acquisition has insulated the RAH pilots from the consequences of the further deterioration of the fixed fee business.

FAPA proposes a Master Seniority List based on five (5) status-and-category groupings, ranking the jobs by "Narrow-Body Captain, Narrow-Body First Officer, Non-Narrow Body Jet Captain (Branded E-190/E-170-175) and Non-Narrow-Body Jet Captain/Turboprop Captain, Non-Narrow-Body Jet First Officer/Turboprop First Officer". FAPA ranks the Frontier and RAH jobs on that basis, giving Frontier pilots pride of place, and then injects the Midwest and Lynx pilots' jobs in the rankings "based on their circumstances". FAPA proposes that "all pilots be credited with their pre-transaction longevity for 'non-competitive' purposes such as pay and benefits".

FAPA also proposes a series of Conditions and Restrictions, which, it contends, "assures that the proposed Master Seniority List operates in a fair and equitable manner going forward". FAPA urges, *arguendo*, that even to the extent that relative financial condition is relevant under the fair and equitable standard, the IBT's assertions are overblown and "no justification for taking the mainline, narrow-body jobs brought to the transactions by the Frontier Pilots, and transferring those expectations to the RAH Pilots through the integration of the seniority lists". FAPA finds the other pilot groups' proposals would result in windfalls at the Frontier Pilots' expense. Finally, FAPA concludes the IMSL must be implemented and applied "only in compliance with the RLA and the parties' pre-transaction collective bargaining agreements, specifically including LOA 39".

**IBT/Republic Pilot Merger Committee (*See* Attachment 4)**

In the view of the Republic Committee, "RAH's acquisition of distressed carriers to create a branded operation has introduced immediate and substantial risk to what was formerly a stable, growing and controlled-risk model". It asserts the Republic Committee proposal "properly balances the reasonable expectations of the differing pilot groups and integrates the lists in a fair and equitable manner that apportions risk and shares the opportunity to benefit from future growth in the integrated operation". In IBT's view, placing RAH pilots alone at the top of the integrated seniority list is appropriate based on RAH, Inc. financial underwriting of the branded service; as well as asserted superior career expectations and life-style options and "a history and expectation of continued growth in FFD service". The Republic Committee opines that whatever benefit is brought to the post-acquisition entity from the Frontier operation is more than offset "by the substantial element of risk now introduced to the RAH system". It also credits active service among all pilot groups above that of every furloughed pilot, citing "the necessarily diminished pre-acquisition prospects of pilots on furlough". Midwest and Lynx pilots active on the acquisition dates, save the junior Lynx pilots (with 2008 hire dates), are placed by IBT above all pilots on furlough on the acquisition date.

According to the Republic Committee, "the risk associated with Frontier's operation warrants those pilots' placement in accordance with the Republic pilot final proposal, which integrates Frontier captains, including downgraded captains and a group of senior first officers, with Republic captains".   The Republic pilots claim the placement accorded to Midwest captains and first officers active on the transaction date is appropriate "given severely impaired career expectancy owing to their inability to continue their careers at Midwest past 2009 and that the Lynx pilots have less career expectations in comparison than any other active pilot groups."   Finally, the Midwest furloughees are placed below all other pilots involved in the integration.

The Republic pilot committee proposes to "pull and plug" only management pilots, take the pilot population numbers identified under each ratio, reduce those numbers by the number of pilots in the grouping on the long-term medical leave of absence and military leave of absence, construct a new ratio based on the reduced numbers, integrate the active pilots under those ratios and then reinsert the LOA pilots.   For example, in the group of 710 Republic pilots and 355 Frontier pilots integrated on a 2:1 basis following the initial 299 Republic pilots, those numbers should be reduced by the number of pilots falling within those populations who are under a covered leave of absence.   A similar reduction would be made to the next ratio grouping of 560 Republic pilots and 280 Frontier pilots, and so on/so forth to all the other ratio groupings of pilots.

## REPUBLIC AIR WAYS HOLDINGS, Inc.

The Company does not have a position on the methodology that should be adopted by the Arbitrator in integrating the four seniority lists at issue in a "fair and equitable" manner – *i.e.* the order in which pilots should be placed on the merged list.   However, the Company does oppose, as operationally impractical, burdensome, unfair and inequitable, and/or outside the jurisdiction of the Arbitrator and the scope of these proceedings, certain "conditions" and/or "restrictions" that have been proposed by FAPA, ALPA and UTU.

The Company maintains that the seniority integration decision should exclude the noted provisions from the FAPA, ALPA and UTU proposals and include the standard conditions/restrictions proposed by the Company: 1) No bump/displacement/system flush; 2) Pilots who, at the time of implementation of the integrated seniority list, have been awarded a new position, shall be permitted to commence and/or complete training and assume the new position, regardless of their relative standing on the integrated list; 3) No requirement for pilots to be compensated for flying not performed as a result of the seniority integration (*e.g.* differential pay for a position not actually flown.   Finally, the Company urges that implementation date of the integrated seniority list should follow certification of the single pilot representative by the NMB and closure on the necessary negotiations with that representative related to contract consolidation.

## DISCUSSION

Arbitrators have uniformly determined that the *Allegheny-Mohawk* "fair and equitable" standard is satisfied if the integration preserves the job expectations and relative bidding positions that employees held prior to the merger. In fleshing out that *Allegheny-Mohawk* standard in the construction of an integrated seniority list for pilots, most informed practitioners acknowledge the appropriateness of considering goals established in ALPA's experience-based Merger Policy. In that regard, a large body of arbitral precedent has evolved around application of the "fair and equitable" standard to the integration of pilot employee seniority lists. In one such recent decision, the arbitrators observed that the lodestar standard posits accomplishment of "the following goals, in no particular order: a. Preserve jobs; b. Avoid windfalls to [any] group at the expense of [any] other(s); c. Maintain or improve pre-merger pay and standard of living; d. Maintain or improve pre-merger pilot status; e. Minimize detrimental changes to career expectations". Delta/Northwest, (R. Bloch, D. Eischen, F. Horowitz at 13, 2008).

In his "Expert Recommendation" regarding the integration of the "Domestic" and "Overseas" pilots of Air New Zealand, the late great David Feller observed:

> There is general agreement among those who have dealt with pilot seniority questions following airline mergers that, in the words of the late David A. Cole in the Easter-Mackey case, "The essential object of our exercise is to prevent impairment, so far as possible, of the job security and the earning and promotional opportunities which each of the pilot groups had on its own airline prior to the merger." Much earlier, in connection with the Braniff-Mid-Continent merger, the principle was stated by the arbitrators in the following words: "It is our purpose to see that each [pilot] on the two lists would retain all they had prior to the merger, would accrue those things which they would have had without the merger, and at the same time be in a position on the integrated lists to permit them to share equitably in any promotional opportunities which will arise as a result of the merged operation. . . . Seniority is, of course, highly relevant in the achievement of the objective stated, in various forms, by almost everyone who has dealt with this question". Seniority, however, is a relative factor. As Professor Benjamin Aaron has said, quoting David Cole in the Pan-American case, "A seniority list (is) not determined solely by time, ... it reflects the priority of job rights and opportunities of employees as among themselves which the employer agrees to respect."

<u>Report of the Expert Witness, Promotion and Seniority Rights of Pilots Employed by Air New Zealand</u>, at 10 (Feller 1980).

In another famous case, Arbitrator Thomas Roberts described his charge as follows: "A study of the record made before the Arbitration Board, as well as a review of applicable arbitral precedent, confirms that, to whatever extent possible, the career expectations of the respective pilot groups, as those expectations existed prior to the merger, are to be maintained and protected. Any recognition of career expectations must include elements of individual pilot income, the nature of the flying assignments available, and pre-merger status advancement opportunities." <u>Northwest/Republic</u>, at 4 (Roberts 1989). *See also* <u>Delta/Northwest</u>, *supra*, at 15: "In constructing this list, we have inquired as to where the respective groups have been . . .made reasoned judgments as to where they were going. . . attempted, at all times, to recognize reasonable expectations of both parties while, in all instances, rejecting proposals that, however facially logical, resulted in untenable windfalls". Perhaps the most succinct statement of the consensus standard was by Arbitrator Richard Kasher in <u>Chautauqua/Shuttle America</u>, at 12 (Kasher 2005): "At bottom, the objective is to preserve, to the extent possible . . . the pilots' career expectations at the time they learned of the transaction and to share equitably the growth opportunities created by the transaction, based on the groups' contributions to that growth".

An arbitrator asked to intervene in such matters is well advised to remember that integration of seniority lists through arbitration is necessary because extremely knowledgeable and experienced negotiators were unable to achieve consensus on an integrated list construction methodology and related conditions. Such negotiations often deadlock and parties routinely must resort to interest arbitration because "[t]he merged list cannot be a copy of any list that previously [applied]; other names now appear. Moreover, no matter the effort in minimizing unfavorable changes to career expectations, merged lists do change career expectations; it is in their nature that they do". *See* <u>US Airway, Inc./America West</u> at 19 (Nicolau, 2007).

As I observed in an earlier case, an arbitrator charged with legislating the bargain for parties, after they fail to reach agreement through their own intensive negotiating efforts, should endeavor to hew, as closely as possible, to what the parties would have bargained had they been able to successfully negotiate a resolution. That means paying close attention to all evidence of mutual intent exhibited by the disputing parties and refraining from arbitral indulgence in extreme solutions, experimentation, or external manipulation of the historical balance of power. *See* USAir/America West (E-190), at 12-13 (Eischen 2006), *citing* Twin City Rapid Transit, LA 845, 848 (McCoy 1947), and North American Aviation, 19 LA 76, 77 (Cole/Aaron/Wirtz 1952). *See also*, Birmingham-Jefferson County Metropolitan Transit Authority, 103 LA 1 (Baroni 1994); United Traction Co., 27 LA 309, 310 (Scheiber 1956).

In Federal Express/Flying Tiger (1990) at 23-24, Arbitrator George Nicolau captured the essence of a pilot seniority list integration process in four trenchant verities that ring as true today as when they were first written twenty years ago: "There are four basic lessons to be learned . . . that each case turns on its own facts; that the objective is to make the integration fair and equitable; that the proposals advanced by those in contest rarely meet that standard; and that the end result, no matter how crafted, never commands universal acceptance".

## EQUITY AND FAIRNESS ANALYSIS

It is fairly easy to articulate the governing standards yet devilishly difficult to attain them in the context of quadruple sets of legitimate but competing equities, demographic, fleet, business model and labor relations system disparities, diverse financial and economic variables, and expert witness opinions which swing the compass 180 degrees. In practice, attaining a fair and equitable seniority integration requires an impartial but somewhat bifurcated, if not bipolar, process of determining facts and making value judgments. Once the facts are determined with objective impartiality, the devil lies in the details of evaluating, mixing, matching, off-setting and balancing disparate equities and conflicting expectations by various methods of integration until the goal of a fair and equitable list is achieved. Not every equity can be quantified but equity determination is accomplished more or less by objective fact-finding. The valuation, prioritizing and balancing of the disparate and competing legitimate equities--notional fairness--is inherently subjective.

### RAH

As in Air Canada and Canadian Airlines, pre-acquisition Republic sustained the other carriers in this proceeding with critical financing, which preserved and/or prevented extinction of the other pilot groups career development under the RAH umbrella. Financial health enabled RAH to subsidize Frontier/Lynx and Midwest operations in 2008 through funding of Frontier's debtor-in-possession financing and loaning Midwest up to $31 million; and also ultimately to acquire both carriers. Not only were Midwest, Frontier and Lynx supported pre-acquisition by RAH financing but, to date and for at least the near term, the new "branded" operation will be subsidized by RAH's FFD operations. On the other hand, by 2008 the exclusively FFD business model as a regional provider of lift capacity for the major airlines was potentially a "melting ice cube."

RAH contrived to counterbalance perceived threats to the FFD side by reducing utilization of more at-risk 37 to 50-seat capacity RJ aircraft in its fleet and acquiring larger regional jets for the competitive edge of making its lift more attractive to its flying partners. But even that movement into larger regional jets did not escape the compressed margins caused by the recession, rising costs, over capacity, reduced demand and expiring CPAs. Moreover, expansion to larger jets has "counterparty" down-sides of its own, such as the costs to RAH of maintaining idle aircraft should one of its partners no longer need or be precluded from contracting for that capacity--all of which are finessed by the ability of post-transaction RAH to operate a mixture of FFD and branded service.

The reasons, risks and rewards surrounding the transactions which are the subject of this proceeding were candidly and accurately described by RAH CEO Bedford, as follows (Emphasis added): "The main reason we took the leap in to the brand business was precisely because we did not see any growth opportunities for RJ flying with our major airline partners. In fact, we feel there is a much greater risk that contracts will not be renewed as the requirement for RJ, especially 50-seat aircraft, is shrinking. . . Had we not made the acquisitions we did last year, we would not have 15 E-190s in operation; we would not have a home for 16 E-170s or a home for 12 small RJs we are flying in Milwaukee. Add all that up and we would have 43 fewer aircraft in service at Republic. You take those 43 aircraft out of the picture and we would have had to furlough more than 1,300 Republic employees . . ."

**Frontier**

Not only did the infusion of capital by RAH as sole DIP lender sustain Frontier through the successful restructuring, but at the conclusion of the auction Frontier acquisition by RAH was the "best deal' for FAPA and others with a significant stake in Frontier's successful emergence from bankruptcy. The only other option in sight, acquisition by Southwest, was conditioned upon cutting and replacing the Airbus fleet, with the stark prospect of FAPA pilots being stapled to the bottom of the SWAPA seniority list.

On balance, however, the Frontier pilot group also brings to the table equity of significant value to the merged carrier and pilot groups. In terms of hard metal, the acquisition of Frontier brought to RAH and its group of pilot employees a new fleet of Airbus family narrow-body mainline aircraft. As already noted, Frontier brought an established brand name and market. In addition, Frontier serves with Midwest as a platform that allows RAH flying of E-190s, competitively valued aircraft that Republic pilots had not and likely would not otherwise be flying today.

The career path of a commercial airline pilot typically traces an onward and upward trajectory: beginning as a new-hire regional First Officer, under regional terms and conditions of employment; progressing to regional Captain; starting over as a new-hire First Officer at a mainline carrier, under mainline terms and conditions of employment; and progressing, finally, to mainline Captain. At acquisition, virtually every Frontier and Midwest pilot was farther along that traditional career path than was any RAH pilot. While that fact does not detract from the proven capabilities and professionalism of the Lynx and Republic pilots, it must be recognized. Moreover, but for the acquisition of Frontier, RAH regional jet pilots could have reached the next level of career progression only by forfeiting accumulated RAH seniority and starting over at the bottom of a seniority ladder as a mainline new hire. The Frontier acquisition now provides the regional jet pilots something of major value to any commercial pilot: a "road less traveled" to the "holy grail": the higher pay and benefits, enhanced life style, better working conditions and enhanced prestige of a mainline carrier Captain position.

**Midwest**

By any objective measure, it cannot be denied that Midwest Airlines was an air carrier on the cusp of failure well down the road to extinction at the time of the transaction. But the record plainly establishes that the pilots of Midwest do not come to this proceeding as mendicants. In all fairness, the Midwest pilots are entitled to vindication in this proceeding of both real and constructive equities they brought to the merger.

In the vernacular, the very word "seniority" is equated with length of service. Appropriate recognition of many long years of additional career development by the Midwest pilots is intuitively fair and equitable in this seniority list integration. *See e.g.,* Chautauqua-Shuttle America, at 11 (Richard R. Kasher 2005). Also, Midwest as a branded airline did not cease to exist when it was acquired by RAH. More specifically, before and after the acquisition, Midwest provided the platform for Republic pilot crews to fly 12 otherwise grounded E-170s. In addition, along with Frontier, Midwest has been a post-acquisition platform for "branded" flying of E-190 aircraft, which RAH pilots had not and could not otherwise have operated in FFD service. Even though the Midwest pilot group brought no metal, *per se*, to the table, fairness requires that the contingent of MEA pilots deemed "active" by the Bloch II SBA decision be accorded constructive equity credit in these proceedings for their share of that enhanced E-jet flying.

One can take no satisfaction in validating the hard cold fact that no reasonable interpretation of fairness and equity justifies placing the remaining pre-acquisition furloughed MEA pilots anywhere but at the bottom tier of the IMSL. There is no evidentiary basis for any expectation that they might have been recalled to active service prior to the acquisition transactions. Nor can they shelter under the protective penumbra of the Bloch II decision, because they were furloughed prior to the transactions. ALPA's theory that RAH, Inc. effectively orchestrated those pre-acquisition furloughs and the eventual demise of Midwest Airlines, by manipulating events beginning in September 2008, is not established by a preponderance of persuasive record evidence and simply cannot be sustained by innuendo and conjecture.

**Lynx**

As to the Lynx pilots, their reasonable expectations for career advancement and job security were the least of the active pilot groups, ranking above only the MEA pre-transaction furloughees. However, the reduced circumstances of the Lynx pilot group proximately caused by the situation on their own ground at transaction time was exacerbated by post-transaction decisions of RAH Inc. In particular, this included liquidating turboprop aircraft Lynx pilots were flying and reallocating RAH-crewed small regional jets to service the Lynx Aviation market.

These facts establish a mixed bag of equities for the Lynx Pilots. On the one hand, they operated only turboprop aircraft, had accumulated only limited seniority while flying for a startup operation that promptly went bankrupt and flew under less favorable wages and working conditions. On the other hand, the Q400 was comparable in seating capacity and productivity to the E-170, to which most of the Lynx Aviation market flying was transferred after acquisition. Treatment of all Lynx pilots as active, with appropriate placement to give them access to that flying is fair and equitable.

# **CONCLUSIONS**

In terms of financial strength, business models, aircraft flown, experience, length of service, career progression, collective bargaining status, pay and benefits, and contributions to the future of the merged enterprise, it would be a challenge to conjure four pre-merger commercial pilot groups and seniority lists exhibiting fewer common attributes than those involved in this case. With regard to all of those factors, the four airlines and pilots involved in this integration proceeding were so disparate and disproportionate at the time of the transactions that traditional methods of list integration fail to produce a fair and equitable list. All agree that a stratified totem pole produced by unqualified date-of-hire dovetailing does not suffice. But none of the respective final proposals and associated conditions and restrictions advanced by the contending Parties would alone produce a fair and equitable result.

Any one group's lop-sided stacking or slanted slotting methodology does not produce a fair and equitable result. Nor is an acceptable fit produced by any of the various iterations of ratioed status/categories woven on skewed looms and tailored by complicated conditions or restrictions. The FAPA and IBT proposals each posit incorrectly that their own pilot group alone is entitled to first class placement at the head of the table; while asserting that less valuable overall contributions warrant placement of the other primary contributor to the merged enterprise well below the salt. FAPA's proposal also brings to the table overly complicated and expansive conditions and restrictions, while UTU and ALPA similarly overstate their own contributions and overreach with assertions of "branded carrier" status equivalent to Frontier's and similarly unrealistic "special conditions". To further strain the seams of the clothing metaphor, neither a monochromatic straight jacket nor a two-tone overly tailored uniform will suffice. Instead, the arbitrated Award uses a composite hybrid methodology, utilizing salient features of each of the competing proposals, to fashion the IMSL as a flexible coat of many colors.

## CONSTRUCTING THE INTEGRATED MASTER SENIORITY LIST

The attached IMSL (Appendix A) has been constructed in the manner set forth below, based on the pre-merger Republic, Frontier, Midwest and Lynx pilot seniority lists (Joint Exhibits 4,6,8 and 9), exchanged by the pilot groups on or about December 13, 2009, [updated as of January 31, 2011, by culling resigned, retired or deceased individuals and adding reinstated pilots], as verified and certified correct by the Technical Assistance Team.

1. All pilots holding seniority on a list but unavailable to hold a line position on the date of the respective acquisitions (July 31, 2009 for Midwest pilots/October 1, 2009 for the other groups), due to employment as management, military leave of absence or long-term medical leave (on leave or disability on acquisition date and still on such medical leave as of September 1, 2010), were removed from the respective purged and updated pre-merger lists.

2. The first 962 positions on the IMSL were filled with the first 650 Republic pilots and the first 312 Frontier pilots, in a ratio of 650:312, beginning with a Republic pilot.

3. The next 1,155 positions on the IMSL were filled with the next 700 Republic pilots, the remaining 334 Frontier pilots and 121 Midwest pilots, in a ratio of 700:334:121, beginning with a Republic pilot.

4. The next 660 positions on the IMSL were filled with the remaining 559 Republic pilots and 101 Lynx pilots, in a ratio of 559:101, beginning with a Republic pilot.

5. The last 204 positions on the IMSL were filled with the remaining Midwest pilots furloughed prior to June 23, 2009, until all of the respective purged and updated pre-merger lists were exhausted.[10]

6. Pilots pulled in Paragraph 1 were inserted into the integrated list immediately above the pilot who appeared immediately below that pulled pilot on the pre-integration list.

7. The relative position of each pilot on the pre-merger lists remained unchanged on the IMSL. Pilots hired after October 1, 2009 are to be placed at the end of the IMSL, by date of hire.

---

[10] Placement of these remaining furloughed Midwest pilots in the bottom Tier of the list is neither unfair nor inequitable and actually leaves them with a possibility of recall that they did not have prior to the transactions.

## **CONDITIONS AND RESTRICTION**

The Award balances divergent pre-acquisition career expectations, gives reasonable credit to each group of pilots for their contribution to the combined operation, accounts for the diminished expectations of Lynx and Midwest pilots, and preserves reasonable career expectations of all pilots in an appropriate fashion. It seeks to accomplish that fair and equitable result by operation of the IMSL itself; unburdened by complicated long-term conditions and restrictions which perpetuate separation and lead inevitably to corrosive disputes, labor strife and endless litigation in arbitration and other tribunals. Too frequently, overly broad and complicated Conditions and Restrictions have contained ticking explosive devices which undermined a fair and equitable arbitrated seniority list and blew away the tremendously hard work and scarce resources invested in its creation.

My jurisdiction in this proceeding is expressly established in the DRA, which grants authority to: (1) resolve disputes regarding production of information; (2) determine any matter conducive to a joint and orderly resolution of the dispute, including procedural issues; 3) determine how the seniority lists at issue should be integrated under the Allegheny-Mohawk "fair and equitable" standard; and (4) resolve disputes arising from the interpretation or application of the DRA. Therefore, proposed conditions/restrictions seeking to modify existing contract provisions, including vacancy bidding, displacement rights, and training freezes/seat locks, are rejected as beyond the scope of my jurisdiction and authority in this proceeding. For the same reasons, proposed conditions or restrictions to toll post-acquisition furlough time in the calculation of recall rights expiration under applicable CBA provisions and practices were rejected Similarly rejected were proposals to apply IMSL seniority based on a "ratio of pilots in the domicile", to schedule "bidding, vacation allocations and all other matters which depend upon relative seniority within the domicile".

My arbitral authority under the DRA does not extend to elimination or modification of existing contract language or to resolution of issues unrelated to the seniority integration, which must be addressed in another forum or at the negotiations table. This seniority integration process cannot be sidetracked by any party seeking changes in disfavored existing CBA provisions, a remedy for every perceived pre-transactions "inequity" or the anticipatory resolution of every post-acquisition problem. The task at hand is the fair and equitable integration of seniority lists. All of those other issues and disputes that fall outside the reach of my arbitral authority under the DRA must be aired or resolved elsewhere.

For all of those reasons, the Conditions and Restrictions awarded in this case are minimal, basic and standard: *i.e.*, no IMSL-caused bump/system flush, commencement/continuation of new position training/assumption; and, no IMSL-caused compensation for flying not performed. Also included is a limited duration aircraft-defined "fence" establishing time-specific priority rights for pilots to fly hard metal or constructive aircraft "brought to the table" by their respective groups, as well as replacements for those aircraft acquired during the fence period. Articulation of the reciprocal fence protections in terms of "priorities" means that, to the extent fenced positions remain open after the exercise of a protected groups priority rights, other pilots on the IMSL can bid for such open positions, in accordance with their integrated seniority and the terms and conditions of applicable CBA provisions; rather than the Carrier filling those positions by hiring new pilots off the street. Those reciprocal, limited duration and aircraft-type defined priority fences do not apply to the E-190 aircraft, flown by none prior to the transactions, or to the anticipated out-year delivered Bombardier CS300 aircraft; both of which fall in a free fly zone between those fences.

The Award does not include proposed "conditions and restrictions" which would require application of one carrier's collective bargaining agreement to work performed at a carrier covered by a different collective bargaining agreement; conditions which are contrary to existing collective bargaining agreement provisions (*e.g.* proposed changes to vacancy bidding rights, displacement provisions, domiciles, and/or training freezes/seat locks); and, conditions that involve matters subject to negotiation (*e.g.* the transfer of longevity credits between collective bargaining agreements, or tolling of recall provisions).

In short, the Award does not contain any of various non-standard, tangential "conditions" or "restrictions" proposed by FAPA, ALPA and UTU, including those that would:

1.  Result in a partial or total system flush or the bumping/displacement of any pilot, including any condition that prevents a pilot who has been awarded a position from completing training and assuming such position.

2.  Create artificial, unrealistic, unduly prolonged, unfair or inoperable fences, defined by such dichotomous terms as "narrow-body/non narrow-body" and "branded/fee-for-departure", within integrated operations.[11]

3.  Create an obligation to maintain separate domicile-related seniority lists based on a different integration standard than devised in this proceeding.

4.  Compensate a pilot for flying s/he did not perform, solely as a result of the seniority integration.

---

[11]     In the unique facts and circumstances of the four carriers and integrated pilot groups in this case, using such debatable labels for fencing the consolidated operation over an unduly protracted period of time would likely be detrimental to all concerned by generating lingering disputes and unduly complicating fleet management; all while producing unfair and inequitable results.

## EFFECTIVE DATE OF THE IMSL

DRA §V (j) provides that that "the award of the arbitrator under . . . §V (g) shall be considered as a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system." In Section V (g) of the DRA, the Parties specify that "the award shall include the date on which the seniority integration will become effective" but that such date "shall not be before the NMB issues its ruling on whether the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system." The parties did not specify in the DRA when, *after* the NMB makes its single system and pilot representation rulings, the IMSL will become effective; thus leaving determination of that issue in the informed discretion of the Arbitrator, under the "fair and equitable" standard.

Perforce, any proposal to make the IMSL effective immediately upon the issuance date of the Award, *before* the NMB makes those referenced rulings and determinations, must be rejected as contrary to the plain language of DRA §V (g). There are, however, very significant differences between the parties to the DRA concerning how soon, *after* the NMB makes the referenced R-case determinations, the Award should make the IMSL "effective", under DRA §V (j), and "part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system", under DRA §V (j).

The Company, joined by FAPA, contends that the Award must and should make the IMSL effective and applicable only after completion of CBA consolidation collective bargaining negotiations between the Company and the Organization, if any, certified by NMB to represent the pilot craft or class on whatever the NMB determines to be the single transportation system. ALPA, takes the starkly opposed position that the Award can and should make the IMSL

effective and applicable "on the date the NMB certifies the representative for the single transportation system". For its part, IBT generally supports the ALPA position that the Award should make the IMSL effective and applicable "at the earliest date feasible" [under the DRA] but articulates it differently, *i.e.*, "the IMSL should be effective upon the issuance of a single carrier determination by the NMB".

These disagreements of the Parties, concerning how soon after the date of the NMB rulings and determinations the IMSL can or should be made effective and applicable, present, a dispute over the interpretation and application of §§V (g) and (j) of the DRA. In that regard, Section V(c) of the DRA states: "In addition to jurisdiction . . . to devise the fair and equitable integration of seniority, <u>the arbitrator shall have the authority to resolve **any dispute** arising out of the interpretation or application of this Agreement</u>." (Emphasis added).

When parties grant an arbitrator such broad authority to resolve a dispute, and do not expressly restrict his authority, then the arbitrator has all powers necessary to properly resolve the dispute, as would a court of law. <u>Mastrobuono v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52 (1995). If the contracting parties seek to limit the authority or jurisdiction of an arbitrator to whom they have submitted a dispute for resolution, that limitation must be plainly and unambiguously articulated. <u>Apache Bohai Corp. v. Texaco China BV</u>, 480 F.3d 397, 404 (5th Cir. 2007) ("Given the requirement that limitations on an arbitrator's authority must be plain and unambiguous and that we resolve all doubts in favor of arbitration, we will not read a clause that refers neither to arbitration nor to any other method of dispute resolution as precluding arbitral jurisdiction to consider the validity of the clause.")

Thus, the DRA grants me jurisdiction and authority to resolve the issues of §V (g) effective date and §V (j) applicability of the awarded IMSL in the manner I deem most fair and equitable, with the single *proviso* that the seniority integration may not be made effective prior to the NMB's issuance of the referenced rulings and certification.

Certification of a single bargaining representative for the combined pilot craft and class in a single transportation system can occur only after (1) an affected employee group's representative petitions the NMB for a finding that a single transportation system exists for the particular craft and class; (2) the NMB finds, in response to that application, that a single transportation system exists for the craft and class; and (3) the NMB certifies a single bargaining representative for the craft and class in such single transportation system, pursuant to applicable Merger Rules and Procedures. The record shows that such representation proceedings concerning the pilot craft or class currently are under way before the NMB. With respect to the flight attendant craft or class, the record also shows NMB has determined that RAH and Midwest constitute a single transportation system, which, at this time, does not include Frontier or Lynx. *See* Chautauqua Airlines, *et al.*, 37 NMB 148 (2010).

It is unknown whether the NMB will find a single transportation system for the pilot craft or class; if so, which of the pre-acquisition carriers will be included; and what organization, if any, will be certified by the NMB as the representative of the combined pilot craft and class in such a single transportation system. As I understand the RLA and the NMB regulations, unless and until the NMB rules otherwise, the existing separate certifications of bargaining representatives for the respective pre-acquisition pilot groups remain in effect; with FAPA as the duly-certified representative of the pilot craft and class on Frontier, ALPA as the duly certified representative of the pilot craft and class on Midwest; the IBT as the duly certified representative of the pilot craft and class on Republic/Chautauqua/Shuttle America; and the UTU as the duly certified representative of the Lynx pilots. *See* NMB Representation Manual §19.[14]

---

[14]     *See also*, Representation Disputes and Resolution (Eischen, 1977), Chapter 2 in The Railway Labor Act at Fifty, Charles M. Rehmus, Editor (Aaron, Eischen, Kahn, Rehmus and Seidenberg).

In the event that the NMB finds a single transportation system and then certifies a single bargaining representative for the system-wide craft or class of pilots, applicable CBAs will remain applicable, in accordance with their terms, until consolidated or otherwise modified by valid mutual agreement between the affected single carrier and a certified single pilot craft or class bargaining representative, if any. There appears to be consensus that the RAH/IBT and Frontier/FAPA collective bargaining agreements remain applicable to the pilot craft and class of those respective properties and that there is no CBA applicable to the UTU-represented pilot craft or class. RAH, ALPA, and perhaps some of the other Parties, continue to dispute whether, or to what extent, the terms and conditions of the ALPA/Midwest CBA retain vitality, and upon whom that particular Agreement is binding and enforceable. However, as noted *supra*, the contested legal, contractual and administrative issues in that particular dispute are beyond the proper reach of the jurisdiction and authority granted me under the terms of the DRA that governs this seniority list integration proceeding.

The ALPA merger policy, which is often applicable in mergers where all pilot groups are represented by ALPA, calls for (1) the negotiation of a joint collective bargaining agreement and possibly a transition implementation agreement; and (2) issuance through negotiation, mediation or arbitration of the integrated seniority list. When there is only one representative, or the representation dispute is resolved on the front-end, the ideal order is to first reach agreement on contract consolidation and then integrate the seniority lists in arbitration. That way, when the arbitrator integrates the seniority list, it can be immediately applicable, *e.g.* Northwest/Delta. In this case, for a variety of quite obvious reasons, the only thing the contesting parties were able to agree on was the DRA process for integrating the four lists. After the NMB makes its determinations, the designated single representative and the Company must negotiate an implementing agreement and/or revise or consolidate the applicable CBAs. Thus, these Parties not only have the cart before the horse but also have yet to attach the wheels and seat the driver.

RAH advanced colorable reasons, including operational efficiency, cost-effectiveness, minimization of grievances and ease of contract administration, for postponing the date on which the seniority integration becomes effective and the Awarded IMSL part of the collective bargaining agreement(s) applicable to the single pilot craft or class on the single transportation system, to allow the Company and the designated single representative an opportunity to negotiate the consolidation and/or revision of the applicable CBAs. The Award therefore affords the Company and the designated single representative a reasonable period time to consummate, at the very least, an implementing agreement to administer the single integrated seniority list under more than one applicable agreement, pending achievement of a consolidated CBA. However, nothing in this Opinion, or in the Award, should be read or construed to imply that the designated pilot and management representatives may agree to change the Award, to abrogate its final and binding effect, or to postpone the awarded effectiveness and application date.

Although the goal of a cost-efficient, orderly and symmetrical implementation of the awarded IMSL is a desirable objective, it cannot be achieved at the expense of fairness and equity-- the bedrock principles that underpin the DRA and the Award. Given the unique facts and circumstances of this case, it would be unfair, inequitable and contrary to the manifest intent of the DRA to leave the post-Award negotiation period completely undefined and open-ended. Indeed, overriding considerations of equity and fairness, as well as DRA mandates and prudent operational reasons, all compel me to make the list effective as soon as reasonably possible.

Each of the Parties to the DRA poured significant expenditures of resources, time, energy and good faith resources into the creation of the IMSL through this arbitration award. To indefinitely delay the effectiveness and applicability of the awarded IMSL, for an open-ended post-Award negotiating period, would invite tactical procrastination calculated to vitiate the cardinal requirement of DRA §V(g) that "the award of the arbitrator . . .shall be final and binding on the Parties to this Agreement and on the pilots employed by RAH and its affiliates".

Recent experience demonstrates that concerns over such a disastrously destructive epilogue are neither alarmist nor simply academic. *See*, <u>Paddington v. US Airline Pilots Association</u>, 606 F.3d 1174 (9th Cir. 2010). Delaying implementation of the IMSL for an undefined open-ended period of time would be more than intolerably corrosive of labor-management relations. Finally, it would be manifestly unfair and inequitable for the Award to require furloughed pilots, with integrated but indefinitely tolled seniority numbers on the awarded IMSL, to remain mired in unemployment as RAH hires new pilots off the street.

Based on all of the foregoing, I hold that it is prudent, fair, equitable and consistent with the manifest intent of the DRA to provide for period of up to sixty (60) days for bargaining following the specified NMB rulings. In my judgment, that is a reasonably defined period of time sufficient to allow knowledgeable, informed and properly motivated labor-management bargainers to consummate at least an implementing agreement, if not the consolidated CBA(s). It is understandable that at least some of the Parties to the DRA would want greater expedition in the effective and applicable date and that the others would prefer a longer period. But there are neither countervailing equities nor insurmountable operational obstacles that justify exercising my arbitral authority under DRA §§V (c), (g) and (j) to order a longer delay after the NMB acts.

The Award also expressly provides that the awarded seniority integration would still be implemented, with appropriate adjustments in the IMSL, if the NMB rules that fewer than all of the carriers are included in a single transportation system for the pilot craft or class. This comports with the unanimous agreement of the Parties, as expressly set forth in the written record. For example, all Parties to the DRA agree that, if the NMB concludes that Frontier is not part of the Republic single transportation system for the pilot craft or class, the integration methodology of the Award will be applied with the Frontier pilots excluded. Thus, the Award makes clear that this is the intended result in the event that the NMB so rules in the instant case.

Building upon the "dynamic" nature of NMB single-carrier determinations, RAH and IBT go further to propose that the Award also direct that an initially "excluded" pilot group(s) must be integrated into the awarded IMSL, without the necessity of another seniority list integration process, if the NMB revisits its initial determination and finds that facts and circumstances have changed to make that previously excluded carrier part now of the RAH single transportation system. Again, this is more than an academic exercise. In the flight attendant case arising out of these same transactions, the NMB excluded Frontier and Lynx from its single carrier finding, but made clear that "[future] changes on the carriers may lead to a different result." <u>Chautauqua Airlines. Inc</u>. 37 NMB 148,167 (2010).

However, if the NMB finds that present facts and circumstances do not support a conclusion that Frontier and Lynx are presently a part of the single carrier in the pilot case, but reaches a different conclusion in a future proceeding, it necessarily follows that the facts and circumstances have materially changed. The present Award is based on facts and circumstances demonstrated in an evidentiary record that was closed in 2010. The "fair and equitable" standard requires that any future integration of presently excluded group or groups be based on the facts and circumstances in existence on the ground and in the air at that time, rather than on the basis of this Award alone.

Based on all of the foregoing, the attached written Award is final and binding on the date of its issuance, for purposes of the first sentence of DRA §V(g). That Award makes the awarded IMSL (Appendix A) effective and applicable, for purposes of the second sentence of DRA §V(g) and the first sentence of DRA §V(j), no later than the date of the sixtieth day (60 days) following the date of the requisite NMB rulings and certification.

## SUMMATION

Under the arbitrated Award there will be one pilot group on an integrated system seniority list that accords pilots, as much as possible, minimal diminution in reasonably held career expectations and a fair chance to share in potential future growth. Proposals designed to give a single group windfalls in job security that none enjoyed pre-acquisition or to claim the lion's share of potential growth are avoided in the hybrid methodology utilized to construct the IMSL. A fair and equitable result is accomplished primarily by way of the actual integration of the list, with standard conditions and restrictions of limited reach and duration.

The seniority integration Award is made effective and applicable on the basis of a schedule which affords the single system labor-management representatives ample time and opportunity to negotiate the ways and means of implementation; while ensuring that fairness and equity are not forfeited should they be unable to do so by the mandated deadline.

The record evidence establishes that each of the four groups faced separate significant problems that threatened pilots' careers and job security. However, there is clear symbiosis of the pilot groups in the new hybrid carrier, which makes the whole greater and stronger than the sum of its parts. Without doubt there will be elements of dissatisfaction going forward, if for no other reason than none achieved exactly what they wanted. No resolution of the serious differences among these Parties imposed by a third party decision can be a perfect solution and no one in the process can expect overnight healing. As the noted American (League) philosopher Lawrence Peter Berra pointed out, "nothing is like it seems but everything is exactly like it is"; which makes it "tough to make predictions, especially about the future". And predicting anything about the future direction and development of the 21st Century airlines industry is to attempt navigation through "Terra Incognita . . . where there be Monsters". That having been said, however, if the FFD and branded service pilots support one another, they all have the potential not only to survive that voyage but also to thrive.

# AWARD

## A.  THE INTEGRATED MASTER SENIORITY LIST (IMSL)

The IMSL for the pilots of Republic Airline/Chautauqua Airlines/Shuttle America (RAH), Frontier Airlines, Midwest Airlines and Lynx Aviation shall be the List attached to this Award as Appendix A.

## B.  CONDITIONS/RESTRICTIONS

1.      These conditions and restrictions are an integral part of the IMSL and shall remain in full force and effect until they expire by their terms.

2.      Pilots hired after October 1, 2009 shall be junior to all pilots on the IMSL and shall be listed in order of date of hire.

3.      Neither the implementation of the integrated seniority list nor the implementation or expiration of a condition or restriction of the IMSL, in and of itself, may cause the displacement of any pilot from his or her then-current position (including pilots who have been awarded positions but had not commenced or completed training).

4.      There shall be no requirement for pilots to be compensated for flying not performed as a result of the seniority integration.  This restriction does not bar application of pay protection provisions of any applicable collective bargaining agreement.

5.      A.      For the period of seven (7) years, beginning with the first bid period after the date on which the seniority integration becomes effective, Frontier Pilots will have priority for all CA and FO jobs on Airbus 320 family aircraft (A318, A319, A320, and A321); including aircraft acquired to replace such aircraft removed from the fleet.

        B.      For the period of seven (7) years, beginning with the first bid period after the date on which the seniority integration becomes effective, Republic Pilots, Midwest Pilots and Lynx Pilots will have priority for all CA and FO jobs on CRJ 200, E-135, E-140, E-145, E- 170 and E-175 aircraft; including aircraft acquired to replace such aircraft removed from the fleet.

6.      Paragraphs 5A and 5B, above, shall expire on the seventh (7th) anniversary of the date on which the seniority integration becomes effective. Any bid awards or displacements effective after that date will not be subject to those restriction.

7.     Dispute resolution procedures shall be in accordance with Section V. of the DRA. To the extent specified in Sections V(c) and V(i), the undersigned Arbitrator retains jurisdiction to resolve any unresolved disputes between the pre-merger pilot groups as to the terms of the DRA and/or the interpretation or application of this Award.

8.     In the event of inadvertent error or unintended omission by the Technical Advisory Team ("TAT") in the certified IMSL attached hereto as Appendix A, the TAT may agree upon and make an appropriate correction. Failing such agreement, the Party seeking such a correction may file a petition for correction with the undersigned Arbitrator.

## C. EFFECTIVE/APPLICABLE DATE OF THE IMSL

The IMSL (Appendix A) shall become effective for purposes of the second sentence of DRA §V (g) and applicable for purposes of the first sentence of DRA §V (j) on the sixtieth (60th) day following the date of the National Mediation Board rulings and certification referenced in DRA §V (g), unless an earlier date is agreed upon by the designated pilot representative and the single carrier.

The awarded seniority integration shall be implemented on the specified effective/applicable date, with appropriate adjustments to the IMSL (Appendix A), if the NMB rules that fewer than all of the carriers are included in a single transportation system for the pilot craft or class.

*Dana E. Eischen*
/s/ Dana Edward Eischen

On this day 19th day of February 2011, I, DANA E. EISCHEN, do hereby certify that I am the individual described herein and that I executed the foregoing instrument on that date, which I affirm upon my oath as Arbitrator to be my **AWARD** in seniority list integration arbitration, under the terms of the Dispute Resolution Agreement of November 3, 2009.