# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MIDWEST PILOTS MERGER COMMITTEE, CARL SCHWERMAN, DONALD TILL, *and* MARK E. WARD,          *Plaintiffs*, <br><br> *v.* <br><br> FRONTIER AIRLINES, INC. *and* FRONTIER AIRLINE PILOTS ASSOCIATION,          *Defendants.* | Civil Action No. 2:14-cv-01441-RTR |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF MPMC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
Phone: (202) 296-8500
Fax: (202) 296-7143
Email: jclarke@highsaw.com

Date: February 9, 2015      Attorney for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The DRA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The IMSL Award And Its Application To The Eight Midwest Pilots Frontier Hired.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    RAH's Sale Of Frontier.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    Frontier And FAPA Refuse To Arbitrate Under The DRA The Disputes MPMC Raised... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    FRONTIER'S AND FAPA'S CLAIM THAT THE DRA CEASED TO APPLY TO THEM ONCE RAH SOLD FRONTIER, RAISES A MINOR DISPUTE OVER THE INTERPRETATION AND APPLICATION OF THE DRA, WHICH THEY HAVE AGREED TO ARBITRATE BEFORE THE DRA § V(c) ADJUSTMENT BOARD... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    Defendants' Claim That The DRA No Longer Applies To Them Raises A "Minor Dispute" Within The Exclusive Jurisdiction Of The Integration Arbitrator Under DRA § V(c) To Resolve.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.    Frontier And FAPA Have *Agreed* To Be Bound By The DRA's Arbitration Provisions... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.    Frontier's And FAPA's Agreement In DRA § V(c) To Arbitrate "*Any* Dispute Arising Out Of The Interpretation Or Application" Of The DRA Encompasses The Dispute They Have Raised Over The DRA's Continued Application To Them.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    II.    THIS COURT HAS THE AUTHORITY TO ENFORCE RLA §§ 2 FIRST AND 204 BY APPROPRIATE EQUITABLE RELIEF. . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

LIST OF ATTACHMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Case 2:14-cv-01441-RTR   Filed 02/09/15   Page 2 of 35   Document 22

# TABLE OF AUTHORITIES

**CASES RELIED UPON:**

*AFA v. USAir, Inc.*, 24 F.3d 1432 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*ALPA v. Midwest Express Airlines, Inc.*, 279 F.3d 553 (7th Cir. 2002). . . . . . . . . . . . 13, 17, 21-23

*Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*AT&T Technologies, Inc. v. CWA*, 475 U.S. 643 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

*BLE v. Louisville & Nashville R.R.*, 373 U.S. 33 (1963). . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 25

*BLE v. Missouri-Kansas-Texas R.R.*, 363 U.S. 528 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Chicago & North Western Ry. v. UTU*, 402 U.S. 570 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Committee of Concerned Midwest Flight Attendants v. IBT*, 662 F.3d 954 (7th Cir. 2011). . . . 20

*Consolidated Rail Corp. v. RLEA*, 499 U.S. 299 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

*Esmark, Inc. v. NLRB*, 887 F.2d 739 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*IAM v. Central Airlines, Inc.*, 372 U.S. 682 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25-26

*IAM v. Street*, 367 U.S. 740 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*IBT v. Frontier Airlines, Inc.*, 628 F.3d 402 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*In re Frontier Airlines, Inc.*, 41 NMB 31 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28

*In re Frontier Airlines, Inc.*, 41 NMB 88 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lambrecht v. O'Neal*, 3 A.3d 277 (DE 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991). . . . . . . . . . . . . . . . . . . . 22-25

*McAllister Brothers, Inc. v. A&S Transportation Co.*, 621 F.2d 519 (2d Cir. 1980). . . . . . . . . 17

*Nolde Brothers, Inc. v. Local 358, Bakery Workers*, 430 U.S. 243 (1977). . . . . . . . . 13, 16, 23-25

*People Express Pilot Merger Committee v. Texas Air* Corp., 1987 WL 18450 (D.NJ 1987). . . . 17

-ii-

*Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960) . . . . . . . . . . . . . . 16, 21, 23

*Steward v. Mann*, 351 F.3d 1338 (11 Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 28

*Thomas v. RAH*, 2012 WL 683525 (D. CO 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*TKB International Corp.*, 240 N.L.R.B. 1082 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**STATUTES AND OTHER AUTHORITIES RELIED UPON:**

Bankruptcy Code, 11 U.S.C. § 101, *et seq.*
    Chapter 11, 11 U.S.C. § 1101, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 21
    Section 2, 9 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 4, 9 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

McCaskill-Bond Amendment, 42 U.S.C. § 42112 note. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Railway Labor Act, 45 U.S.C. § 151, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*
    Section 2 First, 45 U.S.C. § 151 First. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*
    Section 2 Third, 45 U.S.C. § 151 Third. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 2 Sixth, 45 U.S.C. § 151 Sixth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 2 Eleventh, 45 U.S.C. § 151 Eleventh. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 3 First (j), 45 U.S.C. § 153 First (j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 28
    Section 204, 45 U.S.C. § 184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

Section 301, Labor Management Relations Act, 29 U.S.C. § 181. . . . . . . . . . . . . . . . . . 15, 16, 21

Fed. R. Civ. P.
    Rule 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Rule 65(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Rule 65(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

First Annual Report of the National Mediation Board (1935). . . . . . . . . . . . . . . . . . . . . . . . . . 2

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **MIDWEST PILOTS MERGER** | ) | |
| **COMMITTEE,** | ) | |
| **CARL SCHWERMAN,** | ) | |
| **DONALD TILL,** | ) | |
| *and* | ) | |
| **MARK E. WARD,** | ) | |
| *Plaintiffs,* | ) | **Civil Action No. 2:14-cv-01441-RTR** |
| | ) | |
| *v.* | ) | |
| | ) | |
| **FRONTIER AIRLINES, INC.** | ) | |
| *and* | ) | |
| **FRONTIER AIRLINE PILOTS** | ) | |
| **ASSOCIATION,** | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF MPMC'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Midwest Pilots Merger Committee (MPMC) has moved for partial summary judgment pursuant to Rule 56(a), Fed. R. Civ. P., asserting that there are no genuine disputes over facts that are material to this motion and that it is entitled to judgment in its favor on Count I of the complaint. This Memorandum of Law is submitted by plaintiff MPMC in support of its motion.

### STATEMENT OF FACTS

By the end of 2008, Republic Airways Holdings Inc. (RAH), whose three airline subsidiaries at that time[1] provided "capacity" for several of the major air carriers, decided to diversify "into scheduled brand service." February 19, 2011 Seniority Integration Award (IMSL Award), FAPA Ex. 2 at 11 (Doc. #15-2 at 12). RAH accomplished this "by purchasing two established mainline branded carriers" (*Id.*), Midwest Airlines, Inc. and Frontier Airlines, Inc. It did this by acquiring their holding

---

[1] Those subsidiaries are: Republic Airline Inc., Chautauqua Airlines, Inc., and Shuttle America Corp. Plaintiff's Statement of Undisputed Material Facts [hereinafter, "PS"] ¶ 6.

companies. RAH acquired Midwest's parent, Midwest Air Group, Inc., on July 31, 2009. *Id.* And

it acquired Frontier's parent, Frontier Holdings, Inc., by sponsoring Frontier Holdings' Plan of

Reorganization so that Holdings and its two airline subsidiaries (Frontier Airlines and Lynx

Aviation, Inc.) became wholly-owned affiliates of RAH when, on October 1, 2009, Frontier

Holdings emerged from reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101,

*et seq.* IMSL Award at 11, n. 1 (Doc. #15-2 at 12).

Prior to its acquisition of the two brands, RAH operated its three airline subsidiaries as a

"single transportation system"–*i.e.*, a "carrier" subject to the Railway Labor Act (RLA), 45 U.S.C.

§ 151, *et seq.*[2] Its approximately 2,041 pilots were represented by the International Brotherhood of

Teamsters (IBT) through the IBT's Airline Division. PS ¶¶ 7, 21. Those pilots were covered by a

collective-bargaining agreement (CBA) negotiated by the IBT with RAH. IMSL Award at 7 (Doc.

---

[2] Since its beginning, the National Mediation Board (NMB) has been confronted with questions concerning who is the "carrier" for purposes of the RLA where an enterprise provides covered transportation services through affiliated corporations. As the Board explained in its First Annual Report at 22 (1935) (emphasis added; relevant excerpts of the Annual Report are attached hereto as Attachment A):

> Where a railroad system is composed of a number of subsidiary corporations, employees have been in dispute as to whether one vote should be taken of a craft on the whole system or whether the subsidiary corporations are carriers within the meaning of the act whose employees are entitled to separate representation. The Board has ruled generally that where a subsidiary corporation reports separately to the Interstate Commerce Commission, and keeps its own pay roll and seniority rosters, it is a carrier as defined in the act, and its employees are entitled to representation separate from other carriers who may be connected with the same railroad system. *If the operations of a subsidiary are jointly managed with operations of other carriers and the employees have also been merged and are subject to the direction of a single management, then the larger unit of management is taken to be the carrier rather than the individual subsidiary companies.*

#15-2 at 8). Midwest's approximately 383 pilots were represented for purposes of the RLA by the Air line Pilots Association, International (ALPA), and were covered by a CBA. PS ¶¶ 1, 21. Frontier's 694 pilots were represented by the Frontier Airline Pilots Association (FAPA) and they, too, were covered by a CBA. PS ¶¶ 3, 21; IMSL Award at 7 (Doc. #15-2 at 8). Finally, the 132 Lynx pilots were represented by the United Transportation Union (UTU), but that organization and Lynx had not negotiated a CBA. PS ¶ 8, 21.

Each of the three CBAs applicable to the pilots within the RAH corporate family as of October 1, 2009, provided that, in the event its airline engaged in a successorship transaction which resulted in an operational merger, the pilots' seniority should be integrated in a fair and equitable manner as provided in Sections 3 and 13 of the Labor Protective Provisions (LPPs) imposed by the Civil Aeronautics Board in the Board's *Allegheny-Mohawk Merger Case*. PS ¶ 10. Lynx's pilots had no such contractual protection, but they were included in the seniority integration dispute by virtue of the McCaskill-Bond Amendment, 42 U.S.C. § 42112 note. *Id*.

As authorized by ALPA's *Merger & Fragmentation Policy*, the Midwest pilots established a "Merger Committee" and delegated to that Committee "complete and full authority to act for and on behalf of the [Midwest] flight deck crew members . . . for the purpose of concluding a single flight deck crew member seniority list and appropriate conditions and restrictions, which shall not be subject to ratification." PS ¶ 1, *quoting ALPA's Merger & Fragmentation Policy* at Part 3C 1 (MPMC Ex. 15 at 11). Each of the three other unions also formed Merger Committees and gave them comparable authority. MPMC Ex. 1 at 1 (Therefore clause).

-3-

**A.    The DRA.**

On November 3, 2009, the four Merger Committees reached an agreement with RAH and its affiliates as to the process that would be followed to resolve the dispute over the fair and equitable integration of the pilots' seniority. MPMC Ex. 1 (Doc. #1-1 at 1-6). That multi-party agreement–known as the Section 13(b) Dispute Resolution Agreement (DRA)–explained that (Doc. #1-1 at 1):

> . . . [RAH], on behalf of itself and its wholly-owned affiliates Republic Airline Inc., Chautauqua Airlines, Inc. and Shuttle America Corp. (hereinafter collectively, "Republic"), Midwest Airlines, Inc., Frontier Airlines, Inc. and Lynx Aviation, Inc. (RAH and its affiliates together one "party" under this Agreement), and the Republic, Midwest, Frontier and Lynx pilots, as represented by their respective Seniority Merger Committees (the "Merger Committees") as duly created and authorized by each pilot group's duly designated representative (each such Merger Committee another "party" under this Agreement) agree to establish the following procedures for resolving the seniority integration issue in accordance with Sections 3 and 13 of the [*Allegheny-Mohawk*] LPPs . . . .

That Agreement provided for the exchange of information (DRA § I), a period of negotiations among the four committees for an agreement as to how their seniority should be integrated (DRA § II(c)), and negotiations with RAH if they succeeded in reaching an agreement amongst themselves. DRA § II(d). The DRA further provided for mediation (DRA § III), and then for arbitration if an integration agreement was not reached. DRA § II(f).

It also provided procedures to resolve disputes that might arise within 120-days of the Award's effective date "involving an interpretation" of the integration-arbitrator's award (DRA § V(i)), or disputes that might arise after the 120-day period "out of the interpretation or application of the award . . . ." DRA § V(j). Interpretation disputes within the first 120-days of the award's

-4-

effective date were to be resolved by the Integration Arbitrator (DRA § V(i)), while post 120-days "interpretation or application" disputes were to be resolved before an adjustment board "established by the designated representative of the combined craft or class and the single carrier for final and binding resolution." DRA § V(j).

That agreement recognized the inherent conflict the union subsequently designated to represent the combined craft or class would face when attempting to resolve a dispute arising out of the interpretation or application of the integration award.[3] The parties addressed this conflict of interests by providing for the continuation of the Merger Committees by the designated representative of the combined craft or class of pilots, which was to delegate to the Committees its authority to handle such disputes. First, the parties provided in DRA § V(h) that:

> The Organization, if any, designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system shall continue the Merger Committees in existence and delegate to the Merger Committees authority solely for the purpose of adjusting any dispute or disputes that might arise as to the interpretation or application of the award, including authority to compromise such disputes, and to initiate, defend, mediate, and litigate such issues in the dispute resolution mechanism under this Agreement. The Organization shall have authority over the manner in which the Merger Committees' operations are financed. The Merger Committees which are parties to this agreement represent that they have been authorized by their principals (the duly designated representative of their airline's pilots) to enter into the commitments set forth in this paragraph and in this Agreement. Each Merger Committee shall fill its own vacancies by selection made by the remaining members of that Merger Committee.

---

[3]    *See*, *Steward v. Mann*, 351 F.3d 1338, 1344-47 (11 Cir. 2003) (RLA due notice provision, 45 U.S.C. § 153 First (j), which is applicable to airline adjustment boards, requires adjustment board to give notice of seniority dispute to employees who may be impacted so that they might be heard).

-5-

And second, they provided the manner in which the Merger Committees could initiate, handle through the conferences required by RLA § 2 Sixth, 45 U.S.C. § 152 Sixth,[4]and, if necessary, invoke the jurisdiction of the appropriate adjustment board to resolve disputes arising out of the integration award. DRA §§ V(i) and V(j). DRA § V(i) provides *any party* to the DRA could invoke the Integration Arbitrator's jurisdiction to resolve a dispute arising out of the interpretation of the integration award within 120-days of its effective date. Section V(j), which plaintiff MPMC submits is applicable to the seniority dispute it has raised, provides that such an interpretation or application dispute "shall be handled in the usual manner by the applicable Merger Committees up to and including the highest carrier official designated to handle such disputes, but failing to reach an adjustment in this manner, the dispute may be submitted by any party to the dispute to the adjustment board established by the designated representative of the combined craft or class and the single carrier for final and binding resolution." That agreement further provides that in the adjustment board process: "All Merger Committees shall be given notice of the dispute and, in addition to the Merger Committee invoking the adjustment board jurisdiction, may be heard by the system board of adjustment in resolving the dispute, with the decision of the board being made by the arbitrator

---

[4]    RLA § 2 Sixth provides in pertinent part that (45 U.S.C. § 152 Sixth):
In case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, it shall be the duty of the designated representative or representatives of such carrier or carriers and of such employees, within ten days after receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such conference shall be held . . . .

selected pursuant to the applicable agreement to sit with the system board (without a vote by the other members of the system board)." DRA § V(j).[5/]

Finally, the parties recognized that disputes might arise out of the "interpretation or application" of the DRA itself and they provided that the Integration Arbitrator "shall have the authority to resolve any" such dispute. DRA § V(c).

## B.    The IMSL Award And Its Application To The Eight Midwest Pilots Frontier Hired.

RAH's pilots were unable to reach an agreement as to the methodology to integrate their seniority and they, along with RAH, submitted that dispute to the integration arbitrator the parties had selected, Dana E. Eischen, for resolution. PS ¶ 19. Following a hearing and briefing, Arbitrator Eischen issued his integration award on February 19, 2011. As the DRA directed he do (DRA § V(g)), Eischen established a date on which the award would become effective; he provided that the award would be effective sixty (60) days *after* the NMB determined whether "the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system." DRA at 4-5, § V(g); PS ¶ 25. On April 7, 2011, the NMB found that RAH was operating its airline subsidiaries–Republic, Chautauqua, Shuttle America, Frontier and Lynx–as a single transportation system for pilots, and that the Midwest pilots were included in that craft or class. PS ¶ 27. On June 28, 2011, it certified that the IBT was the duly designated representative of those pilots. PS ¶ 28. Thus, the

---

[5/]     That provision, plaintiff MPMC submits, supersedes for disputes within the coverage of DRA § V(j), the "gatekeeper" restrictions in the Frontier/FAPA CBA, which FAPA correctly notes, gives it control over which grievances may be progressed through the CBA's dispute resolution procedures. FAPA Memorandum In Support of Motion To Dismiss [hereinafter, "FAPA Memo."] at 16, n. 6 (Doc. #14).

IMSL Award–and its integrated list–became effective and a "part" of the applicable CBAs on August 27, 2011. PS ¶¶ 25, 29.

During the period between the date the IMSL Award was issued and its effective date, Frontier hired eight furloughed Midwest pilots, who, unlike the other RAH-affiliate pilots it hired in that time frame, did not waive their IMSL rights when hired. MPMC Ex. 2 at 7-8 (Doc. #1-1 at 13-14). During the period before the IMSL effective date, the eight Midwest pilots were considered by Frontier to be new-hires and, as required by the Frontier/FAPA CBA, were assigned their Date-of-Hire (DOH) as their seniority date. PS ¶ 30. Once the IMSL Award became effective, the MPMC maintained that their seniority should be that as established by the Award, while the Frontier Pilots Merger Committee (FPMC) disagreed, asserting that the IMSL Award was *not effective* and would not be effective until RAH and the IBT negotiated either a combined CBA or an agreement providing for the implementation of the award. PS ¶ 31.

MPMC invoked Arbitrator Eischen's jurisdiction under DRA § V(i) to resolve that dispute, which he did on October 25, 2011, when he issued Interpretative Award No. 1. MPMC Ex. 2 at 13-15 (Doc. #1-1 at 19-21). Eischen found that the integrated list did not need either a consolidated CBA or an implementing agreement before it would be effective (MPMC Ex. 2 at 13 (Doc. #1-1 at 19)), and that on August 27, 2011, the integrated list became "'a part of' both the RJET/IBT Agreement and the Frontier/FAPA Agreement." MPMC Ex. 2 at 14 (Doc. #1-1 at 20). He further found that as of August 27, 2011, "the IMSL (Appendix A [to his Award]) and its integral Conditions/Restrictions comprise the seniority list that is to be used in the administration of seniority status based provisions of both the RJET/IBT Agreement and the Frontier/FAPA Agreement." *Id*.

-8-

**C.   RAH's Sale Of Frontier.**

Two years later, on September 30, 2013, RAH entered into a Stock Purchase Agreement with the Falcon Acquisition Group, Inc. to sell to that entity all of its stock in its wholly-owned subsidiary Frontier Holdings, Inc. PS ¶ 34. That transaction closed on December 3, 2013 (*Id.*), and on December 18, 2013, FAPA filed an application with the NMB to represent the Frontier pilots (PS ¶ 35) along with a request that the NMB "investigate whether Frontier . . . now constitutes a separate system from the other carriers that compromised [*sic*] the Republic Airlines et al./Frontier, single system for the craft or class of Pilots." *In re Frontier Airlines, Inc.*, 41 NMB 31 (2014). On March 31, 2014, the NMB issued its findings upon that investigation, finding that "Frontier is operating as a single transportation system for the craft or class of Pilots." *Id.* It proceeded to conduct an election and on June 13, 2014, certified FAPA as the duly designated representative for purposes of the RLA of the craft or class of pilots employed by Frontier. *In re Frontier Airlines, Inc.*, 41 NMB 88 (2014).

While FAPA's representation application was pending before the NMB, Frontier and FPMC informed Arbitrator Eischen in a separate IMSL Award dispute pending before him, that the DRA and the IMSL Award ceased to be applicable to Frontier and its pilots once the NMB found that Frontier was no longer part of the RAH transportation system. PS ¶ 39. They formed that position by relying upon their interpretation of the language and intent of the DRA and IMSL Award. MPMC Exs. 20-23. When Eischen issued his award in that separate dispute on September 12, 2014, he did not address Frontier's and FPMC's arguments as to the continued validity of the DRA and IMSL Award. PS ¶ 40.

Nevertheless, on September 13, 2013, FAPA asked Frontier to agree with it that, as of June 13, 2014, "the Eischen Award and the IMSL are no longer effective with respect to seniority under

-9-

the Frontier CBA" (MPMC Ex. 9 at 3 (Doc. #1-1 at 68)), and that "the seniority of a Pilot under the Frontier CBA shall be determined based on the date on which the Pilot was first placed on the Company payroll as a pilot, in accordance with Section 3.A.1. of the Frontier CBA". *Id*. FAPA made that request based upon its reading of the DRA and the IMSL Award, which it asserted placed various conditions upon the application of the IMSL to the separate airlines owned by RAH when the DRA was negotiated. MPMC Ex. 9 at 1-2 (Doc. #1-1 at 66-67). It then asserted that, as a result of Frontier's sale and FAPA's certification, "none of the conditions for the application of the Eischen Award and the IMSL with respect to Frontier exist, and Section 3 and the other seniority-related provisions of the Frontier CBA apply by their terms without modification." MPMC Ex. 9 at 2 (Doc. #1-1 at 67). Frontier responded that same day, consenting to FAPA's request. FAPA Ex. 3 at Enclosure 2 (Doc. #15-3 at 14). It added that it was adjusting its electronic bid system for the current bidding that was scheduled to close the next day at 0900. *Id*.

Four of the eight former Midwest pilots remained actively employed by Frontier in September 2014, while a fifth pilot was on medical leave. PS ¶ 42. Abrogating their IMSL ranking deprived them–and *only* them–of the "specific seniority rank *status*" they had been awarded by the IMSL Award and reinstated the seniority rank status they held "under old pre-acquisition seniority lists now superseded by the IMSL."[6] MPMC Ex. 2 at 14 (Doc. #1-1 at 20). This deprived them of the superior bidding position the IMSL Award had given them in recognition of the equities they brought to the integrated Frontier operations from their service at Midwest. PS ¶ 42.

---

[6] Frontier's and FAPA's actions also *removed* from the seniority list at Frontier all pilots who had seniority on the IMSL but had not been hired by Frontier by June 2014. MPMC's challenge here also seeks to reinstate those pilots to the seniority list at Frontier.

**D.      Frontier And FAPA Refuse To Arbitrate Under The DRA The Disputes MPMC Raised.**

On September 20, 2014, MPMC asked FAPA to implement DRA § V(h) by informing Frontier that MPMC and the other Merger Committees were authorized by FAPA to handle seniority disputes. PS ¶ 43. Since the Frontier/FAPA CBA placed a time limit on when disputes under that CBA may be initiated (*see*, FAPA Ex. 1 at § 12.C (Doc. #15-1 at 14)), MPMC, relying upon the authority delegated to it by DRA § V(h), initiated the grievance process on September 23, 2014 to dispute Frontier's and FAPA's abrogation of the IMSL. PS ¶44.

FAPA responded on September 24, 2014, reiterating what it had argued to Arbitrator Eischen in June 2014 (MPMC Ex. 20) that the DRA and IMSL Award contained implied conditions to their continued applicability to Frontier. PS ¶¶ 45-46. It asserted that, as a result of Frontier's sale, "none of the conditions for the application of the Eischen Award and IMSL with respect to Frontier exist, and Section 3 and the other seniority-related provisions of the Frontier CBA apply by their terms without modification." MPMC Ex. 6 at 1 (Doc. #1-1 at 51). FAPA asserted that the DRA "is no longer applicable to Frontier . . . or FAPA" and that, "[a]ccordingly, . . . [MPMC's] request to invoke the arbitration provisions of the DRA are without basis, and substantively inarbitrable." *Id.*

MPMC invoked the jurisdiction of Arbitrator Eischen under DRA § V(c) to resolve the DRA-interpretation and application disputes that MPMC asserted were presented by FAPA's and Frontier's positions that the DRA and IMSL Award were no longer applicable to Frontier or FAPA. PS ¶ 47. FAPA and Frontier responded on October 10, 2014 to MPMC's arbitration demand, reiterating their position that the DRA and IMSL no longer applied to Frontier or FAPA now that Frontier was no longer an affiliate of RAH. This, they argued, meant that there was no agreement to arbitrate under the DRA. PS ¶¶ 48, 49. On October 29, 2014, Arbitrator Eischen issued a ruling

-11-

that Frontier had raised "a colorable issue of substantive arbitrability" that must be resolved by a court. PS ¶ 50.

This suit followed.

**ARGUMENT**

I.   **FRONTIER'S AND FAPA'S CLAIM THAT THE DRA CEASED TO APPLY TO THEM ONCE RAH SOLD FRONTIER, RAISES A MINOR DISPUTE OVER THE INTERPRETATION AND APPLICATION OF THE DRA, WHICH THEY HAVE AGREED TO ARBITRATE BEFORE THE DRA § V(c) ADJUSTMENT BOARD.**

Relying upon their interpretation of the language of the DRA and upon their view of the DRA's intent, Frontier and FAPA assert that the DRA and the IMSL Award it generated ceased to apply to Frontier and its pilots after RAH sold Frontier's parent to the Falcon Acquisition Group, Inc. and the NMB found that Frontier is a single transportation system whose pilots are represented by FAPA. MPMC Ex. 9. When plaintiff MPMC challenged defendants' interpretation of the DRA and asked that the dispute be arbitrated under DRA § V(c),[7/] Frontier and FAPA refused, asserting that the agreement in DRA § V(c) to arbitrate no longer applies to them.[8/] MPMC Exs. 8, 10. That refusal to arbitrate, plaintiff MPMC submits, violates defendants' duty under RLA §§ 2 First and 204, 45

---

[7/]   DRA § V(c) provides (Doc. #1-1 at 4; emphasis added):
(c) In addition to jurisdiction to resolve disputes under Section I [dealing with discovery] and to devise the fair and equitable integration of seniority, *the arbitrator shall have the authority to resolve any dispute arising out of the interpretation or application of this Agreement.*

[8/]   FAPA also asserted to the DRA arbitrator that DRA § V(c) has an implicit temporal limitation: It extended, FAPA argues, "only to disputes arising within 120 days of the effective date of the Eischen Award . . . ." MPMC Ex. 8 at 7 (Doc. #1-1 at 63). As FAPA's motion to dismiss shows by *not* raising that defense in this suit, the validity of that interpretation is clearly an issue for the arbitrator to decide.

-12-

U.S.C. §§ 152 First and 184, to resolve through the Act's minor dispute procedures, disputes arising out of the interpretation or application of CBAs. *Consolidated Rail Corp. v. RLEA* [*Conrail*], 499 U.S. 299, 303-04 (1989); *ALPA v. Midwest Express Airlines, Inc.*, 279 F.3d 553, 555-56 (7th Cir. 2002); *accord*, *Nolde Brothers, Inc. v. Local 358, Bakery Workers*, 430 U.S. 243, 252-55 (1977).

A.    **Defendants' Claim That The DRA No Longer Applies To Them Raises A "Minor Dispute" Within The Exclusive Jurisdiction Of The Integration Arbitrator Under DRA § V(c) To Resolve.**

It is axiomatic that the RLA establishes "a mandatory, exclusive, and comprehensive system for resolving" disputes growing out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions–*i.e.*, "minor disputes." *BLE v. Louisville & Nashville R.R.*, 373 U.S. 33, 38 (1963). As the Court explained in *Andrews v. Louisville & Nashville R.R.,* 406 U.S. 320, 323 (1972), "the compulsory character of the administrative remedy provided by the Railway Labor Act for disputes such as that between petitioner and respondent [*i.e.*, minor disputes] stems not from any contractual undertaking between the parties but from the Act itself . . . ." It is Congress which has given RLA adjustment boards "exclusive jurisdiction over minor disputes." *Conrail*, 499 U.S. at 304.

There can be no dispute as to whether the controversy Frontier and FAPA have raised as to the proper interpretation and application of the DRA is a "minor dispute" within the exclusive jurisdiction of the "appropriate" RLA adjustment board to resolve. Both Frontier and FAPA look to the terms of the DRA and to its intent to argue that the DRA and the integration award it produced applied to Frontier *only* so long as Frontier was part of the RAH airline family and to the Frontier pilots *only* so long as they were part of a "combined" craft or class of pilots. FAPA Memo. at 17-21 (Doc. #14); Frontier Memorandum In Support of Motion To Dismiss [hereinafter, "Frontier Memo."]

-13-

at 15-19 (Doc. #17). That interpretation of the DRA as being defeasible raises a minor dispute within the jurisdiction of the appropriate adjustment board, for, as the *Conrail* Court explained, the crucial determination as to whether a dispute is within the adjustment boards' exclusive jurisdiction–*i.e.*, whether it is *arbitrable*–is whether "the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." 499 U.S. at 305. If the dispute, as here, "may be conclusively resolved by interpreting the existing agreement" (*Id.*)–in this case the DRA–it is within the adjustment boards' *exclusive* jurisdiction.

Frontier and FAPA do not question that the dispute over whether they may now use Date-Of-Hire rather than the integrated seniority ranking to govern bids by their pilots, raises a minor dispute that must be adjusted. But they assert that the dispute they believe exists is one within the exclusive jurisdiction of the Frontier/FAPA SBA. *E.g.* Frontier Memo. at 13-14. That argument, however, ignores the fact that the dispute they articulate is *not* the real dispute. It also ignores the fact that the Frontier/FAPA CBA is *not* the agreement that needs to be interpreted. Rather, the real dispute is whether defendants are correct in asserting that the DRA and the IMSL Award are no longer applicable to them. The contractual rights that must be construed are those which flow from the DRA, which MPMC asserts make the IMSL seniority "final and binding" and, thus, immutable. MPMC Ex. 5 at 1 (Doc. #1-1 at 49). Since the Frontier/FAPA SBA's agreement-interpretation jurisdiction does not extend to interpreting the DRA,[9] the Frontier/FAPA SBA is not an *appropriate* adjustment board within the meaning of RLA § 204 to resolve the minor dispute over the continued

---

[9]      *See*, FAPA Ex. 1 (Frontier/FAPA CBA at § 12.A.2 (Doc. #15-1 at 18; emphasis added)): The Frontier/FAPA SBA's jurisdiction extends to "disputes between any employee covered by this Agreement [*i.e.*, the Frontier/FAPA CBA] and the Company growing out of grievances or *out of interpretation or application of any of the terms of this Agreement.*"

-14-

applicability of the DRA because that board cannot "conclusively resolve" the dispute. *Conrail*, 499 U.S. at 304. Nor can Frontier or FAPA argue that the Frontier/FAPA SBA has jurisdiction to determine the other aspect of this case–*i.e.*, whether DRA § V(h) requires FAPA to delegate to the Merger Committees its authority to handle seniority-related disputes, including handling disputes before the Frontier/FAPA SBA.

There is, however, an adjustment board that *does* have sufficient arbitral jurisdiction so as to *conclusively resolve the DRA interpretation disputes*. That board is the one established under DRA § V(c), which the parties to that Agreement expressly provided has "the authority to resolve *any* dispute arising out of the interpretation or application of" the DRA. MPMC Ex. 1 at 4, § V(c) (emphasis added). RLA § 204's provision that unresolved minor disputes "may be referred by petition of . . . either party to an *appropriate* adjustment board"(45U.S.C. § 184; emphasis added), gives MPMC the "right to place the disputed issue before [that] . . . Adjustment Board, *with or without the consent of the other*" party. *BLE v. Louisville & Nashville R.R.*, 373 U.S. at 38 (emphasis added). This Court, plaintiff MPMC submits, has jurisdiction to determine whether defendants are subject to the DRA § V(c) arbitration procedure and whether that multi-party board is the "appropriate" adjustment board before which defendants must participate *if* another party to that process so requests. *IAM v. Central Airlines, Inc.*, 372 U.S. 682, 692 (1963) ("The [RLA § 204] contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. . . . That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts").

-15-

**B.    Frontier And FAPA Have *Agreed* To Be Bound By The DRA's Arbitration Provisions.**

While this Court clearly has the authority to determine whether Frontier and FAPA are bound to the DRA, defendants go further and argue that this Court has the authority to decide the DRA interpretation issue–*i.e.*, whether, due to its structure and intent, the DRA no longer applies to them–for they assert that this raises an issue of substantive arbitrability, which courts have jurisdiction to resolve. Relying primarily upon cases decided under Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 181(a), and the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.*, which enforce *contracts*, Frontier and FAPA argue that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit. *E.g.*, Frontier Memo. at 15 (Doc. #17), *quoting AT&T Technologies, Inc. v. CWA*, 475 U.S. 643, 648 (1986), *quoting Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).[10/] Their argument that they cannot be compelled to arbitrate because the contract containing the agreement to arbitrate *no longer applies* to them is without merit under the RLA, as it would be under the LMRA and FAA, for the undisputed facts show that they agreed (Frontier through RAH, and FAPA through FPMC) to arbitrate "*any* dispute arising out of the interpretation or application of" the DRA. DRA § V(c) (emphasis added). Their contention, that the DRA no longer applies to them, raises just such a DRA-interpretation and -application dispute and, thus, is committed to the

---

[10/]    LMRA and FAA cases are not on all fours, for they are premised upon the assumption that "the duty to arbitrate can only arise upon the parties' agreement to resolve their contractual differences in the arbitral forum." *Nolde Bros., Inc.*, 430 U.S. at 256 (Stewart, J., dissenting); *see*, 9 U.S.C. §§ 2, 4. Under the RLA, however, the obligation to arbitrate arises from the statute. *Andrews*, 406 U.S. at 323. This changes the analysis somewhat, for the issue here is not whether defendants are obligated to *arbitrate* the minor disputes at bar, but whether they have agreed to arbitrate those disputes *under the DRA*.

Case 2:14-cv-01441-RTR   Filed 02/09/15   Page 20 of 35   Document 22

exclusive jurisdiction of the Integration Arbitrator for resolution. *ALPA v. Midwest Express*, 279 F.3d at 556 ("[W]hen an arbitration clause is so broadly worded that it encompasses disputes over the scope or validity of the contract in which it is embedded, issues of the contract's scope or validity are for the arbitrators").

Frontier argues that it is no longer bound to the DRA because it was "subject to the DRA *only insofar* as it is a 'wholly owned affiliate' of RAH" (Frontier Memo. at 16 (Doc. #17; emphasis added)) and once it ceased to be a wholly-owned RAH affiliate, it argues, it ceased to be bound by the DRA. *Id*. That argument is without merit, for the DRA contains no such limiting language. As the DRA provides in its text, RAH entered into that agreement "on behalf of itself and its wholly-owned affiliates" (MPMC Ex. 1 at 1), which the DRA then proceeded to list. That enumeration included "Frontier Airlines, Inc." *Id*. *See also*, DRA at 6 (RAH's Vice President signed for RAH "and affiliates").

What Frontier ignores in arguing that it can no longer be bound to the DRA once it ceased to be an RAH affiliate, is that even under the FAA, "a party may be bound by an agreement to arbitrate even in the absence of a signature. . . . Instead, ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate." *McAllister Brothers, Inc. v. A&S Transportation Co.*, 621 F.2d 519, 524 (2d Cir. 1980). Here RAH, as the owner of *all* of Frontier's parent's stock, clearly had the actual authority to bind Frontier to the DRA–including to the DRA's agreement to arbitrate. *People Express Pilot Merger Committee v. Texas Air* Corp., 1987 WL 18450 at *4 (D.NJ 1987) (Holding companies "acted with apparent authority to bind their carrier subsidiaries"); *see also*, *Lambrecht v. O'Neal*, 3 A.3d 277, 288 (DE 2010) ("As sole owner of [subsidiary, parent] . . . is not required to proceed derivatively [in shareholder derivative suit]; it may

-17-

enforce that claim by direct exercise of its 100 percent control"). That commitment to arbitrate did not end once RAH sold Frontier's parent to the Falcon Acquisition Group, for it was a stock sale (MPMC Ex. 16) and it is well accepted that after such a sale the corporate entity remains bound by its pre-sale contracts. *Esmark, Inc. v. NLRB*, 887 F.2d 739, 751 (7th Cir. 1989) (NLRB "has long held that a corporate entity remains liable after a stock sale for labor obligations which accrued prior to the sale"). Indeed, this is but a recognition that a "stock transfer involves no break or hiatus between two legal entities, but is, rather, the continuing existence of a legal entity, albeit under new ownership." *Esmark, Inc. v. NLRB*, 887 F.2d at 751, *quoting TKB International Corp.*, 240 N.L.R.B. 1082, 1083, n. 4 (1979).

As its actions in entering into the November 26, 2013 Arbitration Agreement to arbitrate DRA disputes show (MPMC Ex. 3 at 5-7 (Doc. #1-1 at 26-28)), Frontier acknowledges that the DRA applied to it. PS ¶ 39. Frontier has *not* pointed to any provision in the DRA that expressly provides that a subsequent event would discharge it from obligations which the DRA imposed–and it cannot point to any such provision since there is none. Instead, Frontier looks to the DRA's structure and to its view of the DRA's intent to claim that RAH bound it to the DRA *only insofar* as it remained an affiliate of RAH. That argument, with which MPMC disagrees, is not a reading of the DRA's plain terms, for it reads into that agreement limiting language–"*only insofar* as it remains an affiliate–which the parties did not assert when the DRA was negotiated. Rather, Frontier's reading of the DRA raises a dispute over the *interpretation* of that agreement over which this Court has no jurisdiction.

Similarly, the clear and undisputed language of the DRA, as well as the manner in which it has been applied, show that FAPA is bound by the commitments in the DRA to arbitrate. The plain

-18-

text of the DRA provides that the four Merger Committees which entered into the DRA were "duly created and authorized by each group's duly designated representative . . . ." DRA at 1. Further, DRA § V(h) stated that: "The Merger Committees which are parties to this agreement *represent* that they have been authorized by their principals (the duly designated representative of their airline's pilots) to enter into the commitments set forth in this paragraph *and in this Agreement*." DRA at 5 (emphasis added). When the FPMC members sought to overturn the IMSL Award, they did *not* argue that they as a Committee lacked the authority from FAPA to enter into the DRA. *See*, *Thomas v. RAH*, 2012 WL 683525 (D. CO 2012). Nor could they have, for their authority to act for the Frontier pilots was enumerated in the DRA and authorized by RLA § 2 Third. 45 U.S.C. § 152 Third (Authorizing parties to delegate authority to bargaining representatives). That delegated authority includes the authority to enter into RLA § 204 agreements. Moreover, when FAPA informed the DRA arbitrator that it was no longer bound by the DRA, it did not challenge its Merger Committee's authority to enter into the DRA and commit it to the DRA's obligations. MPMC Ex. 8.

Nor does the fact that for a period of time (*i.e.*, the period that began to run eighteen months *after* the DRA was executed and which ended with FAPA being certified on June 13, 2014) FAPA was not the duly designated representative of the Frontier pilots, require a different conclusion. This is so because it is well accepted–including by FAPA (MPMC Ex. 21 at 1-2)–that "a change in certified representative by the NMB does not affect existing collective-bargaining agreements; a new representative assumes the existing agreements, and succeeds to the predecessor representative as the union party to such agreements." MPMC Ex. 21 at 1; *see also*, *AFA v. USAir, Inc.*, 24 F.3d 1432, 1439-40 (D.C. Cir. 1994).

Thus, the undisputed facts show that both Frontier and FAPA *agreed* to the DRA commitments–including its dispute-resolution provisions. That is all that plaintiff MPMC must show to prevail on its request to enforce RLA §§ 2 First and 204.

C. **Frontier's And FAPA's Agreement In DRA § V(c) To Arbitrate "*Any Dispute Arising Out Of The Interpretation Or Application*" Of The DRA Encompasses The Dispute They Have Raised Over The DRA's Continued Application To Them.**

Frontier and FAPA nevertheless assert that this Court is the tribunal that must determine whether they remain subject to the DRA's arbitration provisions, and they advance several arguments as to why the DRA, in their opinion, expired as to them when Frontier ceased to be an affiliate of RAH and FAPA became the certified representative of the Frontier pilots. Frontier Memo. at 16-19 (Doc. #17); FAPA Memo. at 19-21 (Doc. #14). Each argument, however, relies upon *their interpretation* of both the DRA's language and its intent to find such an *implied* discharge provision. First, adding limiting language that, as noted above, is not in the DRA, they argue that Frontier is bound *only* as an affiliate of RAH. *E.g.*, FAPA Memo. at 19. Second, they assert that, in their view, FAPA has never been designated as the representative of the "combined" craft or class of pilots. *Id*. at 19-20. And third, they maintain that the Frontier/FAPA CBA is *not* a CBA applicable to the combined craft or class of pilots. *Id*. at 20. Those arguments are all without merit,[11/] but more to the point, they are being presented to the wrong forum: Frontier and FAPA, by agreeing to the DRA with

---

[11/]       For example, in arguing that FAPA is not the certified representative of a "combined" craft of class of pilots, or that the Frontier/FAPA CBA is not a CBA applicable to a combined craft or class, Frontier and FAPA ignore the fact that the Frontier of *today* is the product of a completed operational merger by which Midwest was integrated into Republic *and* Frontier (*Committee of Concerned Midwest Flight Attendants v. IBT*, 662 F.3d 954, 957 (7th Cir. 2011); IMSL Award at 34 (FAPA Ex. 2; Doc. #15-2 at 35)) and its pilots are a *combined* craft or class because of the integrated seniority by which at least five Midwest pilots held integrated seniority on Frontier when FAPA was certified as *their* RLA representative on June 13, 2014.

its dispute resolution provisions, have given the DRA arbitrator exclusive jurisdiction to resolve the dispute raised by their *interpretation* of the DRA.

Even under the LMRA and FAA rubric where courts are to decide arbitrability issues, it is well settled that this authority does not give the courts license to decide the merits of the controversy. As the Court explained in *AT&T Technologies, Inc. v. CWA*, 475 U.S. at 649-50:

> [I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claim. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim is to be decided, not by the court asked to order arbitration, but as the parties have agreed [and, MPMC adds, as Congress has mandated in the RLA], by the arbitrator.

And under LMRA and FAA principles (*Id*. at 650 *quoting Steelworkers v. Warrior & Gulf*, 363 U.S. at 582-83, 584-85):

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." . . . Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation thereunder . . . ." In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

That presumption of arbitrability is particularly appropriate here, for the arbitration clause at issue–DRA § V(c)–is broad and clearly encompasses the "contract validity" disputes raised by Frontier, FAPA and MPMC; construing that clause as compelling the arbitration which plaintiff seeks, furthers the RLA mandate that unresolved minor disputes be settled by arbitration. *ALPA v.*

-21-

*Midwest Express Airlines, Inc.*, 279 F.3d at 555-56. Moreover, the controlling question as to arbitrability as framed by defendants, is also the merits question and raises an issue that arises *under* the DRA, which would remain arbitrable *even* if, as defendants argue, the underlying agreement had terminated. *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 205-09 (1991).

In *Midwest*, the appellate court was faced with an arbitration clause, which the majority (279 F.3d at 556) and the concurring/dissent (279 F.3d at 559) labeled as broad, that provided for the adjustment of disputes "growing out of grievances or out of the interpretation or application of any of the terms of this Agreement." 279 F.3d at 559. Despite that broad arbitration clause, Midwest argued that a prior "last chance" agreement with a pilot, which waived the right to arbitrate, made the pilot's grievance under the subsequent CBA not arbitrable. 279 F.3d at 555. That argument was rejected by the Court of Appeals, for as the court explained (279 F.3d at 55-56):

> The answer here should have been easy. The collective bargaining agreement between Midwest and ALPA contains an arbitration clause applicable to disputes arising from grievances based on the interpretation or application of the agreement, and the grievance that [the pilot] . . . wants to arbitrate is based on an interpretation of the "multiple opportunities" provision of the agreement and also on an interpretation of the agreement as having superseded the earlier settlement agreement with its "last chance" language. No more is required to establish the arbitrability of the dispute. It is true but irrelevant that if the collective bargaining agreement does not supersede the settlement agreement, [the pilot's] . . . grievance lacks merit. Merit is for the arbitrators to decide, not the court. They must interpret the collective bargaining agreement to determine whether the "multiple opportunities" provision is applicable to [the pilot].

DRA § V(c) is clearly as broad and it clearly encompasses the duration dispute Frontier and FAPA have raised, as well as the DRA § V(h) dispute MPMC has raised. Just as the *Midwest* court concluded that the broad arbitration clause in that case encompassed the issue of whether the

-22-

grievance was arbitrable (279 F.3d at 556), so, too, should this Court conclude that DRA § V(c) encompasses the disputes defendants have raised and makes them arbitrable, even if defendants seek to label the dispute they have raised as being one of *arbitrability. Midwest Express*, 279 F.3d at 556 ("[W]hen an arbitration clause is so broadly worded that it encompasses disputes over the scope or validity of the contract in which it is embedded, issues of the contract's scope or validity are for the arbitrators").

In order to escape from DRA § V(c)'s broad grant of jurisdiction to the Integration Arbitrator, defendants must show by the "most forceful evidence . . . a purpose to exclude" from DRA § V(c) disputes over whether the DRA no longer applies to them. *Steelworkers v. Warrior & Gulf*, 363 U.S. at 584. They have made no such showing here, for their sole claim as to why the disputes at bar are not arbitrable is that, in their opinion, the structure and intent of the DRA evidence a purpose that it (and by implication its arbitration provisions) no longer applied to them once Frontier and its pilots separated from RAH's control. That raises a dispute as to the interpretation and application of the DRA–exactly they type of dispute they have agreed to arbitrate under DRA § V(c).

Moreover, even in those situations where the CBA in which the agreement to arbitrate was embedded has expired, there is still a presumption that the agreement to arbitrate survives the CBA's expiration. As the Court explained in *Litton Financial Printing Division v. NLRB*, 501 U.S. at 208: "We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." And as the Court had earlier explained in *Nolde Brothers*, 430 U.S. at 255: "[W]here the dispute is over a provision of the expired agreement, the presumption favoring arbitrability must be negated expressly

-23-

or by clear implication." As noted above, defendants have not presented any such express negation, nor a negation by clear implication.

*Nolde*'s and *Litton*'s presumption applies here, for the dispute as to whether the DRA no longer applies to Frontier and FAPA is one that "arises under" the DRA as that term was defined in *Litton*.[12] First, the dispute at bar is one over whether, as defendants claim, the DRA's terms and intent provide that the DRA no longer applied to them after Frontier ceased to be an RAH affiliate and FAPA was certified as the RLA representative of Frontier's pilots. That is a dispute which "involves facts and occurrences that arose before [the purported] expiration" (*Litton*, 501 U.S. at 205), and, thus, as *Litton* shows, is arbitrable even if defendants are correct in asserting that those events discharged them from the DRA's obligations.

And second, the dispute defendants and MPMC have raised questions whether Frontier and FAPA are correct in claiming that the discharge of their obligations under the DRA gives them the ability to strip the Midwest pilots of the integrated seniority those pilots have enjoyed and exercised for almost three years under the DRA and IMSL Award. The IMSL Award is the result of an arbitration, which the DRA provides was "final and binding on the parties to this Agreement and on the pilots employed by RAH and its affiliates." DRA § V(g). Frontier and Midwest pilots were "pilots employed by RAH and its affiliates" on August 27, 2011, when the IMSL Award became effective and, thus, they are entitled to the benefits of that award. Indeed, the Midwest pilots employed at Frontier enjoyed and exercised those rights for almost three years before Frontier and

---

[12]    *Litton* explained that (501 U.S. at 205-06): "A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."

FAPA–relying upon their disputed interpretation of the DRA–abrogated them. MPMC Ex. 9 at 3 (Doc. #1-1 at 68). Thus, the dispute plaintiff MPMC seeks to place before the Integration Arbitrator under DRA § V(c) is one that "arises under" the DRA to which the *Nolde/Litton* presumption applies, for it seeks to enforce rights "that accrued or vested under the" DRA. *Litton Financial Printing Division v. NLRB*, 501 U.S. at 206.

In short, notwithstanding Frontier's and FAPA's assertion that the DRA no longer applies to them, they have agreed that the determination as to whether their interpretation of the DRA is correct can be made only by an arbitrator under the provisions of DRA § V(c). Defendants may not, as they have done, short circuit that arbitration process by claiming the their *interpretation* of the DRA presents a question of substantive arbitrability. The duty imposed upon both Frontier and FAPA by RLA § 2 First "to exert every reasonable effort . . . to settle all disputes, whether arising out of the application of . . . agreements [concerning rates of pay, rules, and working conditions] or otherwise" (45 U.S.C. § 152 First) requires that they comply with RLA § 204 and arbitrate before the DRA arbitrator the DRA interpretation disputes they and MPMC have raised. *BLE v. Louisville & Nashville R.R.*, 373 U.S. at 38 ("The right of one party to place the disputed issue before the Adjustment Board, with or without the consent of the other, has been firmly established").

## II. THIS COURT HAS THE AUTHORITY TO ENFORCE RLA §§ 2 FIRST AND 204 BY APPROPRIATE EQUITABLE RELIEF.

Federal courts have the authority to enforce the RLA commands at issue in this case–*i.e.*, RLA §§ 2 First and 204. *Chicago & North Western Ry. v. UTU*, 402 U.S. 570, 577 (1971) (RLA § 2 First "was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis"); *IAM v. Central Airlines, Inc.*, 372 U.S. at 690 ("We have held

-25-

. . . duties imposed upon the carriers and their employees by the Railway Labor Act binding and their breach redressable in federal courts . . . . We take a similar view of the duty to establish adjustment boards under § 204"); *accord*, *IBT v. Frontier Airlines, Inc.*, 628 F.3d 402, 404-05 (7th Cir. 2010). Injunctive relief is appropriate in this case for defendants have refused to arbitrate under DRA § V(c) before the DRA arbitrator. Moreover, that injunctive order should allocate to defendants the arbitrator's costs so that the order declaring defendants' obligation to arbitrate is not made ineffective by defendants' refusal to pay the DRA Arbitrator's fees and expenses.

As the Supreme Court observed in *IAM v. Street*, 367 U.S. 740, 761-62 (1961), making, maintaining, and administering CBAs, "while greatly in the public interest, are very costly to the unions." The cost of arbitrating the DRA disputes at bar is no exception, for the cost of the arbitrator alone could run into the tens of thousands of dollars.[13] Typically, the arbitrator's costs are shared by the carrier and the union, and the DRA is no exception. MPMC Ex. 1 at 3-4, § IV (d) ("One half of the salary and expenses of the arbitrator and the costs of the arbitration (such as hearing facilities and court reporter) shall be borne by RAH and the other half by the Merger Committees. Each party shall be responsible for the compensation and expenses of its representatives and participants in the arbitration process").

DRA § IV(d) applied to the seniority integration arbitration and, since the four pre-acquisition unions continued to be the duly designated representatives of the four pilot groups until the IBT was certified on June 28, 2011, the DRA's allocation of the union-side expenses was

---

[13]     If defendants dispute the potential costs of the DRA arbitrator, what those costs were in earlier arbitrations under the DRA, or how they were paid, plaintiffs request that this Court treat this injunction request as one under Rule 65(a), Fed. R. Civ. P., and advance the trial on the merits under Rule 65(a)(2) to address this cost-allocation request.

consistent with the practice in the airline industry where typically the union bears a proportion of the arbitrator's fees. However, that fee-splitting provision does not apply to disputes under DRA § V(j) arising out of the interpretation or application of the IMSL Award. Those disputes were to be handled before an adjustment board formed by the single transportation system and the certified representative of the combined craft. This case, as plaintiff MPMC has alleged, is one within the scope of DRA § V(j). MPMC Ex. 5 at 1 (Doc. #1-1 at 49). The DRA § V(c) issues are essentially threshold jurisdictional issues that must be addressed before the system board's jurisdiction can be perfected under DRA § V(j).

In DRA § V(j) disputes, as the November 26, 2013 Arbitration Agreement for the DRA § V(j) dispute at issue in that controversy shows, the arbitrator's fees are shared equally by the carriers and the combined craft's certified representative, which in that case was the IBT. MPMC Ex. 3 at 6, ¶ 12 ("The fees and expense of the arbitrator shall be split one-half to be paid by the Carriers [*i.e.*, RAH's pre-2009 airlines and Frontier (MPMC Ex. 3 at 5)] and one-half to be paid by the IBT [*i.e.*, the combined craft's certified representative]").

Equity and RLA §§ 2 First and 204 require that an injunction compelling Frontier to arbitrate the DRA interpretation issues with FAPA through the two Merger Committees to whom FAPA has delegated its representational authority–MPMC and FPMC–also contain a provision specifying who should bear the arbitrator's costs. That injunction, plaintiff MPMC submits, should require that the RLA parties to the arbitration being ordered–*i.e.*, the "single transportation system," which in this

case is Frontier,[14/] and the duly designated representative of that combined craft or class, which is now FAPA–bear the fees and expenses of the arbitrator.[15/]

Splitting the arbitrator's costs in this way gives recognition to the fact that the employees "involved" in this dispute are the Frontier pilots whose seniority was impacted by the IMSL Award–*i.e.*, *both* the pre-acquisition Frontier pilots *and* the five remaining former Midwest pilots employed by Frontier. *Steward v. Mann*, 351 F.3d at 1345-46 ("An employee is 'involved' for purposes of [45 U.S.C.] § 153 First (j) [which requires that "involved" employees be given notice of, and a right to be heard at, the adjustment board hearing] if he would be adversely affected by the board's decision"). Those involved pilots are represented by FAPA, but because of the inherent conflict of interest that FAPA faces in disputes arising from interpreting and applying the seniority-integration award, the parties to the DRA provided that the representative of the combined craft or class would delegate to the applicable Merger Committees the authority the RLA gave it to represent those pilots whose interest are in conflict. Thus, MPMC's standing to act on behalf of the former Midwest pilots does not flow from their appointment of MPMC as their representative for this dispute, but from ALPA's formation of the MPMC and from the DRA provisions continuing that Committee in existence to represent the seniority-related interests of the former Midwest pilots if those interests are threatened. DRA §§ V(h) and V(j). Since MPMC's authority to arbitrate under

---

[14/]     *In re Frontier Airlines Pilots*, 41 NMB 31 (2014) (emphasis added): "The current investigation establishes that Frontier is operating as a *single transportation system for the craft or class of Pilots."*

[15/]     It should be noted that MPMC is *not* asking this Court at this time to direct FAPA to pay MPMC's attorney's fees in arbitrating the DRA § V(c) issues, for any such request must await the arbitrator's decision interpreting DRA § V(h) and its funding provision, or a judgment in plaintiff Ward's favor on Count II. What is at issue now is who should bear the fees and expenses of the DRA § V(c) arbitrator and any incidental expenses of the arbitration, such as the costs of the hearing room.

DRA § V(c) is derived from the authority FAPA delegated to it through its commitment to DRA § V(h), it follows that FAPA–and *not* MPMC–should bear the DRA § V(c) arbitrator's costs.

Indeed, allocating the costs in this manner is consistent with the fact that FAPA has exercised the authority RLA § 2 Eleventh, 45 U.S.C. § 152 Eleventh, has given it to enter into an Agency Fee Agreement with Frontier providing that each Frontier pilot who fails to maintain membership in FAPA "shall be required, as a condition of employment, . . . to pay the Association . . . a service charge as a contribution for the administration of the Agreement and the representation of such Pilot." MPMC Ex. 28 at 10 (Frontier/FAPA CBA at § 21.D.1). That Agency Fee is set in the CBA at 1.5% of the pilots gross pay, or at "such monthly Fees as may hereafter be established in accordance with the Constitution of" FAPA. MPMC Ex. 28 at 9. That type of agreement is permitted under the RLA because Congress agreed with the unions that each person represented by an RLA union should bear a proportional share of the representation costs. *IAM v. Street*, 367 U.S. at 762-63. Since MPMC is acting on behalf of the former Midwest pilots at Frontier through the authority delegated to it by *FAPA* in the DRA, and since the other Frontier pilots involved in this dispute–*i.e.*, all Frontier pilots, excluding the five former Midwest pilots, hired before 2013–will be represented by the FPMC, it is equitable that the Merger Committees' principal, FAPA, bear the employees' share of arbitrator's costs for which it charges all of the Frontier pilots either dues or an agency fee.

An order allocating the Arbitrator's expenses to defendants is necessary to ensure that an order directing Frontier and FAPA to arbitrate under DRA § V(c) not become an engine of injustice by placing an insurmountable financial burden on the right of the five Midwest/Frontier pilots to arbitrate their claim. *IBT v. Frontier Airlines, Inc.*, 628 F.3d at 407, *quoting BLE v. Missouri-Kansas-Texas R.R.*, 363 U.S. 528, 532 (1960).

-29-

## CONCLUSION

For the reasons set forth herein, plaintiff MPMC respectfully submits that this Court should enter summary judgment in its favor on Count I of the Complaint and declare that defendant Frontier is required by RLA §§ 2 First and 204 to arbitrate with FAPA (through plaintiff MPMC and the FPMC) under DRA § V(c) the dispute Frontier and FAPA have raised as to the continued application of the DRA to them, and the dispute MPMC has raised as to the application of DRA § V(h). Plaintiff further request that this Court direct Frontier and FAPA to split between them the fees and expenses of the DRA Arbitrator.

Respectfully Submitted,

_____/s/ John O'B. Clarke, Jr._____
John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
Phone: (202) 296-8500
Fax: (202) 296-7143
Email: jclarke@highsaw.com

Date: February 9, 2015          Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I have this 9th day of February, 2015, caused a copy of this Memorandum In Support Of Motion By Plaintiff MPMC For Partial Summary Judgment to be served upon counsel for defendants through the Court's Electronic Case Filing system.

_____/s/ John O'B. Clarke, Jr._____
John O'B. Clarke, Jr.

-30-

**LIST OF ATTACHMENTS**

Attachment A–National Mediation Board 1st Annual Report (1935) (excerpts)
Attachment B–*People Express Pilot Merger Comm. v. Texas Air* Corp., 1987 WL 18450 (D.NJ 1987)
Attachment C–*Thomas v. RAH*, 2012 WL 683525 (D. CO 2012)