# *First*

## ANNUAL REPORT OF THE

# NATIONAL MEDIATION BOARD

### INCLUDING

## THE REPORT OF THE NATIONAL RAILROAD ADJUSTMENT BOARD

*For the Fiscal Year Ended* JUNE 30, 1935

# *First*

## ANNUAL REPORT OF THE

# NATIONAL
# MEDIATION
# BOARD

### INCLUDING

## THE REPORT OF THE
## NATIONAL RAILROAD
## ADJUSTMENT BOARD

*For the Fiscal Year Ended* JUNE 30, 1935

For sale by the Superintendent of Documents
Washington, D. C., Price 10 cents, paper cover

## NATIONAL MEDIATION BOARD

WILLIAM M. LEISERSON, *Chairman* (term expires Feb. 1, 1937).
JAMES W. CARMALT (term expires Feb. 1, 1936).
JOHN M. CARMODY (term expires Feb. 1, 1938).

GEORGE A. COOK, *Secretary*.

II

# CONTENTS

|  | Page |
|---|---|
| I. The Amended Railway Labor Act | 1 |
| 1. Introductory | 1 |
| 2. Foundation principles of the act | 1 |
| 3. Rights and prohibitions | 2 |
| 4. Duties and responsibilities | 3 |
| 5. Types of disputes and methods of adjustment | 4 |
| II. The preceding railway labor legislation | 6 |
| 1. The first act dealing with railway labor, 1888 | 6 |
| 2. The Erdman Act of 1898 | 6 |
| 3. The Newlands Act, 1913 | 6 |
| 4. The Adamson Act, 1916 | 6 |
| 5. Government Administration of the Railroads, 1917–20 | 6 |
| 6. The Transportation Act of 1920 | 6 |
| 7. The Railway Labor Act of 1926 | 7 |
| 8. Bankruptcy and Emergency Transportation Acts, 1933 | 7 |
| III. The Work of the National Mediation Board, 1934–35 | 8 |
| 1. Record of cases | 8 |
| 2. Disposition of cases | 9 |
| 3. Notice regarding contracts of employment | 11 |
| 4. Court proceedings | 13 |
| IV. Representation disputes—Elections | 15 |
| 1. Elections and certification of representatives | 15 |
| 2. Disputes between national unions and system associations | 16 |
| 3. Disputes between national labor organizations | 17 |
| 4. Problems of representation | 19 |
| V. Disputes mediated—Settlements | 25 |
| 1. Cases in process but not completed | 25 |
| 2. Grievances mediated and referred to adjustment board | 25 |
| 3. Mediation agreements | 26 |
| 4. Other adjustments | 26 |
| 5. Problems of mediation | 28 |
| VI. Arbitration and emergency boards | 30 |
| 1. Arbitration awards | 30 |
| 2. Emergency cases | 30 |
| VII. Wage and rule agreements | 32 |
| 1. Collective labor contracts | 32 |
| 2. Classes of employees covered by agreements | 33 |
| 3. The reign of law in labor relations | 35 |
| VIII. Interpretation and application of agreements | 37 |
| 1. The National Railroad Adjustment Board | 37 |
| 2. System and regional adjustment boards | 37 |
| 3. Work of the National Railroad Adjustment Board | 38 |
| IX. Organization and finances of National Mediation Board | 41 |
| 1. Organization | 41 |
| 2. Financial statement | 41 |

## APPENDIXES

| | |
|---|---|
| A. First Annual Report of National Railroad Adjustment Board | 43 |
| B. Railway labor legislation, 1888–1934 | 49 |
| C. Digest of arbitration awards, 1934–35 | 66 |

III

## LETTER OF TRANSMITTAL

NATIONAL MEDIATION BOARD,
OFFICE OF THE CHAIRMAN,
*Washington, D. C., November 1, 1935.*

*To the Senate and House of Representatives of the United States of America in Congress assembled:*

Pursuant to the provisions of section 4, second, of Public, No. 442, approved June 21, 1934, I have the honor to submit the first annual report of the National Mediation Board for the fiscal year ended June 30, 1935, together with the annual report of the National Railroad Adjustment Board, as required by section 3, first, (v), of the same act.

WM. M. LEISERSON, *Chairman.*

v

FIRST ANNUAL REPORT OF THE

# NATIONAL MEDIATION BOARD

## I. THE AMENDED RAILWAY LABOR ACT

### 1. INTRODUCTORY

This is the first annual report of the National Mediation Board created by amendments to the Railway Labor Act of 1926 approved June 21, 1934.[1] The Board is successor to the United States Board of Mediation, established by the act of 1926, which went out of existence on July 21, 1934, when the three members of the National Mediation Board were appointed. The amendments of 1934 also created a National Railroad Adjustment Board, with headquarters in Chicago; and, in accordance with section 3, first (v), of the act, the annual reports of the four divisions of that board are included in this report.

The amended Railway Labor Act is the culmination of 45 years of experience with legislation to govern the relations of employers and employees on the railroads and to promote peace and order in those relations as a means of preventing interruptions to interstate commerce. In this period of almost half a century Congress developed, step by step, a comprehensive policy for dealing with labor relations on the railroads, so that the present law is the most advanced form of Government regulation of labor relations that we have in this country. It imposes positive duties on carriers and employees alike, defines rights and makes provision for their protection, prescribes methods of settling various types of disputes, and sets up agencies for adjusting all manner of differences.

Whereas the early legislation for the railroads, like most of the recent efforts to deal with labor disputes in other industries, made no attempt to differentiate labor controversies but treated them as if they were all of a kind, the amended Railway Labor Act clearly distinguishes various kinds of disputes, provides different methods and principles for settling the different kinds, and sets up separate agencies for handling the various types of labor disputes. These principles and methods, built up through years of experimentation, provide a model labor policy, based on equal rights and equitable relations.

### 2. FOUNDATION PRINCIPLES OF THE ACT

Three basic principles are laid down in the act as a foundation for sound labor relations on the railroads:

1. *Written agreements.*—The relations are to be governed not by the arbitrary will or whim of the management or the men, but by written rules and regulations mutually agreed upon and equally binding on both. A positive duty is imposed on all carriers and their employees "to exert every reasonable effort to make and maintain

---

[1] Public, No. 442, 73d Cong..

1

present writing the number of these disputes coming to the Board is increasing. Whereas the disputes arose mainly because of overlapping jurisdiction, and at first most of the cases were of this character, the antagonism engendered by the contests has developed a tendency for employees who are members of one organization to challenge the representation of other organizations over crafts or classes of employees that they formerly did not seek to represent.

Regrettable as these disputes are, it is nevertheless fortunate that the Railway Labor Act provides a method of settling them peacefully. Such conflicts in other industries often result in strikes and interruptions of service which are costly to the public, to employers, and to employees. If interruptions of railroad service on account of such disputes can be prevented by the procedures under section 2, ninth, of the act, this is a net gain and one of the important accomplishments of the act, no matter how much time and effort it takes and however unwise it may be that employees' organizations whose aims are the same shall be engaged in jurisdictional quarrels.

#### 4. PROBLEMS OF REPRESENTATION

The Board's investigations of disputes among employees under the provisions of section 2, ninth, of the Railway Labor Act, for the purpose of certifying representatives, have developed a series of perplexing problems some of which are now in the courts for judicial determination. These problems in the main involve the extent and nature of the authority of the Board to designate what employees shall participate in elections and to make rules governing the elections.

(a) *Majority rule.*—The first of these problems is whether a majority of all those eligible to vote is necessary to choose a representative or whether a majority of the votes actually cast is sufficient. Section 2, fourth, of the act provides that "the majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this act." This the Board interpreted as requiring a majority of all those eligible rather than a majority of the votes only. The interpretation was made, however, not on the basis of legal opinion and precedents, but on what seemed to the Board best from an administration point of view. Where, however, the parties to a dispute agreed among themselves that they would be bound by a majority of the votes cast, the Board took the position that it would certify on this basis, on the ground that the Board's duties in these cases are to settle disputes among employees, and when an agreement is reached the dispute as to that matter is settled.

Accordingly the Board certified representatives for 107 crafts where by agreement a majority of the votes cast determined the choice. But it refused to certify any representatives for 18 crafts after polling the employees, where there was no such agreement and the required majority of the eligibles was lacking. In some of these latter cases a second election was held and a certification made; in others the second election was equally inconclusive.

Although the Board's interpretation has been protested in a number of cases, in only one case was it challenged in a court proceeding. This was in the case of *System Federation No. 40* v. *The Virginian Railway*

*Company* referred to above (p. 4). The ruling of Judge Way on this point was as follows:

It is also contended by the railway that the election is void because one of the rules under which it was held was in violation of the act which provides, among other things, that the "majority of any craft or class of employees shall have the right to determine who shall be representative of the craft or class", etc. It seems to me that this defense also is without merit. A reasonable interpretation of the act is that the election must be open to each craft or class with full untrammelled opportunity to each eligible employee in such craft, to vote although he is not compellable to exercise that right. The statute is similar, it would appear, to statutes or bylaws providing that a majority of the stockholders of a corporation shall constitute a quorum at a stockholders' meeting. Where such quorum is actually present at a duly called meeting, a majority of those may transact all business of the corporation that may properly come before the stockholders unless the statute or bylaws expressly require a greater number of affirmative votes than a mere majority of the quorum. In this case, in every instance except one, more than a majority of those eligible to vote, actually participated in the election; that is, exercised the right to determine who should represent that craft or class in negotiating with the railway in respect to certain matters. That, it seems to me, meets all the requirements of majority rule in the five crafts where a majority of all eligible actually voted, although in one of those instances less than a majority voted for the Federation. But in the craft (carmen and coach cleaners) where less than a majority of those eligible to vote, actually voted, it would seem to follow that there was no election by that craft, and as to that craft the certification of the board is without force or effect.[14]

(b) *What is a craft or class?*—The Railway Labor Act does not define the terms "craft or class" in which the majority is given the right to determine the representation. Whether the terms are used synonymously or whether a class comprises several crafts or vice versa is not explained. In making rules to govern elections and in designating the employees who may participate in such elections, the Board in most cases has been confronted with disputes as to whether the employees involved constitute one class or craft, or whether they are several distinct crafts for each of which separate representatives are to be chosen by separate majorities. So far as possible the Board has followed the past practice of the employees in grouping themselves for representation purposes and of the carriers in making agreements with such representatives. But these practices have not always been uniform and claims are often made that the amended Railway Labor Act requires change in existing practices.

For example, switchmen have quite generally (but with some exceptions) been considered one class or craft of employees, and the carriers have usually made agreements with one organization representing all these employees, but often exclusive of yardmasters. Many disputes have been presented to the Board, however, in which the yard foremen or conductors of switching crews have requested separate representation as a craft distinct from the yard helpers or brakemen. It is contended that the conductors and brakemen in the yards constitute separate and distinct crafts as is the case generally on the road.

Acting on this basis the Board authorized the taking of separate ballots of yard conductors in a number of cases and certified representatives accordingly. But since these rulings were made, cases have come up in which the yard conductors and brakemen work interchangeably in both occupations during the same pay-roll periods. Separate eligible lists had to be made up, therefore, either on the basis of the preponderant amount of time worked in each occupation during a given period or on basis of assignment as of a given date. Subse-

[14] Judge Way's decision in this case has been appealed by the railway company, and the case is now pending in the United States Circuit Court of Appeals.

quently, also, requests were made to the Board that other yard service employees, such as car retarder operators and switchtenders be voted as separate crafts, each entitled to its own representatives.

This pressure on the Board to split classes of employees hitherto considered as a unit into more and more groups, each of which is claimed to be a distinct craft, has come from all branches of employment. Hostlers and their helpers, who have generally been grouped with firemen for representation purposes have in some cases requested separate representation as a distinct craft; and sometimes the contention is that hostlers are engineers and should be voted together with road engineers. Among the maintenance-of-way employees, it has been argued that section foremen, laborers, bridge tenders, watchmen, and various kinds of mechanics are separate and distinct crafts; and in some cases, it was contended that the last of these should be voted together with various crafts of shop employees. A similar separation of power-house employees into a number of crafts has been requested, and among the clerical, office, and station employees numerous subdivisions have been asked on the basis of variations in the work done by the employees as well as on the basis of jurisdiction of different employees' associations.

When first confronted with these problems, the Board attempted to avoid any general ruling, but to decide each case on the basis of the facts developed by the investigation of that case. After some decisions had been made, however, separating certain groups of employees, insistent demands were made that the board follow the same rulings in subsequent cases, and other groups of employees within a class or craft insisted that they too were entitled to separation as distinct crafts.

On the basis of the whole year's experience in dealing with these problems, the Board is impressed that the tendency to divide and further subdivide established and recognized crafts and classes of employees has already gone too far, and threatens to defeat the main purposes of the Railway Labor Act, namely, the making and maintaining of agreements covering rates of pay, rules, and working conditions and the avoidance of labor disputes. We have also been informed by the management in some cases that such subdivisions tend to interfere with the efficiency of operations.

The Board is inclined, therefore, during the coming year to avoid unnecessary multiplication of subcrafts and subclasses, and to maintain, so far as possible, the customary grouping of employees into crafts and classes as it has been established by accepted practice over a period of years in the making of wage and rule agreements.

Another side of this problem has appeared in a few cases where part of a recognized craft is working in one department of a carrier and others of the same craft are employed in another department. Thus shop laborers and power-house employees have been treated as one class of employees in certifying representatives, on the ground that the customary practice is to group them together for representation purposes. But this policy of the Board has been challenged and is now pending in the United States District Court at Topeka, Kans. The objection is that the shops and the power houses are distinct units requiring separate representation in each unit. Most carriers, however, have recognized the combined grouping in making agreements with the International Brotherhood of Firemen and Oilers.

A similar question arose when the employees in the Buffalo and Cleveland yards of the Nickel Plate Railroad petitioned for a vote for representatives in those two yards, but not in the rest of the yards of the carrier. The Board rejected the petition on the ground that all the yards of a carrier must vote together to choose representatives.

It has been claimed occasionally also, that employees who have seniority rights in several crafts or who work interchangeably in more than one craft should have a vote in each craft in which they may thus have an interest. The Board has felt that the act intended each employee to vote in one class or craft only, and has uniformly ruled accordingly, following a decision of United States District Judge Gordon in a case that arose on the Georgia and Florida Railroad.[15]

(c) *What is a carrier?*—Although the term "carrier" is clearly defined in the act, questions have arisen in connection with representation disputes which made it necessary for the Board to interpret its meaning. Where a railroad system is composed of a number of subsidiary corporations, employees have been in dispute as to whether one vote should be taken of a craft on the whole system or whether the subsidary corporations are carriers within the meaning of the act whose employees are entitled to separate representation. The Board has ruled generally that where a subsidiary corporation reports separately to the Interstate Commerce Commission, and keeps its own pay roll and seniority rosters, it is a carrier as defined in the act, and its employees are entitled to representation separate from other carriers who may be connected with the same railroad system. If the operations of a subsidiary are jointly managed with operations of other carriers and the employees have also been merged and are subject to the direction of a single management, then the larger unit of management is taken to be the carrier rather than the individual subsidiary companies.

The Board's jurisdiction has been questioned in a number of cases on the ground that the employers were not carriers within the meaning of the Railway Labor Act. Some of these were electric interurban railroads and the question was referred to the Interstate Commerce Commission for hearing and decision as provided by section 1, first, of the act. One case involved a freight-forwarding company, and the Board dismissed it, ruling that it was not a carrier as defined. Two cases are pending in which fruit-express companies (car owners that are owned by the railroads) have challenged the authority of the Board to act after it had accepted jurisdiction.

(d) *What is an employee?*—Many questions have arisen in applying the term "employee", as defined in section 1, fifth, of the act, to the particular problem of deciding who may participate in choosing representatives. Is a man who has been furloughed or temporarily laid off with seniority rights of reemployment such an employee? The Board has ruled that such a person is an employee if under rules of an agreement he remains on a seniority roster and is likely to be called for work within a short period, or if he normally was laid off and reinstated with recurring seasonal fluctuations in business, and especially, if from time to time, he has been called back for temporary assignments within a short period of the date of the election. On the other hand, if he has been on furlough without being recalled for a

---

[15] *Georgia Southern and Florida Ry. Co.* v. *Brotherhood of Locomotive Firemen and Enginemen*, Supreme Court, District of Columbia, Equity No. 54632.

long enough time to have his name removed from the seniority roster, he has been considered no longer an employee. In any case be must have been definitely on a pay roll within a reasonable period prior to the election.

Again certain employees, although clearly belonging to a craft or class which is choosing representatives, are often "excepted" from agreements between carriers and employees because they work in confidential capacity to the management or have some supervisory or disciplinary authority over other employees in the same craft. The Board has in the main excluded these from participating in elections, although the claim is sometimes made that they are employees who are entitled to vote with their crafts. Such excepted employees have, of course, the right to select representatives, but only in a class or craft of employees having similar relations with management.

Both the inclusion of furloughed or extra employees and the exclusion of "excepted" and confidential employees have been sustained by Judge Letts in the Supreme Court of the District of Columbia as a reasonable exercise of the discretionary authority vested in the Board by the Railway Labor Act. (See p. 13 above.)

The Board's authority to investigate and determine representation disputes among "red caps" or station ushers has been challenged by a number of carriers on the ground that these are not employees of the railroads but render personal services to passengers and are paid by them. On investigation the Board found that while these employees are not ordinarily paid by the carriers (in some cases small wage payments have been made) the men are hired, disciplined, discharged, and given free transportation by officers of the carrier, and at times they are assigned temporarily to duties for which scheduled hourly rates are paid. For such reasons the Board has ruled that the red caps are covered by the definition of an employee as given in the act, and has accordingly assumed jurisdiction to investigate representation disputes among them. In one case where a certification was issued, however, the carrier has refused to honor the certification, and steps are being considered to get a judicial determination of the validity of the Board's ruling.

Two cases handled by the Board during the year presented the question whether employees working for a contractor to whom a carrier lets out some of its work, are employees subject to the provisions of the Railway Labor Act. In one of these the employees of an ore dock contractor were voted separately from the other employees of the carrier, and later an agreement was signed between the contractor and the certified representatives of these employees. In the second case the Board's investigation revealed that the shop and roundhouse laborers working for a contractor were doing the same kind of work as other laborers of the same class employed directly by the railroad, and that the contract laborers' work was subject to approval by officers of the railroad. The Board ruled, therefore, that all these laborers are of one class, and should be voted together for the purpose of selecting representatives.

(e) *Change of representatives under existing agreements.*—When there is an agreement in effect between a carrier and its employees signed by one set of representatives and the employees choose new representatives who are certified by the Board, the Board has taken the position that a change in representation does not alter or cancel any

existing agreement made in behalf of the employees by their previous representatives.   The only effect of a certification by the Board is that the employees have chosen other agents to represent them in dealing with the management under the existing agreement.   If a change in the agreement is desired, the new representatives are required to give due notice of such desired change as provided by the agreement or by the Railway Labor Act.   Conferences must then be held to agree on the changes exactly as if the original representatives had been continued.