UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MIDWEST PILOTS MERGER COMMITTEE, CARL SCHWERMAN, DONALD TILL, and MARK E. WARD,<br>  *Plaintiffs*,<br><br>v.<br><br>FRONTIER AIRLINES, INC. and FRONTIER AIRLINE PILOTS ASSOCIATION,<br>  *Defendants*. | Civil Action No. 2:14-cv-01441-RTR |

**PLAINTIFF MPMC'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Civil L. R. 56(b)(1)(C), plaintiff Midwest Pilots Merger Committee (MPMC) submits that there is no genuine dispute as to the following material facts which entitle plaintiff MPMC to the relief it is requesting by its Motion For Partial Summary Judgment:

**STATEMENT OF UNDISPUTED FACTS**

1. Plaintiff MPMC is a Merger Committee formed by the Midwest Airlines Master Executive Council pursuant to the Constitution and By-Laws of the Air Line Pilots Association, International (ALPA), which, at the time it formed the MPMC, represented the pilots of Midwest Airlines for purposes of the Railway Labor Act (RLA), 45 U.S.C. § 151, *et seq*. *In re Midwest Express Airlines, Inc.*, 25 NMB 118 (1997). ALPA's *Merger and Fragmentation Policy* in place in April 2009, provided that its Merger Committees "shall have complete and full authority to act for and on behalf of the flight deck crew members of their respective airlines for the purpose of concluding a single flight deck crew member seniority list and appropriate conditions and

restrictions, which shall not be subject to ratification." *Merger & Fragmentation Policy* Part 3C 1 (Declaration of Counsel, Executed February 6, 2015 at ¶ 10, authenticating MPMC Ex. 15 at 11[1/]).

2. Defendant Frontier Airlines, Inc., a Colorado corporation, is a wholly-owned subsidiary of Frontier Airlines Holdings, Inc., a Delaware corporation. Republic Airways Holdings Inc. (RAH) Form 8-K filed December 12, 2013, EX-2.1 at 1 (Counsel Dec. at ¶ 11, authenticating SEC Filing Details and excerpts of Stock Purchase Agreement attached as MPMC Ex. 16).

3. Prior to October 1, 2009, defendant Frontier Airlines was a common carrier by air within the meaning of RLA § 201, 45 U.S.C. § 181; its pilots were represented on October 1, 2009 for RLA purposes by defendant Frontier Airline Pilots Association (FAPA), which represented those pilots from December 3, 1998, until June 28, 2011. *In re Frontier Airlines Flight Deck Crew Members*, 26 NMB 94 (1998); *In re Republic Airlines et al./Frontier Pilots*, 38 NMB 245 (2011).

4. Frontier's parent, Frontier Airlines Holdings, Inc., along with Frontier Airlines and another airline subsidiary, Lynx Aviation Corp., emerged from reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.*, on October 1, 2009, as a wholly subsidiary of RAH. February 19, 2011 Seniority Integration Award [hereinafter, "IMSL Award"] at 17-20 (FAPA Ex. 2 [Doc. #15-2 at 18-21]).

5. On July 31, 2009, RAH acquired Midwest Air Group, Inc., the parent of Midwest Airlines, Inc. by purchasing its stock. IMSL Award at 11, n. 1 (Doc. #15-2 at 12, n.1).

---

[1/] Plaintiffs submitted fourteen (14) exhibits with their complaint, which they are authenticating through the Declaration of their Counsel. They are also submitting additional exhibits through that declaration. Further, plaintiffs will be relying upon exhibits filed by Frontier and FAPA in support of their separate motions to dismiss.

6. Thus, on October 1, 2009, RAH owned Midwest Air Group with its airline subsidiary Midwest Airlines; Frontier Holdings with its airline subsidiaries Frontier and Lynx; and the three airline subsidiaries it owned prior to acquiring Midwest and Frontier: Chautauqua Airlines, Inc., Shuttle America Corp., and Republic Airline Inc. IMSL Award at 7 (Doc. #15-2 at 8).

7. Prior to October 1, 2009, RAH operated its Chautauqua, Shuttle America, and Republic Airline as a single transportation system; its pilots were represented for RLA purposes by the International Brotherhood of Teamsters (IBT) through its Airline Division. IMSL Award at 7 (Doc. #15-2 at 8).

8. On October 1, 2009, Lynx Aviation's pilots were represented for RLA purposes by the United Transportation Union (UTU), but were not covered by a collective bargaining agreement (CBA). IMSL Award at 7 (Doc. #15-2 at 8).

9. By November 3, 2009, once the last Midwest plane was taken out of service, RAH had integrated Midwest's airline operations into its transportation system, using both Republic Airline/Chautauqua and Frontier pilots to fly Midwest's customers. *In re Republic Airlines et al./Frontier Pilots*, 38 NMB 138, 145-46 (2011).

10. ALPA's, IBT's and FAPA's CBAs with their airlines required that in the event of a successorship transaction which resulted in an operational merger, the pilots' seniority should be integrated in a fair and equitable manner as provided in Sections 3 and 13 of the Labor Protective Provisions (LPP) that the Civil Aeronautics Board had imposed in its *Allegheny-Mohawk Merger Case.* IMSL Award at 7 (Doc. #15-2 at 8). While the UTU and Lynx had not reached a CBA (*Id*.), the Lynx pilots were included in the seniority-integration dispute by virtue of the McCaskill-Bond Amendment, 42 U.S.C. § 42112 note. IMSL Award at 8 (Doc. #15-2 at 9).

11.     Prior to November 3, 2009, each of the three other labor organizations representing pilots employed by RAH's operating subsidiaries had formed Merger Committees with authority similar to MPMC's, and those Merger Committees, along with MPMC, negotiated an agreement with RAH and its operating subsidiaries "to establish . . . procedures for resolving the seniority integration issue in accordance with Sections 3 and 13 of the [*Allegheny-Mohawk*] LPPs". MPMC Ex. 1 at 1 (Doc. #1-1 at 1).

12.     That agreement–the Section 13(b) Dispute Resolution Agreement (DRA)–was entered into by RAH (DRA at 1 (MPMC Ex. 1 at 1)),

> on behalf of itself and its wholly-owned affiliates Republic Airline Inc., Chautauqua Airlines, Inc. and Shuttle America Corp. (hereinafter collectively, "Republic"), Midwest Airlines, Inc., Frontier Airlines, Inc. and Lynx Aviation, Inc. (RAH and its affiliates together one "party" under this Agreement), and the Republic, Midwest, Frontier and Lynx pilots, as represented by their respective Seniority Merger Committees (the "Merger Committees") as duly created and authorized by each pilot group's duly designated representative (each such Merger Committee another "party" under this Agreement) . . . .

13.     Besides providing a process to negotiate, mediate, and, if necessary, to arbitrate the seniority integration dispute, the DRA also provided the manner in which the parties would resolve disputes over the interpretation and enforcement of the seniority conferred upon the pilots through that process. DRA § V (MPMC Ex. 1 at 4-5).

14.     Section V(h) of the DRA provided for the continued existence of the Merger Committees to enforce or defend the integrated seniority that might be awarded to its pilot group; it provided (MPMC Ex. 1 at 5):

> The Organization, if any, designated by the NMB as the duly designated representative of the combined craft or class of Flight

> Deck Crew Members for the single transportation system shall continue the Merger Committees in existence and delegate to the Merger Committees authority solely for the purpose of adjusting any dispute or disputes that might arise as to the interpretation or application of the award, including authority to compromise such disputes, and to initiate, defend, mediate, and litigate such issues in the dispute resolution mechanism under this Agreement. The Organization shall have authority over the manner in which the Merger Committees' operations are financed. The Merger Committees which are parties to this agreement represent that they have been authorized by their principals (the duly designated representative of their airline's pilots) to enter into the commitments set forth in this paragraph and in this Agreement. Each Merger Committee shall fill its own vacancies by selection made by the remaining members of that Merger Committee.

15. Section V(g) of the DRA provided that in the event the parties submitted the seniority integration dispute to an arbitrator for resolution: "The award of the arbitrator shall be stated in writing and shall be final and binding on the parties to this Agreement and on the pilots employed by RAH and its affiliates." MPMC Ex. 1 at 4.

16. DRA § V(j) further provided that: "The award of the arbitrator issued under either Section V (g) or V (i) [a provision providing for disputes arising within 120 days after the Award became effective] shall be considered as a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system." MPMC Ex. 1 at 5.

17. Section V(j) of the DRA provided the manner in which disputes arising out of the interpretation or application of the IMSL Award more than 120-days after its effective date were to be "handled." It provided that (MPMC Ex. 1 at 5):

> Any dispute arising out of the interpretation or application of the award more than one-hundred and twenty (120) days after the effective date of the seniority integration shall be handled in the usual

manner by the applicable Merger Committees up to and including the highest carrier official designated to handle such disputes, but failing to reach an adjustment in this manner, the dispute may be submitted by any party to the dispute to the adjustment board established by the designated representative of the combined craft or class and the single carrier for final and binding resolution. All Merger Committees shall be given notice of the dispute and, in addition to the Merger Committee invoking the adjustment board jurisdiction, may be heard by the system board of adjustment in resolving the dispute, with the decision of the board being made by the arbitrator selected pursuant to the applicable agreement to sit with the system board (without a vote by the other members of the system board).

18. DRA § V(c) provided a process to resolve disputes arising out of the interpretation or application of the DRA itself; it provided (MPMC Ex. 1 at 4):

> In addition to jurisdiction to resolve disputes under Section I [dealing with discovery] and to devise the fair and equitable integration of seniority, the arbitrator shall have the authority to resolve any dispute arising out of the interpretation or application of this Agreement.

19. The four pilot groups were unable by negotiation and mediation to reach an agreement among themselves for a method upon which to integrate their seniority, and they, together with RAH, selected Dana E. Eischen to arbitrate the integration dispute. IMSL Award at 8 (Doc. #15-2 at 9).

20. Arbitrator Eischen issued his award on February 19, 2011. FAPA Ex. 2 (Doc. #15-2 at 50).

21. At issue in the arbitration was the method by which to integrate the seniority of the four separate groups of pilots which totaled 3,077 pilots as of February 2011. IMSL Award at Appendix A at 46 (Counsel Dec. at ¶ 12, authenticating MPMC Ex. 17 at 21). Most of those pilots (around 2,041) were employed by RAH's pre-2009 affiliates; the next largest group consisted of

approximately 694 Frontier pilots; then came the approximately 383 Midwest pilots, and 132 Lynx pilots. IMSL Award Attachments 1 to 4 (MPMC Ex. 17 at 31).

22. FPMC proposed to Arbitrator Eischen that the first 341 positions on the integrated seniority list be assigned to Frontier pilots and that the remaining 305 Frontier pilots be integrated with 62 of the 383 Midwest pilots. Republic pilots were to be integrated below all Frontier pilots with the Lynx pilots and the remaining Midwest pilots. IMSL Award at Attachment 3 (MPMC Ex. 17 at 27).

23. Arbitrator Eischen rejected that proposal, and instead assigned the first 962 positions (Tier I) on the integrated list to 650 Republic pilots and 312 Frontier pilots. The next 1,155 positions (Tier II) were assigned to the next 700 Republic pilots, the remaining 334 Frontier pilots and 121 Midwest pilots. The next 660 positions (Tier III) were populated with 559 Republic pilots and 101 Lynx pilots, while the last 204 positions (Tier IV) were assigned to the remaining Midwest pilots. IMSL Award at 36 (Doc. #15-2 at 37).

24. Arbitrator Eischen also imposed "Conditions/Restrictions," which provided *inter alia* that, for a period of seven (7) years, Frontier pilots would have priority for all Captain and First Officer positions on Airbus aircraft flown by Frontier. IMSL Award at 48 (Doc. #15-2 at 49).

25. As authorized by DRA § V(g), Arbitrator Eischen provided that (IMSL Award at 49 § C (Doc. #15-2 at 50)):

> The IMSL (Appendix A) shall become effective for purposes of the second sentence of DRA §V (g) [which made the integrated list effective] and applicable for purposes of the first sentence of DRA §V (j) [which made the Award a "part" of the "applicable" CBA(s)] on the sixtieth (60th) day following the date of the National Mediation Board ruling and certification referenced in DRA §V (g) [*i.e.*, "single carrier" determination and subsequent certification of the representa-

tive for the craft on that single carrier], unless an earlier date is agreed upon by the designated pilot representative and the single carrier.

26. Arbitrator Eischen further provided that (IMSL Award at 49, ¶ 7 (Doc. #15-2 at 50)):

Dispute resolution procedures shall be in accordance with Section V. of the DRA. To the extent specified in Sections V(c) and V(i), the undersigned Arbitrator retains jurisdiction to resolve any unresolved disputes between the pre-merger pilot groups as to the terms of the DRA and/or the interpretation or application of this Award.

27. On April 7, 2011, the National Mediation Board (NMB) found that RAH was operating its airline subsidiaries–Republic, Chautauqua, Shuttle America, Frontier and Lynx–as a single transportation system for pilots, and that the Midwest pilots were included in that craft or class. *In re Republic Airlines et al./Frontier Pilots*, 38 NMB at 138-39.

28. On June 28, 2011 the NMB certified the IBT as the duly designated representative for purposes of the RLA of the craft or class of pilots employed by "Republic Airlines et al./Frontier, its successors and assigns." *In re Republic Airlines et al./Frontier Pilots*, 38 NMB at 246.

29. That certification triggered the 60-day period at the end of which (*i.e.*, August 27, 2011) the IMSL Award was to be effective. IMSL Award at 40-45 (Doc. #15-2 at 41-46).

30. During the period between the date on which the IMSL Award was issued and its effective date, Frontier hired eight (8) furloughed Midwest pilots, each of whom was within the first 121 Midwest pilots that were integrated in Tier II with Frontier First Officers by the IMSL Award. MPMC Ex. 17 at 2-20. However, since the IMSL Award was not effective when they were hired, they were considered by Frontier to be "new-hires," and were assigned seniority dates that coincided with their Dates-Of-Hire (DOH) at Frontier. MPMC Ex. 2 at 7 (Doc. #1-1 at 13).

31. When the IMSL Award became effective on August 27, 2011, MPMC asserted that the integrated seniority replaced the seniority established under the Frontier/FAPA CBA and required that Frontier allow the eight former Midwest pilots at Frontier to use their IMSL seniority in bidding for schedules, vacations and other purposes; FPMC opposed that position, asserting that the integrated list was not, and would not be, effective until RAH and the IBT reached either a consolidated CBA or an interim agreement implementing the IMSL Award. In response to FPMC's opposition to the use of the integrated seniority in bidding for the September 2011 schedule, Frontier claimed "neutrality" but continued to use the eight former Midwest pilots' DOH as their seniority for schedule and vacation bidding purposes. MPMC invoked the jurisdiction of the IMSL Arbitrator under DRA § V(i) to resolve that dispute. MPMC Ex. 2 at 9-10 (Doc. #1-1 at 15-16).

32. On October 25, 2011, Arbitrator Eischen issued IMSL Award Interpretative Award No. 1. MPMC Ex. 2 at 13-15 (Doc. #1-1 at 19-21). Eischen held that (MPMC Ex. 2 at 14, ¶ 1 (Doc. #1-1 at 20); first bracketed material added; second bracketed materials in original):

> Effective August 27, 2011, the IMSL (Appendix A [to the IMSL Award]) and its integral Conditions/Restrictions are a "part of" both the RJET/IBT Agreement and the Frontier/FAPA Agreement. [No opinion is expressed or implied by me herein regarding whether or to what extent the Midwest/ALPA Agreement retains vitality or constitutes a "collective bargaining agreement applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system".]

33. He also held that (MPMC Ex. 2 at 14, ¶¶ 2-5 (Doc. #1-1 at 20); emphasis in original):

> 2) On or after August 27, 2011, the IMSL (Appendix A) and its integral Conditions/Restrictions comprise the seniority list that is to be used in the administration of seniority status based provisions of both the RJET/IBT Agreement and the Frontier/FAPA Agreement.

3) The IMSL confers upon each listed pilot a specific seniority rank *status*, which differs from the seniority rank *status* that s/he held under the old pre-acquisition seniority lists now superseded by the IMSL. Unless and until the Company and the IBT agree upon collectively bargained contractual modifications or new Agreements, the IMSL does so in the context of the RJET/IBT Agreement and the Frontier/FAPA Agreement. Various collectively bargained provisions in those respective Agreements address the *invocation, utilization, administration, implementation and retention* of the seniority rank *status* conferred upon a pilot by the Award.

4) The Conditions/Restrictions set forth expressly in Part B of my February 19, 2011 Award are the only conditions, restrictions, exceptions, qualifications or limitations of the *invocation, utilization, administration, implementation and retention* of the IMSL seniority rank *status* conferred upon a pilot by Appendix A that are contained in or intended by the Award.

5) Nothing contained in or intended by the Award supports or requires the conditions[,] restrictions or limitations imposed during the September and October 2011 bidding periods upon the exercise of IMSL seniority rank status for schedule, vacation and other recurrent bidding by certain furloughed former Midwest pilots who were hired as Frontier First Officers during the period between February 19, 2011 and August 27, 2011.

34. By a Stock Purchase Agreement, dated September 30, 2013, RAH agreed to sell to the Falcon Acquisition Group, Inc. all of the outstanding stock of Frontier Holdings. RAH Form 8-K filed December 12, 2013, EX-2.1 at 1 (MPMC Ex. 16 at 7). That transaction closed on December 3, 2013. RAH Form 10-K for 2013 at 5 (MPMC Ex. 18 at 8).

35. On December 18, 2013, FAPA filed an application with the NMB to represent the craft or class of pilots employed by Frontier Airlines, which FAPA maintained was a separate carrier after its sale to the Falcon Acquisition Group. On March 31, 2014, the NMB issued its Findings Upon Investigation, concluding that "Frontier is operating as a single transportation system for the

craft or class of Pilots." *In re Frontier Airlines, Inc.*, 41 NMB 31 (2014) (Frontier Ex. F, Doc. #18-6 at 2).

36.     On June 13, 2014, the NMB certified FAPA as the duly designated and authorized representative for purposes of the RLA of the craft or class of pilots employed by "Frontier Airlines, Inc., its successors and assigns." *In re Frontier Airlines, Inc.*, 41 NMB 88, 89 (2014) (Frontier Ex. G, Doc. #18-7 at 3).

37.     Shortly before RAH disposed of its ownership interest in Frontier, a dispute arose among the Republic Pilots Merger Committee (RPMC), FPMC and Frontier over whether Frontier must offer new-hire First Officer positions to pilots holding seniority on the IMSL before it hired new pilots "off the street." That dispute was presented to an adjustment board formed under DRA § V(j) and by agreement among Frontier, RAH and the IBT, with Dana E. Eischen being selected as the arbitrator. As authorized by DRA § V(j), MPMC participated in that proceeding. MPMC Ex. 3 at 2-4 (Doc. #1-1 at 23-25).

38.     On May 2, 2014, Arbitrator Eischen asked the parties to submit their "respective positions concerning the impact, if any," on the proceedings before him of the NMB's March 31, 2014 single carrier determination and call for an election. Counsel Dec. at ¶ 14, authenticating MPMC Ex. 19.

39.     In response to the arbitrator's inquiry, Frontier and FAPA took the position that the DRA and the IMSL Award ceased to be applicable to Frontier and its pilots once the NMB determined that Frontier was a separate carrier. Counsel Dec. at ¶¶ 15-16, authenticating MPMC Exs. 20-23. They also asserted that while the arbitrator retained jurisdiction to resolve disputes with respect to the period of time the DRA and Award remained in effect, he had no jurisdiction to

consider claims for the period subsequent to when the DRA and IMSL Award ceased to be effective, for they had not agreed to submit those claims to arbitration. Any claim that the arbitrator had jurisdiction, they asserted, would raise a question of substantive arbitrability. MPMC Ex. 20 at 1-2; Ex. 21 at 1-2.

40. On September 12, 2014, Arbitrator Eischen issued his award on the RPMC dispute, ruling that the IMSL Award did not compel Frontier to offer new hire positions to pilots holding IMSL seniority. MPMC No. 3 at 25 (Doc. #1-1 at 46). In his Award, Arbitrator Eischen noted the argument Frontier and FPMC had made as to the continued effectiveness of the DRA and IMSL Award, stating (Ex. 3 at 19, n. 7 (Doc. #1-1 at 40):

> It was not necessary for me to reach or address the collateral NMB question to fully resolve the merits of the issues submitted to me for determination in these proceedings by the Arbitration Agreement of November 26, 2013. Accordingly, nothing contained in this Opinion or Award is intended to express or imply a resolution of any question relating to the application of the DRA or the Eischen Award following the NMB's separate carrier designation of Frontier or whether I have authority to decide such issues.

41. On September 13, 2014, FAPA sent a letter to Frontier taking the position that based upon the terms of the DRA and the IMSL Award, "[e]ffective June 13, 2014, the Eischen Award and the IMSL are no longer effective with respect to seniority under the Frontier CBA" (MPMC Ex. 9 at 3 (Doc. #1-1 at 68)) and that, effective June 13, 2014, "the seniority of a Pilot under the Frontier CBA shall be determined based on the date on which the Pilot was first placed on the Company payroll as a pilot, in accordance with Section 3.A.1. of the Frontier CBA . . . ." *Id*.

42. Frontier agreed (FAPA Ex. 3 at Enclosure 2 (Doc. #15-3 at 14)) and, as FAPA urged, used DOH rather than IMSL ranking to award the October 2014 schedule. MPMC Ex. 8 at 6 (Doc.

-12-

#1-1 at 62). Using DOH rather than IMSL ranking, deprived the four former Midwest pilots who were bidding[2/] of their superior bidding position that they had under the IMSL Award since August 27, 2011. MPMC Ex. 5 at 1 (Doc. #1-1 at 49); MPMC Ex. 17.[3/]

43.    On September 20, 2014, the MPMC asked FAPA to implement DRA § V(h) by informing Frontier "that the MPMC and the other merger committees have been delegated by FAPA with the authority to adjust any dispute or disputes that might arise as to the interpretation or application of the February 19, 2011 Seniority Integration Award and subsequent interpretative awards, including the authority to compromise such disputes, and to initiate, defend, mediate, and litigate such issues in the dispute resolution mechanism under the DRA." MPMC 4 (Doc. #1-1 at 47). MPMC further requested that FAPA acknowledge "that it will pay the Merger Committees' expenses incurred in the adjusting of such disputes for Frontier pilots, including the Committees' arbitration expenses and fees, lost time for Committee members, and Committee attorney's fees." *Id*.

44.    Relying upon the authority vested in it by DRA § V(h), MPMC initiated the grievance process on September 23, 2014, under Section 12 of the Frontier/FAPA CBA to challenge Frontier's and FAPA's decision to abrogate the former Midwest pilots IMSL seniority at Frontier. MPMC Ex.

---

[2/]    The fifth grievant, Daniel A. Norden, is currently on medical leave.

[3/]    Tier II of the IMSL integrated 121 Midwest pilots, including the five grievants, with 700 Republic pilots and 334 Frontier pilots. IMSL Award at 36 (Doc. #15-2 at 37). The five grievants were in the top 28 of the Midwest pilots (with DOHs at Midwest between June 13, 1983 and October 19, 1987 (MPMC Ex. 17 at 3-6) and were inserted between a Frontier pilot with an October 21, 2002 DOH (MPMC Ex. 17 at 3) and Frontier pilot with an October 8, 20003 DOH. MPMC Ex. 17 at 6. The most senior grievant was integrated at Seniority No. 1051, while the most junior grievant was integrated at Seniority No. 1220. *Id*. The most junior Frontier pilot on the IMSL was hired on April 24, 2008 and was assigned integrated Seniority No. 2185. MPMC Ex. 17 at 20.

5 (Doc. #1-1 at 49). MPMC asserted that Frontier's actions in using DOH as the former Midwest pilots' seniority ranking "violates the IMSL Award, the October 2011 Interpretative Award, and the Frontier Pilots CBA of which the IMSL was made an immutable part."*Id*.

45. On September 24, 2014, FAPA responded to the MPMC's invocation of DRA § V(h), asserting that the DRA "is no longer applicable to Frontier Airlines, Inc. . . . or FAPA" referring to the language of the DRA and the terms of the IMSL Award to support its interpretation of those instruments. MPMC Ex. 6 at 1 (Doc. #1-1 at 51). FAPA then stated: "Accordingly, [MPMC] . . . request to invoke the arbitration provisions of the DRA are without basis, and substantively inarbitrable." *Id*.

46. FAPA also asserted that since the DRA was no longer applicable, MPMC could not invoke the CBA's grievance procedure. MPMC Ex. 6 at 4 (Doc. #1-1 at 54). FAPA added that (*Id*.):

> To the extent that the affected Frontier Pilots who you [*i.e.*, MPMC's counsel] represent believe that Frontier is improperly administering seniority under the Frontier CBA, those pilots (although not the Midwest Merger Committee) may invoke the grievance procedure of that CBA pursuant to the terms thereof. FAPA will fulfill its obligations with respect to the processing of any such grievance in accordance with the CBA.

47. On September 24 and 25, 2014, MPMC invoked the jurisdiction of Arbitrator Eischen under DRA § V(c) to resolve the two disputes that had arisen between MPMC and both Frontier and the Frontier pilots over (1) whether the DRA and IMSL Award no longer apply at Frontier; and (2) whether DRA § V(h) requires FAPA to authorize the Merger Committees to handle seniority integration disputes. MPMC Ex. 7 (Doc. #1-1 at 55).

48. FAPA responded to MPMC's request to invoke Arbitrator Eischen's jurisdiction under DRA § V(c) on October 10, 2014, relying upon its interpretation of the DRA and IMSL Award

to assert that "(1) the DRA is no longer in effect; [and] (2) even if the DRA were otherwise effective, you would lack authority over either the substance of the issue asserted by [MPMC] . . . , or the interpretation or application of the DRA in connection therewith[4] . . . . There is no agreement to submit these matters to you; accordingly, these are all issues of substantive arbitrability, over which you have no jurisdiction." MPMC Ex. 8 at 1 (Doc. #1-1 at 57).

49. Frontier also responded on October 10, 2014 to the MPMC's invocation of Arbitrator Eischen's jurisdiction under DRA § V(c) by adopting the reasoning set forth in FAPA's response and by asserting that it has not agreed to submit the disputes raised by MPMC to arbitration. MPMC Ex. 10 (Doc. #1-1 at 69). It also incorporated by reference its earlier submissions to Arbitrator Eischen where it argued that the DRA no longer applied to Frontier once it became a separate carrier. *Id*.

50. On October 29, 2014, Arbitrator Eischen issued his ruling on the MPMC's purported invocations of his jurisdiction under DRA § V(c), ruling that Frontier had raised "a colorable issue of substantive arbitrability . . . ." MPMC Ex. 11 (Doc. #1-1 at 70). Eischen stated: "It is apparent to me that the Parties have a *bona fide* disagreement over whether they in fact have an agreement to arbitrate disputes such as those raised in [MPMC's] letters. Nor is there any clear and unmistakable provision between them empowering me rather than the courts to resolve that threshold issue." MPMC Ex. 11 at 2 (Doc. #1-1 at 71).

---

[4] FAPA's alternative argument relied upon the wording of DRA § V(c) which, it claimed, limited the arbitrator's jurisdiction to disputes arising within 120 days of the IMSL Award. MPMC Ex. 8 at 7-8.

51. In the interim, relying upon DRA §§ V(h) and V(j), MPMC sought to use the Frontier/FAPA CBA's grievance procedure to adjust the challenge of the five former Midwest Frontier pilots to the abrogation of their IMSL seniority. MPMC Ex. 12 (Doc. #1-1 at 72-73).

52. Frontier and FAPA maintain that MPMC had no right under the CBA to initiate or handle those grievances. Counsel Dec. at ¶¶ 17-19, authenticating MPMC Exs. 24-26.

53. FAPA processed grievances on behalf of the five claimants (MPMC Ex. 13 (Doc. #1-1 at 74)), but in that grievance stated that its position is set forth in its letter to Frontier dated September 13, 2014, and in Letter of Agreement 71 of the CBA." MPMC Ex. 14 (Doc. #1-1 at 75). Letter of Agreement 71 placed into agreement form the abrogation of the IMSL Award. Frontier Ex. B (Doc. #18-2).

54. On January 5, 2015, FAPA informed the five grievants that their grievance would be heard by the Frontier/FAPA four member system board (2 Frontier and 2 FAPA members) on March 18 and 19, 2015. Counsel Dec. at ¶ 20, authenticating MPMC Ex. 27.

55. Grievants counsel asked FAPA to bypass the system board as the CBA permits (FAPA Ex. 1 at §§ 14.A.5, 14.D.2 (Doc. #15-1 at 19, 21)) and go directly to the CBA's Board of Arbitration, but FAPA declined. MPMC Ex. 27 at 1. Alternatively, grievants' counsel requested that FAPA's system board members agree to deadlock so that the dispute would be resolved by a Board of Arbitration where the neutral arbitrator renders the decision (FAPA Ex. 1 at § 14.J.2.c (Doc. # 15-1 at 25)), but again FAPA declined. MPMC Ex. 27 at 1-2.

56. Section 21.D.1 of the Frontier/FAPA CBA provides that each pilot covered by that CBA who is not a dues-paying member of FAPA "shall be required, as a condition of employment, . . . to pay the Association [*i.e.*, FAPA] . . . a service charge as a contribution for the administration

-16-

of the Agreement and the representation of such Pilot." MPMC Ex. 28 at 10. The Agency Shop Fee (and FAPA's dues (*Id.* at 8)) is 1.5% of the pilot's gross pay "or such monthly Fees as may hereinafter be established in accordance with the Constitution of the Frontier Airline Pilots Association . . . ." *Id*. at 9.

Respectfully Submitted,

/s/ John O'B. Clarke, Jr.
John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
Phone: (202) 296-8500
Fax: (202) 296-7143
Email: jclarke@highsaw.com

Date: February 9, 2015        Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that I this 9th day of February, 2015, caused a copy of the foregoing Plaintiffs' Statement Of Undisputed Material Facts, Declaration of Counsel and Exhibits to be served upon counsel for defendants Frontier and FAPA through the Court's Electronic Filing System.

/s/ John O'B. Clarke, Jr.
John O'B. Clarke, Jr.