# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **MIDWEST PILOTS MERGER COMMITTEE, CARL SCHWERMAN, DONALD TILL,** *and* **MARK E. WARD,**       *Plaintiffs*, <br><br> *v.* <br><br> **FRONTIER AIRLINES, INC.** *and* **FRONTIER AIRLINE PILOTS ASSOCIATION,**       *Defendants.* | Civil Action No. 2:14-cv-01441-RTR |

### OPPOSITION BY PLAINTIFFS TO
### DEFENDANTS' MOTIONS TO DISMISS

John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
Phone: (202) 296-8500
Fax: (202) 296-7143
Email: jclarke@highsaw.com

Date: February 17, 2015      Attorney for Plaintiffs

Case 2:14-cv-01441-RTR   Filed 02/17/15   Page 1 of 35   Document 27

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

COUNTERSTATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

COUNTERSTATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    The DRA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    B.    Arbitrator Eischen Integrates The Pilots' Seniority, But The Frontier Pilots Try To Block Its Application To Them.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.    Frontier Hires Eight Midwest Pilots, But FPMC Challenges Their IMSL Seniority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.    RAH's Sale Of Frontier.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    E.    Frontier And FAPA Refuse To Arbitrate Under The DRA The Disputes MPMC Raised... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    I.    THIS COURT HAS JURISDICTION UNDER RLA §§ 2 FIRST AND 204 TO DETERMINE WHETHER THE ARBITRATION PROCESS ESTABLISHED BY DRA § V(c) IS THE APPROPRIATE ADJUSTMENT BOARD TO HEAR THE DRA INTERPRETATION AND APPLICATION DISPUTES DEFENDANTS AND PLAINTIFFS HAVE RAISED. . . . . . . . . . 15
        A.    This Court Has Jurisdiction To Enforce RLA §§ 2 First And 204. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        B.    Count I Does Not Present A Representational Dispute. . . . . . . . . . . . . . 18

    II.    PLAINTIFFS' ALLEGATIONS THAT FAPA CONSPIRED WITH FRONTIER TO STRIP THE FORMER MIDWEST PILOTS OF THEIR INTEGRATED SENIORITY BECAUSE OF DEFENDANTS' HOSTILITY TO THE IMSL AWARD, WHICH THE DRA MADE FINAL AND BINDING, PLAUSIBLY STATES A CLAIM THAT FAPA BREACHED ITS DUTY TO REPRESENT THE FORMER MIDWEST PILOTS FAIRLY, AND THAT FRONTIER KNOWINGLY AND WILLFULLY PARTICIPATED IN THAT BREACH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        A.    Plaintiffs Have Plausibly Claimed That FAPA Breached Its Duty Of Fair Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        B.    Plaintiffs Have Stated A Plausible Claim In Count II Against Frontier. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Appendix A–*Thomas v. RAH*, 2012 WL 683525 (D. CO 2012)

# TABLE OF AUTHORITIES

**CASES RELIED UPON:**

*AFA v. United Airlines, Inc.*, 71 F.3d 915 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*ALPA v. O'Neill*, 499 U.S. 65 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Barton Brands, Ltd. v. NLRB*, 529 F.2d 793 (7th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . 20-23, 26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*BLE v. Atchison, Topeka & Santa Fe Ry.*, 768 F.2d 914 (7th Cir. 1985). . . . . . . . . . . . . . . . 18, 19

*BLE v. Louisville & Nashville R.R.*, 373 U.S. 33 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chicago & North Western Ry. v. UTU*, 402 U.S. 570 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Committee of Concerned Midwest Flight Attendants v. IBT*, 662 F.3d 954 (7th Cir. 2011). . . . . 26

*Consolidated Rail Corp. v. RLEA*, 499 U.S. 299 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cunningham v. ALPA*, 769 F.3d 539 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23, 26

*Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142 (1969). . . . . . . . . . . . . . . . . . . . . . 21, 29

*Ford Motor Co. v. Huffman*, 345 U.S. 330 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 2

*IAM v. Central Airlines, Inc.*, 372 U.S. 682 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Frontier Airlines, Inc.*, 41 NMB 31 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*In re Frontier Airlines, Inc.*, 41 NMB 88 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 24

*In re Republic Airlines et al./Frontier Pilots*, 38 NMB 138 (2011). . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Republic Airlines et al./Frontier Pilots*, 38 NMB 245 (2011). . . . . . . . . . . . . . . . . . . . . . . . 8

*Jones v. TWA*, 495 F.2d 790 (2d Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28, 29

-ii-

*Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7ᵗʰ Cir. 1992),
    *cert. denied*, 510 U.S. 861, 906 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . 19-23, 26-28, 30

*Ramey v. District 141, IAM*, 378 F.3d 269 (2d Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Thomas v. RAH*, 2012 WL 683525 (D. CO 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Vaca v. Sipes*, 386 U.S. 171 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

**STATUTES AND OTHER AUTHORITIES RELIED UPON:**

Railway Labor Act, 45 U.S.C. § 151, *et seq*.
    Section 2 First, 45 U.S.C. § 152 First. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 25, 29, 30
    Section 2 Fourth, 45 U.S.C. § 152 Fourth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 2 Sixth, 45 U.S.C. § 152 Sixth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 2 Seventh, 45 U.S.C. § 152 Seventh. . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 29, 30
    Section 6, 45 U.S.C. § 156. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 204, 45 U.S.C. § 184. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17, 25

McCaskill Bond Amendment, 42 U.S.C. § 42112 note. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 26

Section 301, Labor Management Relations Act, 29 U.S.C. § 181. . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P
    Rule 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15
    Rule 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15
    Rule 56(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 15, 18

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **MIDWEST PILOTS MERGER** ) | |
| **COMMITTEE,** ) | |
| **CARL SCHWERMAN,** ) | |
| **DONALD TILL,** ) | |
| *and* ) | |
| **MARK E. WARD,** ) | |
| *Plaintiffs,* ) | **Civil Action No. 2:14-cv-01441-RTR** |
| ) | |
| *v.* ) | |
| ) | |
| **FRONTIER AIRLINES, INC.** ) | |
| *and* ) | |
| **FRONTIER AIRLINE PILOTS** ) | |
| **ASSOCIATION,** ) | |
| *Defendants.* ) | |
| ) | |

## OPPOSITION BY PLAINTIFFS TO
## DEFENDANTS' MOTIONS TO DISMISS

On January 16, 2015, defendants Frontier Airlines, Inc. and the Frontier Airline Pilots

Association (FAPA) filed separate motions to dismiss the complaint plaintiffs Midwest Pilots

Merger Committee (MPMC) *et al.* brought to enforce the Railway Labor Act (RLA), 45 U.S.C. §

151, *et seq.* This pleading is submitted by plaintiffs in opposition to those motions.

## COUNTERSTATEMENT OF THE CASE

Plaintiffs–a Merger Committee,[1] its officers, and one of the former Midwest Airlines pilots

employed at Frontier on whose behalf MPMC has been authorized to act–filed a two-count

complaint on November 17, 2014, against Frontier and FAPA. Count I of the complaint seeks to

---

[1]    Plaintiff MPMC was formed under the Constitution of the union which represented
Midwest Airline pilots before that airline was integrated into the Republic Airways Holding Inc.
(RAH) system in 2009. Complaint at ¶ 1. MPMC was formed for the purpose integrating the
seniority of the Midwest pilots with the seniority of the three other pilot groups involved in RAH's
expansion into "branded" flying, and it has been continued in existence to enforce that integrated
seniority insofar as the interests of Midwest pilots are impacted. *Id.*

enforce RLA §§ 2 First and 204, 45 U.S.C. §§ 152 First and 184, by requiring defendants to arbitrate disputes arising from the interpretation and application of a collective-bargaining agreement (CBA)–the Section 13(b) Dispute Resolution Agreement (DRA)–before the adjustment board the parties to the DRA and their privies agreed would have jurisdiction to resolve such disputes. Count II seeks to enforce the duty which RLA Section 2 Fourth, 45 U.S.C. § 152 Fourth, imposes on FAPA to represent *all* Frontier pilots fairly, and the duties which RLA §§ 2 First and 2 Seventh place upon Frontier and FAPA to change agreements only in the manner prescribed in the RLA's major dispute provisions or in the agreement itself. Defendants responded by filing separate Fed. R. Civ. P. Rule 12(b), motions to dismiss both counts. They asserted under Rule 12(b)(6) that plaintiffs failed to state a claim in either count on which relief could be granted, and they argued under Rule 12(b)(1) that this Court lacks jurisdiction over Count I. Plaintiff MPMC replied to defendants' challenge to the claim stated in Count I by filing a Rule 56(a) motion for partial summary judgment on February 9, 2015, asking this Court to enter judgment in its favor on Count I of the complaint. By this opposition, plaintiffs are responding to defendants' separate contentions that this Court lacks jurisdiction over Count I, as well as to defendants' claims that Count II fails to state a claim upon which relief can be granted.

### COUNTERSTATEMENT OF FACTS

Plaintiffs submit that when the allegations in the complaint, along with the facts evidenced in the documents either attached as exhibits or incorporated into that pleading, are viewed in the light most favorable to them, as this Court must do (*Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007)), the following facts are relevant to defendants' motions to dismiss:

By the end of 2008, Republic Airways Holdings Inc. (RAH), whose three airline subsidiaries at that time provided "capacity" for several of the major air carriers, decided to diversify "into

-2-

scheduled brand service." Complaint at ¶ 9; February 19, 2011 Seniority Integration Award (IMSL Award), FAPA Ex. 2 at 11 (Doc. #15-2 at 12). RAH accomplished this "by purchasing two established mainline branded carriers" (FAPA Ex. 2 at 11), Midwest Airlines, Inc. and Frontier Airlines, Inc., by acquiring their holding companies. *Id.*

Prior to its acquisition of the two brands, RAH operated its three airline subsidiaries as a "single transportation system"–*i.e.*, a "carrier" subject to the Railway Labor Act (RLA), 45 U.S.C. § 151, *et seq*. Its pilots were represented by the International Brotherhood of Teamsters (IBT) through the its Airline Division and were covered by a CBA negotiated by the IBT. Complaint at ¶ 10. Midwest's pilots were represented for purposes of the RLA by the Air line Pilots Association, International (ALPA), and were covered by a CBA. *Id.* Frontier's pilots were represented by the FAPA and they, too, were covered by a CBA. *Id.* Finally, Lynx Aviation, Inc.'s pilots, whose airline was a wholly-owned subsidiary of Frontier Holdings and acquired by RAH when it acquired Frontier, were represented by the United Transportation Union (UTU), but the UTU and Lynx had not negotiated a CBA. *Id.*

Each of the three CBAs applicable to the pilots within the RAH corporate family as of October 1, 2009, provided that, in the event its airline engaged in a successorship transaction which resulted in an operational merger, the pilots' seniority should be integrated in a fair and equitable manner as provided in Sections 3 and 13 of the Labor Protective Provisions (LPPs) imposed by the Civil Aeronautics Board in the Board's *Allegheny-Mohawk Merger Case*. Complaint at ¶ 10. Lynx's pilots had no such contractual protection, but they were included in the seniority integration dispute by virtue of the McCaskill-Bond Amendment, 42 U.S.C. § 42112 note. *Id.*

As authorized by ALPA's Constitution, the Midwest pilots established a "Merger Committee" and ALPA delegated to that Committee its authority to represent the Midwest pilots

in integrating, in a fair and equitable manner, their seniority with the seniority of the three other pilot groups involved in the consolidation. Complaint at ¶ 1. Each of the three other unions formed Merger Committees and gave them comparable authority. MPMC Ex. 1 at 1 (Therefore clause).

**A.     The DRA.**

On November 3, 2009, the four Merger Committees reached an agreement–*i.e.*, the DRA–with RAH and its affiliates as to the process that would be followed to resolve the dispute over the fair and equitable integration of the pilots' seniority. MPMC Ex. 1 (Doc. #1-1 at 1-6). As that multi-party agreement states (*Id*. (Doc. #1-1 at 1)):

> . . . [RAH], on behalf of itself and its wholly-owned affiliates Republic Airline Inc., Chautauqua Airlines, Inc. and Shuttle America Corp. (hereinafter collectively, "Republic"), Midwest Airlines, Inc., Frontier Airlines, Inc. and Lynx Aviation, Inc. (RAH and its affiliates together one "party" under this Agreement), and the Republic, Midwest, Frontier and Lynx pilots, as represented by their respective Seniority Merger Committees (the "Merger Committees") as duly created and authorized by each pilot group's duly designated representative (each such Merger Committee another "party" under this Agreement) agree to establish the following procedures for resolving the seniority integration issue in accordance with Sections 3 and 13 of the [*Allegheny-Mohawk*] LPPs . . . .

That Agreement provided a process by which the four pilot groups would first attempt to reach agreement amongst themselves on the integration methodology before they would approach RAH. DRA §§ I, II-III (Doc. #1-1 at 1-3). If those efforts were unsuccessful, any party to the Agreement could invoke its arbitration provisions to have an arbitrator devise the integration methodology. MPMC Ex. 1 at 2 (DRA § II(f)).

In addition to providing the process to obtain an integrated seniority list, the DRA also provided procedures to resolve disputes that might arise from the interpretation or application of that integrated list. Interpretation disputes arising within the first 120-days of the award's effective

-4-

date were to be resolved by the Integration Arbitrator (DRA § V(i)), while post 120-days "interpretation or application" disputes were to be resolved before an adjustment board "established by the designated representative of the combined craft or class and the single carrier for final and binding resolution." DRA § V(j). Realizing that disputes might arise out of the "interpretation or application" of the DRA itself, the parties provided that the Integration Arbitrator "shall have the authority to resolve *any*" such dispute. MPMC Ex. 1 at 4 (DRA § V(c); emphasis added).[2/]

In drafting the DRA, the parties recognized the inherent conflict the union subsequently designated to represent the combined craft or class would face when attempting to resolve disputes arising out of the interpretation or application of the integration award. The parties addressed this conflict of interests by providing for the continuation of the Merger Committees with authority delegated to the Committees by the designated representative of the combined craft or class of pilots to handle such disputes. MPMC Ex. 1 at 5 (DRA § V(h)). Section V(h) provides that (*Id.*):

> The Organization, if any, designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system shall continue the Merger Committees in existence and delegate to the Merger Committees authority solely for the purpose of adjusting any dispute or disputes that might arise as to the interpretation or application of the award, including authority to compromise such disputes, and to initiate, defend, mediate, and litigate such issues in the dispute resolution mechanism under this Agreement. The Organization shall have authority over the manner in which the Merger Committees' operations are financed. The Merger Committees which are parties to this agreement represent that they have been

---

[2/] DRA § V(c) provides (Doc. #1-1 at 4; emphasis added):
(c) In addition to jurisdiction to resolve disputes under Section I [dealing with discovery] and to devise the fair and equitable integration of seniority, *the arbitrator shall have the authority to resolve any dispute arising out of the interpretation or application of this Agreement.*

authorized by their principals (the duly designated representative of their airline's pilots) to enter into the commitments set forth in this paragraph and in this Agreement. Each Merger Committee shall fill its own vacancies by selection made by the remaining members of that Merger Committee.

As relevant here, the parties specified in DRA § V(j) the role the Merger Committees were to have in seniority integration related disputes arising more than 120-days after the award became effective:[3] They authorized the Merger Committees to initiate such disputes arising out of the interpretation or application of the IMSL Award, to handle them through the conferences required by RLA § 2 Sixth, 45 U.S.C. § 152 Sixth, and, if still unresolved, to invoke the jurisdiction of the appropriate adjustment board. MPMC Ex. 1 at 5. DRA § V(j) provides that post 120-day disputes arising "out of the interpretation or application of the [integration] award . . . shall be handled in the usual manner by the applicable Merger Committees up to and including the highest carrier official designated to handle such disputes, but failing to reach an adjustment in this manner, the dispute may be submitted by any party to the dispute to the adjustment board established by the designated representative of the combined craft or class and the single carrier for final and binding resolution." Section V(j) further provides that in the adjustment board process: "All Merger Committees shall be given notice of the dispute and, in addition to the Merger Committee invoking the adjustment board jurisdiction, may be heard by the system board of adjustment in resolving the dispute, with the decision of the board being made by the arbitrator selected pursuant to the applicable agreement to sit with the system board (without a vote by the other members of the

---

[3]     The parties devised a different dispute-resolution procedure for disputes arising within 120-days after the award became effective. Those disputes were to be brought by any party to the DRA to the Integration Arbitrator. MPMC Ex. 1 at 5, § V(i).

system board)." DRA § V(j).[4/]

## B. Arbitrator Eischen Integrates The Pilots' Seniority, But The Frontier Pilots Try To Block Its Application To Them.

RAH's pilots were unable to reach an agreement as to the methodology to integrate their seniority and they, along with RAH, submitted that dispute to the integration arbitrator the parties had selected, Dana E. Eischen, for resolution. Complaint at ¶ 17. Following a hearing and briefing, Arbitrator Eischen issued his integration award on February 19, 2011. *Id.*

FAPA's Merger Committee, the Frontier Pilots Merger Committee (FPMC), had proposed that the first 341 positions on the integrated seniority list be assigned to Frontier pilots and that the remaining 305 Frontier pilots be integrated with 62 of the 383 Midwest pilots. Complaint at ¶ 18. Republic pilots, who made up the majority of the combined pilots with 2,041 pilots, were to be integrated below all Frontier pilots. *Id.* Arbitrator Eischen rejected that proposal, and instead assigned the first 962 positions on the integrated list to 650 Republic pilots and 312 Frontier pilots. The next 1,155 positions were assigned to the next 700 Republic pilots, the remaining 334 Frontier pilots and 121 Midwest pilots. The next 660 positions were populated with 559 Republic pilots and 101 Lynx pilots, while the last 204 positions were assigned to the remaining Midwest pilots. IMSL Award at 36 (Doc. #15-2 at 37). Arbitrator Eischen also imposed "Conditions/Restrictions," which *inter alia* provided that, for a period of seven years, Frontier pilots would have priority for all positions on Airbus aircraft flown by Frontier. *Id.* at 48 (Doc. #15-2 at 49).

---

[4/]     That provision, plaintiff MPMC submits, supersedes, for disputes within the coverage of DRA § V(j), the "gatekeeper" restrictions in the Frontier/FAPA CBA, which FAPA correctly notes, gives it control over which grievances may be progressed through the CBA's dispute resolution procedures. FAPA Memorandum In Support of Motion To Dismiss [hereinafter, "FAPA Memo."] at 16, n. 6 (Doc. #14).

Eischen, as DRA § V(g) required, established a date on which the award would become effective; he provided that the award would be effective sixty (60) days *after* the NMB determined whether "the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system." DRA at 4-5, § V(g); FAPA Ex. 2 at 49 (Doc. 15-2 at 50). On April 7, 2011, the NMB found that RAH was operating its airline subsidiaries–Republic, Chautauqua, Shuttle America, Frontier and Lynx–as a single transportation system for pilots, and that the Midwest pilots were included in that craft or class. *In re Republic Airlines et al./Frontier Pilots*, 38 NMB 138 (2011). On June 28, 2011, it certified that the IBT was the duly designated representative of those pilots, thereby replacing FAPA as the collective-bargaining representative of the Frontier pilots. *In re Republic Airlines et al./Frontier Pilots*, 38 NMB 245 (2011). Thus, the IMSL Award–and its integrated list–became effective and a "part" of the applicable CBAs on August 27, 2011. MPMC Ex. 2 at 14 (Doc. #1-1 at 20).

FAPA was upset with the IMSL Award and took steps to avoid, or at least limit, its application to the Frontier pilots. Complaint at ¶ 20. Some of those steps to frustrate the application of the integrated seniority included:

- On May 18, 2011, members of the FPMC, including Scott Gould, who became Frontier's Vice President, Flight Operations,[5] and Michael Haffling, FAPA's grievance chair, brought a suit in the United States District Court for the District of Colorado to set aside the IMSL Award, asserting *inter alia* that it exceeded the arbitrator's authority by changing the manner in which seniority was assigned under the Frontier/FAPA CBA. *Thomas v. RAH*, D. Co. No. 1:11-cv-01313-RPM. That suit was unsuccessful. *Thomas v. RAH*,

---

[5]    Scott Gould is the Frontier officer who agreed to abrogate the IMSL Award's seniority on September 13, 2014 (FAPA Ex. 3 at 14 (Doc. #15-3)), and who signed Letter of Agreement (LOA) 71 for Frontier on October 9, 2014. Frontier Ex. B at 6 (Doc. #18-2 at 7).

-8-

2012 WL 683525 (D. CO 2012) (Attached hereto as Appendix A).

- FAPA sought to abrogate the Award before the seven-year "fence" expired, by entering into agreements with RAH in early June 2011, within days of the date FAPA knew its right to represent Frontier's pilots would end once the NMB counted the votes on the election it was conducting. Complaint at ¶ 22. By those agreements, RAH, in exchange for contract concessions by the Frontier pilots, agreed to structure Frontier as a separate carrier and to dispose of its interest in Frontier by December 31, 2014. Complaint at ¶ 22.

- FAPA sought to structure those agreements in such a fashion that the IBT could not bargain over the terms of the agreements once the IBT became the certified representative of Frontier's pilots. FAPA Ex. 1 at LOA 67 § D (Doc. #15-1 at 35). FAPA's goal was to have Frontier become a separate carrier so that, it believed, the IMSL Award would no longer apply to Frontier pilots. Complaint at ¶ 22.

## C.   Frontier Hires Eight Midwest Pilots, But FPMC Challenges Their IMSL Seniority.

During the period between the date the IMSL Award was issued and its effective date, Frontier hired eight furloughed Midwest pilots, who, unlike the other RAH-affiliated pilots it hired in that time frame, did not waive their IMSL rights to be hired. MPMC Ex. 2 at 7-8 (Doc. #1-1 at 13-14). Those Midwest pilots were considered by Frontier to be new-hires and, as provided in the Frontier/FAPA CBA, were assigned their Date-of-Hire (DOH) as their seniority date. MPMC Ex. 2 at 7 (Doc. #1-1 at 13). Once the IMSL Award became effective, MPMC maintained that the seniority of those pilots should be as established by the Award; FPMC disagreed, asserting that the IMSL Award was *not effective* and would not be effective until RAH and the IBT negotiated either a combined CBA or an agreement providing for the implementation of the award. MPMC Ex. 2 at 8. While RAH implemented the IMSL Award at its non-Frontier operations, Frontier adopted a different position, construing the "fence" as precluding application of the IMSL Award to the eight Midwest pilots flying at Frontier. MPMC Ex. 2 at 8-9.

MPMC invoked Arbitrator Eischen's jurisdiction under DRA § V(i) to resolve that dispute, which he did on October 25, 2011. MPMC Ex. 2 at 13-15 (Doc. #1-1 at 19-21). Eischen found that the integrated list did not need either a consolidated CBA or an implementing agreement to become effective (MPMC Ex. 2 at 13 (Doc. #1-1 at 19)), and that on August 27, 2011, the integrated list became "'a part of' both the RJET/IBT Agreement and the Frontier/FAPA Agreement." MPMC Ex. 2 at 14 (Doc. #1-1 at 20). He further found that as of August 27, 2011, "the IMSL (Appendix A [to his Award]) and its integral Conditions/Restrictions comprise the seniority list that is to be used in the administration of seniority status based provisions of . . . the Frontier/FAPA Agreement." *Id.*

While Frontier complied with the Arbitrator's interpretation of his earlier Award, the Frontier pilots' antagonism to the IMSL Award manifested itself when several Frontier pilots, with the encouragement of FAPA's leadership, created a hostile work environment for the eight Midwest pilots. Complaint at ¶ 29. That antagonism to the Award–and, by transference, that hostility to the Midwest pilots in their mist–was further made evident when Frontier closed its pilot domicile in Milwaukee, where the eight Midwest pilots were assigned, and opened a new domicile in Chicago. Even though Eischen's Interpretative Award held that IMSL seniority was "to be used in the administration of seniority based provisions of . . . the Frontier/FAPA Agreement" (MPMC Ex. 2 at 14, ¶ 2), Frontier required the Midwest pilots to use their DOH rather than their IMSL seniority ranking to displace other pilots, or to bid for vacancies at the new base. This, plaintiffs allege, was done at the urging of FAPA's leadership. Complaint at ¶ 29.

## D.    RAH's Sale Of Frontier.

On September 30, 2013, RAH entered into an agreement to sell Frontier to the Falcon Acquisition Group, Inc. Complaint at ¶ 30. That transaction closed on December 3, 2013 (*Id.*), and

-10-

on December 18, 2013, FAPA filed an application with the NMB to represent the Frontier pilots. On March 31, 2014, the NMB issued its Findings Upon Investigation, finding that "Frontier is operating as a single transportation system for the craft or class of Pilots." *In re Frontier Airlines, Inc.*, 41 NMB 31 (2014). It proceeded to conduct an election and on June 13, 2014, certified FAPA as the duly designated representative for purposes of the RLA of the craft or class of pilots employed by Frontier. *In re Frontier Airlines, Inc.*, 41 NMB 88 (2014).

Shortly before RAH sold Frontier, a dispute arose over whether Frontier was required to offer First Officer jobs to non-Frontier IMSL pilots before it hired pilots "off the street." Complaint at ¶ 32. That dispute was pending before Arbitrator Eischen under DRA § V(j) when the NMB certified FAPA as the representative of the Frontier pilots. Frontier and FAPA informed Eischen that the DRA and IMSL Award ceased to apply to them once the NMB, having found Frontier to be separate from RAH, certified FAPA as the Frontier pilots' representative. Complaint at ¶ 33. Eischen issued his ruling on the DRA § V(j) dispute before him on September 12, 2014, holding that non-Frontier IMSL pilots needed to have some mechanism to transfer their employment relationship to Frontier before they could exercise their IMSL ranking at Frontier. MPMC Ex. 3 at 22-24 (Doc. #1-1 at 43-45). He did not address, however, Frontier's and FAPA's arguments that the DRA and IMSL Award no longer applied to them. MPMC Ex. 3 at 19, n. 7 (Doc. #1-1 at 40).

Nevertheless, on the next day FAPA asked its former official, Frontier's Vice President for Flight Operations Scott Gould, to agree with it that as of June 13, 2014, "the Eischen Award and the IMSL are no longer effective with respect to seniority under the Frontier CBA" (MPMC Ex. 9 at 3 (Doc. #1-1 at 68)), and that "the seniority of a Pilot under the Frontier CBA shall be determined based on the date on which the Pilot was first placed on the Company payroll as a pilot, in accordance with Section 3.A.1. of the Frontier CBA . . . ." *Id*. FAPA made that request based upon

its reading of the DRA and the IMSL Award as implicitly imposing conditions on their *continued* application to Frontier and FAPA. MPMC Ex. 9 at 1-2 (Doc. #1-1 at 66-67). FAPA asserted that, as a result of Frontier's sale and FAPA's certification, "none of the conditions for the application of the Eischen Award and the IMSL with respect to Frontier exist, and Section 3 and the other seniority-related provisions of the Frontier CBA apply by their terms without modification." MPMC Ex. 9 at 2 (Doc. #1-1 at 67). FAPA further stated that Eischen's ruling of the day before, "[t]ogether with the NMB's findings and certification, . . . removes any practical risk that additional pilots would be granted the right to use IMSL seniority under the Frontier CBA." *Id*. In other words, the potential financial exposure to Frontier for agreeing with FAPA was *minimal* since only the remaining Midwest pilots at Frontier could complain about the abrogation of their IMSL rights.

Scott Gould responded for Frontier less than an hour later, consenting to FAPA's request. FAPA Ex. 3 at Enclosure 2 (Doc. #15-3 at 14-15). He added that Frontier was adjusting its electronic bid system for the bidding that was scheduled to close at 0900 the next day. *Id*.

Four of the eight former Midwest pilots remained actively employed by Frontier in September 2014, while a fifth pilot was on medical leave. Complaint at ¶ 34. Abrogating their IMSL ranking deprived them–and *only* them–of the "specific seniority rank *status*" they had been awarded by the IMSL Award, and reinstated the seniority rank status they held "under old pre-acquisition seniority lists . . . superseded by the IMSL." MPMC Ex. 2 at 14 (Doc. #1-1 at 20). This deprived them of the superior bidding position the "final and binding" IMSL Award gave them in recognition of the equities they brought to the integrated Frontier operations from their service at Midwest. Complaint at ¶ 34.

-12-

**E.     Frontier And FAPA Refuse To Arbitrate Under The DRA The Disputes MPMC Raised.**

On September 20, 2014, MPMC asked FAPA to implement DRA § V(h) by informing Frontier that MPMC and the other Merger Committees were authorized by FAPA to handle seniority disputes. Complaint at ¶ 35. Since the Frontier/FAPA CBA placed a time limit on when disputes under that CBA may be initiated (*see*, FAPA Ex. 1 at § 12.C (Doc. #15-1 at 14)), MPMC, relying upon the authority delegated to it by DRA § V(h), initiated the grievance process on September 23, 2014 to dispute Frontier's and FAPA's abrogation of the IMSL. Complaint at ¶36.

FAPA responded on September 24, 2014, reiterating its earlier arguments that the DRA and IMSL Award contained implied conditions to their continued applicability to Frontier, and that, as a result of Frontier's sale, the DRA "is no longer applicable to Frontier . . . or FAPA." MPMC Ex. 6 at 1 (Doc. #1-1 at 51). MPMC invoked the jurisdiction of Arbitrator Eischen under DRA § V(c) to resolve the DRA-interpretation disputes that MPMC asserted were presented by FAPA's and Frontier's positions. Complaint at ¶ 38. FAPA and Frontier responded on October 10, 2014, reiterating their position that the DRA and IMSL no longer applied to Frontier or FAPA. This, they argued, meant that there was no agreement to arbitrate under the DRA. Complaint at ¶¶ 39-40. On October 29, 2014, Arbitrator Eischen ruled that Frontier had raised "a colorable issue of substantive arbitrability" that must be resolved by a court. Complaint at ¶ 41.

In the interim, FAPA and Frontier frustrated MPMC's efforts to use the Frontier/FAPA CBA's grievance procedures to challenge defendants' actions on behalf of the five Midwest pilots at Frontier and on behalf of the Midwest pilots who MPMC maintains continue to have IMSL seniority status at Frontier. Defendants refused to address the merits of the challenges to the abrogation of the Midwest pilots' IMSL rankings because, they asserted, MPMC and individual

-13-

pilots did not have standing to initiate the CBA's grievance process. Complaint at ¶ 43.

MPMC and the individual grievants responded by invoking the CBA's adjustment board process to present the dispute to the Frontier/FAPA System Board of Adjustment (SBA) under DRA § V(j) and Sections 12.F and 14 of the Frontier/FAPA CBA. MPMC Ex. 12 at 2 (Doc. #1-1 at 73). Additionally, MPMC requested that the parties agree to bypass the partisan members of the SBA and proceed directly to an arbitrator–as DRA § V(j) requires and the Frontier/FAPA CBA authorizes. *Id*. MPMC added that, if defendants persisted in challenging MPMC's standing, they should place that DRA § V(h) interpretation issue before Arbitrator Eischen as DRA § V(c) requires. *Id*. Defendants did not respond.

In the meantime, FAPA progressed a grievance on behalf of the five former Midwest pilots, which it advanced to the Frontier/FAPA SBA. Complaint at ¶ 44. In its submission to the SBA–whose decision is to be made by majority vote of its four partisan members unless they deadlock, in which case the decision is to be made by a neutral–FAPA stated that its "position is as set forth in its letter to Frontier dated September 13, 2014, and in its Letter of Agreement 71 of the CBA." MPMC Ex. 14 (Doc. #1-1 at 75). Since FAPA's September 13, 2014 letter (MPMC Ex. 9) asked Frontier to abrogate the Midwest pilots' IMSL ranking, and since LOA 71 (Frontier Ex. B) memorializes that abrogation, all four members of the Frontier/FAPA SBA will have been appointed by parties who disagree with the grievants' position. DRA § V(j)'s provisions, structuring the adjustment board so that the neutral is to resolve integrated-seniority disputes, was designed to eliminate this inherent bias and unfairness. Complaint at ¶¶ 44-45.[6]

---

[6]     Recently, the litigants have agreed to postpone the SBA hearing until after this Court rules on MPMC's Rule 56(a) motion, and, if the Court grants that motion, the postponement will continue until the DRA arbitration is concluded.

-14-

## ARGUMENT

**I.**     **THIS COURT HAS JURISDICTION UNDER RLA §§ 2 FIRST AND 204 TO DETERMINE WHETHER THE ARBITRATION PROCESS ESTABLISHED BY DRA § V(c) IS THE APPROPRIATE ADJUSTMENT BOARD TO HEAR THE DRA INTERPRETATION AND APPLICATION DISPUTES DEFENDANTS AND PLAINTIFFS HAVE RAISED.**

In addition to claiming erroneously that plaintiffs have not stated a claim in Count I upon which relief can be granted,[7] defendants assert that this Court lacks jurisdiction over Count I, each for a separate reason. Frontier argues that the dispute raised by its interpretation of the Frontier/FAPA CBA–which it asserts is whether the CBA, including LOA 71, requires that pilots be assigned a seniority date based on their DOH at Frontier–raises a dispute over the interpretation of that CBA. That dispute, it asserts, is a minor dispute within the exclusive jurisdiction of the SBA established by the Frontier/FAPA CBA. Frontier Memorandum In Support of Motion To Dismiss [hereinafter, "Frontier Memo."] at 13-14 (Doc. #17). This means, Frontier asserts, that Eischen does not have jurisdiction to resolve plaintiffs' claims because the dispute at bar "falls exclusively within the purview of the Frontier/FAPA" SBA.[8] *Id.* at 13. FAPA takes a different tack, for it argues that, to grant the relief plaintiffs seek in Count I, this Court must address matters within the exclusive jurisdiction of the NMB, which this Court, it argues, lacks jurisdiction to do. FAPA Memo. at 22-23. Both arguments are without merit.

---

[7]     Plaintiffs will not address the Rule 12(b)(6) aspects of defendants' motions to dismiss Count I because those arguments have been addressed in Doc. #22, plaintiff MPMC's Memorandum in Support of its Rule 56(a) Motion For Summary Judgment on Count I.

[8]     Technically, Frontier's arguments do not fall within Rule 12(b)(1), for its argument does not challenge the jurisdiction of this Court to consider Count I; rather, it challenges the jurisdiction of the DRA arbitrator to consider the disputes plaintiffs seek to have arbitrated. That, plaintiffs submit, is a Rule 12(b)(6) argument.

-15-

**A. This Court Has Jurisdiction To Enforce RLA §§ 2 First And 204.**

Frontier's jurisdictional argument is specious, for the fact that the dispute Count I seeks to compel be arbitrated is a minor dispute as that term is understood under the RLA does *not* deprive this Court of jurisdiction to enforce RLA § 2 First[9] and the RLA § 204 adjustment board agreement embedded in the DRA, which is what Count I seeks to accomplish. *IAM v. Central Airlines, Inc.*, 372 U.S. 682, 692 (1963). Rather, the jurisdictional impact is just the opposite: The fact that the dispute is a minor dispute gives this Court jurisdiction the *enforce* the RLA's mandatory dispute resolution procedures for minor disputes. *BLE v. Louisville & Nashville R.R.*, 373 U.S. 33, 38 (1963) (emphasis added) ("The right of one party to place the disputed issue before the Adjustment Board, *with or without the consent of the other*, has been firmly established").[10]

What is at issue in Count I–and the subject matter over which this Court has jurisdiction–is the determination whether the DRA § V(c) arbitral tribunal (as Count I contends) or the Frontier/FAPA SBA (as defendants argue) is the "appropriate" adjustment board within the meaning of RLA § 204 to which DRA § V(c) provides MPMC may submit disputes "arising out of the interpretation or application of" the DRA. This Court, as plaintiff MPMC explained in its Memorandum in Support of its Motion for Partial Summary Judgment [hereinafter, "Rule 56 Memo."] at 15 (Doc. #22 at 19), has jurisdiction to make that determination. *IAM v. Central*

---

[9]     *Chicago & North Western Ry. v. UTU*, 402 U.S. 570, 577 (1971) (RLA § 2 First duty "to exert every reasonable effort . . . to settle all disputes, whether arising out of the application of such agreements or otherwise" (45 U.S.C. § 152 First) "was designed to be a legal obligation, enforceable by whatever appropriate means might to developed on a case-by-case basis").

[10]     FAPA raises a similar argument, asserting that RLA §§ 2 First and 204 do not help plaintiffs, for, FAPA argues, the disputes plaintiffs have raised are in fact being presented to an adjustment board–the Frontier/FAPA SBA–and, it asserts, that is all those RLA commands require. FAPA Memo. at 21, n. 7.

-16-

*Airlines*, 372 U.S. at 692 ("The [RLA § 204] contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. . . . That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts").

Frontier argues that the DRA arbitrator lacks jurisdiction to resolve the DRA interpretation issues because resolution of the dispute it views as being at issue "requires interpretation of the Frontier/FAPA CBA" which, it argues, lies within the exclusive jurisdiction of the adjustment board established by that CBA. Frontier Memo. at 13-14. That argument, however, is premised upon a distortion of the *disputes* raised by the MPMC's grievance and defendants' responses. Plaintiffs recognize that the underlying grievance is one arising under the Frontier/FAPA CBA and, thus, within the jurisdiction of the CBA's SBA. Indeed, plaintiffs *have* invoked the Frontier/FAPA SBA's jurisdiction. MPMC Ex. 12. But they have done so under DRA § V(j)–with the modifications that § V(j) makes to the procedures that apply to the handling of seniority-related disputes. *Id.*

Defendants' *opposition* to the applicability of the DRA to the handling of this dispute presents threshold questions that need to be decided *before* the Frontier/FAPA CBA disputes can be addressed by the CBA's adjustment board through the DRA § V(j) gateway–with its modifications to that CBA. *See*, FAPA Memo. at 21, n. 7. Those threshold questions are whether the *DRA*–including the delegation of authority effected by DRA § V(h) and the adjustment board procedural modifications made by DRA § V(j)–continue to apply. If they do, than the manner in which the Frontier/FAPA SBA will hear those disputes will be governed by DRA § V(j)'s modifications to the Frontier/FAPA CBA's adjustment board process. Moreover, the threshold question as to the continued applicability of the DRA will also address Frontier's and FAPA's right

-17-

to enter into the September 13, 2014 agreement and LOA 71. Thus, the continued application of the DRA is the real dispute separating the parties.

It is also, as MPMC has explained in its Memorandum in support of its Rule 56(a) motion, a dispute over which the Frontier/FAPA SBA does not have jurisdiction. Rule 56 Memo. at 14-15 (Doc. #22 at 18-19). Rather, Frontier and FAPA gave that jurisdiction to the DRA Arbitrator when they (Frontier through RAH, and FAPA through FPMC) agreed to the DRA with its § V(c) dispute-resolution process. Interpreting the Frontier/FAPA CBA will not conclusively resolve the threshold issue presented here because the DRA, unlike the IMSL Award, has not been incorporated into that CBA. But those disputes can be conclusively resolved by construing the DRA. Thus, the arbitral body to which jurisdiction to construe that agreement has been given–*i.e.*, the DRA arbitrator under DRA § V(c)–is the "appropriate" adjustment board to resolve the disputes plaintiffs are seeking to arbitrate. *Consolidated Rail Corp. v. RLEA*, 499 U.S. 299, 305 (1989) ("The distinguishing feature of such a case [*i.e.*, a "minor dispute"] is that the dispute may be conclusively resolved by interpreting the existing agreement").

## B. Count I Does Not Present A Representational Dispute.

Similarly, FAPA's jurisdictional argument–that Count I presents a representational dispute within the exclusive jurisdiction of the NMB–is also without merit. FAPA argues that, in order to prevail on Count I, plaintiffs must show that (1) Frontier is a part of a single transportation system and (2) that FAPA is the certified representative of the combined craft or class of pilots in that transportation system. FAPA Memo. at 22. Those inquiries, it asserts, raise representational issues within the exclusive jurisdiction of the NMB. *Id.* FAPA's argument is frivolous, for there is no dispute as to *who* is the duly designated representative of Frontier's pilots–it is FAPA. This means that there is no representational dispute within the NMB's exclusive jurisdiction. *BLE v. Atchison,*

*Topeka & Santa Fe Ry.*, 768 F.2d 914, 919 (7th Cir. 1985); *AFA v. United Airlines, Inc.*, 71 F.3d 915, 919 (D.C. Cir. 1995).

What is at issue in this case, however, is whether the DRA continues to apply to Frontier and FAPA, and the answer to that question requires the interpretation of the DRA's terms and intent–the quintessential "minor dispute." That interpretation must be performed considering the relevant facts, including the fact that the NMB has found that Frontier "is operating as a single transportation system for the craft or class of Pilots" (*In re Frontier Airlines Pilots*, 41 NMB at 31) and that FAPA is the representative of that craft or class. Whether the craft or class of pilots which FAPA now represents is a "combined craft or class" within the meaning of DRA § V(j)–since it includes former Midwest pilots–is the DRA *interpretation* issue the DRA Arbitrator must decide. That issue, plaintiffs submit, raises a minor dispute within the exclusive jurisdiction of the appropriate adjustment board to resolve, applying the agreement terms in light of the NMB's rulings. *BLE v. Atchison, Topeka & Santa Fe Ry.*, 768 F.2d at 919 ("A disagreement over the conditions of employment is . . . a classic 'minor' dispute").

**II.      PLAINTIFFS' ALLEGATIONS THAT FAPA CONSPIRED WITH FRONTIER TO STRIP THE FORMER MIDWEST PILOTS OF THEIR INTEGRATED SENIORITY BECAUSE OF DEFENDANTS' HOSTILITY TO THE IMSL AWARD, WHICH THE DRA MADE FINAL AND BINDING, PLAUSIBLY STATES A CLAIM THAT FAPA BREACHED ITS DUTY TO REPRESENT THE FORMER MIDWEST PILOTS FAIRLY, AND THAT FRONTIER KNOW-INGLY AND WILLFULLY PARTICIPATED IN THAT BREACH.**

FAPA asserts that Count II fails to state a claim upon which relief can be granted because, it argues, it had legitimate union purposes for desiring to make DOH the sole criteria by which seniority would be calculated at Frontier. This means, FAPA contends, relying upon *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir. 1992), *cert. denied*, 510 U.S. 861, 906 (1963), that

-19-

even if the union was motivated by hostility towards the Midwest pilots, advancing legitimate union objectives immunizes its conduct from breaching its duty of fair representation. FAPA Memo. at 27. Frontier adopts that argument (Frontier Memo. at 19) and adds that plaintiffs "have not alleged conduct by Frontier evidencing its bad faith, discrimination, or hostility towards" Midwest pilots, which, it asserts, "is necessary to state a claim against Frontier for collusion in the union's alleged breach" of its duty of fair representation. Frontier Memo. at 19-20. Those arguments are without merit,[11] for viewing the allegations in the complaint and in the incorporated documents in the light most favorable to plaintiffs, shows that plaintiffs have plausibly stated a claim that FAPA breached its duty to represent the former Midwest pilots fairly (*Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 800 (7th Cir. 1976); *accord*, *Cunningham v. ALPA*, 769 F.3d 539, 542 (7th Cir. 2014)) and that Frontier knowingly and willfully participated in that breach. *Jones v. TWA*, 495 F.2d 790, 798-99 (2d Cir. 1974).

Count II has facial plausibility because, viewing the factual averments in the complaint in the light most favorable to plaintiffs shows that FAPA and Frontier juggled the seniority rosters for no purpose other than to deprive former Midwest pilots of the benefits of the IMSL Award–a final and binding arbitration award FAPA despises. Eliminating the Midwest pilots' integrated seniority does not advance the interests of the craft or class as a whole and it imposes all of the adverse effects from the agreement on the minority. This breaches FAPA's duty to represent the former Midwest pilots fairly. *Barton Brands, Ltd. v. NLRB*, 529 F.2d at 799-800; *Rakestraw v. United Airlines, Inc.*, 981 F.2d at 1535; *Ramey v. District 141, IAM*, 378 F.3d 269, 277 (2d Cir. 2004). And

---

[11]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007): "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

it breaches Frontier's duty under RLA § 2 Seventh, 45 U.S.C. § 152 Seventh, *not* to change agreements except in the manner prescribed in such agreements or in RLA § 6, 45 U.S.C. § 156. *Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142, 155 (1969).

### A. Plaintiffs Have Plausibly Claimed That FAPA Breached Its Duty Of Fair Representation.

It is axiomatic that a union's "statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). That tripartite standard "applies to all union activity, including contract negotiation." *ALPA v. O'Neill*, 499 U.S. 65, 67 (1991). While "[n]egotiation means compromise" (*Rakestraw*, 981 F.2d at 1529) and "[b]argaining has winners and losers" (*Id.*, 981 F.2d at 1530), the union's duty to represent fairly the interests of *all* it has been certified to represent, means that it must act with "complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). It does not comply with that obligation when, for no purpose other than to abrogate a seniority-integration award it despises, it deprives a minority of seniority rights a final and binding seniority-integration award made immutable. *Barton Brands, Ltd. v. NLRB*, 529 F.2d at 800.

*Barton Brands* is closely analogous to this case, for in *Barton* the union and the company entered into a CBA that redid an earlier seniority integration, depriving a minority group of employees of a more favorable integration. In 1969, the union and the company entered into an agreement that dovetailed the seniority of two groups of employees that the company proposed be consolidated into the minority-unit's facility, which was to be expanded. 529 F.2d at 795-96. Both groups of employees expected to benefit from this form of seniority integration. *Id*. However, the

-21-

company did not build the new facility and dovetailing seniority caused some of the majority to be laid off and threatened the job security of others while the employees of the minority unit remained employed. 529 F.2d at 796. This lead to the union in the next round of contract negotiations securing as part of the new CBA an agreement cancelling the dovetailing and, in its place, endtailing the seniority of the minority (twelve employees) to that of the majority (approximately 213 employees); the minority employees were then laid off. *Id*. That action, the Seventh Circuit concluded, amounts to a breach of the union's duty to represent the employees fairly *unless* the union showed "some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority." 529 F.2d at 800.

In reaching that holding, the appellate court stated that while a union has a wide range of reasonableness in serving the interests of the employees it represents, "such decisions may not be made solely for the benefit of a stronger, more politically favored group over a minority group." 529 F.2d at 798-99. As the court summarized (759 F.2d at 800; emphasis added):

> [S]ince the established seniority rights of a minority of the Barton employees have been abridged by the 1972 collective bargaining agreement for no apparent reason other than political expediency, there seem to be sufficient grounds in this case to support the Board order. We thus are remanding the case to the Board for a determination whether the Union violated its duty of fair representation . . . . In making its determination, the Board should consider that *in order to be absolved of liability the Union must show some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority*.

*Barton Brands* remains good law after *O'Neill*, for the Seventh Circuit in the post-*O'Neill* case on which FAPA so heavily relies, *Rakestraw*, referred to *Barton Brands* to define what a union *may not do*. 981 F.2d at 1530 ("[A] union may not take away the seniority of some employees for no reason other than that the losers have too few votes to affect the outcome of an intra-union

-22-

election"). Similarly, the *Rakestraw* court explained that "*Barton Brands* holds that a union may not juggle the seniority roster for no reason other than to advance one group of employees over another. The change must rationally promote the aggregate welfare of employees in the bargaining unit." 981 F.2d at 1535. And *Barton Brands*' rationale was followed in *Cunningham v. ALPA*, 769 F.3d at 542,[12/] as well as by the Second Circuit in *Ramey v. District 141, IAM*, 378 F.3d at 276-77.

In the case at bar, plaintiffs have alleged that FAPA was hostile to the IMSL Award which integrated Frontier's 646 pilots with 1,350 RAH pilots and 121 Midwest pilots. Complaint at ¶¶ 18, 20. That Award rejected FAPA's proposal that, at most, would have allowed only 62 pilots to be integrated with the Frontier pilots and those 62 pilots (who were the senior Midwest pilots) would be integrated with the junior Frontier pilots. Complaint at ¶ 18.[13/] Rather than accept the IMSL Award, which became final and binding on August 27, 2011, FAPA took action while it remained

---

[12/]       In *Cunningham*, Judge Easterbrook, the author of *Rakestraw*, stated as follows while addressing the "sort of 'discrimination' that *O'Neill* . . . envisages as problematic" (769 F.3d at 542; bracketed material in original; citations omitted):

> The plaintiffs in *O'Neill* made an argument similar to the one our plaintiffs advance, and the Court gave a brusque reply, noting that "some form of allocation [between competing groups of pilots] was inevitable. A rational compromise was inevitable. A rational compromise on the initial allocation was not invidious 'discrimination' of the kind prohibited by the duty of fair representation." . . .
>
>        Just so in this case. If plaintiffs were arguing that pilots who came from Continental won all the battles, or even the lion's share of them, they might have a point. But plaintiffs have never argued that the Union disregarded the interests of pilots from pre-merger United, or that Agreement 25 reduced their benefits . . . .

In the case at bar, plaintiffs *are* alleging–plausibly–that FAPA completely disregarded their interests and reduced *only* their benefits.

[13/]       Ironically, as a result of the sale of Frontier and Eischen's September 12, 2014 Award, the integration situation at Frontier is similar to what FAPA proposed since only Midwest pilots are integrated with Frontier's junior pilots. Nevertheless, FAPA's hostility to the integration award blinds them to that fact.

the representative of Frontier's pilots to make that Award "go away."

Its leadership sued to have the Award set aside (Complaint at ¶ 21); within days of that date on which its authority to represent Frontier pilots would end, it entered into an agreement with RAH to separate Frontier from the other RAH subsidiaries and, it believed, end the Award's application to it (Complaint at ¶ 22); and it sought to make that separation agreement non-negotiable. FAPA Ex. 1 at LOA 67 § D (Doc. #15-1 at 35-36). Once the Award became effective, FPMC opposed the application of the Award to Midwest pilots and, after its interpretation of the Award was rejected by the DRA Arbitrator, FAPA encouraged Frontier pilots to create a hostile work environment for the former Midwest pilots flying for Frontier with the integrated seniority the Award gave them. Complaint at ¶ 29.

None of this violated FAPA's duty towards the Midwest pilots, mainly because FAPA did *not* represent them when the IMSL Award became effective, or during the pre-2014 certification period when FAPA encouraged Frontier pilots to harass the former Midwest pilots in their mist. But that conduct is relevant, for it supports plaintiffs' claim of post-certification hostility.

FAPA's role changed on June 13, 2014 (*In re Frontier Airlines Pilots*, 41 NMB at 88) when it was certified as the representative of Frontier pilots and, thus, became obligated to represent *all* Frontier pilots fairly, including the five remaining former Midwest pilots flying for Frontier. Plaintiffs' complaint plausibly claims that FAPA breached that duty, for FAPA continued on its quest to abrogate the seniority that the loathsome IMSL Award had given to Midwest pilots, and which those former Midwest pilots had been exercising since October 2011. Complaint at ¶ 44. Frontier–through an officer who, as a FAPA official, had unsuccessfully sued to have the IMSL Award set aside–agreed to FAPA's request within hours of that request being made, and without securing for Frontier any consideration for Frontier's agreement. FAPA Ex. 3 (Doc. #15-3 at 14-15).

-24-

When plaintiff MPMC asked defendants to arbitrate their interpretation of the DRA, defendants refused despite their obligations under RLA §§ 2 First and 204 to exert every reasonable effort to settle all disputes, including arbitrating unresolved minor disputes. Complaint at ¶¶ 35-45.

When those allegations are viewed in the light most favorable to plaintiffs, they plausibly state a claim that FAPA, with Frontier's active and knowing collusion, breached its duty of fair representation by modifying the IMSL Award's placement of the five former Midwest pilots on the seniority roster, and that they did this for the *sole* purpose of ending the continued application of that hated Award at Frontier. Plaintiffs' allegations show that abrogating the IMSL Award did not benefit the craft or class as a whole. It allocated the adverse impact solely to the five former Midwest pilots by lowering *only* their placement on the seniority roster, for only those pilots had seniority placements generated by the Integration Award, which differed from their DOH by Frontier. That action did not have a broader effect which benefitted the craft as a whole–including the five Midwest pilots–for abrogating the IMSL Award *did not* alter the way in which seniority was to be assigned to Frontier new-hires; the IMSL Award applied *only* to RAH-affiliated pilots who had been hired prior to October 1, 2009. All post-2009 new-hires at Frontier–including the eight former Midwest pilots, until the IMSL Award became effective–have been assigned seniority dates based on their DOH, as the CBA required, and still requires. *See*, MPMC Ex. 3 at 15, ¶ 54 (Doc. #1-1 at 36).

To say that the agreements at bar made DOH *sacrosanct* ignores the fact that the Frontier/FAPA CBA contains an exception to the DOH seniority provision, and that is for situations where Frontier engages in an operational integration. In those situations, the CBA provides, "the integration shall be in accordance with Sections 2, 3, and 13" of the *Allegheny-Mohawk* LPPs.

-25-

FAPA Ex. 1 at § 1.G.1 (Doc. #15-1 at 7). That is how the Midwest pilots obtained their seniority at Frontier, and that is exactly what the Frontier/FAPA CBA continues to provide and the McCaskill-Bond Amendment continues to require. *Committee of Concerned Midwest Flight Attendants v. IBT*, 662 F.3d 954, 956-57 (7th Cir. 2011). Defendants' agreement of September 13, 2014, and LOA 71 did not delete Section 1.G.1 from the CBA, which they would have done if defendants' goal for entering into those agreements was–as they argue–to enshrine DOH *by Frontier* as the only way a pilot could be placed on the seniority roster.

Thus, the issue presented by the Duty of Fair Representation aspect of Count II is whether FAPA violated its duty of fair representation by advocating for, and agreeing to, a seniority modification that disadvantaged a minority group of Frontier pilots for no other reason than to favor the pre-2009 Frontier pilots over the Midwest outsiders. As *Barton Brands* and its progeny show, those allegations plausibly state a claim upon which relief can be granted.

FAPA, however, seeks to escape the consequences of its hostile motive by citing *Rakestraw*, 981 F.2d at 1535, and arguing that, even if it acted with hostility to the Midwest pilots, it would breach "its duty of fair representation *only* if it [had] . . . *no* rational reason, and *no* legitimate union purpose, for its action." FAPA Memo. at 27 (emphasis in original). It claims it had rational reasons and legitimate union purposes for its action. FAPA Memo. at 27-29. FAPA's arguments, however, are without merit, for even if *Rakestraw* was as broad as FAPA erroneously believes,[14/] it does not help defendants since, as shown above, the challenged agreement does *not* serve the "interests of

---

[14/]    *Rakestraw* cannot be viewed as conflating *Vaca v. Sipes'* tripartite standard into solely an inquiry as to whether the union's actions were *arbitrary* in negotiating the challenged contract, for *Rakestraw* makes it clear that union action, such as that encountered in *Barton Brands* where the agreement does not serve the aggregate interests of the craft and treats only the minority adversely, breaches the duty. *Rakestraw*, 981 F.2d at 1535; *see also*, *Cunningham v. ALPA*, 769 F.3d at 541-42.

-26-

the workers as a whole . . . ." *Rakestraw*, 981 F.2d at 1535 ("[A] 'bad' motive does not spoil a collective bargaining agreement that rationally serves the interests of the workers as a whole, and that treats employees who are pariahs in the union's eyes no worse that it treats similarly situated supporters of the union"). Viewing the allegations in the complaint as true and in the light most favorable to plaintiffs shows that the challenged agreement does not serve the interests of the craft as a whole; moreover, it targets *only* the five former Midwest pilots and deprives only them of seniority they have enjoyed under a final and binding arbitration award for three years.

Nevertheless, FAPA attempts to inject a rational basis into the equation by asserting that the September 13, 2014 agreement and LOA 71 are rational and serve legitimate union purposes by, among other considerations, restoring the historical definition of seniority at Frontier (FAPA Memo. at 28, No. 1), construing the DRA and IMSL according to their plain terms and intent as no longer applying at Frontier (*Id*. at Nos. 2-8), and "furthering stability" (LOA 71 at 5 (Doc. #15-3 at 20). Those allegations, however, do not deprive the complaint of facial plausibility, for viewing the allegations in the complaint and incorporated documents in the light most favorable to plaintiffs shows that FAPA's claims of legitimate purpose, especially when coupled with their refusal to arbitrate the validity of their DRA interpretation, are nothing more than a failed attempt to hide its true and only motivation for its actions–to rid itself of the hated IMSL Award. In doing so, defendants gave no consideration to the interests of the former Midwest pilots that they were so cavalierly discarding solely to benefit their pre-acquisition cadre.

Thus, the trier of fact could find on the evidence alleged in this complaint that FAPA's true motivation for eliminating the former Midwest pilots' integrated seniority was because FAPA disagreed with the IMSL Award, and that FAPA's recitation of purported "legitimate union purposes" is a pretext to enable it to eliminate an arbitrated outcome that benefitted pilots who were

-27-

and remain outsiders. This states a plausible claim upon which relief can be granted.

## B. Plaintiffs Have Stated A Plausible Claim In Count II Against Frontier.

Frontier argues that, even if a plausible claim were alleged against FAPA for a breach of the duty of fair representation, plaintiffs have failed to allege conduct by Frontier evidencing Frontier's bad faith or hostility towards the Midwest pilots. Frontier Memo. at 19-20. That argument, however, is without merit legally, for plaintiffs do not have to show hostility to its employees on Frontier's part;[15/] all that plaintiffs need show is that Frontier willfully and knowingly participated in FAPA's breach of FAPA's duty to the Midwest pilots. *Jones v. TWA*, 495 F.2d at 798-99 ("TWA cannot take refuge behind the IAM's misfeasance. Its breach of the . . . contracts and its subsequent wrongful discharge of four employees were the direct cause of the appellants' financial injuries"). But it also ignores the facts alleged in the complaint and evidenced in the attached documents, which, when viewed as they must be in the light most favorable to plaintiffs, show that Frontier, through its Vice President for Flight Operations–a former FAPA official and opponent of the IMSL Award–colluded with FAPA in agreeing that the "final and binding" IMSL Award no longer applied at Frontier. FAPA Ex. 3 (Doc. 15-3 at 14-15). The fact that the September 13, 2014 agreement was made in less than an hour after it was requested (*Id.*), provided *no* consideration to Frontier for its agreement (*compare*, *Rakestraw*, 981 F.2d at 1535[16/]), and was made effective within hours before the bidding closed (FAPA Ex. 3 at 14), support the inference that Frontier shared FAPA's hostility

---

[15/]    Indeed, *Rakestraw* shows that employers "are free to prefer one group of employees over another . . . ." 981 F.2d at 1536.

[16/]    *Rakestraw* noted that United had "legitimate reasons to agree to the [union's] request: labor gave concessions worth $200 million, and the alteration of the seniority tables reduced . . . the friction among pilots that was hampering operations." 981 F.2d at 1535.

to the IMSL Award, and willingly participated in FAPA's breach of its duty so it, too, could be relieved of its obligations under the Award. That inference of hostility to the Award and collusion is strengthened by Frontier's actions in refusing to arbitrate its challenged interpretation of the DRA. Thus, plaintiffs have stated a plausible claim that Frontier "shares" FAPA's responsibility for breaching the duty of fair representation. *Jones v. TWA*, 495 F.2d at 798.

There is, however, a further reason why Count II states a claim for relief against Frontier: That Count seeks to enforce RLA §§ 2 First and 2 Seventh,[17/] which, plaintiffs assert, Frontier has violated by changing the Midwest pilots' seniority. RLA § 2 Seventh, together with RLA § 2 First's duty to exert every reasonable effort to "maintain agreements," prohibit Frontier from altering its pilots' seniority *except* in the manner prescribed in the agreements itself or in accordance with the Act's major dispute processes. *Detroit & Toledo Shore Line*, 396 U.S. at 155. As shown above, plaintiffs have plausibly claimed that FAPA, with Frontier's collusion, breached its duty of fair representation in entering into the agreements abrogating the Midwest pilots' integrated seniority; thus, those agreements cannot be said to have been reached in the manner prescribed in the RLA.

Nor can the elimination of the integrated seniority be viewed as having been brought about in the manner prescribed in the DRA and the IMSL Award, for the DRA § V(g) made the Award "final and binding on the parties to this Agreement and on the pilots employed by RAH and its affiliates." MPMC Ex. 1 at 4. Frontier's pilots at the time the Award became effective *were* "pilots

---

[17/]     RLA § 2 Seventh provides that (45 U.S.C. § 152 Seventh): "No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act." As the Court explained in *Detroit & Toledo Shore Line*, 396 U.S. at 155: "The purpose of § 2 Seventh is twofold: it operates to give legal and binding effect to collective agreements, and it lays down the requirement that collective agreements can be changed only by the statutory procedures."

employed by" a RAH affiliate, and, thus, they are bound by that Award with its benefits and obligations. The "final and binding" nature of the Award means, plaintiffs submit, that "the designated pilot and management representatives may [not] agree to change the Award, to abrogate its final and binding effect, or to postpone the awarded effectiveness and application date." IMSL Award at 44 (Doc. #15-2 at 45). It also means that the Award creates *contractual* rights that the Midwest pilots may enforce through the RLA. *See*, *Rakestraw*, 981 F.2d at 1536. Defendants disagree with plaintiffs' interpretation of the DRA and the IMSL Award, but that disagreement raises a minor dispute, which defendants are obligated to resolve, as requested in Count I. If MPMC prevails before the DRA arbitrator, that ruling will show that defendants were contractually committed to *not* change the IMSL Award. This, in turn, would mean that they did not have the right to negotiate changes to the seniority ranking made by the IMSL Award, and this Court would have jurisdiction to enforce RLA §§ 2 First and 2 Seventh by requiring FAPA and Frontier to rescind the September 13, 2014 agreement and LOA 71.

## CONCLUSION

For the reasons set forth herein and in support of plaintiff MPMC's Rule 56(a) motion, plaintiffs submit that defendants' motions to dismiss are without merit and should be denied.

Respectfully Submitted,

   /s/ John O'B. Clarke, Jr.
John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
Phone: (202) 296-8500
Fax: (202) 296-7143
Email: jclarke@highsaw.com

Date: February 17, 2015      Attorney for Plaintiffs

-30-

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 17th day of February, 2015, caused a copy of Plaintiffs'

Opposition To Defendants' Motions To Dismiss to be served upon counsel for defendants through

the Court's Electronic Case Filing system.

                                   /s/ John O'B. Clarke, Jr.
                                 John O'B. Clarke, Jr.