# ARBITRATION

## NOVEMBER 3, 2009 DISPUTE RESOLUTION AGREEMENT, § V(C)
## And
## FRONTIER/FPMC/MPMC ARBITRATION AGREEMENT OF
## MARCH 27, 2015

**************************************************************************
**In the Matter of a Dispute Between:**

**FRONTIER AIRLINES, INC. ("Frontier")**

       **-and-**

**FRONTIER PILOTS MERGER COMMITTEE ("FPMC")**

       **-and-**

**MIDWEST PILOT MERGER COMMITTEE ("MPMC")**

*********************************************************************

## APPEARANCES

**For Frontier:**             O'Melveny & Myers LLP
                                 By Robert A. Siegel

**For FPMC:**                Allison, Slutsky & Kennedy, P.C.
                                 By Wes Kennedy

**For MPMC:**               Highsaw, Mahoney & Clarke, P.C.
                                 By John O'Brien Clarke, Jr.

1

## ISSUE

The March 27, 2015 Arbitration Agreement (Exhibit 74) sets up the sequential submission of three disputed issues, starting with the "threshold" question, which alone is considered and determined in this Opinion and Award:

> Does the DRA continue to apply to Frontier and FAPA now that the National Mediation Board has determined that Frontier is a separate carrier from the Republic Airways Holdings Inc. (RAH) airlines and has certified FAPA as the representative of the craft or class of Pilots at Frontier?[1]

## PROCEEDINGS

The "threshold" matter submitted for determination in this stage of the proceeding was set forth in a March 27, 2015 Arbitration Agreement, *infra*, which settled a U. S. District Court action brought by MPMC officers and one of the five named individual Grievants, to compel arbitration under §V(c) of the Dispute Resolution Agreement ("DRA"), of November 3, 2009 *infra*. MPMC v. Frontier Airlines, Inc., Eastern District Wisconsin, No. 14-cv-01441-RTR.

Based on the Factual Stipulations and joint exhibits catalogued in Appendix A, the Parties agreed that no evidentiary hearing was required. Briefs and reply briefs were exchanged and submitted before the record was closed on May 18, 2015. All of the evidence and position statements in this voluminous record were studied and considered with care in my determination of the submitted issue.

---

[1] At my request, a similar question was briefed by these Parties during handling of the dispute decided in my September 12, 2014 Award, under the November 26, 2013 Arbitration Agreement, *supra*. In rendering that decision, however, I noted: "*It was not necessary for me to reach or address the collateral NMB question to fully resolve the merits of the issues submitted to me for determination in these proceedings by the Arbitration Agreement of November 26, 2013. Accordingly, nothing contained in [the September 12, 2014] Opinion or Award is intended to express or imply a resolution of any questions relating to the application of the DRA or the Eischen Award following the NMB's separate carrier designation of Frontier or whether I have authority to decide such issues*".

# PERTINENT AGREEMENT PROVISIONS

## The November 3, 2009 Dispute Resolution Agreement

\* \* \*

### Section V: The Arbitration Hearing

\* \* \*

(c). In addition to jurisdiction to resolve disputes under Section I and to devise the fair and equitable integration of seniority, the arbitrator shall have the authority to resolve any dispute arising out of the interpretation or application of this Agreement.

\* \* \*

e). Unless during the hearing process the parties reach an agreement as to the manner in which the pilot seniority is to be integrated, the integration, including any conditions thereto, shall be devised by the arbitrator.

\* \* \*

(g). The award of the arbitrator shall be stated in writing and shall be final and binding on the parties to this Agreement and on the pilots employed by RAH and its affiliates. The award shall include the date on which the seniority integration will become effective, which date shall not be before the NMB issues its ruling on whether the RAH affiliates comprise a single transportation system and certifies the Organization, if any, that is the duly designated representative of the pilot craft or class on that transportation system.

(h). The Organization, if any, designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system shall continue the Merger Committees in existence and delegate to the Merger Committees authority solely for the purpose of adjusting any dispute or disputes that might arise as to the interpretation or application of the award, including authority to compromise such disputes, and to initiate, defend, mediate, and litigate such issues in the dispute resolution mechanism under this Agreement. The Organization shall have authority over the manner in which the Merger Committees' operations are financed. The Merger Committees, which are parties to this agreement, represent that they have been authorized by their principals (the duly designated representative of their airline's pilots) to enter into the commitments set forth in this paragraph and in this Agreement. Each Merger Committee shall fill its own vacancies by selection made by the remaining members of that Merger Committee.

\* \* \*

(j). The award of the arbitrator issued under either Section V (g) or V (i) shall be considered as a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system. Any dispute arising out of the interpretation or application of the award more than one-hundred and twenty (120) days after the effective date of the seniority integration shall be handled in the usual manner by the applicable Merger Committees up to and including the highest carrier official designated to handle such disputes, but failing to reach an adjustment in this manner, the dispute may be submitted by any party to the dispute to the adjustment board established by the designated representative of the combined craft or class and the single carrier for final and binding resolution. All Merger Committees shall be given notice of the dispute and, in addition to the Merger

Committee invoking the adjustment board jurisdiction, may be heard by the system board of adjustment in resolving the dispute, with the decision of the board being made by the arbitrator selected pursuant to the applicable agreement to sit with the system board (without a vote by the other members of the system board).

\* \* \* \* \* \*

## Frontier Airlines, Inc./Frontier Pilots Merger Committee (FPMC)/Midwest Pilots Merger Committee (MPMC) Arbitration Agreement of March 27, 2015

Frontier Airlines, Inc., the Frontier Pilots Merger Committee (FPMC) and the Midwest Pilots Merger Committee (MPMC) hereby agree to submit to Dana E. Eischen under Section V(c) of the November 3, 2009 Dispute Resolution Agreement (DRA) on an expedited basis the issue whether the DRA continues to apply to Frontier and the Frontier Airline Pilots Association (FAPA) now that the National Mediation Board has determined that Frontier is a separate carrier from the Republic Airways Holdings Inc. (RAH) airlines and has certified FAPA as the representative of the craft or class of Pilots at Frontier.

Should Arbitrator Eischen rule that the DRA continues to bind Frontier and FAPA, he shall then proceed to hear and determine, under DRA§ V(c), whether DRA *§* V(h) requires FAPA to fund (retroactively to September 20, 2014) and to delegate to the Merger Committees (specifically to MPMC and to the FPMC) its authority to initiate, defend and adjust disputes arising from the interpretation or application of the Integrated Seniority Award, including processing those disputes up to and before the Frontier/FAP A System Board of Adjustment (SBA) in the manner specified in DRA *§* V(j).

Additionally, should Arbitrator Eischen determine that the DRA remains in effect, he shall then proceed to sit as the neutral member of the Frontier/FAPA SBA's Board of Arbitration (as modified by DRA (§ V(j)) with jurisdiction to decide: (1) whether the IMSL (including conditions and restrictions) remains binding on Frontier and FAPA and a part of the Frontier/FAPA Collective-Bargaining Agreement and may not be changed by agreement between Frontier and FAPA, and (2), if so, what remedy should be imposed make the five grievants whole.

Frontier and FAPA agree to bear the fees and expenses of Arbitrator Eischen in resolving the disputes presented to him by this agreement.

Frontier, FAPA and MPMC agree that this agreement is a settlement of litigation and is not to be viewed as creating a precedent. Further, by agreeing to submit the above issues to Arbitrator Eischen under DRA § V(c), Frontier and FAPA do not concede or in any way acknowledge that the DRA remains binding on, or applicable to, Frontier and/or FAPA.

\* \* \* \* \* \*

## The IMSL Award of February 19, 2011
* * *
### Conditions and Restrictions

7.  Dispute resolution procedures shall be in accordance with Section V. of the DRA. To the extent specified in Sections V(c) and V(j), the undersigned Arbitrator retains jurisdiction to resolve any unresolved disputes between the pre-merger pilot groups as to the terms of the DRA and/or the interpretation or application of this Award.

* * *

## C. EFFECTIVE/APPLICABLE DATE OF THE IMSL

The IMSL (Appendix A) shall become effective for purposes of the second sentence of DRA §V (g) and applicable for purposes of the first sentence of DRA §V (j) on the sixtieth (60th) day following the date of the National Mediation Board rulings and certification referenced in DRA §V (g), unless an earlier date is agreed upon by the designated pilot representative and the single carrier.

The awarded seniority integration shall be implemented on the specified effective/applicable date, with appropriate adjustments to the IMSL (Appendix A), if the NMB rules that fewer than all of the carriers are included in a single transportation system for the pilot craft or class.

* * * * * *

## IMSL Award Interpretation No. 1 of October 25, 2011
* * * * * *
### HOLDINGS

1)  Effective August 27, 2011, the IMSL (Appendix A) and its integral Conditions/ Restrictions are "a part of" both the RJET/IBT Agreement and the Frontier/FAPA Agreement. [No opinion is expressed or implied by me herein regarding whether or to what extent the Midwest/ALPA Agreement retains vitality or constitutes a "collective bargaining agreement applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system".]

2)  On and after August 27, 2011, the IMSL (Appendix A) and its integral Conditions/Restrictions comprise the seniority list that is to be used in the administration of seniority status based provisions of both the RJET/IBT Agreement and the Frontier/FAPA Agreement.

3)  The IMSL confers upon each listed pilot a specific seniority rank status, which differs from the seniority rank status that s/he held under the old pre-acquisition seniority lists now superseded by the IMSL.  Unless and until the Company and the IBT agree upon collectively bargained contractual modifications or new Agreements, the IMSL does so in the context of the RJET/IBT Agreement and the Frontier/FAPA Agreement.  Various collectively bargained provisions in those respective Agreements address the invocation, utilization, administration, implementation and retention of the seniority rank status conferred upon a pilot by the IMSL.

4)   The Conditions/Restrictions set forth expressly in Part B of my February 19, 2011 Award are the only conditions, restrictions, exceptions, qualifications or limitations of the invocation, utilization, administration, implementation and retention of the IMSL seniority rank status conferred upon a pilot by Appendix A that are contained in or intended by the Award.

5)   Nothing contained in or intended by the Award supports or requires the conditions restrictions or limitations imposed during the September and October 2011 bidding periods upon the exercise of IMSL seniority rank status for schedule, vacation and other recurrent bidding by certain furloughed former Midwest pilots who were hired as Frontier First Officers during the period between February 19, 2011 and August 27, 2011.

6)   Nothing contained in or intended by the Award requires that a pilot with Part B.5.A priority rights in the fenced operation at Frontier or Part B.5.B priority rights in the fenced operation at RJET must surrender or forfeit his/her priority rights in the original fenced operation as a condition precedent or a condition subsequent to assuming an open position in the other fenced operation.

7)   Resolution of disputes concerning whether, or to what extent, collectively bargained provisions of the RJET/IBT Agreement and/or the Frontier/FAPA Agreement may, can or do constitute enforceable contractual limitations, exceptions or qualifications upon the invocation, exercise, administration, implementation and retention of the seniority right status conferred upon a pilot by Part A and Appendix A of the IMSL Award is beyond the limited scope of the reserved arbitral jurisdiction and authority conferred upon me by § V (i) of the DRA and retained by me in the Award.

8)   Resolution of disputes concerning whether or to what extent the interpretation and application of various contractual provisions of the current RJET/IBT and Frontier FAPA Agreements, inclusive of Parts A (Appendix A) and (B) Conditions/Restrictions of the IMSL Award [which are also now a part of those Agreements], may or may not be impacted by decisions of the judiciary, arbitration decisions, administrative decisions of the NMB and other regulatory agencies, statutory provisions of the Railway Labor Act [45 U.S.C. § 151, et seq.] and/or the "McCaskill Bond" legislation [Public Law No.110-61 (December 26, 2007)] is beyond the limited scope of the reserved arbitral jurisdiction and authority conferred upon me by the terms of DRA § V (i) and retained by me in the Award.

9)   In accordance with the express terms of the first sentence of DRA § V (j), this IMSL Award Interpretation Award No. 1 shall be considered as a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system.

* * * * * *

**FRONTIER/REPUBLIC/IBT 11/26/13 ARBITRATION AGREEMENT AWARD**

1) The Eischen Award does not compel Frontier to offer new first officer positions on Airbus aircraft to pilots on the IMSL, according to their IMSL seniority, before Frontier may hire new pilots off the street.

2) The Eischen Award does not compel Frontier to create and offer a bid process by which Republic pilots may bid for new first officer positions on Airbus aircraft, based on their IMSL status, before Frontier may hire new pilots off the street

3) The Seniority Integration Award, with its provision making the IMSL and its Conditions/Restrictions "a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members" for Republic Airlines *et al.*/Frontier (DRA § V (j)), does not compel Frontier Airlines, Inc. to offer new First Officer positions on Airbus aircraft to pilots on the IMSL, according to their IMSL seniority, before Frontier may hire new pilots off the street.

4) The IMSL and its Conditions/Restrictions, which have been made "a part of the collective bargaining agreement(s) applicable to the combined craft or class of Flight Deck Crew Members" for Republic Airlines *et al.*/Frontier (DRA § V (j)), does not require Frontier to make the "Staffing Adjustment" process in Section 6 of the Frontier CBA available to Republic pilots, so they may use their IMSL seniority to bid for unfilled First Officer positions on Airbus aircraft, before Frontier may hire new pilots off the street.

## BACKGROUND

On September 12, 2014, I issued my Interpretive Award No. 2, ruling that the IMSL Award did not compel Frontier to offer new hire positions to pilots holding IMSL seniority. (Factual Stipulation ¶ 7; Exhibit 51.) That conclusion was based primarily on my holding that I lacked arbitral authority under the DRA to disturb the collectively bargained administration of seniority in the governing separate CBAs, which I explained as follows (Emphasis added):

> The Opinion which accompanied the February 2011 Award pointed out that, for reasons they considered good and sufficient, these Parties all agreed in the DRA to create their IMSL prior to creating any contractual mechanism for implementing awarded IMSL seniority across the fenced operations. Disputes such as those presented here are one consequence of that cart-before-the-horse approach to seniority list integration.

. . . In the Fall 20011 Supplemental Awards, I reiterated that **although the IMSL was "effective" and "a part of" the respective fenced agreements, cross-fence application of IMSL seniority status would have to be determined by collective bargaining between the single carrier and the designated single bargaining representative for an implementing agreement and/or by amending or consolidating the applicable CBAs.**

The assertion that, as a result of the seniority integration, *per se*, pilots acquired cross-CBA vacancy notice and bidding rights, without restriction other than the fence provisions of the Award, is erroneous. The Eischen Award never said the Conditions and Restrictions of the Award were the only limitations on the invocation, utilization, *etc.* of IMSL seniority rank status. Rather, I held that the Conditions and Restrictions are the only such restrictions "contained in or intended by the Award." **The October 2011 interpretations and Supplemental Award made more than clear that the Award does not supersede any limitations, qualification and restrictions on the exercise of IMSL seniority contained in the applicable collective bargaining agreements.**

**At all times both before and after the effective date of the IMSL Award, the Frontier and Republic operations have been governed by two separate CBAs, without any agreement on how a pilot covered by one CBA could cross over into the other CBA.** Each CBA, as is standard in the industry, contains rules for the posting and awarding of vacancies arising under that CBA. Nothing in the Republic CBA addresses the posting or award of pilot vacancies at an operation covered by a different CBA. By the same token, the staffing of Frontier pilot vacancies is governed by the Frontier CBA, and nothing in that CBA provides for the award of a vacancy posted to pilots covered by a different CBA. **Despite post Award efforts by management and the IBT, there still is no negotiated agreement providing rules for the transfer of pilots between Republic and Frontier.**

The IMSL Award, *per se*, does not and could not provide a mechanism for Republic pilots to bid for and be awarded Frontier pilot vacancies. In the October 25, 2011 Supplemental Award, I specifically addressed whether placement on the IMSL, by itself, gives RAH Pilots the right to positions at Frontier. In the passages now selectively cited by the RPMC and MPMC, I affirmed that the IMSL was "effective" and "confers upon each listed pilot a specific seniority rank status."

. . . I reiterated that **the Award's effective grant of seniority status does not, by itself or *per se*, confer enforceable contractual seniority rights:**

> ... Unless and until the Company and the IBT agree upon collectively bargained contractual modifications or new Agreements, the IMSL does so in the context of the RJET/IBT Agreement and the Frontier/FAPA Agreement. **Various collectively bargained provisions in those respective Agreements address the *invocation, utilization, administration, implementation and retention* of the seniority**

**rank status conferred upon a pilot by the IMSL.** (See Exhibit 31, at 14 [Italics in original].

A river cannot rise higher than its source. Within the ambit of the authority vested in me by the DRA, the Eischen Award established relative seniority rank status. The "effectiveness" of the IMSL and making it "part of" the respective fenced agreements, standing alone, does not constitute a contractual mechanism to effect the transfer of pilots from RAH to Frontier, or vice versa. **"Seniority rank status" through placement on the IMSL does not, in and of itself, confer any specific contractual right to the "invocation, utilization, administration, or implementation" of that status for any given position--all of which must be determined by reference to the terms of the existing CBAs.**

Contractually enforceable seniority rights and limits on the exercise of the seniority status of the IMSL derive from mechanisms and processes set forth in the applicable collective bargaining agreement(s). Reduced to its essence, the position advanced by the RPMC and the MPMC is that the Eischen Award somehow repeals, supersedes or rewrites, *sub silentio*, provisions of the Frontier and Chautauqua CBAs that limit or qualify unfettered use of IMSL seniority rank status. **Assertions that the IMSL Award, *ipso facto*, worked a wholesale elimination of any collectively bargained provisions in those agreements that limit, qualify or inhibit the exercise of IMSL seniority rank status are erroneous.**

Superseding, voiding or rewriting solemnly negotiated collectively bargained seniority right provisions in those agreements cannot rightly or properly be done by me under the guise of arbitral interpretation of the Eischen Award or my October 2011 Supplemental Award. [See ¶ 15 of the November 26, 2013 Arbitration Agreement: *"Arbitrator Eischen's jurisdiction shall not extend to changes or modifications to the existing Frontier or Republic pilot collective bargaining agreements"*]. The hard work of amending currently applicable contractual provisions to facilitate expanded utilization of the seniority rank status conferred by the IMSL must be done at the bargaining table, not by an end run through the arbitration forum.

(Exhibit 51, at 21-24 [emphasis in original/footnotes omitted].)

On September 13, 2014, the day after the above-quoted decision was issued, FAPA sent a written communication to Frontier, which reads in parts most pertinent as follows (Factual Stipulation ¶ 8; Exhibit 53):

\* \* \*

FAPA requests that the Company forthwith implement and apply the Frontier CBA in accordance with the foregoing interpretation for all contractual purposes, pending the conclusion of an appropriate agreed-upon written document memorializing the following:

9

1. Effective June 13, 2014, the Eischen Award and the IMSL are no longer effective with respect to seniority under the Frontier CBA.

2. Effective June 13, 2014, the seniority of a Pilot under the Frontier CBA shall be determined based on the date on which the Pilot was first placed on the Company payroll as a pilot, in accordance with Section 3.A.1. of the Frontier CBA; and the Frontier Airlines, Inc. Pilot System Seniority List or "Seniority List" shall be determined in accordance with Section 3.B. of the Frontier CBA.

3. The Company will issue the Seniority List, effective as of June 13, 2014, which shall constitute the Seniority List a defined in Section 3.B. of the Frontier CBA.

4. The Company will maintain and post an accurate copy of the Seniority List, as updated, in accordance with Section 3.B.3 of the Frontier CBA.

5. A Pilot may protest his position on the Seniority List in accordance with Section 3.C. of the Frontier CBA. (*Id.)*

Frontier acknowledged and agreed to those terms on the same date, and immediately began using DOH rather than IMSL rankings to award the October 2014 schedule bids, which closed at 0900 hours on September 14, 2015. (Exhibit 53--Frontier September 13, 2014 Email). Thereafter, the understanding of FAPA and Frontier that "the Eischen Award and the IMSL are no longer effective with respect to seniority under the Frontier CBA" and that seniority of a pilot at Frontier thenceforth will be based on the pilot's DOH at Frontier, as provided in Section 3.A.1 of the Frontier/FAPA CBA, were memorialized in a Letter of Agreement ("LOA 71"), dated October 9, 2014.[2]

---

[2] On October 9, 2014, Frontier and FAPA executed Letter of Agreement 71 to the Frontier CBA ("LOA 71"), which subsequently was ratified by the Frontier Pilots, by a vote of 268 to 3. LOA 71 asserts, *inter alia*, that the agreed interpretation and application of the existing Frontier CBA in the administration of seniority set forth therein "represent reasonable working conditions consistent with proper compensation, by treating all pilots' seniority rights similarly based on the first date each pilot appeared on the payroll as a pilot employee of Frontier; restoring the normal seniority system historically used at Frontier as a separate carrier; and thereby furthering stability and the stated purposes of the Frontier CBA." (Factual Stipulation ¶ 15; Exhibit 63.)

Among the pilots immediately impacted by the terms agreed upon on September 13, 2014 and in LOA 71, it appears that those most adversely affected were five (5) former Midwest pilots. Between the date the IMSL Award was issued on February 19, 2011 and its effective date on August 27, 2013, these individuals had taken jobs with Frontier as "new hires". From their respective Spring 2011 dates of hire, through the August 27, 2013 effective date of the IMSL Award, the seniority ranking of all Frontier pilots, including these former Midwest pilots, had been established by DOH under the express terms of the Frontier/FAPA CBA. However, for roughly the year between the effective date of the IMSL Award and the above-noted September 2014 changes wrought by LOA 71, the seniority ranking of Frontier pilots, including these former Midwest pilots, was determined by IMSL Award ranking---which in most cases differed significantly from their Frontier DOH ranking.

The September 13, 2014 Frontier/FAPA agreement to revert to DOH for seniority determination, retroactive to June 14, 2014, apparently affected 290 of the 768 pilots on the Frontier seniority list for September 1, 2014 (Ex. 54 at 6-12). However, according to MPMC, the change back to DOH adversely affected only five of them: the remaining former Midwest pilots who had established a "new hire" employment relationship with Frontier in April and May 2011, but whose seniority ranking under the IMSL Award differed favorably from their DOH.[3]

---

[3] The change also apparently adversely affected a sixth former Midwest pilot at Frontier–Gary Orange–who was number 341 on the September 2014 seniority list. However, Mr. Orange since retired and was not on the October 2014 roster.

Frontier awarded October 2014 flying on the DOH basis, including that of the former Midwest pilots who bid in September, and subsequently has similarly administered all monthly bids to date. (Factual Stipulation ¶ 8. See id. ¶ 9; Exhibits 54, 55.) MPMC avers that the Fall 2014 reversion to pre-IMSL Award DOH ranking (which also reordered rankings among the former Midwest pilots themselves) "impacted the five former Midwest pilots by dropping their seniority rankings between 319 and 372 of 768 Frontier pilots as of September 1, 2014, to seniority rankings between 604 to 609 of 764 Frontier pilots on the revised October 1, 2014 list. *Compare*, Exhibit 54 at 6-7, with, Exhibit. 55 (October 1, 2014 Seniority List) at 12[4]:

| NAME | Date-Of- Hire at Frontier | September 2014 # of 768 | October 2014 # of 764 | Difference Between Sept. & Oct. |
|---|---|---|---|---|
| Gary Drska | 4/25/11 | 319 | 605 | 286 |
| Daniel Norden | 4/25/11 | 328 | 604 | 276 |
| Martin Burian | 5/9/11 | 354 | 608 | 254 |
| Mark Ward | 5/9/11 | 366 | 607 | 241 |
| Thomas Daniels | 5/9/11 | 372 | 609 | 237 |

[4] Prior to the change, three of the five former Midwest pilots were among the senior First Officers at their domicile in Chicago, but following that change, they dropped to the bottom of the list at Chicago." One of the two remaining former Midwest pilots was and remains on Medical leave (Daniel Norden) and one (Thomas Daniels) was based at Denver. Stipulations at ¶ 8, n.1; Exhibit 54 at 7.

By letter dated September 20, 2014, the MPMC attempted to initiate a dispute under Section V (h) of the DRA (Factual Stipulation ¶ 10; Exhibit 56); and, by letter dated September 23, 2014, to initiate, in its own name, the contractual grievance procedure under the Frontier CBA. (Factual Stipulation ¶ 11; Exhibit 57.) Counsel for FAPA responded to those submissions, by letter dated September 24, 2014 (Factual Stipulation ¶ 12; Exhibit 58), stating in part that the matter was "substantively inarbitrable" under the DRA. [But,] "to the extent that the affected Frontier Pilots who you represent believe that Frontier is improperly administering seniority under the Frontier CBA, those pilots (although not the Midwest Merger Committee) may invoke the grievance procedure of that CBA pursuant to the terms thereof. FAPA will fulfill its obligations with respect to the processing of any such grievance in accordance with the CBA." (*Id.*)

Further email exchanges ensued among the MPMC's counsel, FAPA's counsel, and Frontier's counsel between September 26 and October 15, 2014. (Factual Stipulation ¶ 14; Exhibits 60, 61, 62.)[5] The MPMC then attempted to submit the dispute to me for interpretation and application of the DRA, under Section V(c), by emails on September 25 and October 7, 2014. (Factual Stipulation ¶ 13; Exhibit 59.) FAPA's counsel responded by letter to me dated October 10, 2014, reiterating, *inter alia*, FAPA's position that the DRA no longer was in effect; that, even were the DRA in effect, I lacked authority over the

---

[5] Pursuant to the contractual grievance procedure under the Frontier CBA, the five affected former Midwest pilots submitted informal grievances, which were denied on October 1, 2014. (Factual Stipulation ¶ 19; Exhibits 68, 69.)

matters submitted; and that those contentions represented issues of substantive arbitrability outside of my DRA arbitration authority. (Factual Stipulation ¶ 16; Exhibit 64.)  Frontier concurred in FAPA's position. (Factual Stipulation ¶ 16; Exhibit 65.)  Based on the Parties' dispute over substantive arbitrability, I declined to take jurisdiction over the MPMC's submission, by letter dated October 29, 2014. (Factual Stipulation ¶ 17; Exhibit 66.)

FAPA then appealed Frontier's denial of the grievances to the contractual System Board of Adjustment and notified the five Grievants, on November 8, 2014, as follows:

> FAPA had no obligation to process your grievances under the CBA, but has done so. In addition, although FAPA does not concede that it has any contractual, statutory or other obligation to submit your grievances to a System Board of Adjustment, based on the unique circumstances of this case and on a non-precedential basis FAPA intends to submit the grievances to the System Board of Adjustment within the time limits provided under Section 14.C. of the CBA.

> In addition, although the CBA does not so provide, based on the unique circumstances of this case and on a non-precedential basis FAPA will not oppose a request by some or all of you to appear before the System Board of Adjustment, separately from and in addition to FAPA, with legal representation if you so request. The System Board of Adjustment would otherwise be administered in accordance with the CBA.

(Exhibit 72. See Factual Stipulation ¶ 19 Exhibits 71 and 72).

On November 17, 2014, MPMC and several named individuals filed a two-count Complaint with the United States District Court for the Eastern District of Wisconsin, seeking in Count I injunctive and declaratory judgment relief to compel arbitration under the DRA.  MPMC v. Frontier Airlines, Inc., E.D. WI No. 14-cv-01441-RTR.   On March 27, 2015, Frontier, FAPA and plaintiffs entered into a Settlement Agreement in that MPMC v. Frontier litigation.  On the same

date, the Parties hereto into the Arbitration Agreement setting forth the submission in this proceeding. (Factual Stipulation ¶¶ 21, 22; Exhibit 74.) [6]

## POSITIONS OF THE DISPUTANTS

The following positions were edited from briefs and reply briefs submitted by Counsel for the MPMC and the FPMC.  In lieu of filing a separate brief and reply brief in this case, Counsel for Frontier Airlines elected to support the FPMC position and also referred to its own earlier stated positions in the prior DRA arbitration, concerning application of the DRA and the Eischen Award following the NMB's separate carrier designation of Frontier.

### The MPMC

The plain terms of the DRA show that its intent was to make the IMSL Award "final and Binding," a "part" of the Frontier/FAPA CBA, and enforceable through the Merger Committees utilizing the DRA's dispute resolution processes and the Frontier/FAPA CBA as modified by DRA § V(j).  Frontier's and FAPA's interpretation of the DRA and IMSL Award as containing a hidden self-destruct provision once RAH sold Frontier as a separate airline is at odds with the DRA's intent as reflected by its plain language.  The contingencies that delayed the effectiveness of the integrated list have occurred and by its express terms the IMSL Award has become "final and binding" and a "part" of the Frontier/FAPA CBA, effective August 27, 2011.

There is nothing in the DRA which evidences an intent to nullify that integrated seniority should an affiliate of RAH at the time of the Award's becoming effective, subsequently cease being an affiliate of RAH.  A stock sale in 2013 does not alter the balancing of equities underpinning the IMSL that was made in 2011.  MPMC's reading of the plain and unambiguous terms of the DRA gives effect to the DRA's intent and gives meaning to each of its provisions, while avoiding the forfeiture of rights that Frontier's and FAPA's selective and distorted reading of the DRA would bring about.

FPMC's contention–that the dispute over whether Frontier and its pilots remain bound by the DRA raises an issue of arbitrability–is premised upon a misreading of DRA §§ v(h) and v(j).  Contrary to FPMC'S premise, those sections do not create a separate dispute resolution procedure; rather, they modify the procedures by which disputes over the integrated seniority may be processed to, and heard by, the appropriate contractual

---

[6] At grievants' request, Frontier and FAPA have agreed to hold in abeyance the contractual System Board of Adjustment hearing previously scheduled for March 18 and 19, 2015, in Denver, Colorado (Exhibit 74), pending the resolution of this proceeding. (Factual Stipulation ¶ 23.)

adjustment board, which, in this case, is the Frontier/FAPA SBA. There is no provision–either express or implied–in the DRA which gives Frontier or FAPA the right to reject the limitations which the DRA places upon their bargaining authority to change the IMSL rankings, or which relieves them of the DRA's dispute resolution procedures.

There is simply no warrant in the language or in the clearly expressed intent of the DRA to read it as no longer applying to Frontier and FAPA. Reading the DRA as no longer applying to Frontier or FAPA would render the protections the DRA gives to the Midwest pilots' integrated seniority unenforceable. That is inconsistent with the DRA's clearly expressed intent, which is to protect the IMSL rankings from change and to provide a process to resolve in a fair way disputes arising from the application of the IMSL Award. It is also contrary to the well-accepted maxim of contract construction that "conditions 'subsequent' will be regarded with disfavor if they are such as to cause a forfeiture, that is, if they permit a party to keep the benefits received under the contract [here, the benefits from the operational integration] without giving their agreed equivalent [here, integrated seniority rankings]." 8 J.M. Perillo, Corbin On Contracts at 497, § 39.10 (1999). The DRA's plain terms and clearly expressed intent show that it continues to limit Frontier's and FAPA's ability to change the rankings effectuated by IMSL Award, and continues to provide a process to resolve in a fair manner disputes arising from Frontier's and FAPA's efforts to change the IMSL rankings.

## The FPMC

The only issue now before the Arbitrator is a narrow issue of arbitrability under the DRA and the MPMB bears the burden of proof on that arbitrability issue. Yet, the MPMC devotes most of its argument to the merits of the underlying claims – whether the IMSL (including conditions and restrictions) remains binding on Frontier and FAPA and a part of the Frontier/CBA and may not be changed by agreement between Frontier and FAPA (see Exhibit 74) – rather than the narrow issue of arbitrability under the DRA now before the Arbitrator.

The MPMC places too much reliance on Frontier's former status as an "affiliate" of RAH – a status which no longer exists. And, the MPMC simply ignores the operative plain language of Sections V.g., V.h. and V.j. of the DRA. The express terms of the DRA make clear that the DRA has no application to Frontier or FAPA now that the NMB has determined that Frontier is a separate carrier, and FAPA has been certified as the exclusive bargaining representative of the separate Frontier Pilot craft and class. This is confirmed by the conditions stated by the Arbitrator on the effectiveness of the Integrated Master Seniority List.

The Arbitrator has no authority to review or direct Frontier's conduct once Frontier ceased to be part of the single transportation system; and certainly once the Frontier Pilots were no longer included in the combined craft or class and were separately represented. The administration of seniority at Frontier thereafter is within the scope of the bargaining relationship between Frontier and FAPA as the bargaining representative of the Frontier Pilots, including (without limitation) the resolution of any issue involving the interpretation and application of the Frontier CBA. This is further buttressed by the Arbitrator's consistent recognition that, while the DRA conferred on him the authority to devise a fair and equitable IMSL granting each pilot a specified "seniority rank status," neither the DRA nor the Eischen Award gave him any authority to alter existing contractual collectively-bargained arrangements, including those in the Frontier CBA,

governing "the invocation, utilization, administration, implementation and retention of the seniority rank status conferred upon a pilot by the IMSL."

In summary, the express terms of the DRA make clear that the DRA has no application to Frontier or FAPA now that the NMB has determined that Frontier is a separate carrier, and FAPA has been certified as the exclusive bargaining representative of the separate Frontier Pilot craft and class. This is confirmed by the conditions stated by the Arbitrator on the effectiveness of the IMSL in the Eischen Award. For the foregoing reasons, the Arbitrator should find that the DRA no longer applies to Frontier and FAPA.

## DISCUSSION

The Parties and this Arbitrator are intimately familiar with the events leading to the issuance of the Eischen Award and subsequent developments surrounding genesis of the "threshold issue" that they presented for my arbitral determination in these proceedings. All material facts necessary for a fully informed understanding of the submitted issues are set forth in the Joint Stipulations of Facts and some 72 referenced and incorporated exhibits. Finally, I had the benefit of multiple briefs and reply briefs by learned Counsel on the submitted issue. I carefully analyzed, studied and considered each and all of these evidentiary matters of record in reaching my decision in this case.

Following the NMB's certification of the IBT, as expressly contemplated by the Eischen Award, RAH and the IBT entered into negotiations over implementation/transition issues related to the IMSL, pursuant to the terms of the Award. It is undisputed, however, that those parties never concluded an implementing agreement whereby mechanisms would be created to provide for the transfer of pilots between Frontier and the RAH operations. (2014 Stipulation ¶¶ 25-31; Exhibits 13-16.) Thus, the carriers and the IBT never agreed on an agreement further implementing the terms of the Eischen Award. The separate Frontier and Chautauqua CBAs remained in effect without any such modification,

governing the separate Frontier and Chautauqua/Republic/Shuttle America operations, respectively. (2014Stipulation ¶ 31.)

Similarly, there were never any negotiations regarding a joint collective bargaining agreement amalgamating the Frontier CBA and the Chautauqua CBA. RAH and the IBT have been engaged in negotiations for a successor agreement to the Chautauqua CBA pursuant to Section 6 of the RLA. In connection with those negotiations, the IBT informed RAH management that it wished to conclude Section 6 negotiations for a standalone successor to the Chautauqua CBA before negotiating for a consolidated collective bargaining. (2014 Stipulation ¶ 32.)

Experience teaches that airline mergers are fraught with execution risks even under the best of circumstances when joint collective bargaining agreements and operational integration processes are consummated before the separate pilot seniority lists are integrated. In this case, which may present a cautionary tale, the Parties chose to establish the ISL first and then tried to negotiate ways and means to make it work under consolidated unified operations. From the issuance of the ISL Award in February 2011 to the present day, however, systemic institutional tensions prevented even the most skilled negotiators from reaching closure on agreeable terms for full operational consolidation.

The dominant institutional forces proved to be centrifugal rather than centripetal, which ultimately frustrated the impetus to function operationally as a unified collective whole. At the end of the day, Frontier and the Chautauqua Companies each remained hegemonic under their own CBA and neither was subsumed to the larger symbiotic purpose that was the goal of the DRA exercise. The denouement of this failed marriage was the October 1, 2013 sale of Frontier,

the March 27, 2014 NMB finding that Frontier, *per se*, is again a single carrier and the June 13, 2014 NMB certification of FAPA as the bargaining representative of the craft or class of Flight Deck employees of single carrier Frontier.

At the outset, it is most important to clarify what this particular arbitration proceeding is about and what it is not about. The only issue now ripe for determination by me is a question of substantive arbitrability under the DRA, *i.e.*: *"Whether the DRA continues to apply to Frontier and FAPA now that the National Mediation Board has determined that Frontier is a separate carrier from the Republic Airways Holdings Inc. (RAH) airlines and has certified FAPA as the representative of the craft or class of Pilots at Frontier"*. If, and only if, that question is answered in the affirmative, may I determine the merits issues presented by the underlying grievance claims, *i.e.*, whether the IMSL (including conditions and restrictions) remains binding on Frontier and FAPA as part of the Frontier/FAPA Collective-Bargaining Agreement and may not be changed by agreement between Frontier and FAPA.

Voluntary arbitration is a creature of contract. A party cannot be required to submit a dispute to arbitration procedures to which it has not agreed. <u>AT & T Technologies, Inc. v. Communications Workers of America</u>, 475 U.S. 643, 648 (1986); <u>Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc</u>., 765 F.3d 776, 781 (7th Cir. 2014). The MPMC asserts that Frontier and FAPA have agreed to resolve the underlying claim of the affected former Midwest Pilots now employed by Frontier pursuant to special handling established by Section V (j) of the DBA, rather than the traditional contractual System Board under the Frontier CBA. As

the party moving to compel Frontier and FAPA to arbitrate under the terms of the DRA, the MPMC bears the burden of establishing that the DRA requires those other parties to arbitrate in accordance with § V (j). <u>Henry Technologies Holdings, LLC v. Giordano</u>, No. 14-CV-63-JDP, 2014 WL 3845870, at *3 (W.D. Wis. Aug. 5, 2014), *citing* <u>Fox v. Nationwide Credit, Inc.</u>, No. 09-cv-7111, 2010.

The question presented is not whether the adversely affected former Midwest Pilots are entitled to a hearing on the merits of their grievances. In that regard, it appears to be undisputed that those underlying claims present what are euphemistically termed, in RLA parlance, "minor disputes" *i.e.,* competing interpretations of the seniority administration provisions of the Frontier/FAPA CBA. At bottom line, the underlying controversy concerns which version of the contractual "minor dispute" tribunal provisions govern---the standard unvarnished System Board of Adjustment terms of the Frontier/FAPA CBA or those SBA provisions as modified by DRA § V (j).

This is not a case of weighing equities to determine whether the interests of a beleaguered minority group would be better served by access to the type of modified SBA arbitration that DRA V (j) provides. Such value-laden subjective judgments are beyond the ambit of my limited jurisdiction and authority under the specific threshold issue submitted under the March 27, 2015 ARB Agreement. The only question before me in this stage of the proceedings is whether the DRA's special dispute resolution procedures continue to bind Frontier and FAPA, given the significantly changed circumstances of *In re Frontier Airlines, Inc.,* 41 NMB 31 (2014) and *In re Frontier Airlines, Inc.,* 41 NMB 88, 89 (2014).

Coming full circle, answering that question requires determining whether the DRA, *per se*, continues to bind Frontier after its severance from the Republic Airways Holdings Inc. (RAH) system and FAPA as the certified bargaining representative of the craft or class of Pilots at separate carrier Frontier. And one needs look no farther than the express words of the DRA to arrive at the correct answer.

Even when the parties to an agreement disagree on what contract language means, an arbitrator who finds the language to be unambiguous will enforce its plain meaning. *See* Safeway Stores, 85 LA 472, 476 (Thorp, 1985); Metropolitan Warehouse, 76 LA 14, 17-18 (Darrow, 1981). It is a fundamental maxim of contract construction that an arbitrator cannot ignore clear-cut contractual language nor may he legislate new language under the guise of interpretation, since to do so would usurp the role of the labor organization and employer. Clean Coverall Supply Company, 47 LA 272, 277 (Fred Witney, 1966). *See also*, Continental Oil Company, 69 LA 399, 404 (A. J. Wann, 1977) and Andrew Williams Meat Company, 8 LA 518, 524 (A. J. Chaney, 1947).

The arbitrator's primary goal must be to effectuate the intent of the parties. Ordinarily intent can best be ascertained from the plain words used by them in their agreement. Arbitrators and courts alike presume that understandable language means what it says, despite the contentions of one of the parties that something other than the apparent meaning was intended. Independent School Dist. No. 47, 86 LA 97, 103 (Gallagher, 1985). This rule is both practical and equitable: it brings order to contract construction by excluding as a subject eligible for dispute all of the clear language contained in

the contract.  Further, if language is clear and unambiguous, both parties to a contract are presumed to clearly understand how they are bound when they execute the contract.   The Restatement of Contracts is in accord:  "In the absence of some contrary indication, therefore, English words are read as having the meaning given them by general usage, if there is one.  This rule is a rule of interpretation in the absence of contrary evidence, not a rule excluding contrary evidence."  (Restatement (2nd), N.13 at § 202, comment e.)

When each of the parties to a collective bargaining agreement has a different understanding of what was intended by certain language, it is generally recognized that the party whose understanding is in accord with the ordinary meaning of that language should prevail in the absence of misrepresentation, fraud or mistake.  *See* Hanon & Wilson Company, (S. Katz 1967), 67-2 Arb ¶ 8583; Stewart Hall Company, 86 LA 370, 372 (Madden, 1985). A host of reported arbitration decisions all turn on these principles. Parker White Metal Company, 86 LA 512, 516 (Ipavec, 1985); Anaheim Union School District, 84 LA 101, 104 (Chance, 1984); Arco Pipe Line Company, 84 LA 907, 901 (Nicholas, 1985) and Tri-County Metropolitan Transportation District, 68 LA 1369, 1370 (Tilbury, 1977).

Representative of this line of authoritative precedent are two decisions separated by more than four decades but each turning on the same consistent rationale:

> Plain and unambiguous words are undisputed facts. The conduct of parties may be used to affix a meaning to words and phrases of uncertain meaning. Prior acts cannot be used to change the explicit terms of a contract. An arbitrator's function is not to rewrite the parties' contract. His function is limited to finding out what the parties intended under a particular clause. The intent of the parties is to be found in the words which they, themselves, employ to express their intent. When

the language used is clear and explicit, the arbitrator is constrained to give effect to the thought expressed by the words used.

Phelps Dodge Copper Products Corp., 16 LA 229, 233 (Justin,1951).

\* \* \* \* \* \*

It is a well-established rule in arbitration that an arbitrator is confined in reaching a decision to the express language of the collective bargaining agreement. Where the contract is clear and unambiguous, the arbitrator has no right or authority to go beyond contract language and resort to past practice.

Dunlap Tire Corporation, 1994 WL 837696 (Caraway, June 14, 1994).

The meaning of the preamble of the DRA (particularly when read in conjunction with Sections V (g), V (h) and V (j) of the DRA), is plain from the face of the words. On the face of the DRA, Frontier was a party to that agreement only as an "affiliate" of RAH. Further, the DRA and the integrated seniority list were conditioned upon the existence of a single transportation system and single bargaining representative for the pilots in that single transportation system, with a collective bargaining agreement or agreements "applicable to the combined craft or class." Finally, the dispute resolution processes set forth in Sections V (h) and (j) were applicable only to that single carrier and the "Organization ... designated by the NMB as the duly designated representative of the combined craft or class of Flight Deck Crew Members for the single transportation system;" and as part of a "collective bargaining agreement[] applicable to the combined craft or class of Flight Deck Crew Members for the single transportation system."

In addition to the reference to Frontier only as an RAH "affiliate" in the DRA, the DRA dispute resolution provisions directly invoked by the MPMC make clear that the DRA no longer applies to Frontier and FAPA. These provisions do not apply to Frontier or FAPA because Frontier is no longer part of "**the** single transportation system;" FAPA is not **"[t]he** Organization, if any, designated by

the NMB as **the** duly designated representative of **the combined** craft or class of Flight Deck Crew Members for **the single transportation system**;" and the Frontier CBA is not a "collective bargaining agreement(s) applicable to **the combined** craft or class of Flight Deck Crew Members for **the** single transportation system."

The MPMC's primary substantive argument directed at the interpretation and application of the cited DRA provisions is that, because there are former Midwest Pilots in the Frontier Pilot craft or class now represented by FAPA, the craft or class is "**a** combined craft or class," subjecting Frontier and FAPA to the DRA.[7]  Assuming, *arguendo*, that the MPMC is correct that Frontier's hiring of the affected Midwest Pilots made the Frontier Pilot craft and class "**a** combined craft or class" under the RLA, as a contractual matter it is manifestly clear that this was not what the experienced and sophisticated negotiators of the DRA contemplated by words "**the** combined craft or class" in DRA §§ V (h) and V (j).

Sections V (h) and (j) unambiguously refer only to "**the**" combined craft or class, – a particular combined craft and class, in the singular.  (Exhibit 4, at 5.) Sections V (h) and (j) do not refer to any craft or class; they refer to a specific combined craft or class.  There can be no question as to **"the"** combined craft or class being referred to – it is the combined craft or class created pursuant to the transactions giving rise to the DRA, as found by the NMB in 2011.  *See Republic Airlines, et al*., 38 NMB 138 (2011).  There is no dispute that Frontier is no longer

---

[7] It is a fact that the former Midwest Pilots at issue did not enter the Frontier pilot craft or class as a result of RAH's acquisition of Frontier, but rather were new hires by Frontier before the NMB's 2011 single carrier filing and before the IMSL took effect (January 27, 2014 Joint Stipulation ¶ 17).

a part of **that** single transportation system; that the Frontier Pilots are not part of **that** craft or class; that FAPA is not the bargaining representative of **that** craft or class; and that the Frontier CBA does not apply to **that** craft or class. *See In re Frontier Airlines, Inc.*, 41 NMB 31 (2014).[8]

## AWARD

The DRA does not continue to apply to Frontier and FAPA now that the National Mediation Board has determined that Frontier is a separate carrier from the Republic Airways Holdings Inc. (RAH) airlines and has certified FAPA as the representative of the craft or class of Pilots at Frontier.


*Dana E. Eischen*
/s/ Dana Edward Eischen

On this 22nd day of June 2015, I, DANA E. EISCHEN, do hereby certify that I am the individual described herein and that I executed the foregoing instrument on that date, which I affirm upon my oath as Arbitrator to be my Award, pursuant to the March 27, 2015 Arbitration Agreement.

---

[8] Nothing contained herein is intended to express or imply any opinion concerning or any determination of issues submitted to me, for a separate arbitration proceeding, under the terms of a Settlement Agreement dated June 1, 2015, in *MPMC et al v. RAH, Inc, et al* US Dist. Court E.D. Wisconsin, Civil Action No. 2:ll-cv-0358-RTR.

# APPENDIX A

## JOINT STIPULATION OF FACTS and EXHIBITS 1-42
## (January 25, 2014)

Republic Airlines, Inc. ("Republic"), Chautauqua Airlines, Inc. ("Chautauqua"), Shuttle America Corp. ("Shuttle America"), and Frontier Airlines, Inc. ("Frontier") (collectively, the "Carriers"), and the Republic Pilots Merger Committee, the Frontier Pilots Merger Committee, and the Midwest Pilots Merger Committee (collectively, the "Merger Committees"), hereby stipulate to the following facts, for purposes of this proceeding under Section V.(j) of the November 3, 2009 Dispute Resolution Agreement and the November 26,2013 Agreement to Arbitrate:

### The Pre-Merger Carriers and Bargaining Relationships

1. At all relevant times, Frontier has been a mainline air carrier operating Airbus A-319, A-320, and/or A-321 aircraft under its own brand, with its own Operating Certificate from the Federal Aviation Administration ("FAA").

2. Frontier Holdings, Inc. ("Frontier Holdings") was founded in 2006 as a holding company, with Frontier as an operating subsidiary. Lynx Aviation, Inc. ("Lynx") was founded in 2006 as a separate operating subsidiary of Frontier Holdings. Lynx was an air carrier offering turbo-prop service under the Frontier brand, operating with its own FAA Operating Certificate until its cessation of operations on or about March 19,2011.

3. At all relevant times, Republic, Chautauqua, and Shuttle America have been wholly-owned subsidiaries of Republic Airways Holdings Inc. ("RAH"), a holding company; and have been regional air carriers operating regional jet aircraft on a "code share" or "fee for departure" basis, under the brands of other air carriers pursuant to contracts with such other carriers. Republic, Chautauqua and Shuttle America have at all times each operated with its own FAA Operating Certificate.

4. At all times prior to November 3,2009, Midwest Airlines, Inc. ("Midwest") was a mainline air carrier, operating MD-80 and/or B-717 aircraft on its own brand, and with its own pilots and FAA operating certificate. Midwest surrendered its FAA Operating Certificate in December 2009.

5. At all times prior to June 28, 2011 the Frontier Airline Pilots' Association ("FAPA") was the duly recognized bargaining representative of the Frontier Pilots under the Railway Labor Act ("RLA"). Frontier and FAPA were parties to a collective bargaining agreement governing the terms and conditions of employment of the Frontier Pilots (the "Frontier CBA"). Attached, as Exhibit 1, is a true and correct copy of the Frontier CBA, as amended.

6. From September 3, 2009 until June 28, 2011, the United Transportation Union ("UTU") was the duly recognized bargaining representative of the Lynx Pilots under the RLA. Lynx and the UTU never concluded a collective bargaining agreement.

7. At all relevant times prior to June 28, 2011, the International Brotherhood of Teamsters, Airline Division (the "IBT") was the duly recognized bargaining representative of the Chautauqua, Republic, and Shuttle America Pilots under the RLA. Chautauqua and the IBT were (and are) parties to a collective bargaining agreement governing the terms and conditions of employment of the Chautauqua, Republic, and Shuttle America Pilots (the "Chautauqua CBA"), which has been amendable within the meaning of the RLA since October 17,2007. Attached, as Exhibit 2, is a true and correct copy of the Chautauqua CBA.

8. At all relevant times prior to June 28, 2011, the Air Line Pilots Association, International ("ALPA") was the duly recognized bargaining representative of the Midwest Pilots under the RLA. Midwest and ALPA were parties to a collective bargaining agreement governing the terms and conditions of employment of the Midwest Pilots (the "Midwest CBA"), which became amendable within the meaning of the RLA in or about September 2008.

## RAH's Acquisitions of Midwest. Frontier and Lynx

9. RAH acquired Midwest Air Group, the parent of Midwest, pursuant to an acquisition agreement entered into on June 23, 2009, which closed on July 31, 2009.

10. Effective on or about October 1, 2009, RAH acquired Frontier Holdings, Frontier, and Lynx pursuant to a Second Amended and Restated Investment Agreement approved by the United States Bankruptcy Court. *In re Frontier Airlines Holdings. Inc., et al,* L 08-11298 (S.D.N. Y.). Attached, as Exhibit 3, is a true and correct copy of the Second Amended and Restated Investment Agreement.

11. As a condition of RAH's purchase of Frontier Holdings, Frontier, and Lynx, FAPA and Frontier (on behalf of RAH) entered into Letter of Agreement 39 in connection with RAH's acquisition of Frontier Holdings, effective September 30,2009. Letter of Agreement 39 has remained part of the Frontier CBA since that date.

## The Eischen Arbitration and Integrated Master Seniority List

12. On November 3, 2009, the Carriers, along with Midwest Airlines, Inc. and Lynx Aviation, Inc., and the Merger Committees, including the Lynx Pilots Merger Committee, entered into a Dispute Resolution Agreement (the "DRA") to address pilot seniority integration. Attached as Exhibit 4 is a true and correct copy of the DRA.

13. The parties were unable to devise a seniority integration through negotiation or mediation pursuant to the DRA. That matter was thereupon submitted to arbitration before Arbitrator Dana E. Eischen pursuant to the DRA.

14. Arbitrator Eischen conducted 13 days of evidentiary hearings, commencing on March 15, 2010, and concluding on August 11,2010.

15. On February 19, 2011, Arbitrator Eischen issued his final Opinion and Award (the "Eischen Award"), a true and correct copy of which is attached as Exhibit 5.

## March 2011 IBT Dispute

16. On March 19,2011, Lynx Aviation ceased operations, and its aircraft and pilots were absorbed into Republic.

17. On or about March 11,2011, RAH announced that 20 Airbus First Officer positions were to be filled at Frontier. The jobs were filled as new-hire First Officer positions. Pilots employed by Chautauqua, Republic, Shuttle America and Lynx (including, but not limited to, former Midwest Pilots) were permitted to apply for those positions, as were Midwest Pilots on furlough. Pilots hired for the Frontier First Officer positions were not selected in IMSL or any other seniority order.  Any pilot at Chautauqua, Republic and Shuttle America who assumed such a position at Frontier was required to resign his integrated seniority status rank, as well as Republic seniority, and be treated as a post-transaction new hire as to all pilots on the IMSL when the integrated list later became effective. Pilots furloughed from Midwest, who had not become employees of Chautauqua, Republic or Shuttle America, were not required to surrender their integrated seniority status rank to assume such a position at Frontier.

18. By letter dated March 15,2011, a true and correct copy of which is attached as Exhibit 6, the Republic Merger Committee sought to initiate a dispute before Arbitrator Eischen, asserting that RAH was in violation of the Eischen Award by requiring RAH Pilots to resign their pre-merger seniority as a condition of applying for the vacant Frontier Airbus First Officer positions.

19. A true and correct copy of RAH's response to the Republic Merger Committee's submission is attached as Exhibit 7. A true and correct copy of the Frontier Merger Committee's response is attached as Exhibit 8. A true and correct copy of the Midwest Merger Committee's response is attached as Exhibit 9.

20. The Republic Merger Committee replied by letter dated March 18,2011, a true and correct copy of which is attached as Exhibit 10. The Frontier Merger Committee replied by letter dated March 19, 2011, a true and correct copy of which is attached as Exhibit 11.

21. By letter dated March 20,2011, a true and correct copy of which is attached as Exhibit 12, Arbitrator Eischen declined to consider the Republic Merger Committee's request.

## Single Carrier Proceeding

22. On or about October 10,2010, the IBT applied to the NMB for a finding that Chautauqua, Republic, Shuttle America, Frontier and Lynx (but not Midwest) comprised a single transportation system for purposes of the pilot craft and class under the RLA. On April 7,2011, the NMB found that Chautauqua, Republic, Shuttle America, Frontier and Lynx were operating as a single transportation system, and that former Midwest Pilots were included in the single transportation system. _Republic Airlines. et al_ 38 NMB 138.

23. On or about May 2, 2011, the NMB directed that an election be conducted among the Carriers' pilots. 38 NMB 199 (2011). The NMB conducted an election and, on June 28, 2011, the NMB certified the IBT as the pilots' collective bargaining representative. 38 NMB 245(2011).

24. At all relevant times since June 28,2011, Frontier, Chautauqua, Republic, and Shuttle America, each have continued to operate pursuant to separate FAA Operating Certificates.

## Implementation of the Eischen Award

25. Following the NMB's certification of the IBT, RAH and the IBT entered into negotiations over implementation/transition issues related to the IMSL, pursuant to the terms of the Eischen Award. On August 26,2011, RAH made an opening proposal to the IBT regarding IMSL implementation/transition issues. A true and correct copy of the August 26,2011 proposal is attached as Exhibit 13.

26. On August 27, 2011, the IMSL became effective pursuant to the terms of the Award.

27. On August 31, 2011, the IBT made a counterproposal regarding IMSL implementation/transition issues in response to RAH's August 26,2011 proposal. A true and correct copy of the IBT's August 31,2011 proposal is attached as Exhibit 14.

28. On or about September 9, 2011, IBT Local 357 issued an update to its membership, a true and correct copy of which is attached as Exhibit 15.

29. On September 23,2011, representatives of the Company and the IBT met to discuss their IMSL implementation/transition proposals. Following those discussions RAH made an additional IMSL implementation/transition proposal. A true and correct copy of the September. 23,2011 proposal is attached as Exhibit 16.

30. March 8, 2012, representatives of RAH and the IBT again met and discussed the IMSL implementation/transition proposals, at which time the IBT re-submitted its August 31, 2011 proposal (Exhibit 14) without change.

31. Since the March 8, 2012 meeting, there have been no further meetings or proposals exchanged regarding IMSL implementation/transition issues, and no agreement has been reached regarding implementation/transition issues related to the IMSL. The Carriers and the IBT have not agreed on an agreement further implementing the terms of the Eischen Award. The separate Frontier and Chautauqua CBAs remain in effect without any such modification, each governing the Frontier or Chautauqua/Republic/Shuttle America operations, respectively.

32. RAH and the IBT have been, and continue to be, engaged in negotiations for a successor agreement to the Republic/IBT CBA pursuant to Section 6 of the RLA. In connection with those negotiations, the IBT informed Republic management that it wished to conclude Section 6 negotiations for a standalone successor Republic/IBT CBA before negotiating for a consolidated collective bargaining agreement covering pilots at the Carriers.

## The Fall 2011 Interpretive Disputes

33. Attached as Exhibit 17 is a true and correct copy of a letter dated September 8, 2011 from the Frontier Merger Committee to RAH, and RAH's response thereto.

34. Attached as Exhibit 18 is a true and correct copy of the Frontier Merger Committee's September 12,2011 submission to Arbitrator Eischen.

35. Attached as Exhibit 19 is a true and correct copy of the Midwest Merger Committee's September 13,2011 submission to Arbitrator Eischen.

36. Attached as Exhibit 20 is a true and correct copy of RAH Merger Committee's September 14,2011 submission to Arbitrator Eischen.

37. Attached as Exhibit 21 is a true and correct copy of an email exchange between Arbitrator Eischen and counsel, from September 14 to 20,2011.

38. Attached as Exhibit 22 is a true and correct copy of the Midwest Merger Committee's September 16,2011 submission to Arbitrator Eischen.

39. Attached as Exhibit 23 is a true and correct copy of RAH's September 23, 2011 submission to Arbitrator Eischen.

40. Attached as Exhibit 24 is a true and correct copy of the Frontier Merger Committee's September 25,2011 submission to Arbitrator Eischen.

41. Attached as Exhibit 25 is a true and correct copy of the RAH Merger Committee's September 26,2011 submission to Arbitrator Eischen.

42. Attached as Exhibit 26 is a true and correct copy of the Midwest Merger Committee's September 28,2011 submission to Arbitrator Eischen.

43. Attached as Exhibit 27 is a true and correct copy of the Frontier Merger Committee's October 10,2011 submission to Arbitrator Eischen.

44. Attached as Exhibit 28 is a true and correct copy of the second Frontier Merger Committee October 10,2011 submission to Arbitrator Eischen.

45. Attached as Exhibit 29 is a true and correct copy of the Midwest Merger Committee's October 10,2011 submission to Arbitrator Eischen.

46. Attached as Exhibit 30 is a true and correct copy of further email exchange with Arbitrator Eischen on October 10,2011.

47. October 22,2011, Arbitrator Eischen issued Dispute Resolution No. 1, and on October 25, 2011, Arbitrator Eischen issued IMSL Award Interpretation Award No. 1 (collectively, the "Supplemental Award") addressing the disputes raised in September 2011 by the Merger Committees, a true and correct copy of which is attached as Exhibit 31.

48. Attached as Exhibit 32 is a true and correct copy of emails and correspondence between the Merger Committees and Arbitrator Eischen regarding the payment of compensatory relief pursuant to Arbitrator Eischen's Interpretation Award No. 1 to those pre-transaction Midwest Pilots who had been hired as new-hire Frontier Pilots in March 2011. That issue was resolved in a written grievance settlement agreement between Frontier and the IBT under the Frontier CBA, dated December 23,2011, a true and correct copy of which is attached as Exhibit 33.

## The 2013 IBT Grievance

49. On January 10,2013, the IBT submitted a grievance to Frontier (assigned Grievance No. 12-12-9155) claiming that, in December 2012, Frontier First Officers should have been allowed to bid to an EMB-190 upgrade class for Captain positions at Republic. A true and correct copy of the grievance is attached as Exhibit 34. On January 25,2013, Frontier denied the grievance. A true and correct copy of Frontier's denial is attached as Exhibit 35. On February 2, 2013, IBT re-submitted the grievance as a second level grievance. A true and correct copy of IBT's second level grievance is attached as Exhibit 36. On February 14,2013, Frontier denied IBT's second level grievance. A true and correct copy of Frontier's denial is attached as Exhibit 37. On February 17,2013, IBT filed a notice of appeal to the system board. A true and correct copy of IBT's notice of

appeal is attached as Exhibit 38. Grievance No. 12-12-9155 has not yet been scheduled for arbitration before the system board. No notice to the Merger Committees was provided with respect to the dispute asserted in Grievance No. 12-12-9155.

## Hiring/Recalls Since 2011

50. Since August 28,2011, Chautauqua, Republic and/or Shuttle America have from time to time hired new-hire First Officers. Those new-hire positions have not been offered to incumbent Frontier Pilots before hiring pilots off of the street.

51. Effective on or about August 30,2012, Frontier closed its Milwaukee pilot domicile and opened a Chicago pilot domicile, pursuant to a Voluntary Staffing Adjustment under the Frontier CBA. Displacements and vacancy awards in that bidding process were administered based on Frontier date of hire, not on IMSL seniority order. No grievance or claim was initiated as a result of that bidding process.

52. The status of the Midwest CBA is the subject of a pending suit in the United States District Court for the Eastern District of Wisconsin, *Freitas v. RAH*, E.D. WI No. 11-cv-0358-RTR, and an arbitration proceeding between the IBT and Midwest before a System Board of Adjustment chaired by Richard Bloch, pursuant to the Order of the United States District Court in *Freitas*, 2011 WL 5506679 (E.D. Wis. 2011).

53. Since the effective date of the Eischen Award (August 27,2011), no additional pilots (including no pre-merger Midwest Pilot, Chautauqua Pilot, Republic Pilot, Shuttle America Pilot, or Lynx Pilot) have been hired or employed by Frontier until the instant dispute.

54. Commencing with training starting on September 16, 2013, Frontier has initiated voluntary staffing adjustments pursuant to the Frontier CBA based on the need for additional staffing of Airbus First Officer positions. Pursuant to those staffing adjustments, as of January 6, 2014, Frontier has hired approximately 68 new-hire pilots pursuant to the Frontier CBA, and has assigned those pilots to Airbus First Officer positions.

55. On or about August 8,2013, the IBT transmitted a document to Frontier management, a true and correct copy of which is attached as Exhibit 39.

## RAH's Sale of Frontier to Indigo Partners, LLC

56. On October 1, 2013, RAH announced that it had entered into a definitive agreement to sell Frontier Holdings and Frontier to an investment fund affiliated with Indigo Partners, LLC.

57. On November 26, 2013, the parties entered the Arbitration Agreement regarding arbitration of the instant dispute, a true and correct copy of which is attached as Exhibit 40.

58. On December 3,2013, RAH announced that it had closed on the sale of Frontier. A true and correct copy of RAH's December 3, 2013 press release is attached as Exhibit 41.

59. On December 17,2013, FAPA filed a petition with the NMB, seeking a finding that Frontier is a separate transportation system, and certification as the exclusive bargaining representative of the pilot craft and class in that system. A true and correct copy of FAPA's petition is attached as Exhibit 42. The NMB assigned FAPA's petition NMB File no. CR-7107.

60. In addition to the exhibits attached, the parties agree that any and all other correspondence submitted to Arbitrator Eischen by the parties in conjunction with the prior matters/disputes that resulted in the Eischen Award and the Supplemental Award, as well as any documents or exhibits submitted in conjunction with those matters/disputes and hearing transcripts from those matters/disputes, shall be considered part of the record in this dispute.

61. The parties agree that this factual stipulation has been entered for purposes of this proceeding only, and that it will not be used for any other proceedings.

62. While the parties agree that the above facts and attached exhibits are accurate, the parties reserve all of their rights regarding the relevancy, importance and weight to be given to the facts agreed to in this stipulation.

\* \* \* \* \* \*

## JOINT STIPULATION OF FACTS and EXHIBITS 43-75 (April 20, 2015)

Frontier Airlines, Inc., the Frontier Pilots Merger Committee (FPMC), and the Midwest Pilots Merger Committee (MPMC), hereby agree and stipulate to the following facts, for the purposes of this proceeding:

1. The parties hereby adopt and incorporate into the record of this proceeding the Joint Stipulation of Facts dated January 27, 2014, including Exhibits 1 through 42, which was entered into the record in the dispute submitted to the Arbitrator by the November 26, 2013 Arbitration Agreement (the "2013 Dispute"). Exhibits 1 through 42 to the Joint Stipulation are hereby designated as Exhibits 1 through 42 here.

2. Attached as Exhibit 43 is a true and accurate copy of excerpts from the Stock Purchase Agreement between Republic Airways Holdings Inc. (RAH), as Seller,

and Falcon Acquisition Group, Inc., as Buyer, as filed with the Securities and Exchange Commission on December 9, 2013.

3. On March 31, 2014, the NMB issued its Findings Upon Investigation, concluding that "Frontier is operating as a single transportation system for the craft or class of Pilots." In re Frontier Airlines, Inc., 41 NMB 31 (2014).

4. On June 13, 2014, the NMB certified FAPA as the duly designated and authorized representative for purposes of the RLA of the craft or class of pilots employed by "Frontier Airlines, Inc., its successors and assigns." In re Frontier Airlines, Inc., 41 NMB 88, 89 (2014).

5. By email on May 2, 2014, a true and correct copy of which is Exhibit 44 hereto, Arbitrator Eischen asked the parties to the 2013 Dispute to submit their "respective positions concerning the impact, if any," on the proceedings before him of the NMB's March 31, 2014 single carrier determination and call for an election.

6. In response to the arbitrator's inquiry, Frontier, FPMC and MPMC submitted position statements to the Arbitrator dated June 2, 2014, true and correct copies of which are Exhibits 45, 46, and 47 hereto. They also submitted replies on June 16 and 17, 2014, true and correct copies of which are Exhibits 48, 49, and 50 hereto. RAH and RPMC also submitted position statements on June 2, 2014, and replies on June 17, 2014.

7. On September 12, 2014, Arbitrator Eischen issued his award on the 2013 Dispute, a true and correct copy of which is Exhibit 51 hereto, ruling that the IMSL Award did not compel Frontier to offer new hire positions to pilots holding IMSL seniority.

8. On September 13, 2014, FAPA sent a letter to Frontier, a true and correct copy of which is Exhibit 52 hereto. Frontier responded the same day by email, a true and correct copy of which is Exhibit 53 hereto. FAPA notified several of the five remaining Midwest pilots at Frontier that they should rebid the October 2014 schedules since their Frontier seniority was no longer based on the IMSL, but was based on the definition of seniority in the Frontier CBA, *viz*, the date on which they first appeared on the Frontier payroll as pilots. Frontier proceeded to award the four former Midwest pilots who were bidding on that basis, and has similarly administered subsequent monthly bids. (The fifth grievant, Daniel A. Norden, is currently on medical leave)

9. Attached hereto as Exhibit 54 is a true and accurate copy of the September 2014 Seniority List for pilots at Frontier, and attached hereto as Exhibit 55 is a true and accurate copy of that seniority list for October 2014.

10. On September 20, 2014, the MPMC transmitted a document to FAPA, a true and correct copy of which is Exhibit 56 hereto.

11. On September 23, 2014, the MPMC submitted a document to Frontier, with a copy to FAPA, a true and correct copy of which is Exhibit 57 hereto.

12. On September 24, 2014, counsel for FAPA transmitted a document in response to the MPMC's September 20, 2015 submission, a true and correct copy of which is Exhibit 58 hereto.

13. On September 25 and October 7, 2014, counsel for the MPMC transmitted emails to Arbitrator Eischen, true and correct copies of which are Exhibit 59 hereto.

14. Counsel for the MPMC engaged in email exchanges with FAPA's counsel and Frontier's counsel between September 26 and October 15, 2014, true and correct copies of which are Exhibits 60, 61, and 62 hereto.

15. On October 9, 2014, Frontier and FAPA executed Letter of Agreement 71 ("LOA 71") to the Frontier CBA, a true and correct copy of which is Exhibit 63 hereto. LOA 71 was ratified by the Frontier Pilots, by a vote of 268 to 3.

16. On October 10, 2014, FAPA transmitted to Arbitrator Eischen a response to the MPMC's submission, a true and correct copy of which is Exhibit 64 hereto. Frontier submitted a response to Arbitrator Eischen on the same date, a true and correct copy of which is Exhibit 65 hereto.

17. On October 29, 2014, Arbitrator Eischen issued his ruling on the MPMC's purported invocations of his jurisdiction under DRA § V(c), a true and correct copy of which is Exhibit 66 hereto.

18. Beginning September 23, 2014, MPMC sought to use the Frontier/FAPA CBA's grievance process to adjust the challenge of the five former Midwest pilots to the change of their seniority ranking and on November 10, 2014 transmitted a letter to Frontier and FAPA, a true and correct copy of which is Exhibit 67 hereto.

19. Pursuant to the contractual grievance procedure under the Frontier CBA, the five affected former Midwest pilots submitted informal grievances (examples attached as Exhibit 68), which were denied on October 1, 2014, as reflected by Group Exhibit 69 hereto. FAPA processed grievances on behalf of the five individual Grievants, true and correct copies of which are Group Exhibit 70 hereto. Frontier denied those grievances and FAPA appealed the grievances to the contractual System Board of Adjustment on November 8, 2014, a true and correct copy of which is Exhibit 71 hereto. On November 8, 2014, FAPA transmitted a notice to the five Grievants, a copy of which is Exhibit 72 hereto.

20. On January 5, 2015, FAPA transmitted a notice to the individual Grievants, a true and correct copy of which is Exhibit 73 hereto.

21. On November 17, 2014, MPMC and named individuals filed a two-count Complaint with the United States District Court for the Eastern District of Wisconsin, seeking in Count I injunctive and declaratory judgment relief to compel arbitration under the DRA. MPMC v. Frontier Airlines, Inc., E.D. WI No. 14-cv-01441-RTR.

22. On March 27, 2015, Frontier, FAPA and plaintiffs entered into a Settlement Agreement in the MPMC v. Frontier litigation. On the same date, the parties hereto entered into an Arbitration Agreement, constituting the submission in this proceeding, a true and correct copy of which is Exhibit 74 hereto.

23. At Grievants' request, the Grievants, Frontier and FAPA have agreed to hold in abeyance the contractual System Board of Adjustment hearing referenced in the January 5, 2015 notice to the Grievants (Ex. 73 hereto), pending the resolution of this proceeding.

24. Attached hereto as Exhibit 75 is a true and accurate copy of the Air Line Pilots Association, International's Merger and Fragmentation Policy in place in April 2009.

25. The parties agree that this factual stipulation has been entered for the purposes of this proceeding only, and that it will not be used for any other proceedings absent agreement of all parties hereto.

26. While the parties agree that the above facts and attached exhibits are accurate, the parties reserve all of their rights regarding the relevancy, importance and weight to be given to the facts agreed to in this stipulation.

* * * * * * * * * * * * * *